## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| DEON PATRICK, | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 14 C 3658** |
| | ) | |
| **v.** | ) | **Judge Ronald A. Guzmán** |
| | ) | |
| CITY OF CHICAGO, ANTHONY | ) | |
| VILLARDITA, THOMAS JOHNSON, | ) | |
| RICK ABREU, TERRY O'CONNOR, | ) | |
| BRIAN KILLACKY, SEAN GLINSKI, | ) | |
| MICHAEL BERTI, UNIDENTIFIED | ) | |
| EMPLOYEES OF THE CITY OF | ) | |
| CHICAGO, ILLINOIS, MARTIN | ) | |
| FOGARTY, JOSEPH MAGATS, | ) | |
| UNIDENTIFIED EMPLOYEES OF | ) | |
| THE COOK COUNTY STATE'S | ) | |
| ATTORNEY'S OFFICE, | ) | |
| | ) | |
| **Defendants.[1]** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, who spent twenty-one years in prison for a murder he did not commit, sues the City of Chicago, Chicago police officers Anthony Villardita, Thomas Johnson, Rick Abreu, Terry O'Connor, Brian Killacky, Sean Glinski, Michael Berti, and other unidentified police officers (collectively, "the officers"), Cook County Assistant State's Attorneys Joseph Magats and Martin Fogarty ("ASAs"), and other unidentified Cook County Assistant State's attorneys pursuant to 42 U.S.C. § 1983 for conspiring to violate and violating his Fifth and Fourteenth Amendment rights, and for maliciously prosecuting him and intentionally inflicting emotional distress on him. Pursuant

---

[1]Plaintiff originally sued Cook County as well, but later voluntarily dismissed it from the suit. (*See* 8/25/14 Notice Voluntary Dismissal, Dkt 50.)

to Federal Rule of Civil Procedure 12(b)(6),[2] the officers move to dismiss Counts I-VI, and X, and the City and ASAs move to dismiss Counts I-VII, and IX-XIII.  For the reasons set forth below, the Court grants in part and denies in part the motions.


**Facts**

On November 16, 1992, Jeffery Lassiter and Sharon Haugabook were shot and killed in Lassiter's apartment at 910 West Agatite Street in Chicago.  (Compl. ¶ 13.)  Immediately after the murders, eyewitness Faye McCoy told several police officers that she saw "Goldie," whose real name is Dennis Mixon, leaving the courtyard of Lassiter's building with three other men.  (*Id.* ¶ 14.) McCoy, who was active in the community, told the officers that she only recognized Mixon, and that neither he nor the three other men were from the neighborhood.  (*Id.*)  McCoy later identified Mixon from a photo array as one of the four men she saw leaving the courtyard of Lassiter's building.  (*Id.* ¶ 15.)

The officers, however, could not find Mixon.  (*Id.* ¶ 16.)  On November 26, 1992, defendant Villardita went on vacation, leaving a note for his colleagues that said, "'This case better be cleared by the time I get back . . . .'"  (*Id.*)  Between the date of the murder and December 1, when Villardita returned from vacation, the officers did not discover any evidence that linked plaintiff or the other young men who were also charged with the crimes to the murders.  (*Id.* ¶ 17.)

On December 2, 1992, the officers arrested plaintiff, Lewis Gardner, Akia Phillips, Paul Phillips, Daniel Taylor, Joseph Brown, and Rodney Mathews for the murders.  (*Id.* ¶¶ 13, 18, 23,

---

[2]The ASAs also invoke Rule 12(b)(1), presumably because they assert sovereign immunity to the state claims.  However, "sovereign immunity does not diminish a court's subject-matter jurisdiction."  *Blaogovich v. Gates*, 519 F.3d 370 (7th Cir. 2008).  Thus, the Court analyzes the motion solely under Rule 12(b)(6).

24.)  Gardner, who has an IQ of 70, was then fifteen years old, Akia Phillips was seventeen years old, Paul Phillips was eighteen years old, and plaintiff was twenty years old.  (*Id.* ¶¶ 1, 18.)

The officers and ASA Fogarty questioned Gardner for more than fifteen hours without his mother or a lawyer present, and told him he could go home if he agreed to the false statement that defendants had given him, which implicated plaintiff and the others.  (*Id.* ¶ 19.)  Gardner agreed, and at 3:20 a.m. on December 3, 1992, he gave a false confession to ASA Fogarty.  (*Id.* ¶¶ 19- 20.)

A few hours later, Akia Phillips and Daniel Taylor gave similar false confessions to ASA Fogarty and Magats, respectively.  (*Id.* ¶¶ 21-23.)  The officers and ASAs knew or should have known that Gardner, Akia's and Taylor's confessions were false because they contained statements that could not have been true and/or conflicted with existing evidence.  (*Id.* ¶¶ 20-23.)

