IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DEON PATRICK, | ) | |
| _Plaintiff,_ | ) | |
| v. | ) | No. 14 C 3658 |
| | ) | |
| CITY OF CHICAGO, | ) | |
| ANTHONY VILLARDITA (# 20849), | ) | |
| THOMAS JOHNSON (# 20820), | ) | |
| RICK ABREU (# 20796), | ) | |
| TERRY O'CONNOR (# 20831), | ) | |
| BRIAN KILLACKY (# 20748), | ) | |
| SEAN GLINSKI (#3122), | ) | |
| MICHAEL BERTI (#12881), | ) | |
| UNIDENTIFIED EMPLOYEES OF | ) | |
| THE CITY OF CHICAGO, | ) | |
| MARTIN FOGARTY, | ) | **JURY TRIAL DEMANDED** |
| JOSEPH MAGATS, and | ) | |
| UNIDENTIFIED EMPLOYEES of the | ) | |
| COOK COUNTY STATE'S ATTORNEY | ) | |
| OFFICE, | ) | |
| _Defendants._ | ) | |

## FIRST AMENDED COMPLAINT

Plaintiff Deon Patrick alleges as follows against Defendants City of Chicago ("the City"),

Anthony Villardita (# 20849), Thomas Johnson (# 20820), Rick Abreu (# 20796), Terry

O'Connor (# 20831), Brian Killacky (# 20748), Sean Glinski (#3122), Michael Berti (#12881),

Unidentified Employees of The City, all acting pursuant to the City's policies and practices

(collectively "Defendant Officers"), Martin Fogarty, and Joseph Magats (collectively, "State's

Attorney Defendants"), (the City, Defendant Officers and State's Attorney Defendants are

collectively referred to as "Defendants") as follows:

1

## Introduction

1.      Arrested at age 20, Deon Patrick spent over 21 years in prison for a brutal double murder he did not commit.  On January 10, 2014, the Cook County State's Attorney's Office ("CCSAO") moved "in the interest of justice" to vacate Mr. Patrick's conviction and to dismiss the criminal case against him in its entirety.  The Circuit Court of Cook County granted the Motion, and Mr. Patrick was freed later that day.

2.      On January 23, 2014, the Chief Judge of the Cook County Criminal Courts issued a Certificate of Innocence to Mr. Patrick.  To obtain this certificate, Mr. Patrick was required to present evidence sufficient to persuade the court that he was innocent of the murders for which he was tried and convicted.  The CCSAO did not oppose Mr. Patrick's request for a Certificate of Innocence.

3.      Although Mr. Patrick now has his freedom, he lost more than 21 years of his life as a result of Defendants' misconduct, which is set out in detail below.  Mr. Patrick now brings this lawsuit seeking compensation for the injuries he suffered as a result of the repeated and continued violations of his civil rights from December 3, 1992 to January 10, 2014.

4.      Unfortunately, the Defendants' misconduct that caused Mr. Patrick's wrongful conviction was not an isolated incident. To the contrary, the Chicago Police Department ("CPD"), including officers working within the geographic "Area" where the investigation of the underlying murders occurred, engaged in a pattern of unlawfully coercing confessions over a period of years, frequently preying on young African-American men in order to close unsolved cases through overzealous methods of interrogation. Likewise, the City has a pattern and practice of withholding from the courts, prosecutors, and defendants exculpatory evidence in department "street files," as was done here.

**Jurisdiction and Venue**

5.      Mr. Patrick brings claims both pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Mr. Patrick's rights under the United States Constitution and pursuant to the Constitution and common law of the State of Illinois.

6.      This Court has jurisdiction over Mr. Patrick's federal claims pursuant to 28 U.S.C. § 1331 and over his state law claims pursuant to 28 U.S.C. § 1367.

7.      Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because the events giving rise to Mr. Patrick's claims all occurred within this judicial district.  Venue is also proper in this district under 28 U.S.C. § 1391(c)(2) because the Court has personal jurisdiction over all the defendants, including the entity defendants. Venue may also be proper in this district under 28 U.S.C. § 1391(b)(1) if all Defendants still reside in this judicial district (which they did at the time of the material events, but which Mr. Patrick cannot establish without discovery.)

**The Parties**

8.      Mr. Patrick is 43 years old and currently resides in Chicago, Illinois. On December 2, 1992, Mr. Patrick was 20 years old and resided in Chicago.

9.      Defendant City of Chicago (the "City") is a municipal corporation under the laws of the State of Illinois. The City was the employer of all Defendant Officers.

10.      At all relevant times, each of the Defendant Officers – Villardita, Johnson, Abreu, O'Connor, Killacky, Berti, and Glinski – were CPD officers. Each officer is sued in his individual capacity, acted under color of law, and acted within the scope of his employment during the investigation of the murders at issue.

11.      At all relevant times – each of the State's Attorney Defendants – Fogarty, Magats, and the unnamed employees of the CCSAO– were prosecutors with the CCSAO who had non-

3

prosecutorial, investigatory responsibilities during the investigation of the murders at issue. Each is sued in his or her individual capacity, acted under color of law, and acted within the scope of his or her employment during the investigation of the murders at issue.

### The Murder

12.     On November 16, 1992, at approximately 8:43 p.m., Jeffrey Lassiter and Sharon Haugabook (the "victims") were shot in Lassiter's apartment at 910 West Agatite Street in the Uptown neighborhood of Chicago. Both victims died. Mr. Patrick had nothing to do with this horrible crime. Neither did six of seven of his criminal co-defendants also charged with the crime: Akia Phillips, Joseph Brown, Rodney Mathews, Paul Phillips, Lewis Gardner, and Daniel Taylor (together, with Mr. Patrick, the "Co-Defendants"). The Co-Defendants ranged in age from 15-22 at the time of the crime. All were African-American youth from the North side of Chicago.

### The Defendants' Unconstitutional and Malicious Conduct

### The Murder Investigation

13.     Immediately following the murders, eyewitness Faye McCoy told several of the Defendant Officers that she observed an individual she knew as "Goldie," whose actual name was Dennis Mixon, exiting the courtyard of Mr. Lassiter's building with three other men. Ms. McCoy lived in the same apartment complex as Jeffrey Lassiter and was active in the community.  She told police that the four men she saw exiting the apartment building were not from the neighborhood, and, aside from Goldie, she did not recognize the other three.

14.     Shortly after Ms. McCoy identified Dennis Mixon as one of the four men she saw leaving the scene of the crime, she picked his photo out of an array of photographs and identified him again to Defendant Officers. Defendant Officers also learned that Mixon had been living in

and selling drugs out of Mr. Lassiter's apartment for some time and then further learned that Mixon had had an altercation with Mr. Lassiter a week or two prior to Lassiter's murder. Mixon became the primary suspect.

15.     Although Mixon was the primary suspect, the Defendant Officers could not locate him in November 1992. On or about November 26, 1992, ten days after the murders occurred, Defendant Villardita left for a period of days off. He left a note for his colleagues stating, "This case better be cleared by the time I get back from leave." Villardita returned on December 1, and the case was not cleared. Unable to locate Mixon or to otherwise "clear and close" the case, Defendant Officers conspired to fabricate and coerce false confessions from the Co-Defendants.

