# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **DEON PATRICK,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 14-cv-3658** |
| **v.** | ) | |
| | ) | **Judge Ronald A. Guzmán** |
| **CITY OF CHICAGO, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## MEMORANDUM OPINION & ORDER

The Court grants in part and denies in part Defendants' motions for summary judgment [140] [141] [148]. The Court grants judgment on Count III (*Brady*) in favor of all Defendants and on Count IV in favor of the ASA Defendants as to the failure to intervene claim. Count VI, supervisory liability, is dismissed without prejudice. Plaintiff is entitled to a trial on his remaining claims. A status hearing is set for October 25, 2016 at 9:30 a.m. to set a trial date.

## STATEMENT

This case concerns the alleged malicious prosecution and wrongful imprisonment of plaintiff Deon Patrick ("Plaintiff"). He claims that seven Chicago police officers, Anthony Villardita, Thomas Johnson, Rick Abreu, Terry O'Connor, Brian Killacky, Sean Glinski, and Michael Berti ("Officer Defendants" or "Officers"), as well as two Assistant State's Attorneys, Joseph Magats and Martin Fogarty ("ASA Defendants" or "ASAs") (collectively "Defendants") framed him for murders he did not commit.[1] The operative thirteen-count complaint alleges that

---

[1] The City of Chicago is also named as a Defendant for *Monell* liability, indemnification, and *respondeat superior*. It has adopted by reference varying portions of the Officer Defendants' briefs.

Defendants engaged in a myriad of egregious misconduct, such as coercing Plaintiff's confession, fabricating evidence against him, withholding exculpatory evidence, maliciously prosecuting him, and conspiring to maliciously prosecute him. Defendants now move for summary judgment on virtually all of Plaintiff's claims. For the following reasons, the Court grants in part and denies in part Defendants' motions.

## BACKGROUND

### I.    The Undisputed Facts[2]

*The Lassiter/Haugabook Murders*

The truly undisputed facts here are relatively few. Around 8:00 p.m. on November 16, 1992, Jeffrey Lassiter and Sharon Haugabook were shot and killed in Lassiter's apartment in Chicago. (Officers' Facts [Dkt # 144] ¶ 10.) The police arrived shortly thereafter, with Detectives Villardita and Johnson leading the investigation. (Pl.'s Facts [Dkt. # 162] ¶ 2.) At the scene, the detectives spoke with Faye McCoy, a nearby resident and neighborhood activist, who told them that she saw four black males leaving the courtyard around the time of the murders. (*Id.*) Two days later, after looking at a photo array set up by the police, McCoy identified one of the men leaving the courtyard as "Goldie" (a.k.a. Dennis Mixon), whom she knew frequented Lassiter's apartment. (Officers' Resp. Pl.'s Facts [Dkt # 183] ¶ 3.) A police report filed the day after the murders further depicted Mixon as a suspect. (11/17/1992 Police Rept. [Dkt. # 164, Ex. 6] at 1.) Particularly, the report stated that various local residents were aware of a conflict

_____

[2] At various points, Defendants criticize Plaintiff's statement of facts for not complying strictly with local Rule 56.1, for example by including more than 100 paragraphs of material facts, or by citing compound facts in one paragraph. While Plaintiff's arrangement of the facts is by no means exemplary, it is worth noting that those facts are a combined response to three moving parties (two of whom were given leave to cite more than 90 material facts each), and, moreover, that many of Defendants' facts would not pass muster under a *strict* application of Local Rule 56.1, either. In any event, neither party's statement of facts is so poor that it (a) prejudices the opposing party or (b) frustrates the Court's investigation.

between "Goldie" and Lassiter, that Lassiter's apartment was apparently a crack house, and that "Goldie" and his crew of "Vice Lords" wanted to oust Lassiter and move in with their business (selling crack). (*Id.* at 1-2.) In the weeks that followed, however, neither Mixon nor any of his associates were arrested in connection with the murders. (Pl.'s Facts ¶ 4.)

The case essentially remained dead in the water until December 2, 1992, when another lead emerged — a fifteen year old named Lewis Gardner, who was arrested with two of his friends for drug possession. (Officers' Facts ¶ 12.) Yet, through a series of disputed circumstances/events, Gardner later confessed to the Lassiter/Haugabook murders and implicated Plaintiff and five others (Paul Phillips, Akia Phillips, Daniel Taylor, Rodney Matthews, and Joe Brown) (collectively "the codefendants"). (*Id.*; ASAs' Facts ¶¶ 15-20.) With Gardner's confession in hand, the Officers believed they had probable cause to arrest the remaining codefendants, who, one by one, were interrogated and confessed to the murders as well.[3] (Pl.'s Facts ¶¶ 39, 42.)

The circumstances surrounding their confessions, however, as well as those surrounding Plaintiff's subsequent criminal trial and conviction, are hotly disputed. In fact, there is so little overlap between the parties' versions of events that there are really two stories to tell, each of which finds some support in the record. The Court will therefore summarize them for narrative purposes and deal with disputes of fact or other conflicts, as necessary, in the analysis section.

---

[3] The confessions also depicted Mixon as part of the group, but he was not found until March 1993. (Pl.'s Facts ¶ 42.)

## II.    Defendants' Story[4]

Defendants claim this case is nothing but straightforward police work that led to the arrest and conviction of eight murderers.

(i)    *The Initial Arrests and Confessions*

On December 2, 1992, police were conducting routine surveillance in Gardner's neighborhood when they noticed him and his two friends, Akia and Paul Phillips, behaving suspiciously. (ASAs' Facts ¶¶ 11-13.) The three were subsequently arrested for drug possession and taken to the Chicago Police Department's 23rd District for questioning. (*Id.*) Paul was soon released on bond, though, leaving only Akia and Gardner. (*Id.* ¶ 13.)

While in lockup, Gardner asked to speak to one of the on-duty police officers, Officer Forrest, in private. (*Id.* ¶ 14.) Officer Forrest then walked Gardner down to the station's youth office, where Gardner spontaneously volunteered that his drugs were supplied by "C-Deon" (a name associated with Plaintiff) and that C-Deon was involved in the Lassiter/Haugabook murders. (*Id.*) Naturally, Officer Forrest took these remarks seriously and asked Gardner if he would be willing to talk to detectives, to which Gardner agreed. (*Id.* ¶ 15.) Gardner was then taken to the Area 6 Violent Crimes Unit ("Area 6") and interviewed by Detectives Villardita and Johnson around 7:00 p.m. (*Id.* ¶ 16.)

After Gardner gave an oral confession to the detectives, inculpating himself and the codefendants, Villardita called the State's Attorney's Office Felony Review Unit[5] to request approval of felony charges. (*Id.* ¶ 17.) Accordingly, Assistant States Attorney Fogarty was

---

[4] Unless otherwise noted, the ASAs' facts, the Officer Defendants' facts, and the City's facts are either the same or substantially similar.

[5] Assistant States Attorneys assigned to the Felony Review Unit review cases when police officers seek approval of felony charges. (ASAs' Facts ¶ 73.) Typically, this involves going to the police station, talking to the detective or arresting officer, reviewing any available reports/evidences, and sometimes speaking to the suspect in custody. (*Id.* ¶¶ 74-76.)

dispatched to Area 6 the same day and arrived at approximately 9:00 p.m., but he did not memorialize Gardner's confession with a court reporter until roughly 2:00 a.m. the next day. (*Id.* ¶¶ 18-21.)

With Gardner out of the way, Officer Forest returned to the 23rd District, where he was advised that Akia had given a false name (Dion Bonner) and birthdate, which required reprocessing him as an adult under his actual identity. (*Id.* ¶ 25.) During the reprocessing, Akia asked Officer Forrest where Garnder went and learned that he was moved to Area 6. (*Id.* ¶ 27.) What followed was another unexpected, but voluntary, comment: Akia said that Gardner must be at Area 6 because of the murders. (*Id.*) Recognizing that this was no mere coincidence, Officer Forrest arranged for Akia to be taken to Area 6 for questioning as well. (*Id.* ¶ 27.) And, much like Gardner, Akia was interviewed by Detectives O'Connor and Abreu around 7:30 p.m., after which he orally confessed to the murders and implicated the other codefendants. (*Id.* ¶ 28-29.)

Now, with two confessions and eight suspects, the case was taking on a new life and complexity, which prompted a Felony Review Unit supervisor to order another set of hands for assistance — Assistant States Attorney Magats. (*Id.* ¶¶ 31-32.) He arrived at Area 6 sometime between 11:00 p.m. on December 2nd and the early morning of December 3rd, where he largely remained, along with Assistant States Attorney Fogarty and the Officer Defendants, until December 4th. (*Id.*) It was during this period that the remaining codefendants were arrested, brought to Area 6, and interrogated, culminating in seven signed confessions. (*Id.* ¶¶ 33-37.)

(ii)     *Plaintiff's Arrest and Confession*

Plaintiff's arrest, interrogation, and confession were no different. He was arrested by Detectives O'Connor, Abreu, Delaney, and Killacky at approximately 11:30 p.m. on December 2, 1992 and taken to Area 6, where he initially denied any involvement in the murders. (*Id.* ¶¶

41-43.) The next day, at about 8:20 p.m., he was put in a lineup with Taylor, Matthews, and Paul Phillips. (*Id.* ¶ 44.) Faye McCoy viewed the lineup and identified each of them as kids from the neighborhood. (*Id.* ¶ 45.) She further stated, according to a report written by Detectives Delaney and Killacky, that she saw the four kids leaving the area around Lassiter's apartment on the night of the murders, but that she was afraid to testify against them. (*Id.*) Shortly after the lineup, Plaintiff confessed to Detectives O'Connor and Abreu. (*Id.* ¶ 45.)