Meanwhile, plaintiff was also being interrogated.  (*Id.* ¶ 24.)  During the interrogation, which lasted nearly twenty-eight-hours, he was handcuffed by one arm to a wall, so he had either had to stand or sit on the floor with one arm stretched above him.  (*Id.* ¶ 24.)  Though plaintiff asked for a lawyer by name, neither the officers nor ASA Magats let him call her or anyone else.  (*Id.* ¶¶ 25, 27.)  The officers did not give plaintiff anything to eat or drink, would not let him sleep, and told him he could go home if he confessed.  (*Id.* ¶ 25.)  They gave plaintiff the false confessions of Gardner, Akia and Paul Phillips, and Taylor, and periodically brought them to plaintiff's interrogation room, where they pointed at him and said he was the killer.  (*Id.* ¶¶ 25, 29-30.)  The officers told plaintiff they would beat him, and he would end up in the electric chair if he did not confess.  (*Id.* ¶¶ 25, 29.)  Ultimately, plaintiff signed the false confession ASA Magats and the officers gave to him.  (*Id.* ¶¶ 31-32.)

At some point during plaintiff's interrogation, eyewitness McCoy was brought in to view a lineup that included plaintiff, Daniel Taylor, Paul Phillips, and Rodney Mathews.  (*Id.* ¶ 34.)

McCoy unequivocally stated that none of the men, all of whom she recognized from the neighborhood, was among the group she saw leaving the courtyard of Lassiter's building on the night of the murders. (*Id.*) Instead of documenting the actual results of the lineup, the officers created a report that said McCoy only said she was afraid to go to court. (*Id.*)

All of the false confessions said that Daniel Taylor planned the murders, met with the other men at Clarendon Park to do so, and was one of the four men inside the apartment when the murders were committed. (*Id.* ¶ 35.) In his own confession, Taylor said that he hid the murder weapon. (*Id.*)

After giving the false confession, however, Taylor told the officers he could not have committed the murders because he was in police custody at the time they were committed. (*Id.* ¶ 36.) An arrest report and bond slip established that Taylor had been arrested for disorderly conduct at 6:45 p.m. on the night of the murders, and was in a CPD lock-up at Addison and Halsted when the murders were committed. (*Id.*) That fact was also corroborated by James Anderson, who was in the lock up with Taylor that night, and immediately identified Taylor as his cell mate when the police showed him Taylor's photo. (*Id.* ¶ 41.) Anderson said one officer took notes about what he said, but neither the notes nor a report of the interview with Anderson were ever given to plaintiff. (*Id.* ¶¶ 41-42.)

The information about Taylor did not, however, prompt defendants to release Taylor, plaintiff, and the others, or to redirect the investigation. (*Id.* ¶ 37.) Instead, two days after learning that Taylor was in a CPD lock up at the time of the murders, officers Villardita and Johnson coerced another man, Adrian Grimes, into falsely stating that he saw Taylor and the others meeting in Clarendon Park when Taylor was in the lock up. (*Id.* ¶ 38.) The officers obtained Grimes' cooperation by reinstating drug charges against him and offering him leniency on the charges if he made the false statement. (*Id.*) Villardita and Johnson memorialized Grimes' false statement in a

4

report, which they gave to the grand jury without telling the prosecutors, plaintiff, or the other defendants that the report was false. (*Id.* ¶ 39.)

In addition, Villardita and Johnson had officers Berti and Glinski write a false report claiming that they stopped someone they knew as "Black T" and "Dan Taylor" ninety minutes after the murders occurred and took him with them as they went to look for another suspect. (*Id.* ¶ 40.) The government gave this report to plaintiff before his trial but did not tell him it was false. (*Id.*)

Several months later, the police arrested Dennis Mixon, who was the initial suspect in the case. (*Id.* ¶ 43.) The officers coerced Mixon into making a statement that implicated plaintiff and the six other men who had been charged with the murders. (*Id.*) Much later, Mixon recanted that portion of his confession. (*Id.*)

In 1993, plaintiff was tried and convicted of two counts of first degree murder, armed robbery, and home invasion. (*Id.* ¶ 45.) Though the government asked for the death penalty, plaintiff was ultimately sentenced to natural life in prison without the possibility of parole. (*Id.* ¶ 45.) Taylor, Gardner, and Paul Phillips were also convicted and sentenced to extended prison terms. (*Id.* ¶ 47.)

On January 10, 2014, twenty-one years after he was imprisoned, the Cook County State's Attorney moved to vacate plaintiff's conviction, and on January 23, 2014, the Circuit Court of Cook County issued a Certificate of Innocence to him. (*Id.* ¶¶ 1-2.)