16.     From November 16, 1992, the date of the murders, until at least December 1, 1992, Defendants did not learn any information that implicated Mr. Patrick or any of the Co-Defendants in the murders. There was no eyewitness, ear-witness, fingerprint, serology, DNA, ballistic, or any other physical evidence of any kind that linked any of the Co-Defendants to the murders.

17.     Undeterred by the lack of evidence against them and motivated to "clear" the case, on December 2, 1992, the Officer Defendants arrested Lewis Gardner, who was 15 years old with an IQ of 70, and Akia and Paul Philips, who were 17 and 18 years old respectively.. Defendant Officers began the process of coercing these individuals into giving false confessions.

18.     Mr. Gardner was the first to break.  Defendant Officers O'Connor and Villardita, as well as other Officer Defendants and Defendant Fogarty, tricked and coerced Gardner into falsely implicating himself and the other innocent Co-Defendants in the murders, in part, by keeping his mother out of the interrogation room, interrogating Mr. Gardner for more than 15 hours without counsel, psychologically abusing Mr. Gardner, and promising that he could go

5

home if he provided Defendant Officers and Defendant Fogarty with a statement parroting the false version of the crime Defendant Officers were providing to him. Exhausted, confused and scared, Mr. Gardner ultimately succumbed to the coercion and agreed to provide the fabricated statement they were demanding.

19.    Defendant Fogarty began taking Mr. Gardner's court-reported oral confession on December 3, 1992, at 3:20 a.m. Defendant Fogarty knew or should have known that Mr. Gardner's transcribed oral confession was false as numerous statements made by Gardner could not have been true and/or conflicted with existing evidence.

20.    Less than three hours later, the Police Officer Defendants and Defendant Fogarty coerced a second confession from Co-Defendant Akia Phillips. Defendant Fogarty knew or should have known that Mr. Phillips' transcribed oral confession was false as numerous statements made by Mr. Phillips could not have been true and/or conflicted with existing evidence.

21.    Among other things, Mr. Gardner's and Phillips' confession described a "pre-planning meeting" at Clarendon Park ("Clarendon Park Meeting") where the roles of the participants and the plan for the murders were allegedly discussed.

22.    Defendant Magats and Defendant Killacky began taking Daniel Taylor's transcribed oral confession on December 3, 1992, at 5:27 a.m. Defendant Magats knew or should have known that Mr. Taylor's transcribed oral confession was false as numerous statements made by Taylor could not have been true and/or conflicted with existing evidence.

**The Defendant Officers Arrest and Interrogate Plaintiff**

23.    Mr. Patrick was arrested at his apartment at approximately 11:45 p.m. on December 2, 1992 by Defendants Abreu and O'Connor and several other unidentified Chicago police officers. When he was taken to an interrogation room, Defendant Abreu handcuffed one

6

of Mr. Patrick's arms to a ring on the wall and then kicked the chair underneath the ring away from Mr. Patrick so that he could not sit down. After standing for hours, Mr. Patrick was left with no choice but to sit in a position on the floor that caused great pain and discomfort as a result of the need to outstretch his arm, still handcuffed to the wall. Mr. Patrick remained locked to the wall for the vast majority of the 28 hours that he was interrogated. At one point, Defendant Abreu even tightened the handcuffs to increase Mr. Patrick's pain and discomfort.

24.     Mr. Patrick was also denied the right to have an attorney present despite identifying an attorney by name ("Sheila Kalish") and requesting that she be called. He was similarly deprived of food, drink and sleep, and was intentionally awakened every time he began to nod off. Mr. Patrick was also the subject of psychological abuse during his interrogation, as the Defendant Officers Abreu, O'Connor and Villardita and Defendant Magats provided Mr. Patrick with copies of other Co-Defendants' false confessions which implicated him in the murders. Mr. Patrick was repeatedly told that if he did not confess as his Co-Defendants had, he would take the blame for the murders by himself and would go to the electric chair. At various other times, the Defendant Officers would bring another Co-Defendant to the door to point at Mr. Patrick and say, "Yes, that's Deon Patrick. He's the one who killed those two people." That Co-Defendant would then be whisked away before Mr. Patrick could say anything. At another time, the Defendant Officers brought Daniel Taylor into the interrogation room to try to convince Mr. Patrick to confess so that "everybody could go home."

25.     Mr. Patrick was held in custody for nearly 30 hours despite repeatedly denying any involvement in the crime. He maintained his innocence throughout his lengthy interrogation. Despite his repeated insistence that he had nothing to do with the murders, the Defendant Officers persisted in telling Mr. Patrick their version of what he and the other six Co-Defendants

had purportedly done to Mr. Lassiter and Ms. Haugabook. The Defendant Officers told Mr. Patrick to go along with the story they provided him. They also kept telling him that if he confessed, he could go home and sleep in his own bed.

26.     At one point, Defendant Magats who was acting in an investigatory capacity, was brought into the interrogation room. Mr. Patrick told Mr. Magats that he had asked for his lawyer, Sheila Kalish, but that she was not called. Mr. Magats ignored this information and simply told Mr. Patrick that *he* was not acting as Mr. Patrick's lawyer.

27.     At another point, Mr. Magats came to the room with a court reporter, ostensibly to take a statement from Mr. Patrick. As soon as they walked in and the court reporter was set up, Mr. Patrick said, "So you all are going to make me say I killed these people even though I didn't?" Mr. Magats immediately took the court reporter out of the room. She did not return.

28.     The Defendant Officers Abreu and O'Connor then resumed the coercive tactics outlined in detail above, telling Mr. Patrick that they are not "playing games". They told Mr. Patrick that they did not need his help since they had the confessions of the other Co-Defendants implicating him. They also told him that if he did not tell "his side of the story," he would go to death row and never see his children again. At some point Mr. Patrick heard his friend Rodney Matthews screaming from another interrogation room. The Defendant Officers told Mr. Patrick that if he did not cooperate, they would do to him what they were doing to Mr. Matthews.

29.     Defendant Magats returned hours later and brought the confessions of Lewis Gardner and Akia Phillips, which Mr. Patrick had been shown already. This time Defendant Magats had two additional confessions from Paul Phillips' and Daniel Taylor, both implicating Mr. Patrick. Mr. Magats showed the confessions to Mr. Patrick and said that he should tell his side of the story or he would take the blame himself.

30.     As a result of the Defendant Officers' improper and undue coercion, Mr. Patrick's will eventually became fully broken, and he finally agreed to falsely implicate himself and his Co-Defendants in the murders, based on the information that the Defendant Officers and Defendant Magats provided. Defendant Magats asked Mr. Patrick a few personal questions, like where he went to high school, and then shortly after, presented a handwritten statement for Mr. Patrick to sign (the "Fabricated Confession"). Defendant Magats gleaned the information for the Fabricated Confession from the fabricated confessions of the other Co-Defendants, which in turn had been coerced by the Defendant Officers and Defendant Fogarty.