Around midnight, Assistant States Attorney Magats entered Plaintiff's interrogation room and introduced himself as a State's Attorney with the Felony Review Unit. (*Id.* ¶ 49.) The two spoke for about a half hour, with Detective O'Connor as a witness. (*Id.* ¶ 48.) During this time, Plaintiff again orally confessed and further agreed to have his confession memorialized in handwritten form, which Magats prepared and reviewed with Plaintiff in detail. (*Id.* ¶¶ 49, 52.) The whole process was fairly routine, and Plaintiff appeared to be of sound mind throughout, leaving Magats with no reason think that his confession was anything but knowing and voluntary. (*Id.* ¶ 54.)

     (iii)    *The Next Steps and the Taylor Question*

Magats contacted his supervisor, Anna Demacopoulous, to discuss whether felony charges should be approved. (*Id.* ¶ 61, 67.) (Neither he nor Fogarty had the authority to do so, *id.*) She reviewed the files, approved charges against Plaintiff and each codefendant, and the case proceeded to the grand jury. (*Id.* ¶ 68.) There was one wrinkle, though: Daniel Taylor.

Despite confessing to a role in the murders, and each codefendants' confession placing him at the murder scene, Taylor told Detectives Villardita and Johnson at one point that he could not possibly have been at Lassiter's apartment on that night because he was already in lockup at

the 23rd District for disorderly conduct. (Officers' Facts ¶ 19.) Accordingly, Detectives Villardita and Johnson set out to investigate the potential alibi. (*Id.* ¶¶ 20-21.)

They searched Taylor's criminal history report, yet found nothing for November 16, 1992. (*Id.* at ¶ 20.) But out of an abundance of caution, Villardita also asked 23rd District Officer Steve Caluris to manually look at the arrest reports from that night, to see if anything had slipped through the cracks. (*Id.* at ¶ 21.) And indeed, something had: Officer Caluris, on December 6th, located a disorderly conduct arrest report for a "Daniel Taylor" that indicated he was in lockup from 6:45 p.m. to 10:00 p.m. on the night of the murders, after which he was released on bond. (*Id.* ¶¶ 23, 25.) This posed potentially serious problems for the integrity of the case, so Villardita and Johnson searched for more concrete evidence of Taylor's whereabouts that night, such as his fingerprints or mugshot at the 23rd District, but to no avail. (*Id.* ¶ 26.) They did, however, obtain copies of Taylor's arrest report and bond slip, along with a list of names and assignments for 23rd District personnel who worked that night. (*Id.* ¶¶ 24, 27.)

The "Taylor alibi" evidence was thus inconclusive, at least according to Villardita and Johnson. (*Id.* ¶ 25.) Nonetheless, they felt duty-bound to record this information in a police report. (*Id.*) They also informed Assistant States Attorney David Styler (who would later lead the grand jury proceedings) about the potential conflict between the confessions and Taylor's whereabouts. (*Id.* ¶ 30.) Styler undertook his own investigation, too, interviewing various 23rd District officers and even searching for one of Taylor's potential cell mates at the 23rd District, James Anderson. (*Id.* ¶¶ 33-34, 45-51.) None of this changed the momentum of the Lassiter/Haugabook investigation, however, and each of the codefendants was eventually indicted by a grand jury, thereby ending Defendants' active roles in the case.

(iv)    *Plaintiff's Trial*

Two Assistant States Attorneys — Thomas Needham and Jeanne Bischoff — were assigned to prosecute the charges against Plaintiff and the codefendants. (*Id.* ¶¶ 5-6, 54, 60.) Like Assistant States Attorney Styler, they were each made aware of the conflict between Taylor's confession and the alibi evidence. (*Id.*) Plaintiff's trial attorney, John Theis, was similarly aware of the Taylor alibi, albeit through different means: he shared office space with Taylor's attorney, Nathan Diamond. (*Id.* ¶ 66.) Theis, however, did not further investigate the Taylor alibi or pursue it as part of Plaintiff's trial strategy. (*Id.* ¶¶ 69-70.) Indeed, he did not even object to the state's motion *in limine* to exclude from Plaintiff's trial any mention of Taylor's disorderly conduct arrest. (*Id.* ¶ 73.) Thus, no evidence of the Taylor alibi was introduced at Plaintiff's trial. (*Id.* ¶ 81.) In fact, the only evidence introduced against Plaintiff was his own confession and various testimony, most of which came from Defendants. (*Id.* ¶¶ 81-86.) The result: Plaintiff was found guilty on March 10, 1995 and sentenced to natural life in prison, where he remained for the next nineteen years until his conviction was vacated on a motion by the Cook County Conviction Integrity Unity in 2014. (*Id.* ¶¶ 1, 87.)

## III.    Plaintiff's Story

Plaintiff has a different take on things. He does not dispute the general sequence of events depicted by Defendants; he disputes what happened at each step. In his eyes, the Lassiter/Haugabook investigation and the confessions were all carefully fabricated lies.

(i)    *The Initial Arrests*

The tone of the investigation was set just a few days before the first arrest, when Detectives Villardita and Johnson left a note in a General Progress Report ("GPR") to the Officer

Defendants: "Clear this case by the time we come back from our days off." (11/29/1992 GPR [Dkt. # 164, Ex. 12] at 1.) This is where the parties' stories diverge.

Contrary to Officer Forrest's account, for example, Gardner denies that he ever spoke with anyone in private or "volunteered" a confession. (Pl.'s Facts ¶ 7.) Indeed, he claims to have been with his mother while at the 23rd District (since he was a juvenile) and that the two were *asked* to go to Area 6 for questioning, with Gardner assuming that it was related to his drug arrest. (*Id.*). Once they arrived at Area 6, however, Gardner's mother was told to go back to work and that she would be called to pick him up after the detectives were finished. (*Id.*) What followed was a concerted effort by Defendants to break the arrestees' wills and force them to confess.

(ii)     *The Confessions*

The circumstances surrounding each codefendants' confession are the focal point of Plaintiff's story and discussed in greater detail in the analysis section. But here are the basics: no codefendant denies *signing* a confession for one reason or another; however, each has subsequently (1) had his charges dismissed or been exonerated, (*see id.* ¶¶ 21-22, 98-100), and (2) recanted his confession and claimed that it was the product of Defendants' coercive interrogation tactics (e.g., sleep deprivation, starvation, violence, false promises of lenience, or the ASAs masquerading as public defenders), (*see, e.g.,* Gardner Dep. [Dkt. # 164, Ex. 16] at 165:7-12; Akia Dep. [Dkt. # 164, Ex. 19] at 151-74; Pl.'s Dep. [Dkt # 152, Ex. 1] at 528:13-531:14; Taylor Dep. [Dkt # 164, Ex. 21] at 246:2-23).

The codefendants have testified, moreover, that the confessions were entirely fabricated, in that none of them actually had any part in the murders or were even around Lassiter's apartment on the night in question. (*See, e.g., id.*) Indeed, Defendants' entire "investigation" was

really just a hand-drafted story on a spiral notebook — a "master confession" — that Defendants concocted and coerced the codefendants into signing. (*See, e.g.,* Gardner Dep. at 165:7-186:12; Akia Dep. at 151:9-163:14.) This wasn't a one-shot process, either: Defendants prepared numerous drafts of the confessions, revising any conflicting facts or stories as the interrogations unfolded, and even negotiated with some of the codefendants the various (fabricated) roles they could play in the murders (*See*, *e.g.,* Pl.'s Dep. at 600:1-603:10) (explaining that the "original confession" depicted Plaintiff as murdering Ms. Haugabook, but that Defendants changed the story, at Plaintiff's request, to depict him as murdering Mr. Lassiter, since Plaintiff did not want to be known for murdering a woman.) Then, as each fabricated confession was signed, Defendants used them as leverage against the remaining codefendants who hadn't confessed. (*See, e.g.,* Akia Dep. at 181:3-12; Pl.'s Dep. at 529:4-11.)

(iii)    *More Fabricated Evidence*

The fabrication didn't end with the confessions, though. Defendants also had to square away the Taylor alibi and Faye McCoy (who, to this day, maintains that she never saw the codefendants leaving the murder scene).

<u>The Gillespie/Grimes Report</u>

After learning of the Taylor alibi, Villardita and Johnson took it upon themselves to diminish its credibility. First, they created a police report that stated they had met with the 23rd District officer on "first watch" (i.e., the front desk) who signed Taylor's bond slip, Officer Gillespie. (Pl.'s Facts ¶ 48.) The report explained that Gillespie didn't *remember* seeing Taylor that night, which Gillespie has since reaffirmed. (*Id.*) But it also quoted him as saying that Taylor "could have been gone" by the time Gillespie signed the bond slip, around 10:00 p.m., (*id.*), a point that Gillespie later found troubling. (*See* Gillespie Dep. [Dkt # 164, Ex. 52] at 104:16-

105:7) ("I don't know why I would [have said] that. Because, first of all, I don't understand what [the report] mean[s] by ["could have been gone"] . . . . Who was gone and who signed the slip? I wouldn't have said that because, like I said earlier . . . I wouldn't be given a bond with someone's signature on it and then fill out the bond and sign it.")