## Discussion

On a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded factual allegations of the complaint, drawing all reasonable inferences in plaintiff's favor. *Hecker v. Deere & Co.*, 556 F.3d 575, 580 (7th Cir. 2009). "[A] complaint attacked by a Rule 12(b)(6) motion to

dismiss does not need detailed factual allegations" but must contain "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

In Count I, plaintiff alleges that by coercing a false confession from him, the officers and ASA Magats violated his Fifth Amendment right not to incriminate himself. The officers contend that this claim is time-barred. Untimeliness is an affirmative defense, *see* Rule 8(c), and thus is not an appropriate basis for dismissal under Rule 12(b)(6) unless plaintiff pleads facts that establish "an impenetrable defense." *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004). Whether that is the case here depends on when plaintiff's claim accrued.

Plaintiff, relying on *Heck v. Humphrey*, 512 U.S. 477 (1994), argues that the claim did not accrue until January 2014, when his conviction was vacated. The plaintiff in *Heck*, after being convicted of manslaughter in state court, filed a § 1983 suit against the officers and prosecutors who secured the conviction. *Id.* at 478. Heck alleged that the defendants had violated his rights by "'knowingly destroying' [exculpatory] evidence" and using an "'[an] unlawful voice identification procedure" at his trial. *Id.* at 479. The district and appellate courts dismissed the suit, reasoning that plaintiff was really seeking a writ of habeas corpus, and therefore had to exhaust administrative remedies before filing suit. *Id.* at 479-80. The Supreme Court disagreed, and held that:

> [T]o recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. . . . Thus, when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated.

*Id.* at 486-87 (footnotes omitted).

6

*Heck* made clear that the delayed-accrual rule does not apply to all § 1983 claims challenging aspects of the criminal process. *Id.* at 487 & n.7. It said, for example, that a successful § 1983 unreasonable search claim would not necessarily impugn a conviction because the tainted evidence might still have been admitted at trial pursuant to the independent source or inevitable discovery doctrines, or may have had no impact on the verdict. *Id.* The same is true for a § 1983 false arrest claim, the Seventh Circuit subsequently held, "because a wrongful arrest claim, like a number of other Fourth Amendment claims, does not inevitably undermine a conviction; one can have a successful wrongful arrest claim and still have a perfectly valid conviction." *Booker v. Ward*, 94 F.3d 1052, 1056 (7th Cir. 1996); *see Gonzalez v. Entress*, 133 F.3d 551, 553 (7th Cir. 1998) ("[A] claim asserting a violation of the fourth amendment necessarily 'accrues' at the time of the unlawful search or seizure . . . .").

What the *Heck* Court did not make clear is whether the outcome of the delayed-accrual test is controlled by the nature of the claim asserted or the facts of an individual claim. In *Wallace v. City of Chicago*, however, the Seventh Circuit held it is the former, at least for false arrest claims:

> [*Heck*] suggests that . . . a suit for damages arising from an unreasonable search could go forward as a § 1983 claim without invalidating a criminal prosecution, because of the independent source or inevitable discovery doctrines. . . .
>
> In *Booker v. Ward*, we interpreted *Heck* to allow a false arrest claim to go forward before the defendant's conviction was invalidated . . . . [by] look[ing] to the legal nature of the wrongful arrest claim, rather than to the specific facts of the case. The *Gauger* opinion, in contrast, rejects an across-the-board approach to Fourth Amendment claims in favor of a case-by-case examination under which at least some false arrest claims would not accrue until after the conviction was invalidated . . . .
>
> . . . .
>
> To the extent . . . that *Gauger* eschews a clear rule for false arrest claims in favor of an evaluation of the evidence, we disapprove its approach and instead reaffirm our holding in *Booker v. Ward* that a "§ 1983 unlawful arrest claim . . . accrue[s] on the day of [ ] arrest." *Id.* at 1056-57. Individuals and attorneys who wish to preserve a

claim for false arrest or similar Fourth Amendment violations should file their civil rights action at the time of arrest.

440 F.3d 421, 426-27 (7th Cir. 2006).

Plaintiff urges this Court to hold that *Wallace* applies only to Fourth Amendment claims, as did the court in *Rivera v. Lake County*:

> . . . . Plaintiff has alleged that Defendants violated his Fifth and Fourteenth Amendment right to be free from compulsory self-incrimination by using physical abuse to extract an inculpatory statement from him which was later introduced at trial. The Complaint alleges, and Defendants do not contest, that Plaintiff's conviction rested largely on his statement. Thus, Plaintiff's success on his § 1983 coerced confession claims would have implied the invalidity of his conviction, and therefore Plaintiff could not have brought these claims while his conviction was still valid.
>
> Under *Heck*, Plaintiff did not have a "complete and present cause of action" until his conviction was set aside in December 2011. This conclusion is consistent with the weight of authority in this District, which holds that *Wallace's* accrual rule does not trump the *Heck* bar in the coercive interrogation context where "the plaintiff's conviction rested largely upon the allegedly coerced conviction." *Tillman v. Burge*, 813 F. Supp. 2d 946, 970-71 (N.D. Ill. 2011) (collecting cases).