31.     Mr. Magats included information in Mr. Patrick's Fabricated Confession that did not even pertain to Mr. Patrick or that was on its face false. For example, to make it appear that Mr. Patrick had been well-treated by him and the Defendant Officers, Mr. Magats added that Mr. Patrick had been permitted to smoke cigarettes. Mr. Patrick, however, did not smoke cigarettes at that time or any time afterward.   In addition, Mr. Magats wrote that Mr. Patrick had made changes and initialed them, but no changes were  made and no initials appear on the fabricated confession. After nearly 30 hours of interrogation,   including the application of numerous techniques to break Mr. Patrick's will, Mr. Patrick's will  was in fact was broken, and he agreed to sign the handwritten confession prepared by Defendant  Magats, even though the information set forth in the statement was fabricated and false.

**The Defendant Officers Arrest the Other Co-Defendants**

32.     In addition to the wrongful arrests, interrogation, coercion of Mr. Gardner, Akia Philips, and Mr. Patrick,  and the preparation  of  their fabricated confessions, the  Defendant Officers also arrested and coerced the  false statements of the other Co-Defendants, many of whom were only  teenagers at the time. To coerce false confessions from these other Co-

Defendants, the Defendant Officers, as well as Defendants Fogarty and Magats engaged in one or more of the following acts of misconduct against each of the young men: (a) they isolated them from their family and interrogated them without legal representation for extended periods of time, in most instances more than 20 hours; (b) they threatened them, including putting a gun inside the mouth of one of the Co-Defendants; (c) they physically abused several of the Co-Defendants; (d) they deprived them of food, drink and sleep; (e) they refused to let them use the bathroom, causing at least one Co-Defendant to urinate on himself; (f) they routinely brought one Co-Defendant to the door of another interrogation room and had him point and "identify by name" the one being interrogated so it appeared he was being implicated as the perpetrator; and (g) they fed them information about the crime so that the "confessions" would appear consistent with the crime scene and consistent with one another. By using these tactics, the Defendant Officers and Defendants Fogarty and Magats obtained the Fabricated Confessions of all of the Co-Defendants (collectively, the "Fabricated Confessions"). At no time did the Defendant Officers or Defendants Fogarty and Magats disclose to the prosecutors who prosecuted these claims the misconduct in which they engaged in order to get the Co-Defendants to sign the Fabricated Confessions.

**The Line-Up**

33.     While Mr. Patrick and other Co-Defendants were being interrogated, Defendant Officers brought Faye McCoy to view a lineup which included Mr. Patrick and Co-Defendants Daniel Taylor, Paul Phillips and Rodney Matthews. Ms. McCoy unequivocally denied that any of the Co-Defendants she observed were among the four men she saw at the scene of the crime on the night of the murders, as she knew the Co-Defendants from the neighborhood and knew she did not see them on the night of the murders. Despite her unequivocal denials, Defendant

10

Officers prepared an incomplete, misleading, and false police report in which Defendant Officers said Ms. McCoy simply stated that she was "afraid" to go to court. They did not memorialize that Ms. McCoy had not only failed to identify Messrs. Patrick, Taylor or Phillips as perpetrators, but also intentionally omitted the fact that she affirmatively stated that she had ***not*** seen these individuals exiting the courtyard with Mr. Mixon immediately after the murders.

### The Defendant Officers Are Presented With Proof That The Confessions Were Fabricated

34.     Each of the Fabricated Confessions placed co-defendant Daniel Taylor in a central role in both the planning and perpetration of the murders. Each Fabricated Confession stated that he attended the Clarendon Park Meeting where the murders were planned, and that Mr. Taylor was one of four individuals inside the apartment when the murders occurred. Indeed, all of the Fabricated Confessions said that Mr. Taylor actively participated in the murders, including dragging one of the victims into the room and holding her down while she was shot. Mr. Taylor's own confession stated that he hid the murder weapon.

35.     While in police custody after his Fabricated Confession was procured by Defendants, Daniel Taylor informed Defendant Officers that he could not have committed the murders because he was in police custody at the time of the shootings. Within days of being told this by Mr. Taylor, Defendant Officers were presented with evidence corroborating Mr. Taylor's alibi in the form of an arrest report and bond slip from the evening of the murders. This evidence established that at the precise time that the murders occurred, Mr. Taylor was in a CPD lock-up at the corner of Addison and Halsted in Chicago (the "CPD Lock-Up"), having been arrested for disorderly conduct at approximately 6:45 p.m. that same evening.

36.     This evidence clearly established both Mr. Taylor's innocence and that all seven confessions given by the Co-Defendants were false since they each placed Mr. Taylor in a

11

prominent role in the planning and perpetration of the murders, a physical impossibility given his incarceration at the time. Rather than releasing the seven Co-Defendants and beginning the investigation anew however, Defendants instead conspired to, and proceeded to, further frame Mr. Taylor, Mr. Patrick and the other Co-Defendants for the crimes by fabricating additional evidence, coercing additional witnesses, and withholding exculpatory evidence about Mr. Taylor's alibi, all in violation of Mr. Patrick's constitutional rights.

37.     In order to rebut the evidence that showed Mr. Taylor was in the CPD Lock-Up at the time of the murders, two days after receiving the evidence that Mr. Taylor was in CPD Lock-Up, Defendants Villardita and Johnson coerced a witness named Adrian Grimes to provide false testimony placing Mr. Taylor and the other Co-Defendants at the Clarendon Park Meeting at the time Mr. Taylor was in lock up and then near the scene of the crime shortly after the murders occurred. Defendants Villardita and Johnson reinstated drug charges against Mr. Grimes in order to provide leverage over Mr. Grimes. They then threatened serious consequences arising out of these drug charges and offered leniency to Mr. Grimes on the charges if he agreed to provide the false testimony against Mr. Taylor and the other Co-Defendants.

38.     Defendants Villardita and Johnson also created a false police report reflecting the fabricated statement that they coerced from Mr. Grimes. Defendants Villardita and Johnson also arranged for Mr. Grimes' false testimony to be placed before the grand jury empaneled on the case and did so, without disclosing to the prosecutors, the Co-Defendants or their counsel that the testimony Mr. Grimes gave to the grand jury was coerced, false, and fabricated. Mr. Grimes falsely testified to Mr. Patrick's grand jury. Mr. Grimes also falsely testified at Mr. Taylor's trial. Years later, Mr. Grimes fully recanted his false testimony and explained in a sworn

affidavit the manner in which his testimony was coerced and fabricated by Defendants Villardita and Johnson.

39.     In a further effort to cast doubt on the timing of Mr. Taylor's incarceration on the night of the murders, Defendants Villardita and Johnson also conspired with Defendant Officers Berti and Glinski to fabricate an encounter with Mr. Taylor on the evening of the murders. On December 14, 1992 (after the Defendant Officers learned that Mr. Taylor had been in a CPD Lock-Up at the time of the murders), Defendants Berti and Glinski, at the urging of Defendants Villardita and Johnson, created a false police report stating that at approximately 9:30 p.m., they saw an individual known to them as "Black T" and "Dan Taylor" walking westbound on the street where the murders occurred. Defendants claim that they stopped Mr. Taylor at this time and he accompanied them as they went to find one of the other Co-Defendants. Defendants Glinski and Berti memorialized this false and fabricated encounter with Daniel Taylor in a false police report, dated four weeks after the alleged encounter occurred. This false police report was not signed or approved by any supervisor, which is a violation of CPD policy. While this false report was produced to Plaintiff prior to trial, the Defendant Officers did not disclose to Deon Patrick or his attorney that the information contained in the police report was fabricated by them and untrue.