Beyond casting doubt on whether anyone actually saw Taylor at the 23rd District, the report went a step further and stated that another witness — Adrian Grimes — saw Taylor and the codefendants near Lassiter's apartment on the night of the murders. (Pl.'s Facts ¶ 48.) But Grimes has since recanted that statement. (*See* Grimes Dep. [Dkt 164, Ex. 45] at 45-48) (explaining that he testified against Taylor because the police came to his house and arrested him on drug charges, beat him while in lockup, and then offered to make those charges go away if he would testify that he saw Taylor near Lassiter's apartment with the codefendants).)

The Berti/Glinksi Supplementary Report

Villardita and Johnson didn't stop with one report, either. They also asked two of the Officer Defendants who responded to the Lassiter/Haugabook murders, Berti and Glinski, to write a supplementary report about that night. (*See* Pl.'s Facts ¶ 53.) While it is unclear whether the detectives *told* Berti and Glinski what to say, (*see* Officers' Resp. Pl.'s Facts ¶ 53), the supplementary report nonetheless states that the two officers saw Taylor running in the streets near Lassiter's apartment and questioned him around 9:30 p.m. — an event curiously absent from their original report, which indicated the only black male they spoke to (and arrested) was named "Tillis," (*compare* 11/16/1992 Police Rep. [Dkt. # 164, Ex. 86] at 2, *with* 12/14/1992 Supp. Rep. [Dkt. # 164, Ex. 59] at 2).

<u>The McCoy Lineup Report</u>

Next, Detectives Villardita and Johnson, along with Officers Delaney and Killacky, worked together to fabricate Faye McCoy's responses to the line-up report. (The officers wrote the report, but Villardita and Johnson were the ones behind the glass talking to McCoy, *see* Pl.'s Facts ¶ 28.) McCoy, however, denies ever suggesting that she was afraid of the codefendants or that she saw any of them leaving the murder scene. (*See* McCoy Dep. [Dkt. # 164, Ex. 5] at 59:8-61:4.) Quite the contrary: she testified that after the lineup, she told the Officers "they had the wrong people; go and find Goldie." (*Id.* at 59:19-20.)

<u>The Seymore Report</u>

Lastly, Plaintiff claims that Villardita and Johnson directed two non-defendant officers, Elmore and Gildea, to seek out and interview Michael Seymore, the person who apparently sold Gardner the drugs for which he was initially arrested. (Pl.'s Facts ¶ 51.) Villardita and Johnson later memorialized the interview in a report and falsely indicated that Seymore also saw Taylor near Lassiter's apartment on the night in question. (*Id.*)

(iv)     *The Grand Jury*

With seven fabricated confessions and various pieces of fabricated evidence to support their case, Defendants passed it on to Assistant States Attorney Styler to present to the grand jury. Although Styler has not been named as a defendant, Plaintiff insists that he played a vital role in continuing the violation of his rights. Shortly after the Taylor alibi surfaced, for example, Styler sought to extinguish it by having Grimes and Seymore testify to seeing Taylor at the murder scene before 10:00 p.m. (Pl.'s Facts ¶ 85.) Two weeks later, Styler put the nail in the coffin by calling Detective O'Connor as a witness to testify to the entire sequence of events,

most of which was gleaned from the codefendants' fabricated confessions. (*Id.* ¶ 87.) The grand jury returned an indictment against all seven codefendants immediately afterwards. (*Id.*)

(v) *Plaintiff's Trial and the Withheld/Fabricated Evidence*

At trial, Plaintiff's attorney had a tough choice on his hands: what to make of the Taylor alibi. (*Id.* ¶¶ 89-90.) Despite the hole it could poke in the integrity of the investigation, the documents Theis was provided in discovery, such as the Berti/Glinski report and the Grimes/Seymore reports, suggested to him that the Taylor alibi was possibly a clerical mistake. (*See* Pl.'s Facts ¶¶ 48, 52, 53, 90.) This is significant because there were real costs to introducing a less-than-solid alibi about a codefendant: at Plaintiff's pretrial hearing, the judge ruled that if Plaintiff opened the door to evidence about any of his codefendants, then he would lose the protection afforded by *Bruton v. United States*, 391 U.S. 123 (1968)[6] and *all of the evidence* related to them would be admitted, including the six confessions that placed him at the murder scene. (*Id.* ¶ 92.) Since Theis had no reason to suspect any of the evidence he received was fabricated, he accordingly chose not to present the Taylor alibi at trial.[7] (*Id.* ¶¶ 48, 52, 53, 90.)

Instead, Theis focused on the absence of physical evidence linking Plaintiff to the crime and Faye McCoy's testimony that Plaintiff was not one of the men she saw leaving the crime scene. (*Id.* ¶ 93; *see also* 3/8/1995 Trial Tr. [Dkt. # 164, Ex. 78] at 81-109; 3/9/1995 Trial Tr. [Dkt. # 164, Ex. 30] at 64-73.) But these arguments were ultimately unavailing: the gravamen of the testimony implicated Plaintiff in the murders, his written confession was read to the jury, and

---

[6] In *Bruton*, the Court held that a defendant's confrontation clause rights are violated when a nontestifying codefendant's confession, naming the defendant as a participant in the crime, is introduced at trial. 391 U.S. at 232.

[7] Plaintiff also claims that Theis's strategic decisions were hampered by Defendants' failure to disclose exculpatory evidence related to the Taylor alibi. But, for reasons explained below, Plaintiff's *Brady* claim fails as a matter of law, so the Court need not delve into the circumstances surrounding those alleged *Brady* violations.

the prosecution impeached McCoy based on her (fabricated) statements from the lineup report, all of which led to a guilty verdict. (*Id.*)

## **LEGAL STANDARD**

Summary judgment is appropriate where the admissible evidence shows that no genuine dispute exists as to any material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). "A 'material fact' is one identified by the substantive law as affecting the outcome of the suit." *Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 681 (7th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A 'genuine issue' exists with respect to any such material fact, and summary judgment is therefore inappropriate, when 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Bunn*, 753 F.3d at 681-82 (citing *Anderson*, 477 U.S. at 248). Conversely, "where the factual record taken as a whole could *not* lead a rational trier of fact to find for the nonmoving party, there is nothing for a jury to do." *Bunn*, 753 F.3d at 682 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis in original)). In determining whether a genuine issue of material fact exists, the court construes the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party. *Bunn*, 753 F.3d at 682 (citing *Anderson*, 477 U.S. at 255).

## **ANALYSIS**

The operative complaint contains the following constitutional claims under 42 U.S.C. § 1983, which are against all Defendants unless otherwise indicated:

| | |
|---|---|
| Count I | Coerced Confession (v. the Officers and Magats) |
| Count II | Due Process: Fabrication of Evidence |
| Count III | Due Process: *Brady* |
| Count IV | Failure to Intervene |
| Count V | Conspiracy |
| Count VI | Supervisory Liability (v. unnamed defendants) |

Count VII       *Monell* (v. the City)

(Am. Compl. [Dkt. # 92] at 26-35.) The complaint also contains two state law claims against all Defendants for malicious prosecution (Count IX) and conspiracy (Count XI), and two state law claims against the City for *respondeat superior* (Count XII) and indemnification (Count XIII). (*Id.* at 34-36.)[8] The ASA Defendants move for judgment on all claims on the basis of absolute immunity, and, in the alternative, they further challenge the merits of Counts II, IV, V, IX, and XI. The Officer Defendants similarly seek judgment on Counts II, III, IV, V, and VI. For the City's part, since the claims against it are all derivative, it has moved for judgment insofar as the claims against the Officer Defendants fail. The Court will address each argument in turn.

## I.    Count I – Coerced Confession

Coercive interrogations may violate both a person's right against self-incrimination and the due process clause. *See* U.S. Const., amend V ("[N]o person . . . shall be compelled in any criminal case to be a witness against himself."); *Chavez v. Martinez,* 538 U.S. 760, 774 (2003) (holding that the due process clause can apply to coerced confessions when the circumstances of the interrogation are grossly inappropriate); *United States v. Stadfeld*, 689 F.3d 705, 709 (7th Cir. 2012) ("A conviction obtained by the use of an involuntary confession violates due process."). In that respect, Count I asserts that the Officer Defendants and Assistant States Attorney Magats collectively violated Plaintiff's Fifth and Fourteenth Amendment rights by coercively interrogating him to the point where his will was broken and he confessed involuntarily. (Am. Compl. at 26.) Only Magats,[9] however, moves for judgment on this claim, arguing as follows:

---

[8] Counts VIII and X have been dismissed.

[9] The ASAs technically move for summary judgment together, but for narrative purposes only Magats will be referred to in this section.

> [T]he evidence establishes that there was no coercion. ASA Magats was not present for and did not participate in Plaintiff's interrogation that resulted in Plaintiff's confession to detectives. Undeniably, ASA Magats was not even present at Area 6 when Plaintiff was interrogated. Moreover, Plaintiff never told ASA Magats that he was not involved in the murders. (SOF ¶ 54.) Plaintiff also admits that he confessed . . . as part of a plan he devised to get before a judge to prove his innocence. (SOF ¶ 57.) Accordingly, ASA Magats is entitled to judgment on Plaintiff's claims of coercion.