974 F. Supp. 2d 1179, 1188 (N.D. Ill 2013).

But, as Judge Posner's dissent in *Wallace* makes clear, that court did not view its holding to be limited to Fourth Amendment claims:

> The panel decision creates an intercircuit conflict on a recurrent issue: when does a claim for damages arising out of a false arrest or other search or seizure forbidden by the Fourth Amendment, or a coerced confession forbidden by the due process clause of the Fifth Amendment, accrue, when the fruits of the search or the confession were introduced in the claimant's criminal trial, and he was convicted?

*Wallace*, 440 F.3d at 430. Moreover, just last year, the court the applied the logic of *Wallace* to a Fifth Amendment claim in an unpublished order issued in *Franklin v. Burr*, 535 Fed. Appx. 532 (7th Cir. 2013). The plaintiff in that case, who had pleaded guilty to and was convicted of murder, filed a § 1983 Fifth Amendment claim against the police and prosecutor for their alleged interrogation

8

of him after he asked for a lawyer. *Id.* at 533. The district court, believing that *Heck* applied, dismissed the suit, and on reconsideration said that, even if *Heck* did not apply, the dismissal would still be proper because the claim would then be untimely. *Id.* The Seventh Circuit agreed with the latter assertion:

> The district court thought that Franklin's claim . . . , if accepted, would be incompatible with the validity of the convictions. Yet the convictions rest on Franklin's guilty plea, not on the admissibility of any particular evidence. *Wallace v. Kato*, 549 U.S. 384, 127 S. Ct. 1091, 166 L. Ed. 2d 973 (2007), holds that a claim contending that arresting officers violated the Fourth Amendment accrues at the time of the arrest, not when a conviction is set aside, because the remedy of suppression under the exclusionary rule does not necessarily prevent a valid conviction. Moreover, a motion to suppress evidence may be denied even when a violation of the Constitution occurred; the exclusionary rule is not coterminous with the substance of the Bill of Rights. That is equally true of a contention that a confession is invalid. . . . There is no necessary inconsistency between the propositions that (a) a conviction based on a guilty plea is valid, and (b) the police violated the accused's rights at the time of arrest or interrogation. . . . Given *Wallace*, Franklin's claim is not barred by *Heck* – which means that the claim accrued [when the unlawful interrogation occurred] and that this suit is untimely.

*Id.* at 533-34; *see Saunders v. City of Chi.*, Nos. 12 C 9158, 12 C 9170, 12 C 9184, 2013 WL 6009933, at *6 (N.D. Ill. Nov. 13, 2013) ("The Seventh Circuit made clear in *Wallace* and *Booker* that false confession claims do not *necessarily* impugn the validity of a conviction, even when the confession formed the basis of the prosecution" and "[the] Seventh Circuit decision in *Franklin* further supports th[at] notion . . . .") (emphasis original).

In short, *Wallace* teaches that *Heck's* delayed accrual applies only to the kinds of § 1983 claims that, if successful, would invariably impugn a plaintiff's conviction. Because Fifth Amendment claims are not, as *Franklin* notes, in that category, they are not subject to *Heck*. Thus, plaintiff's claim accrued when his confession was used against him at trial in 1993. *See Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1025 (7th Cir. 2006) (stating that "the Fifth Amendment is violated when a criminal defendant's *Miranda*-infirm statements are admitted as evidence against

him in the prosecution's case-in-chief at criminal trial").  Because the statute of limitations for §
1983 claims filed in Illinois is two years, *Johnson v. Rivera*, 272 F.3d 519, 521 (7th Cir. 2001),
plaintiff's claim, which was not filed until 2014, is time-barred.  Accordingly, the Court grants
defendants' motion to dismiss Count I.

In Count II, plaintiff alleges that defendants violated his due process rights by fabricating
evidence and using it to prosecute and convict him.  The officers characterize Count II as a
substantive due process/malicious prosecution  claim, a cause of action our court of appeals has
rejected.  *See McCann v. Mangialardi*, 337 F.3d 782, 786 (7th Cir. 2003) (stating that plaintiff's
substantive due process claim for being prosecuted and convicted with false evidence, was "in
essence, [a claim] for malicious prosecution," and was defeated by the existence of the common law
cause of action under Illinois law); *Brooks v. City of Chi.*, 564 F.3d 830, 833 (7th Cir. 2009) ("A
plaintiff cannot state a due process claim 'by combining what are essentially claims for false arrest
under the Fourth Amendment and state law malicious prosecution into a sort of hybrid substantive
due process claim under the Fourteenth Amendment.'") (quoting *McCann*, 337 F.3d at 786).
Plaintiff does not, however, invoke substantive due process.  Rather, he alleges a violation of
procedural due process, *i.e.*, that defendants deprived him of a fair trial.  Moreover, the Seventh
Circuit has repeatedly held that police or prosecutors acting in an investigatory capacity can be held
liable under § 1983 for violating a plaintiff's due process rights if they fabricated evidence that was
used to convict him at trial.  *See Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012) ("We
have consistently held that a police officer who manufactures false evidence against a criminal
defendant violates due process if that evidence is later used to deprive the defendant of her liberty
in some way.") (citing *Jones v. City of Chi.*, 856 F.2d 985, 993 (7th Cir. 1988); *Dominguez v.
Hendley*, 545 F.3d 585, 589 (7th Cir. 2008)); *Fields v. Wharrie*, 740 F.3d 1107, 1114 (7th Cir. 2014)