**The Defendant Officers Withheld James Anderson Evidence**

40.     Around this same time, one or more of the Defendant Officers were assigned to locate the person believed to be Daniel Taylor's cellmate on the night of the murders, a man named James Anderson. Ultimately, one or more of the Defendant Officers found Anderson and informed him that they were investigating a crime and were trying to determine whether a young man had been locked up when the crime occurred. The Defendant Officers then showed  Anderson

a photograph of Daniel Taylor, and Mr. Anderson immediately identified Mr. Taylor as the person with whom he had been locked in a cell on November 16, 1992, from approximately 6:45 p.m. until 10 p.m. According to Mr. Anderson, one of the officers was taking notes. As soon as Mr. Anderson identified the photograph, the detectives quickly ended the interview and told Mr. Anderson that his help would not be needed. To this day, neither the officer's handwritten notes (the "Withheld Anderson Notes") nor any General Progress Report or Supplemental Report of the Anderson interview (the "Withheld Anderson Report") has been produced to Mr. Patrick or any of the Co-Defendants.[1]

### The Defendant Officers Withheld A December 30 General Progress Report

41.     While neither the Withheld Anderson Notes nor the Withheld Anderson Report was ever produced to Mr. Patrick, the State did produce two general progress reports ("GPRs") that specifically reference Mr. Anderson. The first, dated December 29, 1992, identifies a sergeant directing officers to find Mr. Anderson (the "December 29 GPR"). The second, dated December 31, 1992, states that the reporting officer was unable to locate Mr. Anderson (the "December 31 GPR"). The December 31 GPR, however, makes a specific reference to a GPR from one day earlier – December 30, 1992 – that was written by the two lead detectives, Defendants Villardita and Johnson (the "Withheld December 30 GPR"). Even though the December 31 GPR expressly states, "in regards to the G.P.R. of 30 Dec 1992 from Villardita and Johnson . . .," the Withheld December 30 GPR was never produced to Mr. Patrick or any other Co-Defendant,

---

[1]     On December 17, 2014 and April 23, 2015, this Court held that the Withheld Anderson Notes, Withheld Anderson Report, and the Withheld December 30 GPR (see ¶ 41) do not state a constitutional claim under *Brady v. Maryland*. These allegations nevertheless remain in the case in support of Mr. Patrick's state law malicious prosecution claim.

nor was it placed in the Investigative or Permanent Retention files for the Lassiter/Haugabook murders.

**The Defendant Officers and City Withhold Additional *Brady* Evidence**

42.     The City and Defendant Officers also withheld from Mr. Patrick additional exculpatory evidence that would have been material to his defense.  This evidence includes:

a.     A list of the detainees who were held at the CPD Lock-Up on November 16 and November 17, 1992 (the "Withheld CPD Lock-Up List").  The Withheld CPD Lock-Up List shows Mr. Taylor, Mr. Anderson, and other individuals in the CPD Lock-Up during the "3rd Watch" on November 16, 1992 (which ended at approximately 9:30 p.m.) and further shows Mr. Taylor, Mr. Anderson, and the same other individuals as *still being in the CPD Lock-Up* when the "1st Watch" shift began at 9:30 p.m. Even though Defendants Villardita and Johnson obtained the Withheld CPD Lock-Up List from the 23d District during their investigation of Daniel Taylor's whereabouts on November 16, 1992, they did not place it in the Investigative File or the Permanent Retention File for the Haugabook/Lassiter murders and it was never provided to Mr. Patrick or his counsel prior to trial.

b.     A list of the CPD officers who were on duty at the CPD Lock-Up on November 16 and November 17, 1992 during the 3rd Watch and the 1st Watch (the "Withheld CPD Personnel List"). The Withheld CPD Personnel List contained the names of the CPD officers who worked the main desk and lock-up on November 16 from approximately 7:25 p.m. (when Mr. Taylor was received in the 23d District lock-up) to 10:00 p.m. (when Mr. Taylor received his bond and left the lock-up).  Even though Defendants Villardita and Johnson obtained the Withheld CPD Personnel List from the 23d District during their investigation, they did not place it in the Investigative File or the Permanent Retention File for the Haugabook/Lassiter murders and it was

never provided to Mr. Patrick or his counsel prior to trial. (After Mr. Patrick and Mr. Taylor were convicted, Officer Mitchell – whose name was never disclosed in pretrial discovery of the criminal case – stated in a sworn affidavit in one of Mr. Taylor's post-conviction proceedings that it is not possible that Mr. Taylor was released early or by mistake before 10:00 p.m. on November 16, 1992, which is the time that was listed on Taylor's arrest report and bond slip.)

c.      The first page of an undated, two-page GPR written by Defendants Villardita and Johnson, which set forth a detailed chronology of Mr. Taylor's whereabouts on the night of November 16, 1992 (the "Villardita/Johnson timeline GPR"). The Villardita/Johnson timeline GPR shows that Mr. Taylor was in continuous police custody from 6:45 to 10:00 p.m. on November 16, 1992 and that he did not leave the CPD Lock-Up until 10:00 p.m. Defendants Villardita and Johnson never dated this GPR, never signed the G.P.R. (other than typing their names in the body), never got the GPR approved by a supervisor, and never placed it in the Investigative File or the Permanent Retention File for the Haugabook/Lassiter murders notwithstanding CPD Regulations which at the time required every GPR to be placed in the investigative and permanent retention files. Most significantly, the undated Villardita/Johnson timeline GPR was never provided to Mr. Patrick or his counsel prior to trial.

d.      A visual check lock-up log book, which memorialized visual checks that CPD officers performed approximately every 15 minutes at the CPD Lock-Up on November 16, 1992 (the "Withheld Visual Check Lock-Up Log Book"). The purpose of this visual check was to confirm that all detainees were safe and that nothing unusual had occurred in the lock-up during the intervening time. So important was this visual 15-minute check to the lock-up's procedure that the lock-up personnel conducting the visual check were required to indicate in the "condition" column whether or not everything was okay during the check, and then sign their initials and

officer numbers in the corresponding column for the time that the visual inspection was conducted. Occasionally the supervisor – a lieutenant or sergeant -- would also verify that the visual check was done. In those instances, the supervisor would sign his name under the "supervisor" column corresponding to the time the supervisor confirmed the check. This log book was exculpatory of Mr. Taylor, Mr. Patrick, and the other co-defendants because it was further proof that multiple visual inspections were conducted in the lock-up during the 7:25 p.m. to 10:00 p.m. time frame when Mr. Taylor was in custody (including at the time the purported pre-planning gang meeting and the murders at issue occurred) and that nothing out of the ordinary had occurred in the lock-up. It would also have shown the names of the lock up personnel who conducted each visual check during that period, at what time, and which supervisors ensured that the visual checks were being conducted appropriately. Defendants Villardita and Johnson never placed the Withheld Visual Check Lock-Up Log Book into the Investigative File or the Permanent Retention File for the Haugabook/Lassiter murders, and it was never provided to Mr. Patrick or his counsel prior to trial.