(ASAs' Br. [Dkt # 141] at 17.) But each of these "undeniable" facts is disputed, inaccurate, or unsupported by the record.

First, the inaccurate: Magats *was* at Area 6 during Plaintiff's interrogation. It is undisputed that Magats arrived at Area 6 in the "late evening" on December 2, 1992 and stayed until 11:00 a.m. the next day; he then returned at 10:00 p.m. on December 3 and left again at around 7:00 a.m. on December 4. (ASAs' Resp. Pl.'s Facts ¶ 38.) It is also undisputed that Plaintiff arrived at Area 6 on December 2, 1992 at 11:45 p.m. and did not sign his confession until December 4, around 3:30 a.m. (*Id.* ¶ 39.) There was thus a substantial overlap between Magats' time at Area 6 and the duration of Plaintiff's interrogation.

Of course, whether Magats participated in the interrogation or otherwise coerced Plaintiff's confession is another story, but Magats' "argument" that he was not present and did not participate is entirely conclusory and lacking a record cite. As such, it is a nonstarter for summary judgment purposes. *See Blanck v. Cohn*, 65 Fed. App'x 74, 76 (7th Cir. 2003) ("A party's failure to identify evidence in support of his claim, or to explain how his evidence establishes a material question of fact, waives his argument.")[10]

---

[10] Magats does no better in his reply brief. He merely notes, without citing the record or any law, that Plaintiff's arguments fail to demonstrate coercion. Perhaps such an argument would be availing if Magats had carried his initial burden of establishing that no dispute of material fact exists on this claim. *See* Fed. R. Civ. P. 56(a) (requiring the party asserting that a fact is undisputed to support the assertion by "citing to particular parts of materials in the record"). But Magats has not done so, and consequently his argument fails.

In addition, in contrast to the above passage from the ASAs' brief, Plaintiff testified that when Magats entered the interrogation room, Plaintiff immediately exclaimed "so y'all going to make me confess to something that I didn't do?" — after which Magats hurried the court reporter out of the room. (Pl.'s Dep. [Dkt # 152, Ex. 1] at 538:18-19). A jury could credit this testimony and conclude that Magats, at the least, had reason to doubt the voluntariness of Plaintiff's confession. Moreover, Plaintiff further testified that Magats later returned by himself with a prefabricated confession, at which point he and O'Connor began negotiating with Plaintiff what role he would be portrayed as playing in the murders. (*See id.* at 399:1-402:1; 406:1-24) ("Q: Did you have an actual discussion with the State's Attorney and Detective O'Connor about this issue about you not admitting to shoot the woman? A: Yes. Q: What did you tell them about that? A: That I wasn't going to sign anything that said I killed a woman. Q: And what did they say in response to that? A: Again, they allowed me to sign the one that said I didn't kill the woman.").) This testimony dooms Magats' argument on summary judgment, since it is wholly at odds with Magats' claim that he did nothing more than memorialize Plaintiff's confession. *See Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (explaining that summary judgment is inappropriate where sworn testimony conflicts with the moving party's version of events); *Hill v. City of Chi.*, No. 06 C 6772, 2009 U.S. Dist. LEXIS 5951, at *20-21 (N.D. Ill. Jan. 26, 2009) (denying summary judgment on a coerced confession claim where the plaintiff testified via deposition that the police fed him details of the crime and instructed him to confess to them). If true, this portion of Plaintiff's sworn testimony has Magats actively advising and helping the police in plaintiff's ongoing interrogation, not merely memorializing his previously obtained confession — a crucial distinction.

In so ruling, the Court is mindful of a factually similar case, *Hunt v. Jaglowski*, 926 F.2d 689, 691–92 (7th Cir. 1991), where the Seventh Circuit came out in favor of an assistant state's attorney on a coercion claim. In *Hunt*, the plaintiff claimed that when the assistant state's attorney first met with him, he (the plaintiff) explained that he had been beaten, deprived of food and water, and was not permitted to contact his attorney, which led to him giving an involuntary, coerced confession. *Id.* He further testified that he showed the assistant state's attorney the bruises from the police beating and that the prosecutor responded that there was nothing he could do because he was just there to take a statement. *Id.* At this time, the plaintiff claimed that the assistant state's attorney left the interrogation room and one of the police officers re-entered the room, accused the plaintiff of "telling on him," and threatened to resume the beatings. *Id.* The plaintiff admitted that, at this point, he *agreed* to confess, after which the assistant state's attorney came back into the room and took his confession with the court reporter. *Id.*

In seeking to hold the assistant state's attorney liable, the plaintiff's argument was that a jury could reasonably conclude that the assistant state's attorney knew of the coercion, shared in its goal, and contributed to its effectiveness. *Id.* at 692. But the Seventh Circuit rejected this argument, noting that the plaintiff had no contact with assistant state's attorney until after he had confessed and agreed to give a statement. *Id.* at 692-93. The assistant states attorney's function in being present was merely to review, approve or disapprove, and issue the charges the police were seeking. *Id.* He was not present during any of the crucial moments of alleged coercion: time the plaintiff was arrested, the polygraph test, the lineup, the multiple occasions on which the plaintiff claimed he was beaten, or the particular time the confession was first given. Indeed, the plaintiff's initial contact with the assistant state's attorney came only after he had confessed and the police were seeking approval of criminal charges. *Id.* Accordingly, because the assistant

state's attorney's conduct merely constituted an act toward "initiating a prosecution and in presenting the state's case," the court concluded that he enjoyed absolute immunity.

These facts are similar in many respects to the case at bar — but with one very important distinction: Plaintiff further claims that Magats helped detective O'Connor in obtaining his confession in its final form. This, if true, would be an investigatory function and not protected by prosecutorial immunity. Magats' remaining contentions therefore need not be addressed,[11] and his motion for summary judgment on this issue is denied.

## II.    Count II – Fabrication of Evidence

A fabrication-of-evidence due process violation occurs when (1) a police officer or a prosecutor (acting as an investigator) manufactures evidence that he knows to be false and (2) a criminal defendant is deprived of liberty as a result. *Petty v. City of Chi.*, 754 F.3d 416, 422 (7th Cir. 2014). To this end, Plaintiff claims the Officer Defendants and the ASA Defendants (acting as investigators) violated his due process rights[12] by knowingly fabricating the following evidence:

- Plaintiff's written confession
- The confessions of his codefendants

---

[11] The Court notes, however, that Magats' argument regarding the reason Plaintiff confessed (his "plan" to get before a judge) is both irrelevant and mischaracterizes the record. True, Plaintiff did testify that part of his motivation for confessing was the hope that he would get before a judge to proclaim his innocence, but this does not resolve (1) whether Magats coerced him in any way, or (2) whether his will was compromised. *See Hardaway v. Young*, 302 F.3d 757, 763 (7th Cir. 2002) (noting that the voluntariness of a confession is a question of fact to be determined by the totality of circumstances). Plaintiff's "plan" cannot be divorced from context: he further testified that his will was totally broken from being detained for so long and being coercively interrogated, which made him willing to do anything to get out of lockup. (*See* Pl.'s Dep. at 394:8-17.)

[12] In addition to his right to a fair trial, Count II also alleges that "Defendants proximately caused [Plaintiff's] unjust criminal conviction. . . . Without their misconduct of fabricating evidence against him, Mr. Patrick would not have been prosecuted." (Am. Compl. [Dkt # 92] ¶ 86.)

- The McCoy lineup report
- The Grimes/Seymore report;
- Grimes's and Seymore's grand jury testimony; and
- The Berti/Glinski report

Before delving into the substance of this claim, however, the Court must first address two threshold issues raised by Defendants: (1) whether Plaintiff's due process rights were violated in the first instance, since the above evidence was never directly introduced against him during his criminal trial (save his confession); and (2) whether Count II is, in reality, a claim for malicious prosecution. Neither issue is fatal to Plaintiff's claim.

(i)     *Due Process and Evidence Introduced at Trial*

*Whitlock v. Brueggemann*, 682 F.3d 567 (7th Cir. 2012) and *Fields v. Wharrie*, 740 F.3d 1107 (7th Cir. 2014) ("*Fields II*"), taken together, stand for the principle that police officers and prosecutors (acting as investigators) who fabricate evidence against a criminal defendant violate due process if that evidence is used to deprive the defendant of her liberty "in some way." *Whitlock*, 682 F.3d at 580; *see also Fields II*, 740 F.3d at 1116. But what qualifies as a relevant liberty deprivation, and thus what defines a constitutionally prohibited use of fabricated evidence, has been the subject of much debate in this district.

Defendants, interpreting *Whitlock* and *Fields II*, contend that fabricated evidence must be introduced at trial in order to form the basis of a due process claim, and certain cases in this district support that position. *See, e.g., Starks v. City of Waukegan*, 123 F. Supp. 3d 1036, 1046 (N.D. Ill. 2015) (interpreting *Whitlock* and subsequent Seventh Circuit precedent as requiring that fabricated evidence be introduced at trial to state a due process claim). But other courts in this district, also interpreting *Whitlock* and *Fields II*, have concluded that the scope of the inquiry is much broader. *See, e.g., Collier v. City of Chi.*, No. 14 C 2157, 2015 WL 5081408, at *7 (N.D. Ill. Aug. 26, 2015) (permitting a due-process fabrication claim where the plaintiff, who spent 15

months in jail awaiting trial, claimed that fabricated evidence was used to secure his arrest and indictment). Having reviewed the applicable precedent, the Court finds the "broad view" more persuasive in light of the Seventh Circuit's recent statements in *Armstrong v. Daily*, 786 F.3d 529 (7th Cir. 2015).