10

("[I]t was established law by 1985 (indeed long before), when the fabrication is alleged to have occurred, that a government lawyer's fabricating evidence against a criminal defendant was a violation of due process."); *see also Petty v. City of Chi.*, 754 F.3d 416, 422 n.3 (7th Cir. 2014) ("[T]he same due process constitutional analysis that applies to prosecutors applies to police officers during the early stages of an investigation because the police and prosecutors are essentially performing the same investigatory function"). Because that is exactly what plaintiff alleges, *McCann* and its progeny do not provide a basis for dismissing the Count II claims asserted against the officers or the ASAs.

Even if Count II states a claim, the ASAs contend they are absolutely immune from it. That is true if their alleged conduct was "'intimately associated with the judicial phase of the criminal process.'" *Smith v. Power*, 346 F.3d 740, 742 (7th Cir. 2003) (quoting *Imbler v. Pachtman*, 424 U.S. 409 (1976)). If, however, the ASAs' alleged "acts [were] investigative and unrelated to the preparation and initiation of judicial proceedings," immunity does not apply. *Id.* (citing *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993)). Though the line separating these functions is not always clear, *Imbler*, 424 U.S. at 430 n.32, the Supreme Court has said that "[a] prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested." *Buckley*, 509 U.S. at 274 (footnote omitted); *see Whitlock*, 682 F.3d at 580 (noting that the "focus of [the] case, as we have narrowed it, is exclusively on the period before probable cause supported the prosecution, when a prosecutor is unquestionably acting in an investigative role"). Plaintiff alleges that the ASAs never had, and at all times knew they did not have, probable cause to arrest plaintiff . (Compl. ¶¶ 20-32.) These allegations are sufficient to defeat the ASAs' motion to dismiss Count II on the grounds of absolute prosecutorial immunity. *See Fields*, 740 F.3d at 1113-14 (holding that a prosecutor who fabricated evidence before plaintiff's arrest and introduced the

11

evidence at his trial was not absolutely immune from § 1983 claim); *Whitlock*, 682 F.3d at 577-80 (7th Cir. 2012) (stating that a prosecutor does not have absolute immunity from a due process claim based on his pre-probable cause fabrication of evidence).

Plaintiff's allegations also preclude a finding that the ASAs have qualified immunity. Qualified immunity shields public officials from liability for conduct that "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). It was clearly established in 1992 that fabricating evidence and using it to obtain a conviction was a violation of due process. *See Fields*, 740 F.3d at 1114 (stating that it was established "long before" 1985 that a government lawyer's fabrication of evidence violated due process.). Thus, Count II survives the ASAs' qualified immunity challenge.

In Count III, plaintiff alleges that defendants violated his due process rights by withholding from him: (1) his co-defendants' repeated denials that they or plaintiff were involved in the murders; (2) the coercion of Adrian Grimes' false testimony about Taylor; (3) Fay McCoy's exculpatory statements; and (4) James Anderson's identity, his exculpatory statements, and the officers' notes and reports about their conversation with Anderson. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963) (holding that the prosecution is constitutionally required to disclose material, exculpatory evidence to the defense). To state a viable *Brady* claim as to any of this evidence, plaintiff must allege that: (1) the evidence is exculpatory or impeaching; (2) the evidence was suppressed by the government; and (3) he was prejudiced as a result. *Harris v. Kuba*, 486 F.3d 1010, 1014 (7th Cir. 2007). Evidence is suppressed if: "(1) the prosecution failed to disclose the evidence before it was too late for the defendant to make use of the evidence, and (2) the evidence was not otherwise available to the defendant through the exercise of reasonable diligence." *Id.* (quotation omitted).

12

Plaintiff's allegations establish that one none of this evidence was suppressed within the meaning of *Brady*. Plaintiff knew that he and his co-defendants were innocent, and thus that any statement to the contrary allegedly made by them, Adrian Grimes, Fay McCoy, or anyone else was false. Armed with that knowledge, he could have asked his co-defendants, Grimes and McCoy what they told the police and why. Moreover, though plaintiff alleges that the state failed to turn over certain evidence regarding James Anderson, he admits that reports that were produced to him identified Anderson. (Compl. ¶ 42.) Thus, he could have investigated Anderson on his own. In short, plaintiff's allegations establish that he knew about or could reasonably have been expected to discover the withheld evidence. Therefore, his *Brady* claims fail.