e.      The November 16, 1992 arrest report of James Anderson, which shows that Mr. Anderson was arrested for begging (a form of disorderly conduct) and detained at the CPD Lock-Up on November 16, 1992 in the same cell as Mr. Taylor (the "Withheld James Anderson Arrest Report"). The Withheld James Anderson Arrest Report also shows that Anderson bonded out at 10:00 p.m., precisely the same time that Mr. Taylor bonded out. The Withheld James Anderson Arrest Report was never placed in the Investigative File or the Permanent Retention File for the Haugabook/Lassiter murders and was never provided to Mr. Patrick or his counsel prior to trial.

f.      The November 16, 1992 bond slip of James Anderson, which shows that Mr. Anderson was issued the very next I-bond after the one issued to Mr. Taylor, and that Mr. Anderson bonded out at 10:00 p.m. on November 16, 1992, the same time that Mr. Taylor bonded out (the

17

"Withheld James Anderson I-Bond"). The Withheld James Anderson I-Bond was never placed in the Investigative File or the Permanent Retention File for the Haugabook/Lassiter murders and was never provided to Mr. Patrick or his counsel prior to trial.

g. The November 16, 1992 arrest report of Eugene Fisher, which shows that Mr. Fisher was also arrested for disorderly conduct on the same evening Mr. Taylor was arrested, detained in the CPD Lock-Up beginning at 8:35 p.m., and then released on bond at 10:05 p.m., just minutes after Daniel Taylor and James Anderson were released, and that the bond given to Mr. Fisher was the next in sequential order after James Anderson's bond (the "Withheld Fisher Arrest Report") and two after Daniel Taylor. Given that Mr. Fisher was arrested for the same offense as Mr. Taylor and bonded out at approximately the same time, he too could have testified to the fact that Mr. Taylor was still at the CPD Lock-Up after the murders occurred or, at the very least, that the two of them bonded out within minutes of each other. Mr. Fisher's name was never disclosed to Mr. Taylor, his counsel, any of his criminal co-defendants, or their counsel because neither the Withheld CPD Lock-Up List nor any of the documents identifying Mr. Fisher, including the Withheld Fisher Arrest Report, were ever placed in the Defendant Officers' Investigative File or the City's Permanent Retention File or produced to Mr. Patrick and his counsel.

43. All of this evidence would have been exculpatory and critical to Mr. Patrick's defense because it showed that Mr. Taylor could not have participated in the murders of Lassiter and Haugabook, which in turn would have revealed that Mr. Patrick's confession – the only evidence of guilt that was admitted against him – could not be true because that confession placed Mr. Taylor at the Clarendon Park Meeting before the murders occurred and it also described Mr.

Taylor's integral involvement in perpetrating the murders at Lassiter's apartment at approximately 8:43 p.m., when he was undisputedly in lock up.

44.     This evidence was also not available to Mr. Patrick because only the Officer Defendants and the City possessed the CPD records and reports which showed that Mr. Taylor's participation in the murders was a physical impossibility.  Not only was this evidence not disclosed to Mr. Patrick, but he was affirmatively told in the answer to his motion for discovery that "The People are unaware of any evidence or witnesses which may be favorable to the defense in this cause."

**The Defendant Officers Arrest Dennis Mixon and Fabricate Portions of His Confession**

45.     Dennis Mixon, the initial primary suspect, was finally arrested by Defendant Officers several months after the Co-Defendants had already been charged. As Mixon was 10-15 years' older than the Co-Defendants, the Co-Defendants did not know Mixon and he did not know them. Nevertheless, in order to continue the façade of having legally  obtained the confessions of the Co-Defendants and to conceal the other misconduct described above, at the time the Defendant Officers arrested Mixon, the Defendant Officers coerced Mixon to falsely implicate the seven Co-Defendants based on the same false version of the murders that were used to procure the Fabricated Confessions. The Defendant Officers simply fed Mixon the details of the Fabricated Confessions so that his confession would conform to the others. In a statement against his own penal interest, Mr. Mixon has since admitted that he was at Mr. Lassiter's apartment on the evening of the murders, but significantly, he has recanted his confession (to the CCSAO and others) and admitted in a series of sworn statements that Mr. Patrick and the other Co-Defendants were not there and had nothing to do with the murders.

46.     While Mr. Mixon was in custody, Defendant Officers again brought Faye McCoy to view a lineup with Mr. Mixon. Unlike the first lineup which included Mr. Patrick, who Ms. McCoy unequivocally said was not there, Ms. McCoy identified Mr. Mixon as one of the individuals she saw leaving the courtyard of the building immediately after the murders occurred.

**Mr. Patrick's Wrongful Conviction**

47.     Despite no evidence linking him to the victims or their murders aside from his Fabricated Confession, as a result of Defendants' misconduct, Deon Patrick was wrongfully convicted of two counts each of first degree murder, armed robbery, and home invasion. Though prosecutors initially sought the death penalty, he was ultimately sentenced to a natural life prison term and two concurrent 30 year prison terms. Mr. Patrick was not eligible for parole.

48.     Co-Defendant Taylor was also convicted and given the same sentence as Mr. Patrick. Co-Defendants Gardner and Paul Phillips were each convicted and sentenced to 30 years in prison.

49.     Without the Defendants' misconduct, Plaintiff would not have been prosecuted or convicted.

**The City and Defendant Officers Lose the Co-Defendants' File**

50.     Under CPD regulations in effect in November and December 1992, the City and Defendant Officers were required to place "all handwritten notes and investigative documents" into the "Investigative File" created for that investigation. In addition, per required department operating procedures, all homicide investigative files that resulted in a conviction were required to be sent to the Records Division of the Chicago Police Department for post-conviction retention.

51.     Under CPD regulations in effect in November and December 1992, the City was also required to maintain a separate "Permanent Retention File." The homicide detectives and their

20

supervisors were required to send every document of any kind that was placed in the Investigative File to the Records Division of the Chicago Police Department for placement in the Permanent Retention File. The City was required to maintain the Permanent Investigative file permanently.

52.     At some time after Mr. Patrick, Mr. Taylor, and other co-defendants were convicted of the crimes at issue, the City and Defendant Officers *lost in their entirety* both the "Investigative File" and the "Permanent Retention File" in violation of Chicago Police Department Detective Division Standard Operating Procedures, which require the Department to retain them.  To date, and despite Patrick's (as well as co-defendant Taylor's) repeated requests to view these files, the Defendants have been unable to produce them.  Because the City and Defendant Officers are unable to produce these files, they are unable to establish that each of the exculpatory documents that existed in the Investigative and Permanent Retention Files at the time of the charges and convictions were in fact produced to Mr. Patrick and his counsel.  The failure of the City and Defendant Officers to have maintained either of these two crucial files also hinders Mr. Patrick's ability to fully discover additional material and exculpatory evidence that should have been but was not turned over prior to trial.

**The City's Pattern and Practice of Using "Street Files"**

53.     The constitutional violations that caused Mr. Patrick's wrongful conviction were the result of the City's policies, practices, and procedures of pursuing wrongful convictions based on profoundly flawed investigations and coerced confessions.