In *Armstrong,* the plaintiff alleged that the defendants violated his due process rights by destroying exculpatory evidence on two separate occasions: once before his first trial, and then again before his second trial, which never took place because a judge vacated the charges on account of persistent prosecutorial misconduct. *Id.* at 550. Within this context, the defendants argued that the plaintiff's due process claim was based on "a due process right to a fair trial, so the fact that he was not retried on remand defeat[ed] his claim." *Id.* at 551. The Seventh Circuit flatly rejected that argument, beginning with an apt title:

> 1. *Is a Trial Needed for a Constitutional Violation?*
>
> The constitutional violation that Armstrong asserts is the deprivation of his liberty without due process of law, as the result of the destruction of evidence by a state actor. *See Zahrey v. Coffey*, 221 F.3d 342, 349 (2d Cir. 2000) (defining the right at issue as "the right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigating capacity"). *Though the most common liberty deprivation cases are based on post-trial incarceration after a wrongful conviction, the essential elements of this constitutional claim are more general and not limited to wrongful convictions. See Fields v. Wharrie*, 740 F.3d 1107, 1112 (7th Cir. 2014) ("[T]he fabrication of evidence harmed the defendant before and not just during the trial, because it was used to help indict him."). Armstrong's claim therefore has two essential elements: (1) the defendant destroyed exculpatory evidence . . . (2) that caused a deprivation of the plaintiff's liberty.

*Id.* at 441 (emphasis added). This passage is significant for several reasons. First, the precise issue in *Armstrong* is the issue driving the instant debate — whether a trial is a necessary predicate for a due process violation. The Seventh Circuit doesn't think so, and nowhere in *Armstrong* did it endeavor to distinguish *Brady* claims from fabrication claims in this respect.

Quite the opposite: it cited two due-process fabrication cases, *Zahrey and Fields II,* to ground its analytic framework. Second, in explaining that liberty deprivations (which are equally critical to the elements of both *Brady* and fabrication claims) should not be categorically narrowed to cases involving post-trial conviction and incarceration, *Armstrong* quoted what is perhaps the most controversial line in *Fields II*: "The fabrication of evidence harmed the defendant before and not just during trial, because it was used to help indict him." And third, in framing the "essential elements" of the plaintiff's due process claim, the Seventh Circuit employed the familiar causal analysis espoused in *Whitlock* and *Fields II*: that the defendant committed some constitutional wrong that caused the plaintiff to be deprived of liberty.

Taken together, these cases stand for the principle that what matters for a due-process fabrication claim is simply whether fabricated evidence caused a plaintiff to be wrongfully confined ("in some way"),[13] an approach that contemplates a textured, fact-specific analysis guided by familiar tort principles of causation.[14] This approach is incompatible with the bright-line "introduced at trial" rule suggested by Defendants, and the Court therefore declines to grant

---

[13] This interpretation is further supported by *Alexander,* 692 F.3d at 557 and *Bianchi v. McQueen*, 818 F.3d 309 (7th Cir. 2016), the only two Seventh Circuit cases besides *Fields II* that discussed *Whitlock* in relevant detail. Both cases emphasize that the due process violation — that is, the liberty deprivation — caused by fabricated evidence results when that evidence is used to secure the defendant's wrongful confinement (as opposed to post-conviction incarceration). *See id; see also Ballard v. Watson*, No. 16 C 977, 2016 WL 3364801 at *2 (N.D. Ill. 2016) (interpreting *Whitlock* to provide a due-process fabrication claim where the fabricated evidenced is used to "cause an infringement" of the plaintiff's *liberty interest*).

[14] At least two other courts in this district that have considered *Armstrong, Fields II,* and *Whitlock* in conjunction appear to agree with this approach. *See Sumling v. Vill. of E. Dundee*, No. 14 C 3794, 2015 WL 5545294, at *3 (N.D. Ill. Sept. 18, 2015); *Alvarado v. Hudak*, No. 14 CV 9641, 2015 WL 9489912, at *3 (N.D. Ill. Dec. 30, 2015). Other courts that reached the opposite conclusion did so on the basis that *Armstrong* does not apply to fabricated evidence, *see Starks,* 2015 WL 5012131, at *25 *and White v. City of Chi.*, No. 14 C 9915, 2016 U.S. Dist. LEXIS 19606, at *20 (N.D. Ill. Feb. 18, 2016), an interpretation with which this Court disagrees.

Defendants judgment on Count II simply because the purportedly fabricated evidence was not directly introduced at Plaintiff's trial.[15]

(ii)     *Fabrication vs. Malicious Prosecution*

Nonetheless, the issue remains whether Plaintiff's due-process fabrication claim is, in essence, one for malicious prosecution. This point, too, has been the subject of much debate in this district. Until recently, the dominant view, as expressed in *McCann v. Mangliardi*, 377 F.3d 782, 786 (7th Cir. 2003), was as follows:

> [T]o the extent that [the plaintiff] maintains that [the defendant officers] denied him due process by causing him to suffer '[a] deprivation of liberty . . . obtained from the use of false evidence,' his claim is, in essence, one for malicious prosecution . . . . [And] as we emphasized in *Newsome v. McCabe* . . . the existence of a tort claim under state law knocks out any constitutional theory of malicious prosecution.

*McCann*, 337 F.3d at 786 (citing *Newsome v. McCabe*, 256 F.3d 747, 750-51 (7th Cir. 2001); *see also Bianchi v. McQueen*, No. 12-CV-00364, 2014 WL 700628, at *9 (N.D. Ill. Feb. 24, 2014) (cataloguing cases and noting that courts in this district typically interpreted *Newsome, McCann*, and their progeny as requiring that due-process fabrication claims be brought under state law rather than Section 1983).

But this view was (seemingly) put to rest in *Saunders-El*:

> The district court did not address our recent case law in this area and, instead, focused on prior decisions [such as *Newsome v. McCabe*] – interpreting them as an edict from this court that fabrication-based due process claims can never form the basis of a constitutional tort. That reading, not uncommon among district courts in this circuit it seems, is inaccurate and requires clarification. . . . None of these decisions . . . stands for the proposition that fabricating evidence does not violate a defendant's due process rights. . . . Instead, they merely establish that allegations that sound in malicious prosecution must be brought pursuant to state law. To the extent that these decisions have rendered the law in this area

---

[15] While much of the fabricated evidence was not used against Plaintiff at trial, his allegations (if true) paint a troubling picture, whereby the fabricated evidence was used to leverage other false confessions, affect plaintiff's defense strategy, and to impeach the credibility of defense witnesses.

uncertain, our recent decisions have been explicit. In *Whitlock v. Brueggemann*. . . we expressly stated that a police officer who manufactures evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of liberty in some way.

778 F.3d at 560 (internal quotation marks omitted). Although several courts in this district have concluded broadly since *Saunders-El* that the availability of a malicious prosecution claim under state law no longer forecloses a due process claim on based on the fabrication of evidence,[16] a recent case from the Seventh Circuit casts doubt on that interpretation as well — *Stinson v. Gauger*, 799 F.3d 833 (7th Cir. 2015), *reh'g en banc granted, opinion vacated* (Dec. 3, 2015).

The problem, as framed by *Stinson*, is as follows:

A line of cases in this circuit has squarely held that a police officer's fabrication of evidence is not actionable as a violation of due process as long as state law provides an adequate remedy for the fabrication — usually in the form of a malicious prosecution tort action. [citing *McCann and Newsome*]. *Whitlock* did not address this line of cases. If they remain good law, then the due-process claim against prosecutors recognized in *Whitlock* and applied in *Fields II* might not be available against police officers . . . unless state law lacks an adequate tort remedy.

*Id.* at 842 (emphasis added). Although *Stinson* has since been vacated pending a rehearing *en banc*, the quoted language highlights what may be a conflict in Seventh Circuit decisions. Yet *Whitlock* and *Fields II*, which are both more recent than cases cited in *Stinson*, have also been clear in holding that there is no principled reason to distinguish between police officers and investigating prosecutors who fabricate evidence. *See Whitlock*, 682 F.3d at 581 ("[T]he whole point of the Supreme Court's rule in *Buckley* is that police and investigating prosecutors are subject to the same constraints."). Thus, it appears that a due process claim based on fabricated evidence is at least arguably available.

---

[16] *See, e.g., Alvarado,* 2015 WL 9489912 at *3; *Collier*, 2015 WL 5081408, at *6; *Sumling,* 2015 WL 5545294, at *3.

The Court will therefore follow the thrust of *Whitlock*, which leaves *Saunders-El* as the most recent and pertinent authority on the malicious prosecution/fabrication of evidence issue. And under *Saunders-El*, Plaintiff's due-process fabrication claim faces no obstacles.