The Seventh Circuit's decision in *Boss v. Pierce*, 263 F.3d 734 (7th Cir. 2001) does not dictate a different result. The alleged *Brady* violation in that case was the prosecution's failure to tell defendants that one of their alibi witnesses claimed that the prosecution's star witness told her that he, and not the defendants, had committed the crime. *Id.* at 737-38. The lower courts, reasoning that the information "was available to [defendants] through the exercise of reasonable diligence," rejected the claim. *Id.* at 740.

The Seventh Circuit disagreed:

[T]he state argues that Janice Hill was a defense witness and, therefore, the [defendants] had ample access to any information she possessed. . . .

. . . .

. . . . Defense counsel can certainly be expected to ask witnesses (defense and otherwise) questions relevant to what counsel understands the witness's role to be in the case. However, defense counsel cannot be expected to ask witnesses about matters completely unrelated to the witness's role in the case. A contrary conclusion would require defense counsel to conduct a fishing expedition with every defense witness (and potential defense witness). Reasonable diligence does not require such a practice.

13

. . . .

> . . . . [T]he Illinois Appellate Court's ruling that reasonable diligence required [defense] counsel to ask Janice Hill about what [the prosecution witness] had been saying around the neighborhood regarding the attack . . . is an unreasonable application of *Brady* and its progeny. [Defense] counsel could not have reasonably expected Janice Hill to have knowledge regarding this topic. Janice was simply an alibi witness . . . . Nothing about her role in the case suggested that she might also have knowledge regarding what the prosecution's chief witness was saying around the neighborhood.
>
> Holding that reasonable diligence requires defense counsel to ask witnesses about matters of which counsel could not have reasonably expected a witness to have knowledge is inconsistent with the aim of Brady and its progeny.

*Id.* at 740-43.

Unlike in *Boss*, the allegedly suppressed evidence in this case, what plaintiffs' co-defendants and various witnesses told the police about their involvement in or knowledge about the crime, pertains directly to each individual's role in the case. As defense counsel could have obtained this information by asking the witnesses "questions relevant to . . . [their roles] . . . in the case," which counsel is expected to do, *id.* at 741, *Boss* does not control here.

In Counts IV, V, VI, and VII, respectively, plaintiff seeks to hold defendants liable for their failure to intervene in the other defendants' unconstitutional conduct and conspiring to violate plaintiff's constitutional rights, to hold unidentified supervisors liable for their failure to train defendants, and to hold the City liable for his injuries. Defendants argue that these claims fail because plaintiff has not stated a viable claim for violation of his constitutional rights in Counts I-III. Given the Court's ruling that Count II is viable, however, its purported failure is not a basis for dismissing Counts IV, V, VI, and VII.

Alternatively, the ASAs contend that Count IV should be dismissed because they cannot, as a matter of law, be held liable for failing to intervene in the officers' or each other's allegedly

unconstitutional conduct. The seminal case in this circuit on failure to intervene is *Byrd v. Brishke*, 466 F.2d 6 (7th Cir. 1972). The plaintiff in that case sued police supervisors under § 1983 for their failure to stop their subordinates from beating him. *Id.* at 9-10. The trial court entered a directed verdict for the supervisors on Byrd's claim, which the Seventh Circuit reversed:

> We believe it is clear that one who is given the badge of authority of a police officer may not ignore the duty imposed by his office and fail to stop other officers who summarily punish a third person in his presence or otherwise within his knowledge. That responsibility obviously obtains when the nonfeasor is a supervisory officer to whose direction misfeasor officers are committed. So, too, the same responsibility must exist as to nonsupervisory officers who are present at the scene of such summary punishment, for to hold otherwise would be to insulate nonsupervisory officers from liability for reasonably foreseeable consequences of the neglect of their duty to enforce the laws and preserve the peace. . . .

*Id.* at 11. Moreover, in *Windle v. City of Marion, Ind.*, 321 F.3d 658 (7th Cir. 2003), the Seventh Circuit stated that police officers are not the only state actors who have a duty to intervene, and suggested that the duty may exist across agencies:

> . . . . Appellant has not included in this suit a claim against Rigsbee, who as a teacher could also be considered a state actor. Rigsbee's status as a potential state actor does however raise one important question regarding the duties of the Marion Police. In certain cases liability under § 1983 may exist when one state actor fails to intervene to prevent another state actor from causing direct harm to a victim. *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). Just such a case can exist when one law enforcement officer has reason to know "that any constitutional violation has been committed by [another] law enforcement official; and the officer had a realistic opportunity to intervene to prevent the harm from occurring." *Id.* Liability under this theory is certainly not limited to the context of a police officer's relationship with other officers in her department; but on the other hand the rule is not so broad as to place a responsibility on every government employee to intervene in the acts of all other government employees. In the instant case there appears no particular governmental connection between Rigsbee and the Marion Police. Appellant has not alleged that the Marion Police have any authority over teachers that they do not have over any other citizen of Marion or that they share any joint responsibility with school officials. [Thus], we are not today deciding a case where an employee of one government entity failed to intervene to prevent harm by an employee of another entity where the two entities shared, in practice, some relationship. . . .