54.     In particular, the unconstitutional withholding of exculpatory information relating to Mr. Patrick's Co-Defendant, which in turn, would cast doubt on the veracity of Mr. Patrick's confession – the only evidence used against him at trial – was undertaken pursuant to, and proximately caused by, CPD's policy and practice. Specifically, at all times relevant hereto, CPD

21

Officers, including the Defendant Officers in this action, systematically suppressed *Brady* material by intentionally concealing discoverable and exculpatory information in so-called "street files."

55.     On information and belief, there are a set of "street files" that are or at all relevant times, were maintained in the basement of Areas One and Three and at CPD Headquarters. These files are not inventoried or indexed in any manner, and instead are kept in a file cabinet that purportedly contains "open" police investigations.

56.     As a matter of widespread custom and practice, these secret street files were routinely withheld from the Cook County State's Attorney's Office and from criminal defendants, and over the years, some of these files may have been destroyed.

57.     Consistent with the municipal policy and practice described above, Defendants in this case concealed exculpatory evidence, including evidence relating to Mr. Anderson, in street files, which were never disclosed to Mr. Patrick's criminal defense lawyer and, on information and belief, were also never disclosed to prosecutors.

58.     The street files practice described above was consciously approved at the highest CPD policy-making level and was a proximate cause of the injuries suffered by Mr. Patrick.

59.     The street files practice described above was enjoined by court order and supposedly discontinued prior to the investigation of the victims' murders. Contrary to CPD's public pronouncements, however, the street files practice continued through and including the investigation into the victims' murders, directly causing a violation of Mr. Patrick's rights.

**The City's Pattern and Practice of Coercing False Confessions**

60.     The Defendant Officers' coercion of false statements from Mr. Patrick and his Co-defendants was also undertaken pursuant to, and proximately caused by, a CPD policy and practice.

61.     In an article examining thousands of murder cases in Chicago from 1991 through 2000, an article which featured Daniel Taylor's and his Co-Defendants' criminal case, *The Chicago Tribune* found that Chicago police detectives had been involved in a wide range of cases that ultimately collapsed even though the detectives had obtained confessions.

62.     The Chicago Police Department has a long history of using physically and psychologically coercive interrogation tactics in order to elicit statements from suspects in criminal cases, which has caused false confessions and led to wrongful convictions.

63.     The wrongful convictions of innocent persons who gave coerced and false confessions include numerous cases in which Department detectives used the very same tactics that the Defendants employed against Mr. Patrick and his Co-Defendants in this case. These tactics include: (a) physical abuse; (b) psychological intimidation and manipulation; (c) fabrication of confessions; (d) misleading of parents and denial of parents' access to their children during interrogations; (e) concealment of exculpatory information; (f) false promises of leniency in exchange for "cooperation" in the form of a confession; and (g) use of other unlawful tactics to secure the arrest, prosecution, and conviction of persons, including juveniles and teenagers, without regard to their actual guilt.

64.     At the time of the events leading to Mr. Patrick's coerced and Fabricated Confession and wrongful conviction, CPD Officers systematically promoted the improper

prosecutions of teenagers and other vulnerable individuals by using abusive and coercive interrogation tactics to force them to confess to crimes they did not commit.

65.     Consistent with the municipal policy and practice described above, CPD Officers, including but not limited to the Defendant Officers, systematically suppressed evidence pertaining to these fabricated and coerced confessions, from the CCSAO, from criminal defendants, and from their counsel.

66.     As a matter of both policy and practice, municipal policy makers and department supervisors condoned and facilitated a code of silence within the CPD. In accordance with this code, CPD Detectives refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

67.     As a result of the City's established practice of not tracking and identifying police officers who are repeatedly accused of the same kinds of serious misconduct; failing to investigate cases in which the police are implicated in obtaining coerced and false confessions, as well as wrongful charges and convictions; failing to discipline officers accused of this unlawful conduct; and facilitating a code of silence within the CPD, CPD Officers (including the Defendant Officers) have come to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse consequences.

68.     The City's failure to train, supervise, and discipline its officers effectively condones, ratifies, and sanctions the kind of misconduct that the Defendant Officers committed against Mr. Patrick and his Co-Defendants in this case. Constitutional violations such as those that occurred in this case are encouraged and facilitated as a result of the City's practices and *de facto* policies set forth above.

69.     The City and CPD officials failed to act to remedy the abuses described above, despite actual knowledge of this pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Mr. Patrick's ongoing injuries.

70.     The policies and practices described in the foregoing paragraphs were consciously approved by City policymakers who were deliberately indifferent to the violations of constitutional rights described here.

## Plaintiff's Damages

71.     Mr. Patrick was taken from his family and placed in custody when he was just 20 years-old. His incarceration for murders he did not commit and for which he was not involved, was more than 21 years before the CCSAO finally requested that his conviction be vacated and he ultimately obtained a Certificate of Innocence.

72.     Mr. Patrick was degraded and demeaned in prison, subjected to physical and mental abuse, and treated by prison guards as a double-murderer for 21 years.

73.     In addition, during these years, the Defendants' misconduct cost Mr. Patrick the ability to spend time with his family and his friends, to share holidays, births, funerals, and other life events with loved ones, and of his fundamental and constitutionally-protected freedoms by causing Mr. Patrick's incarceration with fabricated and false evidence and through the concealment and withholding of material exculpatory evidence.

74.     Mr. Patrick must now attempt to make a life for himself outside of prison without the benefit of nearly two decades of life experiences, during the entirety of his young adulthood, which normally equip adults for that task. Mr. Patrick must also face life with the additional trauma of 21 years of prison life, as well as the continuing trauma and stigma that comes with

having been convicted and incarcerated for two murders, even though he did not commit them.

75.     Defendants' misconduct, as outlined in this Complaint, proximately caused all of these injuries.

**Plaintiff's Claims**
**Count I – 42 U.S.C. § 1983**
**Violation of the Fifth and Fourteenth Amendments**

76.     Plaintiff incorporates each preceding paragraph of this Complaint as if fully restated here.

77.     Defendant Officers and Defendants Magats, individually, jointly, and/or in conspiracy, as well as under color of law and within the scope of their employment, forced Mr. Patrick to incriminate himself falsely and against his will. Therefore, Defendant Officers and Defendant Magats violated Mr. Patrick' constitutional rights under the Fifth and Fourteenth Amendments.

78.     Defendant Officers unconstitutionally interrogated Mr. Patrick causing Mr. Patrick to make involuntary statements that implicated Mr. Patrick in the victims' murder.

79.     Defendant Officers and Defendant Magats fabricated, unlawfully coerced, and wrote false statements that Defendant Officers and Defendant Magats knew to be false. These false statements were used against Mr. Patrick to his detriment in Mr. Patrick' underlying criminal case. Mr. Patrick was prosecuted and convicted for the victims' murder based solely on these false statements.

80.     The Defendant Officers' and Defendant Magats' misconduct was objectively unreasonable. Defendant Officers and Defendant Magats acted intentionally and with willful indifference to Mr. Patrick' constitutional rights.

81.     The Defendant Officers and Defendant Magats proximately caused Mr. Patrick to suffer injuries, including but not limited to loss of liberty, personal physical injury, and emotional distress.