(iii)     *Substantive Challenges*

Defendants claim that Plaintiff has failed to provide evidence from which a jury could infer either that certain evidence was fabricated or that it was used to deprive Plaintiff of liberty. Not so. Beginning with the most salient example — the "confession evidence" — a reasonable jury could find that Defendants knowingly fabricated evidence that caused Plaintiff to be deprived of liberty. Plaintiff and the codefendants have given sworn testimony that they never took part in the murders, and that Defendants (working in various teams/pairs) fed them details about the murders and forced them to confess accordingly, all based on a prefabricated script concocted by Defendants. If true, this is the essence of evidence fabrication. *Fields II*, 740 F.3d at 1110 ("Coerced testimony is testimony that a witness is forced by improper means to give; the testimony may be true or false. Fabricated testimony is testimony that is made up; it is invariably false. False testimony is the equivalent; it is testimony known to be untrue by the witness and by whoever cajoled or coerced the witness."); *Wrice v. Burge*, No. 14 C 5934, 2015 U.S. Dist. LEXIS 129628, at *24 (N.D. Ill. Sep. 25, 2015) (holding that the plaintiff stated a claim for coercion/malicious prosecution because, in contrast to genuine fabrication cases, the police officers used only coercive tactics rather than "telling [the witnesses] what to say" or "fabricating their statements out of whole cloth"). Thus, if the jury credits this "script" testimony, it may conclude that Defendants knowingly fabricated the confessions. Moreover, because (1) Plaintiff's written confession was introduced at his trial, and (2) he testified that being presented with the other codefendants' confessions played a role in leveraging his own confession, that

same jury could further find that all of the confession evidence was used to deprive plaintiff of liberty "in some way."

The same can be said of the "Taylor not in lockup evidence." [17] Defendants point out that Plaintiff's trial attorney, Theis, knew of the potential Taylor alibi but declined to present it. Thus, Defendants argue that Theis was an intervening cause of sorts, in that his choice not to present the defense was a strategic decision and precludes any liability on Defendants' part. But Theis' decision was influenced if not dictated by the existence of the fabricated evidence placing Taylor at the crime scene as well as his knowledge that to put Taylor's alibi in play would open the door to the evidence of the other defendant's fabricated confessions. Thus, the fabricated evidence placing Taylor at the scene of the crime and the fabricated confessions of the other defendants prevented Plaintiff from presenting evidence that would call into question the reliability of the confessions of the other defendants and, by virtue of their common origins, the reliability of Plaintiff's own confession as well. Accordingly, there is a sufficient showing that the evidence allegedly fabricated against Taylor deprived Plaintiff of liberty "in some way". *See Volkman v. Ryker*, 736 F.3d 1084, 1089 (7th Cir. 2013) (explaining that causation is generally a question of fact best decided by a jury). The Court therefore declines, at this stage, to preclude Plaintiff from presenting the Taylor evidence at trial.

Lastly, regarding the McCoy lineup report, Plaintiff has provided McCoy's sworn deposition testimony, in which she denies ever telling Defendants that (1) she was afraid to testify against Plaintiff and the codefendants, or that (2) she saw them at the murder scene shortly after the killings. To the contrary, McCoy testified in her deposition that she explicitly told the Officers "they had the wrong people; go and find Goldie." (McCoy Dep. at 59:19-20.)

---

[17] The "Taylor not in lockup" evidence comprises the Gillespie/Grimes report, the Berti/Glinski report, the Seymore report, and the Grimes/Seymore grand jury testimony.

Thus, there is evidence, which if believed, would show that the report was fabricated by the Defendants. Defendants, however, suggest that because the McCoy lineup report was never *given* to the jury as evidence, it could not have deprived Plaintiff of liberty. Yet Defendants recognize that when McCoy testified in Plaintiff's defense, she was impeached with the content of the fabricated lineup report. Thus, the report was used as impeachment evidence to discredit legitimate evidence of innocence.  This is another causation issue, which belongs to the jury.

Taken together, these considerations preclude judgment on Count II for all Defendants.

## III.    The ASAs' Absolute Immunity

The ASAs claim that they are absolutely immune from Plaintiff's Section 1983 claims because they did nothing more than analyze evidence gathered by the Officer Defendants and memorialize the codefendants' confessions — conduct intimately associated with the judicial phase of the criminal process. *See Smith v. Power,* 346 F.3d 740, 742 (7th Cir. 2003) (explaining that prosecutors are absolutely immune from Section 1983 liability while they perform core prosecutorial functions). But the record contains evidence that the ASAs did more than analyze and memorialize: as explained in detail above (Section II), there are facts from which a jury could infer that the ASAs participated in coercive interrogations, that they fabricated the confessions, and that they reduced the confessions to writing so the codefendants could sign them. This behavior, if true, is incompatible with probable cause and the performance of core prosecutorial functions, and it therefore precludes a finding of absolute immunity. *See Lewis v. Mills*, 677 F.3d 324, 331 (7th Cir. 2012) (*"*Indeed, a showing that a prosecutor investigated and fabricated evidence against a target would automatically defeat absolute prosecutorial immunity."*)

In the alternative, the ASAs also claim qualified immunity and state-law prosecutorial immunity, but they are similarly off the table at this stage. *See Dominguez v. Hendley*, 545 F.3d 585, 589 (7th Cir. 2008) ("There was and is no disputing that such conduct [including fabricating evidence] violates clearly established constitutional rights."); *Fields II*, 740 F.3d at 1115 ("Since we've already held that [the prosecutor] is not entitled to absolute immunity from being sued on the federal claims against him, there is no basis for giving him absolute prosecutorial immunity from the state law claims for the same conduct alleged as a violation of Illinois tort law.")

## IV.     Count III - Plaintiff's *Brady* Claim

Under the *Brady* line of cases, police officers generally have a duty, rooted in due process, to turn over exculpatory evidence to the prosecutor. *Carvajal v. Dominguez*, 542 F.3d 561, 566 (7th Cir. 2008). A *Brady* violation encompasses three elements: (1) the evidence must be favorable to the accused, by being either exculpatory or impeaching; (2) it must have been suppressed by the government; and (3) there is a reasonable probability that the defendant was prejudiced at trial by not having such evidence. *Id*. In this respect, Plaintiff claims the Officer Defendants failed in their *Brady* duties by withholding a variety of evidence related to Taylor's presence in CPD lockup during the time the murders took place, such as:

- A list of detainees who were held at the 23rd District lockup from November 16-17, 1992, which contains Taylor's name
- A list of the 23rd District officers on duty while Taylor was in lockup
- A General Progress Note written by Villardita and Johnson that contains a timeline documenting Taylor's arrest and processing at the 23rd District
- A logbook entry from the 23rd District on November 19, 1992 detailing visual checkups on detainees

(Am Compl. ¶ 42.) The relevance of this list of undisclosed evidence centers on one point: if Taylor was in lockup when the murders took place, then his confession could not have been entirely true, and by extension, neither could have Plaintiff's.

But it is undisputed that Plaintiff's trial lawyer, Theis, was well aware of the Taylor lockup issue and its potential value as an alibi for Taylor and as exculpatory evidence that would cast doubt on Defendant's confession as well. (*See* Pl.'s Resp. Officer's Facts ¶ 66). Accordingly, Theis could have obtained any of the above evidence if he so desired. That the evidence was reasonably available to Plaintiff is fatal to his *Brady* claim. *See Ienco v. Angarone*, 291 F. Supp. 2d 755, 761 (N.D. Ill. 2003) (noting that evidence is not "suppressed" in the *Brady* sense if the defendant either knew of it or could have obtained it the through reasonable diligence).

Theis's deposition testimony says it all:

Q. Did you have a conversation with [Taylor's attorney] about [Taylor's] whereabouts on the night of the murders . . . ?

A. Yes . . . . at some point . . . I learned that Mr. Taylor apparently was in custody during the period of time that the incident occurred.

[. . . .]

Q. Back in 1995, before Mr. Deon Patrick's trial, were you aware that there was an arrest report that indicated that Daniel Taylor was arrested for disorderly conduct on [the night of the murders]?

A. I mean, maybe some of the details I can't remember now, but, yes, I knew that there was an issue with regard to his being in custody.

Q. Well, were you aware that there was an arrest report that documented [that]?

A. I think so, yes.

Q. Were you are that there was a bond slip for Mr. Taylor for that disorderly conduct arrest . . .?

A. I mean, I became aware of that.

Q. Did you become aware of that prior to Mr. Patrick's criminal trial . . .?

A. I believe I did, yes.

> Q. Did you introduce [this evidence] at [Mr. Patrick's] criminal trial?
>
> A. No.
>
> Q. Why not?
>
> A. Well, first of all, it's the bigger questions of whether the fact that there was evidence that Daniel Taylor was in custody and was also being – was in custody at the time of the offense and was also being charged with having committed the same offense, as Mr. Patrick was, that there would have to be a decision made whether to try the case on what would amount to a corollary theory that not only -- that, look, they're pointing the finger at Mr. Taylor and he couldn't have done it because he's in custody and, therefore you should acquit Mr. Patrick. That would have been the -- I think that's the assumption you're making. . . . I can certainly speculate. I don't recall specifically, but I feel pretty strongly that there would have to be a -- weighing process as to whether the benefit of introducing this information about Mr. Taylor would be helpful enough to Mr. Patricks's case to outweigh the fact that it might introduce other things that wouldn't be helpful to Mr. Patrick.