15

*Id.* at 663; *see Yang*, 37 F.3d at 285 ("[U]nder certain circumstances a state actor's failure to intervene renders him or her culpable under § 1983.").

Several courts have concluded from these cases, and from *Whitlock's* holding that prosecutors who fabricate evidence during an investigation are held to the same standard as police, 682 F.3d at 580-81, that prosecutors can be liable for failure to intervene:

> The Seventh Circuit recognizes that a state actor's failure to intervene may render him culpable under § 1983. . . . As support for their contention that failure to intervene liability does not extend to prosecutors, the ASA Defendants cite to a few Northern District of Illinois cases that declined to recognize such a claim. *See Gordon v. Devine*, No. 08-CV-377, 2008 WL 4594354, at *17 (N.D. Ill. October 14, 2008) (declining to recognize failure to intervene claim against prosecutors who failed to intervene in the unlawful conduct of other State's Attorneys); *Andrews v. Burge*, 660 F. Supp. 2d 868, 876 n.6 (N.D. Ill. 2009) (declining to recognize prosecutor's duty to intervene, because prosecutors do not have police powers or command of police operations); *Hobbs v. Cappelluti*, 899 F. Supp.2d 738, 773 (N.D. Ill. 2012) (finding the reasoning in *Gordon* and *Andrews* persuasive). The Court, however, is disinclined to foreclose the possibility of extending failure to intervene liability to prosecutors in this case, in large part, because the Seventh Circuit's recent decision in *Whitlock* suggests that prosecutors and police are subject to the same duties when acting in an investigatory capacity. *Whitlock*, 682 F.3d at 580 ("The only question is whether a prosecutor who is acting in an investigatory capacity is subject to rules that are any different. We think not.").

*Saunders*, 2013 WL 600993, at *10, *reconsidered in part on other grounds*, 2014 WL 3535723 (July 11, 2104); *see Rivera*, 974 F. Supp. 2d at 1191 (holding that plaintiff stated a viable failure to intervene claim against prosecutors by alleging that the prosecutors "act[ed] as police officers [when they] . . . participate[d] in the interrogation," and thus "had 'a realistic opportunity to step forward and prevent a fellow officer from violating a plaintiff's right[s].'") (quoting *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005)); *Wilkinson v. Ellis*, 484 F. Supp. 1072, 1085 (E.D. Pa. 1980) ("[W]e believe that allegations that the [assistant district attorneys] were present during police beatings or coercion, even without any allegations of direct participation, would state a claim against them."). The Court agrees with the reasoning of *Saunders*, *Rivera*, and *Wilkinson* that a prosecutor,

16

who allegedly acts as an investigator and fabricates evidence against a defendant, can be held liable under section 1983 for failure to intervene.  Accordingly, the ASAs' motion to dismiss Count IV is denied.

The Court also rejects the ASAs' assertion that the Count V conspiracy claim is inadequately pled.  "A civil conspiracy is a combination of two or more persons acting in concert to commit an unlawful act . . . the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage." *Cooney v. Casady*, 735 F.3d 514, 519 (7th Cir. 2013) (emphasis and quotation omitted).  Conspiracy is not among the matters that must be pleaded with specificity.  *See* Fed. R. Civ. P. 9(b).  Thus, "it is enough in pleading a conspiracy merely to indicate the parties, general purpose, and approximate date, so that the defendant has notice of what he is charged with." *Walker v. Thompson*, 288 F.3d 1005, 1007 (7th Cir. 2002).  Plaintiff's complaint satisfies these requirements.  Accordingly, the motion to dismiss Count V is denied.

In Count VI, plaintiff seeks to hold unidentified supervisors of the defendants liable for failure to supervise and train them.   The City contends that this count must be dismissed because "[c]laims against unidentified defendants are meaningless and uncompensable."  (City's Mot. Dismiss at 12) (quotation and citations omitted).  That is only true if plaintiff fails to identify and notify the unidentified supervisory defendants before the statute of limitations and service period expire. *See* Fed. R. Civ. P. 15(c) (stating that an amended complaint relates back to the original complaint, if it changes the name of a party sued, asserts a claim that arises from conduct alleged in the original complaint, and if the newly-named party knew about the suit within the service period).  Accordingly, at this point, the fact that the supervisors are unnamed is not a basis for dismissal.