82.     The misconduct described in this Count was undertaken pursuant to the policies and practices of the City.

**Count II – 42 U.S.C. § 1983**
**<u>Violation of Due Process – Fabrication of Evidence, Subsequently Used At Trial</u>**

83.     Mr. Patrick incorporates each preceding paragraph of this Complaint as if fully restated here.

84.     The Defendant Officers, Officer Magats, and Officer Fogarty, acting individually, jointly, and/or in conspiracy, as well as under color of law and within the scope of their employment, deprived Mr. Patrick of his constitutional right to due process and a fair trial.

85.     As described more fully above, the Defendant Officers and Defendants Magats and Fogarty, acting individually, as well as jointly, and/or in concert and in conspiracy with one another, fabricated the Fabricated Confessions, false reports, and other false evidence which caused the conviction of Mr. Patrick.

86.     The Defendants proximately caused Mr. Patrick's unjust criminal conviction and his continued wrongful imprisonment.  Without their misconduct of fabricating evidence against him, Mr. Patrick would not have been prosecuted or convicted.

87.     The Defendants deprived Mr. Patrick of his constitutional right to a fair trial, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

88.     The Defendants also proximately caused Mr. Patrick to suffer injuries, including but not limited to physical injury, loss of liberty, and emotional distress.

27

89.     The Defendants' conduct was objectively unreasonable.  The Defendants acted intentionally and with willful indifference to Mr. Patrick's constitutional rights.

90.     The misconduct described in this Count was undertaken pursuant to the policies and practices of the City.

**Count III – 42 U.S.C. § 1983**
**<u>Violation of Due Process –  Withholding Exculpatory Evidence</u>**

91.     Mr. Patrick incorporates each preceding paragraph of this Complaint as if fully restated here.

92.     The Defendants, acting individually, jointly, and/or in conspiracy,  as well as under color of law and within the scope of their employment, deprived Mr. Patrick of his constitutional right to due process and a fair trial.

93.     The Defendants, acting individually, jointly, and/or in concert and in conspiracy with one another, deliberately withheld exculpatory evidence from Mr. Patrick before, during, and after his trial.  Mr. Patrick has described the exculpatory evidence the Defendants withheld in paragraphs 42 – 44 of this First Amended Complaint.[2]

---

[2]     Mr. Patrick has previously alleged and argued that the Defendants violated his due process rights by withholding: (1) his co-defendants' repeated denials that neither they nor Mr. Patrick were involved in the murders or knew anything about them; (2) Faye McCoy's statements that neither Mr. Patrick nor any of his co-defendants were among the four men she law leaving the crime scene; (3) the threats and offers of leniency the Defendants used to coerce false testimony from Adrian Grimes, and the fact that the police report that memorialized Grimes' statements was false; and (4) the Withheld Anderson Notes, the  Withheld  Anderson  Report, and the Withheld December 30 Anderson GPR.  The Court has ruled that none of these allegations state a viable *Brady* claim, and so Mr. Patrick does not repeat them in this First Amended Complaint.  But Mr. Patrick does reserve the right to argue on appeal that the Court's conclusion that these allegations fail to state a claim under *Brady v. Maryland* is an error of law.

94.     The Defendants proximately caused Mr. Patrick's unjust criminal conviction and his continued wrongful imprisonment. Without their misconduct of withholding exculpatory evidence, Mr. Patrick would not have been prosecuted or convicted.

95.     The Defendants deprived Mr. Patrick of his constitutional right to a fair trial, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

96.     The Defendants also proximately caused Mr. Patrick to suffer injuries, including but not limited to physical injury, loss of liberty, and emotional distress.

97.     The Defendants' conduct was objectively unreasonable. The Defendants acted intentionally and with willful indifference to Mr. Patrick's constitutional rights.

98.     The misconduct described in this Count was undertaken pursuant to the policies and practices of the City.

## Count IV – 42 U.S.C. § 1983
### Failure to Intervene

99.     Mr. Patrick incorporates each preceding paragraph of this Complaint as if fully restated here.

100.     As described more fully above, Defendants, by their conduct and color of law, stood by without intervening to prevent the violation of Mr. Patrick's constitutional rights, even though they had the opportunity to do so.

101.     Mr. Patrick suffered injury, including but not limited to physical injury, loss of liberty, and emotional distress, as a result of the Defendants' failure to intervene to prevent the violation of Mr. Patrick's constitutional rights.  Defendants had a reasonable opportunity to prevent this harm, but failed to do so.

102.    Defendants' conduct was proximately caused by Defendants and was objectively unreasonable.   Defendants acted intentionally and with willful indifference to Mr. Patrick's constitutional rights.

103.    The misconduct described in this Count was undertaken pursuant to the policies and practices of the City.

**Count V – 42 U.S.C. § 1983**
**Conspiracy To Deprive Mr. Patrick of His Constitutional Rights**

104.    Mr. Patrick incorporates each preceding paragraph of this Complaint as if fully restated here.

105.    As described more fully above, after the murders and after the case was not cleared and closed as Detective Villardita had demanded, the Defendants, acting within the scope of their employment and under color of law, agreed to frame Mr. Patrick and his Co-Defendants for the murders and deprive Mr. Patrick and his Co-Defendants of their constitutional rights, including but not limited to his rights to due process and a fair trial, the right to be free from unconstitutionally coercive interrogation, and the right to be free from evidence fabricated against him and subsequently used to convict him at trial.

106.    The Defendants further conspired to deprive Mr. Patrick of exculpatory information to which he was lawfully  entitled and which would have led to Mr. Patrick's confession being recognized as false, which would have led to Mr. Patrick not being charged, Mr. Patrick not being convicted, or Mr. Patrick's more timely exoneration.

107.    The Defendants, in concert with other unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

108.    In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

109.    Defendants willfully conspired with malice and/or reckless indifference to the rights of Mr. Patrick and his Co-Defendants.

110.    Mr. Patrick's rights were violated, and he suffered physical harm, financial damages, and severe emotional distress and anguish as a direct and proximate result of the Defendants' illicit prior agreements set forth above.

## Count VI – 42 U.S.C. 1983
### Liability of Supervisors

111.    Mr. Patrick incorporates each preceding paragraph of this Complaint as if fully restated here.

112.    The Defendants' Officers, Defendant Fogarty, and Defendant Magats each had supervisors who also caused Mr. Patrick's unfair trial, wrongful conviction, and continued wrongful detention by their deliberate indifference and recklessness, including, when they failed to adequately train and supervise the Defendants Officers (hereafter, the "Unidentified Supervisory Defendants"). Specifically, the Unidentified Supervisory Defendants either knew of the constitutional violations of Mr. Patrick's rights as outlined in this Complaint or, in the absence of their deliberate own indifference and recklessness, should have known of their subordinates' violations of Mr. Patrick's rights as outlined in this Complaint.

113.    Furthermore, the Unidentified Supervisory Defendants failed to supervise the individual defendants in constitutionally adequate law enforcement practices, particularly those which concerned interviews of suspects and witnesses, the taking of confessions, and the production of exculpatory evidence. The Unidentified Supervisory Defendants encouraged and/or permitted the Defendants to coerce and fabricate inculpatory evidence and to conceal and withhold exculpatory and impeachment evidence, which caused the constitutional deprivations of Mr. Patrick's rights.