(Theis Dep. [Dkt. # 150, Ex. 7] at 42:21-43:13; 159:21-163:4.) Theis was aware of the Taylor alibi and the evidence thereof; he simply chose not to pursue it. The potentially exculpatory evidence was available to him, which means it was not "suppressed" within the meaning of *Brady*. *See United States v. Shields*, 789 F.3d 733, 747 (7th Cir. 2015); *see also See Boss v. Pierce*, 263 F.3d 734, 741 (7th Cir. 2001) ("In the typical reasonable diligence case, the question is whether defense counsel had access to the document containing the *Brady* material."); *United States v. Zackson*, 6 F.3d 911, 919 (2d Cir. 1993) (noting that where a defendant is on notice of the essential facts that would allow him to take advantage of exculpatory evidence, that evidence is beyond the purview of *Brady*). The Court therefore grants judgment on Count III in favor of the Officer Defendants.

## V.     Count IV – Failure to Intervene

The Seventh Circuit has consistently recognized that a state actor's failure to intervene in the violation of another's constitutional rights may render him liable under Section 1983. *Yang v.*

*Hardin*, 37 F.3d 282, 285 (7th Cir. 1994); *Byrd v. Brishke*, 466 F.2d 6, 11 (7th Cir. 1972) ("[O]ne who is given the badge of authority . . . may not ignore the duty imposed by his person in his presence or otherwise within his knowledge."). As such, police may be liable if they (1) have reason to know that another official has violated a citizen's constitutional rights, and (2) fail to prevent that harm despite being present or otherwise having a realistic opportunity to do so. *Yang*, 37 F.3d at 285; *Green v. City of Chi.*, No. 11 C 7067, 2015 U.S. Dist. LEXIS 59764, at *13 (N.D. Ill. May 6, 2015). Here, while Count IV alleged broadly that Defendants failed to intervene in the violation of Plaintiff's constitutional rights, it is unclear regarding precisely what the specific failures to act are. The parties' briefing, however, focuses on Plaintiff's interrogation and confession, so the Court will confine its discussion to that issue only.

First, the Officer Defendants: they contend that Count IV is time barred by Illinois' two-year statute of limitations, since, on their account, a failure-to-intervene claim does not impugn the validity of a conviction and therefore does not qualify for *Heck* deferral. *See generally Heck v. Humphrey*, 512 U.S. 477, 114 (1994) (holding that if a Section 1983 claim would impugn the validity of a conviction, it does not become viable until that conviction is overturned). There are two corollary principles that stem from the *Heck* ruling: (1) a Section 1983 claim that impugns the validity of a conviction does not accrue for statute of limitations purposes until the conviction is overturned; and (2) a Section 1983 claims that does not impugn the validity of a conviction accrues when the constitutional wrong occurs. The Officer Defendants believe that Count IV falls into the latter category, but they are mistaken.

Although the case law appears to be largely undeveloped on whether a failure-to-intervene claim falls into either category, *see Harris v. City of Chi.*, No. 15 CV 3859, 2015 U.S. Dist. LEXIS 122500, at *10-11 (N.D. Ill. Sep. 15, 2015) (cataloguing cases and noting differing

approaches to *Heck*-barred claims), the Court is persuaded that Count IV is not untimely. As Plaintiff notes, the substance of Count IV rests heavily on the allegations in Count I (coerced confession), which the Court previously concluded was not time-barred, *see Patrick v. City of Chi.*, 103 F. Supp. 3d 907, 913 (N.D. Ill. 2015). The Officer Defendants do not dispute this point in their reply brief, nor do they make any other argument against Count IV beyond conclusory assertions of untimeliness. The Court thus finds no basis to grant judgment in their favor at this time.

Turning to the ASA Defendants, they present a multitude of arguments against Count IV: absolute immunity; qualified immunity; and the contention that they were either not present when Plaintiff confessed or had no realistic opportunity to intervene. As noted in the preceding sections, absolute immunity is off the table because disputes of material fact exist regarding whether Fogarty and Magats had probable cause or were otherwise acting as investigators.

Qualified immunity presents a trickier issue. Qualified immunity protects "government officials performing discretionary functions ... from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Siebert v. Severino,* 256 F.3d 648, 654 (7th Cir. 2001) As best the Court can determine, the duty to intervene that Plaintiff claims was violated, is this: at the very least, Assistant States Attorneys Magats and Fogarty knew that he was being framed for murder and sat idly by — literally sat there — as the Officer Defendants coerced his false confession; at worst, the ASAs actively played a role in framing him and made no attempt to right their wrongs at any stage of his criminal proceedings.

The ASA Defendants respond that there is no such duty in this Circuit, much less clearly established duty even today, let alone in 1992. They have a point. Courts in this district are split

on whether prosecutors have a duty to intervene. *Compare, e.g., Andrews v. Burge,* 660 F. Supp. 2d 868, 876 (N.D. Ill. 2009) and *Gordon v. Devine*, No. 08 C 377, 2008 WL 4594354, at *17 (N.D. Ill. Oct. 14, 2008) (finding no duty) *with Rivera v. Lake Cnty.*, 974 F. Supp. 2d 1179, 1191 (N.D. Ill. 2013) (denying a motion to dismiss a failure-to-intervene claim against prosecutors who were accused of putting themselves in a position where they were exercising police powers and would have had a realistic opportunity to step forward and prevent a fellow officer from violating a plaintiff's right[s]) and *Patrick v. City of Chi.*, No. 14 C 3658, 2014 U.S. Dist. LEXIS 174325, at *24 (N.D. Ill. Dec. 17, 2014).[18]

It can be argued that Common sense alone dictates that Court's recognize a duty to intervene under the circumstances plaintiff alleges. *See Whitlock*, 682 F.3d at 586 ("[A] right can be clearly established on the basis of common sense.") (quoting *Giebel v. Sylvester*, 244 F.3d 1182, 1189 (9th Cir. 2001)). When the allegations of misconduct are so flagrant as alleged in the case at bar, the argument is a strong one. However, the issue is complex. In *Gordon v. Devine*, Judge Aspen explained as follows:

> As the Defendant State's Attorneys point out, the Seventh Circuit has recognized failure to intervene claims against peace officers under § 1983. *See, e.g., Harper v. Albert,* 400 F.3d 1052, 1064 (7th Cir.2005); *Yang v. Hardin,* 37 F.3d 282, 285 (7th Cir.1994). However, neither the Seventh Circuit, nor any Northern District of Illinois court, has recognized a failure to intervene claim against a prosecutor…. We decline the opportunity to expand the law to recognize such a claim here.

2008 WL 4594354, at *17. There are good reasons to be cautious in expanding the law in this area to include the Defendant State's Attorneys. First, it is not clear how to frame such a duty. If Plaintiff claims the duty was to intervene at the police station, the underlying premise — that the

---

[18] In a prior ruling this Court determined, in the motion to dismiss context, that it was not inclined to foreclose the possibility of extending liability for failure to intervene to prosecutors. While the Court remains firm in that position *in principle*, it is now persuaded that Plaintiff's failure-to-intervene claim cannot stand against Magats and Fogarty on the facts presented.

prosecutor is like another police officer — is incorrect. "In Illinos . . . a prosecutor does not have police powers, nor do prosecutors have command of police operations, though at times courts act as if they do." *Andrews,* 660 F. Supp. 2d 876. Indeed, the prosecutor's lack of authority in such a situation is true in both the legal sense and in the practical sense. Prosecutors called to police stations to memorialize a confession lack not only the legal authority to direct or limit law enforcement officers in their investigations, but also any practical means by which they can effectively intervene.

The prosecutor's real power in such a situation, it can be argued, lies in his/her authority to refuse to bring the indictment or to prosecute a case in which he believes a confession was coerced or fabricated. That power could conceivably be effectively used to intervene in the manner in which an investigation is being carried out. But that determination, to prosecute or not to prosecute, is not in any sense investigatorial and enjoys the protection of absolute immunity. To the extent that imposing a duty to intervene implies a duty to refuse to prosecute or to memorialize a (tainted) confession, imposing such a duty arguably interferes with the prosecutor's absolute discretion to determine the value of a case and decide or decline to prosecute.

Given the present state of the law in this Circuit, the nuanced considerations both pro and con, and the particular facts of this case, the Court cannot say that the ASA Defendants were under a duty to intervene, nor does the evidence show that they had any reasonable means or opportunity to do so. The ASA defendant's motion for summary judgment as to the failure to intervene cause of action is, therefore, granted.

## VI.     Count IX – State Law Malicious Prosecution

Next, in Count IX, Plaintiff contends that Defendants maliciously prosecuted him by using their positions to influence and institute criminal charges against him, for example by filtering fabricated evidence and false testimony to the charging prosecutor. Under Illinois law, malicious prosecution has five elements: (1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff. *Swick v. Liautaud*, 662 N.E.2d 1238, 1242 (Ill. 1996); *Saunders-El*, 778 F.3d at 561. Importantly, liability for malicious prosecution extends not only to prosecutors who file the charging documents but also to those who "take an active part . . . in continuing or procuring the continuation of the criminal proceedings." *Starks*, 2015 WL 5012131, at *59 (citing *Adams v. Sussman & Hertzberg, Ltd.*, 684 N.E.2d 935, 945 (Ill. App. Ct. 1997)).