17

In Counts IX-XIII,[3] plaintiff seeks to hold defendants, their supervisors and the City liable for conspiring to and prosecuting him maliciously and intentionally inflicting emotional distress on him. The ASAs argue that they are shielded from these claims by prosecutorial immunity, citing *White v. City of Chicago*, 861 N.E.2d 1083 (Ill. App. Ct. 2006), as support. The plaintiff in that case was wrongly arrested for two murders, tortured by the police until he confessed, and detained for five years before being acquitted at trial. *Id.* at 1086-87. Subsequently, he sued the Cook County State's Attorney and an ASA for false arrest, intentional infliction of emotional distress ("IIED"), and conspiracy, alleging that, though they did not know his confession was false, they investigated his case after the police obtained it and discovered exculpatory information that they withheld from him. *Id.* at 1086-88. The trial court dismissed the claims on the grounds of prosecutorial immunity. *Id.* at 1088. The appellate court, applying the immunity standard that applies to § 1983 cases, *id.*, concluded that the prosecutors were immune because their actions occurred *after* plaintiff was arrested and confessed, *i.e.*, when there was probable cause to prosecute. *Id.* at 1090-93.

Unlike the defendants in *White*, the defendants in this case are alleged to have fabricated plaintiff's confession, not to have unwittingly acted upon a false confession obtained by the police, and to have acted with full knowledge that they lacked probable cause. Given these critical differences, the Court's foregoing immunity analysis, not *White*, controls here. Thus, the ASAs' motion to dismiss the state law claims on the grounds of prosecutorial immunity is denied.

Alternatively, the ASAs' argue that the state claims are barred by sovereign immunity. With certain exceptions not relevant here, the state of Illinois and its employees are immune from suit in any court but the Illinois Court of Claims. *See* 705 Ill. Comp. Stat. 505/8; 745 Ill. Comp. Stat. 5/1.

---

[3]Count VIII was only asserted against the County, which is no longer a party to this suit. *See* n.1.

18

"Whether an action is in fact one against the State, and hence one that must be brought in the Court of Claims, depends not on the formal identification of the parties but rather on the issues involved and the relief sought." *Healy v. Vaupel*, 549 N.E.2d 1240, 1247 (Ill.1990). "Sovereign immunity affords no protection . . . when it is alleged that the State's agent acted in violation of statutory or constitutional law or in excess of his authority." *Id.* If, as we must assume for now, plaintiff's allegations are true, then the ASAs acted beyond the scope of their authority, and thus are not cloaked with sovereign immunity. *See Loman v. Freeman*, 890 N.E.2d 446, 462 (Ill. 2008) (holding that claim for conversion against state university employee was not barred by sovereign immunity because "[t]he essence of a claim for conversion is an allegation that the defendant engaged in an intentional, wrongful act"); *Patterson v. Burge*, 328 F. Supp. 2d 878, 887 (N. D. Ill. 2004) (denying ASAs motion to dismiss claims for, among other things, false imprisonment, malicious prosecution, and IIED because plaintiff's allegations, if true, "would establish that the [ASAs] acted outside the scope of their authority as state's attorneys").

The officers ask the Court to dismiss the IIED claim in Count X as time-barred. The statute of limitations for an IIED claim is one year. *See* 745 Ill. Comp. Stat. 10/8-101 ("No civil action . . . may be commenced in any court against a local entity or any of its employees for any injury unless it is commenced within one year from the date that the injury was received or the cause of action accrued."). Moreover, the cause of action accrues when "the last injurious act occurs or the conduct is abated." *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 89 (Ill. 2003). The officers contend that the last allegedly injurious act occurred during plaintiff's trial in 1993, and thus this claim, which was filed eleven years later, is untimely.

The Court agrees. *See Bridewell v. Ewell*, 730 F.3d 672, 678 (7th Cir. 2013) (holding that an IIED claim is not a continuing violation, and when the conduct occurs "in the course of arrest and

prosecution[, the claim] accrues on the date of the arrest"). Though many courts in this district have taken issue with its outcome, *see, e.g.*, *Rivera*, 974 F. Supp. 2d at 1188-89 (not addressing *Bridewell* and stating, "Courts . . . . hold consistently that IIED claims based on facts alleged in parallel claims for malicious prosecution accrue only when state criminal proceedings are terminated.") (quotation omitted); *Hobbs v. Cappelluti*, 899 F. Supp. 2d 738, 762-63 (N.D. Ill. 2012) (collecting district court cases and stating, "courts have held that when a plaintiff's IIED claim incorporates the conduct underlying his malicious prosecution claim, the claim does not accrue until the criminal proceedings against him are terminated"), the Court is bound to follow *Bridewell*. Accordingly, plaintiff's IIED claim accrued when he was arrested in 1992, and was time-barred when he filed this suit in 2014.

## Conclusion

For the reason set forth above, the Court grants in part and denies in part the motions to dismiss of the City, the officers, and the ASAs [Dkt. Nos. 42, 28 & 43]. Counts I, III and X are dismissed with prejudice. Counts II, IV-VII, IX, and XI-XIII stand.

**SO ORDERED.**                                        **ENTERED:   December 17, 2014**


**HON. RONALD A. GUZMAN**
**United States District Judge**