114.    These interview techniques, failures in producing exculpatory evidence, fabrications, and other investigative procedures were contrary to accepted methods used by law enforcement agencies. The Unidentified Supervisory Defendants failed to train and supervise their subordinates to ensure that they employed proper investigation procedures. The Unidentified Supervisory Defendants thus demonstrated deliberate indifference and reckless disregard for Mr. Patrick's constitutional rights.

115.    The Unidentified Supervisory Defendants' proximately and directly caused Mr. Patrick's constitutional deprivations and grievous personal injuries, including the above-mentioned injuries and damages, by failing to train and supervise the individual defendants and employees as described above.

116.    The Unidentified Supervisory Defendants' conduct was objectively unreasonable, and was undertaken intentionally, with malice, willfulness, and deliberate indifference to Mr. Patrick's constitutional rights.

### Count VII – 42 U.S.C. § 1983
### _Monell_ Policy Claim Against The City

117.    Mr. Patrick incorporates each preceding paragraph of this Complaint as if fully restated here.

118.    At all times relevant to this complaint, Defendant City's municipal policy makers with final policy-making authority and CPD supervisors ratified, condoned, and facilitated the following policies, practices, and customs within the CPD:

a.    Conducting unlawfully coercive interrogations of witnesses, suspects, and arrestees to obtain confessions and the false implication of others;

b.    Unlawfully manipulating juveniles and teenagers to falsely confess and falsely implicate others, including by using the unlawful tactics described above;

     c.      Filing false reports, and giving false statements and testimony about interrogations, confessions, and witness statements;

     d.      Suppressing evidence concerning unlawful interrogations, coerced confessions, and the coerced false statements against others, including but not limited to suppressing evidence by transferring it to unlawful "street files," instead of turning over such evidence to prosecutors, as required by law.

     e.      Pursuing and obtaining prosecutions and imprisonments on the basis of confessions obtained during the unlawful interrogations, and otherwise covering up the true nature of the interrogations, confessions, and witness statements; and

     f.      Failing to video and/or audio tape interrogations.

119.     As a result of the City's and CPD's policies and practices described above, members of the CPD, including Defendant Officers, acted with impunity when they violated citizens' civil rights, including teenagers such as Mr. Patrick.

120.     The City's failure to train, supervise, and discipline Defendant Officers effectively condoned, ratified, and sanctioned these Defendant Officers' violation of Mr. Patrick' and his co-defendants' constitutional rights.

121.     The City's policies and practices described above were consciously approved by City policymakers who were deliberately indifferent to the violations of constitutional rights described herein.

122.     Defendant Officers acted pursuant to the CPD's policies and practices described above.

123.     The City maintained and implemented the CPD's policies and practices described above with deliberate indifference to Mr. Patrick's constitutional rights.

124.    Mr. Patrick's rights were violated, and he suffered physical harm, financial damages, and severe emotional distress and anguish as a direct and proximate result of the City's policies, practices, and customs.

125.    The City is therefore liable for the Defendant Officers' misconduct.

**Count VIII – 42 U.S.C. § 1983**
***Monell* Policy Claim Against The County**

**This claim has been dismissed.**

**Count IX – State Law Claim**
**Malicious Prosecution**

126.    Mr. Patrick incorporates each preceding paragraph of this Complaint as if fully restated here.

127.    Defendants accused Mr. Patrick of criminal activity knowing those accusations to be without genuine probable cause.

128.    Defendants made statements in writing, and on information and belief, orally, to prosecutors (including but not limited to Defendants Magats, Fogarty, and others yet unknown), with the intent to exert influence and to institute and continue judicial proceedings against Mr. Patrick.

129.    Defendants caused Plaintiff to be improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

130.    Defendants made false statements regarding Mr. Patrick's alleged culpability with knowledge that their statements were false and perjured. One or more Defendants also fabricated

evidence by coercing false testimony from Mr. Patrick, Mr. Patrick's Co-Defendants, and from other witnesses.

131.    Defendants withheld the facts related to their manipulation of and fabricated evidence fed to Mr. Patrick, Mr. Patrick's Co-Defendants, and others.

132.    Defendants acted with malice, willfulness, and reckless indifference to Mr. Patrick's rights.

133.    Mr. Patrick sustained and continues to sustain injuries, including but not limited to physical injury, loss of liberty, and pain and suffering because of Defendants' misconduct.

**Count X – State Law Claim**
**<u>Intentional Infliction of Emotional Distress</u>**

**This claim has been dismissed.**

**Count XI – State Law Claim**
**<u>Civil Conspiracy</u>**

134.    Mr. Patrick incorporates each preceding paragraph of this Complaint as if fully restated fully here.

135.    Defendants, acting in concert with other known and unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

136.    Defendants committed overt acts and were otherwise willful participants in joint activity in furtherance of the conspiracy.

137.    Defendants acted with malice, willfulness, and reckless indifference to the rights of others.

138.    Mr. Patrick suffered damages, including severe emotional distress and anguish, as a proximate result of Defendants' misconduct and conspiracy to engage in misconduct.

**Count XII – State Law Claim**
**<u>Respondeat Superior</u>**

139.    Mr. Patrick incorporates each preceding paragraph of this Complaint as if fully restated here.

140.    The City is liable for Mr. Patrick's damages (and any award of attorneys' fees) that were caused by the misconduct of the other Defendants, including the as-yet unknown Former Employees of the City because the City was the employer of the Defendant Officers as defined above.

**Count XIII – State Law Claim**
**<u>Indemnification</u>**

141.    Mr. Patrick incorporates each preceding paragraph of this Complaint as if fully restated here.

142.    Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

143.    The City must indemnify the Defendant Officers for any and all judgments entered against them (except for punitive damages).

WHEREFORE, Plaintiff DEON PATRICK respectfully requests this Court to:

(a)     enter judgment in his favor and against all Defendants jointly and severally;

(b)     award him compensatory damages jointly and severally,

(c)     award him attorneys' fees and costs against each Defendant jointly and severally;

(d)     enter punitive damages against each of the individual Defendants;

(e)     award pre-judgment interest for all applicable damages;

(f)     award post-judgment interest for all applicable judgments; and

(g)     award such other relief as this Court deems appropriate.

**<u>Jury Demand</u>**

Deon Patrick demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on

all issues so triable.

Dated:  May 14, 2015                                    Respectfully submitted,


                                                        /s/ Stuart J. Chanen
                                                        One of Plaintiff's Attorneys

Stuart J. Chanen
Nicole Nehama Auerbach
Daniel Wucherer
VALOREM LAW GROUP
35 East Wacker Drive, Suite 3000
Chicago, IL  60601
Phone: (312) 676-5480
Stuart.chanen@valoremlaw.com
Nicole.auerbach@valoremlaw.com
Daniel.wucherer@valoremlaw.com

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on **May 14, 2015**, I caused a true and correct copy of the attached document,

**First Amended Complaint**, to be served upon all counsel of record via the Court's ECF system.


/s/ Stuart J. Chanen
Stuart J. Chanen