Only the ASAs move for judgment on this claim. Their sole challenge concerns probable cause, which is defined in this context as "a state of facts that would lead a person of ordinary care and prudence to believe or to entertain an honest and sound suspicion that the accused committed the offense charged." *Williams v. City of Chi.*, 733 F.3d 749, 759 (7th Cir. 2013) (citing *Gauger v. Hendle*, 954 N.E.2d 307, 329-30 (Ill. App. 2011)). "It is the state of mind of the person commencing the prosecution that is at issue — not the actual facts of the case or the guilt or innocence of the accused." *Id.* (citing *Sang Ken Kim v. City of Chi.*, 858 N.E.2d 569, 574 (Ill. App. Ct. 2006)). Curiously, the ASA Defendants do not frame their arguments in terms of their state of mind or the particular facts known to them at the time. Nor do they cite the relevant law

on probable cause in their briefs, the combination of which runs dangerously close to waiver.[19] Instead, they merely note that Gardner confessed and implicated Plaintiff, that Plaintiff confessed as well, and that, in any case, Plaintiff was indicted by a grand jury, which is *prima facie* evidence of probable cause.

There are several problems with this analysis. First, the confessions themselves do not necessarily establish probable cause. The circumstances surrounding Gardner's confession, for example, are far from clear. The ASAs say he orally confessed to the detectives and implicated Plaintiff of his own will, and only then did Fogarty take his confession. Yet Gardner denies ever confessing on his own and instead claims that he was fed a prefabricated story written on a spiral notebook and tricked into adopting it by the detectives and an Assistant States Attorney who apparently posed as his lawyer, with Fogarty being the likely candidate. (*See* Gardner Dep. [Dkt # 164, Ex. 16] at 160:1-4; 168:1-169.)[20] The facts surrounding Gardner's purported confession are disputed and there cannot support the ASAs' motion for summary judgment.

_____

[19] *See Judge v. Quinn*, 612 F.3d 537, 557 (7th Cir. 2010) ("[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.") (internal quotation marks and alterations omitted); *Milligan v. Bd. of Trs. of S. Ill. Univ.*, 686 F.3d 378, 386 (7th Cir. 2012) ("[T]he forfeiture doctrine applies not only to a litigant's failure to raise a general argument . . .  but also to a litigant's failure to advance a specific point in support of a general argument.").

[20] Plaintiff's statement of material facts states that "a State's Attorney" told Gardner that he was his lawyer, which leaves room for doubt about who that State's Attorney was. (*See* Pl.'s SOMF ¶ 12.) The ASAs' response sheds no light on the unnamed ASA's identity, either; it simply denies that an "Assistant State's Attorney" posed as Gardner's lawyer. (*See* ASAs' Resp. Pl.'s SOMF ¶ 12.) The Officer Defendants' response, however, indicates that Fogarty was the Assistant States Attorney who met with Gardner, (*see* Officers' Resp. Pl. SOMF ¶ 12), and Gardner's deposition further supports this conclusion by referring to only one person as both "the guy who said he was [Gardner's] attorney," and the person who later revealed himself to be an ASA, (Gardner Dep. [Dkt. # 164, Ex. 16] at 171:16-24). And since there is no indication that any other ASA was present for Gardner's interrogation/confession besides Fogarty, and Fogarty's deposition confirms that he went in and out of the interrogation room where Gardner confessed, (*see* Fogarty Dep. [Dkt # 183, Ex. 4] at 133:1-142:24), it follows that Fogarty is the likely candidate for the unnamed Assistant States Attorney.

In the end, it bears emphasizing that (1) the existence of probable cause may change as a case evolves, *see Starks*, 2015 WL 5012131, at *59-60 (holding that even if probable cause exists to *arrest* a defendant, state actors may still be liable for malicious prosecution if they take an active part in the prosecution *after* learning that probable cause is lacking) (citing *Adams,* 684 N.E. 2d at 945), and that (2) the relevant time for determining probable cause in this context is when the charging documents were filed, not when a suspect is interrogated, *see Holland v. City of Chi.*, 643 F.3d 248, 254 (7th Cir. 2011). Thus, even assuming Fogarty initially and honestly believed that probable cause existed, the alleged *disputed* misconduct that he took part in with respect to the other codefendants is sufficient to preclude summary judgment. The same holds true of Magats and Plaintiff's confession, leaving the grand jury indictment as the only remaining issue.

In that regard, while the ASAs correctly note that a grand jury indictment is *prima facie* evidence of probable cause, *see Swearnigan El v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 852, 863 (7th Cir. 2010), they gloss over a pertinent exception to this presumption: where there is evidence that the indictment was procured through false or fraudulent testimony, *see Wade v. Collier*, 783 F.3d 1081, 1085 (7th Cir. 2015) (citing *See Freides v. Sani-Mode Mfg. Co.*, 211 N.E.2d 286, 289 (Ill. 1965)). Here, when taken in the light most favorable to Plaintiff, the record suggests that the confession evidence may have been fabricated, which means any grand jury testimony about those confessions would be necessarily false, as well. Furthermore, Detective O'Connor, who also testified before the grand jury, indisputably gave statements based on the confession evidence. (*See* ASAs' Resp. Pl. Facts ¶ 87.) For these reasons, the motion for summary judgment is denied.

**VII. Counts V and XI – State and Federal Conspiracy**

Lastly, Defendants contend, in a summary fashion, that Plaintiff's state and federal conspiracy claims must fail. According to the Officer Defendants, no reasonable jury could infer the existence of a conspiracy based on the record. And by the ASAs' account, they are absolutely immune from Plaintiff's constitutional claims, which means any conspiracy claims against them must fail as well. *See Drager v. Vill. of Bellwood*, 969 F. Supp. 2d 971, 984 (N.D. Ill. 2013) (noting that conspiracy claims are not an independent basis of Section 1983 liability and therefore require an underlying constitutional violation). Not so.

As noted throughout this opinion, there are disputes of material fact concerning each of Plaintiff's remaining claims that preclude both absolute immunity and summary judgment. The Officer Defendants' argument is equally unavailing, but it requires some unpacking.

Under both Section 1983 and Illinois law, civil conspiracy is a combination of two or more persons acting in concert to commit an unlawful act, "the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage." *Cooney v. Casady*, 735 F.3d 514, 519 (7th Cir. 2013). An express agreement among the conspirators is not necessary; the participants must simply share the same general conspiratorial objective. *Id.* Direct proof of such an agreement, however, is rarely available since conspiracies are by their very nature secretive. *See Beaman v. Freesmeyer*, 776 F.3d 500, 511 (7th Cir. 2015); *Reuter v. MasterCard Int'l, Inc.*, 921 N.E.2d 1205, 1216 (Ill. App. Ct. 2010). Accordingly, the existence of a conspiracy may be inferred through the combination of common sense and circumstantial evidence. *Beaman* 776 F.3d at 511; *Adcock v. Brakegate, Ltd.*, 645 N.E.2d 888, 895 (Ill. 1994). And in the instant case, a reasonable jury could conclude that Defendants conspired to deprive Plaintiff of his constitutional rights.

Consider just one example. Plaintiff and his codefendants have stated via sworn deposition that Defendants coerced and fabricated their confessions — a point not to be taken lightly since each of them was either acquitted at trial, had his case dismissed, or had his conviction later overturned. (*See* Pl.'s Facts ¶¶ 21-22, 98-100). Those confessions, moreover, each placed Taylor at the murder scene, whereas his arrest and bond slip placed him in CPD lockup. (*See id.* ¶ 45.) Based on the lockup evidence, a reasonable jury could conclude that Taylor could not possibly have been at the murder scene, and, combined with the working relationship between the Officer Defendants and the ASAs, that same jury could also infer that the only way to get eight people to confess (separately) to witnessing an impossible event (viz., Taylor being at the murder scene) would be through conspiracy. This is precisely the sort of circumstantial evidence that precludes summary judgment on a conspiracy claim. *See, e.g., Geinosky v. City of Chi.*, 675 F.3d 743, 749 (7th Cir. 2012) (concluding that the receipt of 24 "bogus parking tickets" from several police officers, some of which indicated that the plaintiff's car was in two places at once, made it a "challenge to imagine a scenario in which [the officers' conduct] would not have been the product of a conspiracy").

## VIII.   Count VI – Supervisory Liability

Plaintiff has agreed to dismiss Count VI, (*See* Pl.'s Br. [Dkt. # 158] at 56 n.9), and it is accordingly dismissed without prejudice.

## IX.   The City's Motion

The City stipulated to judgment on Count VII (*Monell*) insofar as a jury finds that any of the Officer Defendants violated Plaintiff's constitutional rights. (*See* Stipulation [Dkt. # 136].) Beyond that, its motion for summary judgment hinges entirely on the extent to which the Officer

Defendants are entitled to judgment. (*See* City's Reply Br. [Dkt # 184] at 1.) Therefore, the City is entitled to judgment on Count III (*Brady*) only.

## CONCLUSION

The Court grants in part and denies in part the Defendants' motions for summary judgment [140] [141] [148]. The Court grants judgment on Count III (*Brady*) in favor of all Defendants. Count VI (supervisory liability) is dismissed without prejudice. Plaintiff is entitled to a trial on his remaining claims. A status hearing is set for October 25, 2016 at 9:30 a.m. to set a trial date.

**SO ORDERED.**                                    **ENTERED:  October 4, 2016**

**HON. RONALD A. GUZMÁN**
**United States District Judge**