IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DEON PATRICK, )
) 
Plaintiff, )
)
)
-vs- ) Case No. 14 C 3658
)
) Chicago, Illinois
CITY OF CHICAGO, et al., ) March 21, 2017
) 9:45 o'clock a.m.
Defendants. )

VOLUME 8A
TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE RONALD A. GUZMAN, and a jury

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | VALOREM LAW GROUP LLC<br>BY: MR. STUART JAY CHANEN<br>MS. NICOLE NEHAMA AUERBACH<br>218 N. Jefferson Street, Suite 300<br>Chicago, Illinois 60661 |
| For Defendant City of Chicago: | DYKEMA GOSSETT PLLC<br>BY: MR. DANIEL MATTHEW NOLAND<br>10 South Wacker Drive, Suite 2300<br>Chicago, Illinois 60606 |
| For the individual defendant police officers: | BORKAN & SCAHILL, LTD.<br>BY: MR. TIMOTHY P. SCAHILL<br>MS. MISHA ITCHHAPORIA<br>MR. STEVEN BLAIR BORKAN<br>20 South Clark Street, Suite 1700<br>Chicago, Illinois 60603 |

APPEARANCES: (Continued)

| | |
|---|---|
| For Defendants County of Cook, Martin Fogarty and Joseph Magats | COOK COUNTY STATE'S ATTORNEY<br>BY MR. CHAKA M. PATTERSON<br>MR. THOMAS EDWARD NOWINSKI<br>500 Richard J. Daley Center<br>Chicago, Illinois 60602 |
| | JONES DAY<br>BY: MS. PAULA SUE QUIST<br>77 West Wacker Drive, Suite 3500<br>Chicago, Illinois 60601 |

MS. MARY M. HACKER, CSR, FCRR
Official Court Reporter
United States District Court
219 South Dearborn Street, Room 1212
Chicago, Illinois 60604
(312) 435-5564
Mary.hacker.csr@gmail.com

THE CLERK: 14 C 3658, Patrick versus City of Chicago. Jury trial.

MS. AUERBACH: Good morning, your Honor. Nicole Auerbach and Stuart Chanen on behalf of the plaintiff, Deon Patrick.

THE COURT: I don't think this has been handed out, has it, Imelda?

THE CLERK: No.

THE COURT: Okay. Why don't you hand this out to the parties.

(Document tendered.)

THE COURT: I think that was our most urgent order of business.

(Brief pause.)

MS. AUERBACH: Your Honor, I have read this -- I've read your ruling.

THE COURT: Okay.

MS. AUERBACH: I wonder if I might be allowed to mention it to my client so that he doesn't walk into something, or if you could advise the client before he takes the witness stand so that he doesn't inadvertently violate this by blurting something out regarding his observations.

THE COURT: Well, the way I foresee this going forward is if you wish to introduce this statement, is your client being asked what he observed about Mr. Brown; and if

his observations are sufficient to establish a basis in fact for the reasonable inference or conclusion that he draws about Mr. Brown's state of mind, I will allow him to testify to that.

MS. AUERBACH: I understand that, your Honor. But your ruling said that you need to determine that after you've had an opportunity to determine that. And so --

THE COURT: Do it during the course of the trial. I mean, you're entitled to ask him what he observed. He's entitled to testify to that whether the statement is deemed admissible or not.

MS. AUERBACH: That's fine, your Honor.

THE COURT: Okay.

If we get to that point where it appears that the declaration is going to be offered in evidence and you're not satisfied that there's a sufficient foundation, you can ask to voir dire the witness. We'll exclude the jury and I'll allow you to voir dire Mr. Brown with respect to his observations and his conclusion -- I'm sorry, Mr. Patrick as to Mr. Brown's state, and then move forward from there.

Okay. I think I have one more order. I'm not sure we handed this out either.

(Document tendered.)

THE COURT: This is just a written formulation of my prior ruling on the -- orally on the series of motions to

reconsider.

So with that, we should be ready to proceed.

MR. CHANEN: Judge, there's one issue.

Mr. --

MS. AUERBACH: There's two.

MR. CHANEN: I'm sorry. One that I have.

Mr. Scahill indicated this morning that he wants to move into evidence three pages filed by Ms. Kalish in Mr. Patrick's criminal proceedings.

May I hand them up to your Honor?

THE COURT: So this is your motion?

MR. SCAHILL: Well, so last night I -- after hearing Mr. --

THE COURT: You always starts your arguments with "well, so." Did you know that?

MR. SCAHILL: It's a verbal tick, Judge. I didn't say "apples and oranges" this time, though.

Last night, when I was reflecting on Mr. Patrick's testimony, there were two things that stuck out in my mind.

THE COURT: I bet that was fun. Go ahead.

MR. SCAHILL: It was very fun, and I assume it's going to be fun tonight, too.

In any event, there are two things that came up that were of concern to me.

No. 1, Ms. Auerbach had elicited from Mr. Patrick

the idea with respect to his other convictions, the felony convictions prior to December of 1992, that he had pled guilty and taken responsibility for his actions, and so on and so forth.

In the criminal court files for those convictions I just wanted to elicit that, in fact, when Mr. Patrick was first charged with those offenses he did not, in fact, plead guilty right away. It was a substantial period of time before he pled guilty. He originally pled not guilty.

Now, I don't think Mr. Patrick is going to deny that. It's just a matter of record. I'm just going to ask him. I probably won't even need to move that into evidence. I think it's undeniable.

But that was the purpose for one aspect of one of the exhibits that I had provided to them, which were listed in the pretrial order which we had not intended to affirmatively move into evidence, but there was this issue that was brought up which seemed to imply somehow that Mr. Patrick is immediately taking responsibility for his actions when, in fact, that wasn't the case. It was a substantial period of time before --

THE COURT: Okay. These documents are what?

MR. SCAHILL: They're contents of the criminal file from those cases. And these were pleadings filed by his attorney on his behalf in those pleadings, where --

THE COURT: What are they?

MR. SCAHILL: It's discovery answers where it indicates that he was pursuing a theory that he was not guilty of the offenses charged. That was -- that's three of the documents that I had referenced last night.

(Document tendered.)

MR. CHANEN: Judge, here's the problem I have with it. At 26th Street a lawyer steps up and pleads at the initial arraignment and -- and it happens here, too -- and pleads not guilty for the client. Then the client has an opportunity to meet with the lawyer, look at the evidence, talk about what -- their life ahead of them, talk about all kinds of issues, and then he changed his plea.

And so, he didn't say immediate -- I immediately took responsibility and pled guilty the moment the charge came through. And he didn't mean -- and he didn't suggest that or anything like that. He said, I ultimately -- I pled guilty to these crimes.

And if we put -- first of all, they're not admissible because they're hearsay and double hearsay. But even if -- even if you're gonna let them go down this road, but then it opens up this whole issue of, well, how does a guilty plea work, and how does a change of plea work and all this.

And so we're starting -- we're really dancing on

the head of a pin on the issue of, you know, did he go 30 days before he changed his mind? Did he go 60 days? Is that immediate? Is that not immediate?

This just -- can he cross-examine on it? I don't have a problem with his cross-examining on it, but I don't understand how these three documents come into evidence.

THE COURT: Here's, as I understand it, why these documents are here. They're here in case your client denies that he first plead not guilty, and only after talking to his lawyer did he decide to plead guilty.

Is that right?

MR. SCAHILL: More or less, yeah.

THE COURT: If he denies that, then they're going to want to prove up that he did, in fact, do that, and then he's the one that's making it complicated.

Now, you've established that he pled guilty and he said he took responsibility. And I assume that that's so you can establish credit with the jury for him. Perfectly proper.

But they have a right also to rebut that, okay? And evidence of the fact that he didn't immediately step up and own up and plead guilty and accept responsibility serves that purpose. So they have a right to bring that out as well. You bring out the good side, they bring out the not-so-good side. That's the way it works.

The question is: If we go down the road of a denial of that, how do they then establish that it didn't happen that way?

I don't know if, frankly, these documents will do it. I can't imagine why you can't just get a copy -- a certified copy of the docket indicating a not-guilty plea the first time he steps up and the change of plea, whatever, two, three, four court appearances down the road, whatever it was.

MR. SCAHILL: The reason that I chose that particular document -- there's two reasons. No. 1 is, that's -- I think that would be admissible because it's something filed by his attorney on his behalf. A, it's a public record, and B, it's an agency admission. So there's an admissibility issue why I chose that.

But the second issue is that I believe the docket entries back in the very early '90s were handwritten by people that didn't have great penmanship. And so, it's very difficult to discern what --

THE COURT: They're not handwritten any more?

MR. SCAHILL: No, they're not. They're all typed out now.

THE COURT: Wow!

MR. SCAHILL: You can go over to the Daley Center and get them. I think they're 15 bucks.

THE COURT: Are they in court with typewriters and

computers?

MR. SCAHILL: They may be over there, over at the Daley Center.

But, in any event, that's the reason why I had submitted that particular document. So that's sort of where I am on that.

MR. CHANEN: Judge --

THE COURT: So the docket reads PNG/MS?

MR. SCAHILL: Something like that.

MR. CHANEN: Judge, you know --

THE COURT: Okay.

MR. CHANEN: I don't think we're gonna have to get to a point where they come in, but just so that there's a clear record, I also just want to repeat something I've said in the past. This document was not on their original C3 list in the pretrial order, so it was on only for impeachment -- or refresh recollection or other purposes.

Then you give them a second chance to identify, which they would move in to admit and which they would not. And it wasn't on the we-will-move-to-admit-it list; it was on a list of another 700 documents that were in reserve.

So I just want to preserve that argument. I didn't -- you know, to say, well, it's in the pretrial order, Judge -- every single document they show you is in the pretrial order. That doesn't mean it was ever identified as

one that they intended to use. So --

THE COURT: Well, that's, frankly, not my biggest concern.

MR. CHANEN: Yeah.

THE COURT: I don't think it would be reasonable to expect them to anticipate that your client would infuse a sense of "I took responsibility" in his testimony as to what happened in his previous criminal cases.

And when your client testified to that, they reacted and this document suddenly became -- or these documents suddenly became much mover relevant than they or you probably thought they would be. So I don't have a problem with that. It's not as if it's a new fact.

But let's see what happens. I still think, frankly, the certified record of the docket of the proceedings with an explanation as to what the annotations mean would be the best way of doing it. But we'll reach that -- we'll make that determination when we get to it, if we get to it.

Anything else?

MR. SCAHILL: There was another document that I had provided to counsel as well, which also touched upon something that they raised yesterday, which I had absolutely no intention of interjecting into this case but they raised it, which was Ms. Auerbach asked Mr. Patrick affirmatively

whether he had ever used drugs or alcohol or anything in -- throughout the course of his entire life. That was never asked by anyone during discovery, nor did we intend to go into that. But they decided to bolster him as being sort of a squeaky clean guy.

Well, the problem is that in concert with Mr. Patrick's convictions and guilty pleas, he was, in fact, evaluated per court order by TASC, by order of Judge Cawley. This is the month before the guilty plea. So I believe this is actually taken into account in determining what sentence he gets, which ultimately was boot camp. And it was determined that Mr. Patrick was a heroin addict and a -- that he was also an abuser of alcohol.

So, you know, again, this is in the court file, it's a matter of record. They brought this out, which was sort of surprising to me, that they would bolster him in that fashion, but that's what the records say.

So I would like to question him about whether that -- whether that's true.

MR. CHANEN: Judge, we don't have any problem with him questioning him about it. What we have a problem with is this exhibit coming into evidence. It's triple hearsay.

It's someone, whose signature I cannot read, writing a letter of some evaluation that was done by someone unidentified within TASC and conclusions that that they

reached.

This person is not on their -- you know, we can't cross-examine it, we can't ask for context, we can't ask for anything.

And so, again, they absolutely can question him on what -- what this is all about.

THE COURT: Okay. And if he denies it?

MR. CHANEN: If he denies -- what's the "it," Judge? It depends, I suppose, how the question was.

If he was --

THE COURT: The question is going to be: Were you ever a heroin addict? Did you ever use heroin? Did you ever abuse alcohol? And if he denies those things, what then?

MR. CHANEN: I still don't think the document comes in, Judge. It's not -- I mean, it still has to meet the evidentiary requirements.

THE COURT: I don't know if it does or not. I'll have to take a close look at it and see. But there is this public record exception, you know, the findings, et cetera, of public agencies.

If this is a document ordered by the Court, it could very well fall under that category. TASC has been around for a long time and they are, if not officially, semi-officially an arm of the Circuit Court of Cook County with respect to making evaluations for programs such as boot

camp, which your client testified he got as a sentence.

So I'm not ready to make that determination right now, but there's certainly an avenue there. Well, let's wait and see.

MS. AUERBACH: Your Honor, the last issue is the Fifth Amendment issue that you yourself raised.

THE COURT: Yes. Writing on that right now, as we speak.

Do you need to have the ruling now?

MS. AUERBACH: I don't know how quickly I'm going to progress, but there's a possibility that -- I'm going to try to move as quickly as possible. I wish I could tell you that I don't need it before lunch. If we could take a five-minute break if I get to that point --

THE COURT: Okay. That's what we'll do if we get to that point.

MS. AUERBACH: Thank you.

THE COURT: Ready for the jury?

MR. SCAHILL: I'm sorry, Judge. Could I have my document back for my examination?

THE COURT: What am I going to do with it?

MR. SCAHILL: There is one on your thumb drive buried somewhere in there.

THE COURT: Oh, I'm sure.

MR. SCAHILL: Thank you, Judge.

THE COURT: Okay. Bring out the jury, please.

MS. AUERBACH: Can the witness take the stand?

THE COURT: Yes.

Is your computer hooked up? Are you going to use it?

MS. AUERBACH: Yes.

THE COURT: I think I'm at the right input here, so you need to -- okay.

(Jury entered the courtroom.)

THE COURT: Good morning, ladies and gentlemen. Welcome back.

We ready to proceed?

Sir, you understand you're still under oath?

THE WITNESS: Yes.

DEON PATRICK, CALLED IN HIS OWN BEHALF, PREVIOUSLY SWORN

DIRECT EXAMINATION

BY MR. AUERBACH:

Q. Good morning, Deon.

When we left off yesterday you said that you had run out of money and you began to sell drugs. This is in the fall of 1992. Tell the jury, why did you start doing that?

A. Well, at the time I still had obligations as far as rent, helping take care of my kids, and paying other bills and I didn't have a job at the time.

Q. Was selling drugs a requirement of being in your gang?

A. No, it was not.
Q. Did you give a cut of any of the money that you made selling drugs to your gang?
A. No.
Q. Was it mandatory for younger gang members to sell drugs for older members?
A. No, it was not.
Q. Were you personally out on the street corner selling drugs yourself?
A. No.
Q. Who was selling drugs for you?
A. There were a couple of guys that were selling them, a couple of girls.
Q. Were some of the guys the individuals who were charged with you on this murder?
A. Yes, they were.
Q. Okay. Who were they?
A. At the time Paul -- Paul Phillips, Lewis Gardner, and Akia Phillips sometime.
Q. Okay.
Were all of them directly selling for you? I mean, in other words, you gave them drugs directly?
A. No. I think like they would all be out there together sometime, and wherever I gave it to directly would probably ask them to help them sell it.

Q. Okay. Lewis, Paul and Akia were not Conservative Vice Lords, were they?
A. No.
Q. They were Traveling Vice Lords?
A. Yes.
Q. And was their selling, to your knowledge, gang related?
A. No.
Q. And explain why not.
A. Because it wasn't like we were selling for the gang. It was like we were basically selling for ourselves.
Q. Did you force Lewis, Paul or Akia to sell drugs for you?
A. No, I did not.
Q. Do you know if Rodney Matthews placed any influence upon them to sell drugs for you?
A. No, I don't know. But I don't -- to my knowledge, no, he didn't.
Q. Were these individuals selling drugs for you on a daily basis?
A. I guess any day we can get our hands on it, but it wasn't -- I don't think it was actually every day.
Q. Were you in the Agatite/Hazel area in the fall of 1992 on a daily basis attempting to either sell drugs or connect with people who were selling for you?
A. Yes. We were out there every day.
Q. How often did you resupply with drugs in the fall

of 1992?
A. I probably would say every two -- two to three days or three to four days.
Q. Okay. Did you have to pay the people who were selling drugs for you?
A. Yes.
Q. Did they get some cut of the amount that you were making?
A. Yes, they did.
Q. And what about to purchase drugs? Did you have to put up money in order for the drugs to be purchased?
A. Yes.
Q. On average, on the days that people were selling drugs for you, how much money were they selling -- or how much -- let me back up.
How much total money was coming in on a daily basis on average when people were selling drugs for you?
A. I would say anywhere from two to $3,000.
Q. That's a lot of money. So how much of that went to the sellers?
A. Off of -- every 500 they got 200. So off of 3,000 I think they would get like 1,200.
Q. How much money were you spending on the drugs themselves?
A. At the time like -- it was like a thousand dollars, I

think, an ounce, or 1,100.
Q. So if you were making two to $3,000, how much of that had been spent for the drugs themselves?
A. Probably like a thousand dollars.
Q. What did you do with the rest of the money?
A. Pay bills and took care of my kids.
Q. You testified earlier that when you first became involved with the gang, you guys just hung out and played ball, you know, basketball, and gotten in some fights with rival gangs. Do you remember that testimony?
A. Yes.
Q. By the fall of 1992 it was quite a bit more than that, correct?
A. By the fall of '92?
Q. Yes.
A. Well, we were hanging out a lot more and -- in the neighborhood and selling drugs, yes.
Q. So it wasn't just that you were with a bunch of your friends and playing basketball, right?
A. No.
Q. By then you had spent some time in jail, right?
A. Yes.
Q. And you had gotten in trouble with the police for fights and gang activities, right?
A. Yes.

Q. How do you explain the -- today the person that you had become at that point?
A. I think I was like -- I was just a lost kid. I ain't no -- I didn't have any direction. And I think I gravitated to the gang because my friends was like my family at the time, and by me just losing my family, which was my mother, I felt like -- I hung around them a lot more.
Q. When you look back on that period in your life, is that something that you're proud of?
A. Absolutely not.
Q. So focusing now on the timeframe around November of 1992, where were you spending most of your time?
A. In -- you say November '92?
Q. Correct.
A. In the Clarendon Park area, the Agatite neighborhood area.
Q. And with whom were you spending most of your time?
A. Most of the time I was with Rodney Matthews because that was my friend, and there would be other guys around, too.
Q. Why were you focused on that area, the Clarendon Park, Agatite/Hazel area?
A. That's where I grew up at. Those are the guys I went to school with. Those are the guys I knew.
Q. Tell me about when you first met Rodney Matthews. When was that?

A. I was in the sixth or the seventh grade and we had met at the YMCA on Lincoln and Belmont at a basketball tournament.
Q. So that was when your mom was still alive?
A. Yes.
Q. To your knowledge, was Rodney Matthews in a gang at the time that you met him?
A. No, he was not.
Q. Were you in a gang at that time?
A. No.
Q. In the fall of 1992 would you describe Rodney Matthews as one of your best friends?
A. He was like my brother.
Q. And in the fall of 1992 Rodney Matthews was a Traveling Vice Lord, correct?
A. Yes.
Q. From which side of the city?
A. From the north side.
Q. Did you know Rodney's family?
A. Yes, I did.
Q. Did you know his sister, Audrey?
A. Yes.
Q. Was Audrey older or younger than Rodney?
A. Audrey was older.
Q. Was she involved in gangs, to your knowledge?

A. No, she was not.
Q. Did she have a job?
A. Yes, but I don't know where she worked at.
Q. Did you know where she lived in the fall of 1992?
A. Yes, I did.
Q. Where?
A. She stayed on the corner of Foster and Winthrop.
Q. Did you spend time in the fall of 1992 at Audrey Matthews' house?
A. Yes.
Q. How often did you do that?
A. Practically every day because that's where Rodney was living. So either I would pick him up or we would end up there sometime during the day.
Q. We've heard a fair amount about nicknames or street names in this case. Can you tell the jury what a street name is?
A. I guess the name that the people on the street call you, or a nickname would be like a name your family gave you when you were smaller, or from growing up or something.
Q. Well, to your knowledge, is a street name a gang-related thing?
A. No.
Q. Did you have a street name or a nickname in -- that you went by in 1992?

A. No, I did not.
Q. We have seen and heard a lot about the nickname C-Deon in this case. Is that a name that you had heard before you were arrested on December 2nd, 1992?
A. That was the first time I ever heard that name.
Q. Had anyone ever called -- to your face called you C-Deon?
A. No, they hadn't.
Q. Do you know why that name emerged in this case?
A. To my presumption, it's like there was another Deon on this case.
Q. Who is that?
A. Akia Phillips. His name was Deon.
We learned his name was Akia after we got charged with this case. And that was their way of distinguishing him from me in their so-called court-reported statements.
Q. So you heard Detective Villardita testify, correct?
A. Yes.
Q. And did you hear him say that he obtained information on your nickname, or your gang name, from the 23rd District?
A. The 23rd District had no record of my name being C-Deon.
Q. You know --
MR. SCAHILL: Objection. Foundation, Judge. Move to strike.
THE COURT: I will allow it to stand.

BY MR. AUERBACH:
Q. We talked about earlier the fact that the police would take down aliases or nicknames that you gave them in the course of the various arrests, correct?
A. Yes.
Q. To your knowledge, did you ever use the name C-Deon in connection with any arrest or any interaction that you had with the police?
A. No, I did not.
Q. To your knowledge, was there any record of an arrest or a charge or interaction with the police where your name was listed as C-Deon?
A. There is not one.
Q. Did Audrey Matthews have a nickname or a street name, to your knowledge?
A. She had a nickname. Her nickname was Big Nae, N-A-E.
Q. And did you know Audrey Matthews' real name in the fall of 1992?
A. No, I did not.
Q. What did you think it was?
A. By nickname being Big Nae, I thought it was Renee.
Q. But you came to learn it was Audrey at some point?
A. Yes.
Q. When did you learn that?
A. I had to have been in the county, I think, when they

started to put together a list of names.
Q. A list of names for purposes of discussing what?
A. Names like a list of witnesses as to my whereabouts and stuff.
Q. Okay. I want to talk a little bit about the other individuals, the young men and boys that you were charged with for these crimes.
We talked about Rodney, but could you tell me -- when did you first get to know the other individuals that were charged with you between December 2nd and December 5th? So Lewis Gardner, Paul Phillips, Akia Phillips, Joe Brown, everybody else, Daniel Taylor.
A. I met him at the mall.
MR. SCAHILL: Objection. Compound, Judge, form of the question.
THE COURT: You might want to ask one at a time.
MS. AUERBACH: You want me to ask one at a time? Sure.
BY MR. AUERBACH:
Q. Let's talk about Lewis Gardner. Did Lewis Gardner have a nickname?
A. Yes.
Q. What was it?
A. Popeye.
Q. Can you describe Lewis for us?

A. Young kid, kind of quiet. I wouldn't say he was a loner but he didn't talk much.
Q. When did you first meet Lewis Gardner?
A. Sometime in August of '92.
Q. So you did not know him before you returned from the boot camp program?
A. No, I did not.
Q. Who did Lewis hang out with, to your knowledge?
A. He hung around with a couple years younger than us, guys like Daniel, Akia and Paul.
Q. Didn't you think that Lewis was a little bit young to be selling drugs for you?
A. Now that I look back on it, yes. I think at the time he was already selling drugs when I came around, so I didn't really -- I don't even know if I knew his age at the time. I just knew he hung around in the neighborhood.
Q. Let's talk about Paul Phillips for a moment. Did he have a nickname, to your knowledge?
A. Not that I know of.
Q. Did he sell drugs -- you've mentioned already. Strike that.
Did you know who he lived with?
A. Yes. He lived with his mom and his brother.
Q. Did you know his mom's name at the time?
A. We knew her as Cookie, I think.

Q. Have you come to learn her real name?
A. Yes.
Q. What is it?
A. Andrea Phillips.
Q. And did you know where the Phillips lived?
A. Yes. They stayed on -- in the 800 block on Agatite.
Q. Describe Paul for us.
A. Somewhat similar to Lewis. He was gone a lot during that time, and -- I may have met him a little later than that, when he came back from somewhere.
Q. So you didn't know Paul before you left for boot camp?
A. No.
Q. Okay. What about Akia? Could you tell us a little bit about Akia?
A. Loud, center of attention, like attention, kind of outgoing.
Q. Did he -- you said that he went by Deon, but did he have a separate street or nickname?
A. Yes. His nickname was Baby T.
Q. And did you know who he hung out with?
A. His brother, Daniel, and Lewis.
Q. When did you first meet Akia Phillips?
A. It might have been in August, because I think he was there when I came -- they weren't living there when I left the first time. So I didn't know them before I left and came

back.
Q. So they, meaning Paul Phillips and Akia, did not live in the Agatite/Hazel area when you left?
A. I don't think any of them lived there before I left.
Q. Okay. Let's talk a little bit about Daniel Taylor. Can you describe him for us?
A. Kind of athletic, easy going, laid back.
He stayed in the boys home on the corner of Montrose and Clarendon at Maryville, and there were some kids from there that used to come around, too, and like play basketball at the park.
Q. Did Daniel Taylor have a nickname?
A. Yes. It was Black T.
Q. And did Daniel sell drugs for you?
A. I don't think so. If he did, he probably got it from one of them, but he didn't directly deal with me.
Q. And did you know who Daniel hung out with in the fall of '92?
A. He hung out with the same group of guys, Lewis, Paul and Akia.
Q. What about Joe Brown? When did you first meet Joe Brown?
A. It was sometime in that short span. But Joe had just moved to the north side, too, and he had start coming around.
Q. Forgive me. I may have missed the question with Daniel

Taylor. But did you know Daniel Taylor before you went to boot camp?
A. No, I did not.
Q. Did you know Joe Brown before you went to boot camp?
A. No, I did not.
Q. Did Joe Brown have a nickname?
A. Yes.
Q. What was it?
A. It was Slick.
Q. Did Joe Brown sell drugs for you?
A. No.
Q. Describe Joe for us, please.
A. He like didn't mess with a lot of people. And I guess the people that he did gravitate to, he hung with them a little more because he didn't really know that many people in the area because he had just moved up there.
Q. Is Joe Brown still alive?
A. No, he's not.
Q. Do you know when he died?
A. It was while I was incarcerated, and I think -- I learned it in the course of us trying to find him.
Q. Okay. Let me ask you about Dennis Mixon.
Before December 23rd, 1992, had you ever spoken to Dennis Mixon?
A. No, I hadn't.

Q. Did you know, though, who he was?
A. Yes.
Q. Did you know him to have a nickname?
A. Yes. They were calling him Goldie.
Q. And did you know how old he was?
A. I didn't know his exact age but I know he was much older than us.
Q. Did you know where Goldie lived?
A. They were saying that he had came out the projects from the west side, I think the Henry Horner's or Rockwell.
Q. Did you know if Dennis Mixon was part of a gang?
A. Yes.
Q. What gang was he in?
A. He was a Traveler from the west side.
Q. Okay.
So Dennis Mixon was in the same gang as Rodney Matthews and the others but was that a different gang than yours?
A. Yes.
Q. Did you know who Dennis Mixon hung out with?
A. No. He came up there with some other guys and probably a couple females that I didn't know.
Q. Did you ever see him in the neighborhood, in the Agatite/Hazel area?
A. Yes.

Q. At one point did you see him talking to somebody that you knew?
A. Yes.
Q. And who was that?
A. He was talking to Rodney Matthews.
Q. And were you part of that conversation?
A. No, I was not.
Q. Did you come to learn what they discussed?
A. Yes.
Q. What did they discuss?
A. Mixon was telling Matthews that it was kind of crowded on the west side and he was wondering if he could come up there and sell drugs.
Q. And did you know if he was asking for permission from Rodney Matthews?
A. I don't think it was permission because you didn't need permission. It was more so just letting him know that he was there and he was gonna be around there.
Q. Since I'm asking you about people, let me ask you about Jeffrey Lassiter. Did you know Jeffrey Lassiter?
A. I had never met him before in my life.
Q. What about Sharon Haugabook?
A. Never.
Q. Before December of 1992 had you ever heard their names?
A. No.

Q. To your knowledge, did you ever see them in the area?
A. No, I hadn't.
Q. Did you ever talk to either of them?
A. No, I did not.
Q. Were you in the 910 West Agatite building at any time in 1992?
A. I've never been in the 910 West Agatite building, to my recollection.
Q. There are other portions of 910 West Agatite, correct?
A. Yes.
Q. Had you ever in your life been in any other section of that connected U-shaped building?
A. I had some friends stayed in the courtyard, but I don't think in '92 they were there or I had went in there in '92.
Q. Okay. Did you know Faye McCoy?
A. Yes, I knew who she was.
Q. How did you know Faye McCoy?
A. Actually, she has a daughter that's close to our age that grew up, lived in the neighborhood, and we knew that that was her mom. And she did a lot in the community for us, like block club parties and different things like that.
Q. Okay. I want to turn your attention to the day of the murders, November 16th, 1992.

We know that the murders occurred at 8:43 p.m. Who were you with at that time on November 16th?

A. I was with Rodney Matthews, Marshall Payne, and we were at Rodney's sister's house, Audrey Matthews.
Q. I think you earlier said that Audrey Matthews lived at Foster and Winthrop, is that correct?
A. Yes.
Q. Who is Marshall Payne?
A. He's a guy that attended Lincoln Park High School with me.
Q. Was it a friend of yours then?
A. Yes.
Q. And did you meet him in high school?
A. Yes.
Q. Okay. When is the first time that day that you saw Marshall?
A. It was early afternoon. I want to say like 11:00 or 12:00 o'clock.
Q. Did you spend most of the day with Marshall?
A. I think we were around each other all day that day.
Q. When did you first see Rodney Matthews?
A. Probably a little later, like 12:00 or 1:00 or somewhere in there.
Q. Okay.
How far was Audrey Matthews' apartment from Agatite and Hazel from -- like walking -- walking-wise? How long would it take you?

A. I would say it would take 15 to 20 minutes, but it was little over a mile from there.
Q. Approximately what time did you get to Audrey Matthews' apartment that evening?
A. I think we got there around 7:30, 8:00 -- somewhere like 7:30, 7:45, in there.
Q. How long did you stay?
A. We were there at least an hour-and-a-half to a couple hours.
Q. Did you have a watch on that night?
A. I don't recall. I may have.
Q. If you did, did you make a note of every single thing that you did and what time you did it?
A. No, I did not.
Q. On November 16th did you have any reason to take note of what you were doing and at what time?
A. No.
Q. Did you actually see Audrey Matthews when you got to her apartment?
A. I saw her because she let us in. So I saw her when we first got there.
Q. Did you ever learn that her boyfriend, Gary Tate, was also in the apartment?
A. I think later on. But like when we were there we never saw Gary because he stayed in the room all the time.

Q. When you say that you learned it later on, do you mean sometime after November 16th?
A. Way after November 16th.
Q. You didn't have any personal knowledge that he was there, though, right?
A. No.
Q. What did you do when you were at Audrey Matthews' apartment with Marshall and Rodney on the evening of November 16th?
A. We were sitting around waiting on the football game to come on, and then we started to watch the game.
Q. What night was it?
A. A Monday night.
Q. And at some point did Rodney Matthews get a phone call?
A. Yes, he did.
Q. Okay. Describe what happened in connection with that.
A. He got a call from Donna Crump. And she was calling him pertaining to --
MR. SCAHILL: Objection. Foundation.
THE COURT: Sustained.
MR. AUERBACH: Did you sustain it, Judge? Did you Rule?
THE COURT: Sustained.
BY MR. AUERBACH:
Q. Okay. Let me ask you a couple of questions.

Was Rodney in the same room as you when he received a phone call?
A. Yes.
Q. Did you come to learn who he was talking to?
A. Yes, I did.
Q. And who was he talking to?
A. He was talking to Donna Crump.
Q. Who is Donna Crump?
A. She was the mother of, at the time, his girlfriend.
Q. And, first of all, did you know Donna Crump yourself?
A. Yes, I did.
Q. How well did you know Donna Crump?
A. I knew her very well because we had grew up with her kids also, with her son and her other three -- her other -- her three daughters.
Q. Did you come to learn the reason for Donna Crump's call to Rodney Matthews?
A. Yes, I did.
Q. And what was it?
A. She had just found out that night that her daughter was pregnant, and she was calling him to talk about what were they gonna do to raise this child and take care of this baby.
MR. SCAHILL: Objection. Move to strike, hearsay. It's hearsay, and it's foundation.
THE COURT: It's too late for foundation. I'll

overrule the hearsay objection.
BY MR. AUERBACH:
Q. Was it your understanding that Rodney Matthews was the father of Ms. Donna Crump's daughter's child?
A. Yes. That was his girlfriend at the time.
Q. Okay. And what was Donna Crump's daughter's name?
A. Tamara. We called her Angel.
Q. Okay. So how long did the conversation that Rodney Matthews had with Donna Crump take?
A. They were talking at least 15 to 20 minutes.
Q. And --
A. Maybe a little longer.
Q. First of all, did Rodney Matthews have a cordless phone at the time?
A. Yes.
Q. And was he always in the room with you throughout the duration of the conversation?
A. I think once she told him about the baby, he started pacing. So he was walking back and forth.
Q. Were you focused on their conversation or were you focused on the football game at the time?
A. When they started discussing the baby I kind of focused in on the conversation as well as the game because I was trying to figure out what they were talking about.
Q. At some point did Rodney Matthews say anything to you

about leaving the apartment?
A. Yes. He had told me and Marshall Payne to get our coats, that Donna wanted us to -- wanted him to come back down there so she could talk to him.
Q. When you say that Donna wanted him to come back down, where is "back down?"
A. Donna actually stayed home, Montrose and Hazel, a block up from Agatite and Hazel.
Q. And so, it was your understanding that Donna Crump wanted Rodney to come down to the Agatite and Hazel area to speak with her?
A. Yes.
Q. Okay. Were you intending to go with him to see Donna Crump?
A. No. I was actually intending to go back and get my car that was on -- that was parked on Agatite and Hazel.
Q. Okay. So what happened after Rodney indicated that he was gonna need to leave the apartment?
A. That was -- before, I think, there was also another like -- it wasn't a call, but T Mack was paging people, and finally somebody -- either Rodney or me called him back. And he was telling us that there was a lot of police down there and he didn't know what was going on at the time.
Q. Okay. So let me unpack that a little bit.
Who is T Mack?

A. T Mack is the guy that's been spoke about early in the case -- in this trial.
Q. But who was he to you?
A. He was a friend of ours. He was another Traveling Vice Lord from down there.
Q. Is this someone that you spent a fair amount of time with in the fall of 1992?
A. Yes. He was around Matthews a lot, so he was around me, too.
Q. Let me just ask about what you said that T Mack told you.
You said that he was down there and he said that there were a lot of police down there?
A. Yes.
Q. What is "down there?"
A. He was on Hazel and he was out selling drugs at the time. And he had just said that a lot of police had pulled up and they was all in the area right now.
Q. And what else was said in that conversation, if anything?
A. Well, when he said that, he was told to like not to sell anything else, just leave that stuff alone for the night. And from that point we started to get ready to go down there.
Q. Okay. Let me ask you a little bit more about T Mack for a moment.

We heard that name in Detective Villardita's testimony, correct?
A. Yes.
Q. I believe that at the beginning he said that he thought that T Mack was Mark Tillis. Did you hear that?
A. Yes.
Q. Do you know who Mark Tillis is?
A. Yes.
Q. Is T Mack Mark Tillis?
A. No. Mark Tillis was a Conservative. He wasn't a Traveler.
Q. So T Mack and Mark Tillis are two different people?
A. Yes.
Q. Okay. Are you aware that Lewis Gardner and Akia Phillips in their confessions identified T Mack as being in attendance at the gang meeting that allegedly occurred on November 16th?
A. Yes.
Q. Are you aware that Lewis Gardner identified T Mack as somebody as going upstairs and into the apartment?
A. Yes.
Q. Are you aware that Lewis Gardner identified -- I'm sorry, that Akia Phillips identified T Mack as a lookout?
A. Yes.
Q. Did you hear Detective Villardita say later in his

testimony that they were unable to figure out who T Mack was in December of 1992?
A. Yes. But T Mack -- T Mack was out there every day --
MR. SCAHILL: Objection. Move to strike, non-responsive.
THE COURT: That will be sustained.
BY MR. AUERBACH:
Q. So I'll reask the question and just ask for a yes or no.
Did you hear Detective Villardita say that they couldn't figure out who T Mack was in December of 1992? Yes or no?
A. Yes.
Q. In your opinion would it have been difficult to find T Mack in December of 1992?
A. No --
MR. SCAHILL: Objection. Foundation, how would -- what the police could have done.
MS. AUERBACH: Your Honor, I asked for his opinion.
MR. SCAHILL: Of whether they could find -- whether the police could do something.
THE COURT: You can ask him about his abilities, not about the police abilities.
BY MR. AUERBACH:
Q. To your knowledge, where was T Mack located in December of 1992 -- let me start with November and December of 1992?

A. On the corner of Agatite and Hazel.
Q. And was that a place that he spent time on a regular basis?
A. Every day.
Q. Other than hearing from T Mack that there was a lot of police activity in the Agatite/Hazel area, did you hear anything from Rodney Matthews' conversation with Donna Crump about anything going on at Agatite and Hazel?
A. Well, eventually she had told Matthews, that he related to us, that there was a lot of police down there, so she didn't want him to come back down there that night. But nobody actually knew what had happened at the time.
Q. So describe what happened when you left Agatite and Hazel.
A. When I left?
Q. Well, did you leave at some point -- I'm sorry, not Agatite and Hazel. Forgive me.
At some point did you leave Audrey Matthews' apartment?
A. Yes. I had to -- I had to go home because I was on electronic monitoring, so I couldn't spend a night out. And so I decided that I was gonna walk back down there to get my car and go home.
Q. And did you walk out with anybody else?
A. Me and Marshall Payne left.

Q. Did Rodney go with you at the time?
A. No, he didn't. He stayed home.
Q. Approximately what time was it?
A. It had to be around 9:00, 9:15, somewhere in there.
Q. What happened on your way to Agatite and Hazel?
A. Well, we was walking up Sheridan. A friend of ours named Jordan pulled up in a car, and he was under the impression that some of our friends had got shot on Agatite. So he had told us that one of our friends -- or two of our friends had got shot down there.
So I had asked him would he go get Matthews, and I started to jog back down Sheridan towards Agatite and Hazel.
Q. Did you see anybody else along the way?
A. We ran into these girls that we knew, named Kimberly Jefferson and Sherena, and I think they were on their way to Matthews' house. So I told them when they get there, to ask him to come back down there, too.
Q. So at this point did you think it was your friends who had actually been shot?
A. Yes.
Q. Deon, let me ask you, on November 16th at any time did you attend a gang meeting?
A. No, I did not.
Q. On November 16th were you included in a Traveler Vice Lord gang meeting at Clarendon Park?

A. No, I was not.
Q. Did you have any conversation with anybody about collecting a drug debt?
A. No.
Q. Did you have a conversation where Jeffrey Lassiter's name was mentioned?
A. No.
Q. Did you have a conversation where Jeffrey Lassiter was described as somebody who owed money to any gang members?
MR. SCAHILL: Objection to leading in this line of questioning.
THE COURT: Overruled.
BY THE WITNESS:
A. No.
BY MR. AUERBACH:
Q. Did you go inside the building at 910 West Agatite on November 16th, '92?
A. No, I did not.
Q. Were you with anybody who did?
A. No.
Q. Did you break down the door to Jeffrey Lassiter's apartment?
A. No, I did not.
Q. Did you shoot Jeffrey Lassiter?
A. No, I did not.

Q. Did you shoot Sharon Haugabook?
A. No.
Q. Were you with anybody who did?
A. No.
Q. Did you have anything at all to do with the murders?
A. Absolutely not.
Q. So once you arrived at that Agatite and Hazel area with Marshall Payne, what happened next?
A. Well, there was a lot of people like milling around in front of the courtyard, and I noticed that they had three guys handcuffed to the front of the gate that were actually from the neighborhood. And we was still under the impression that somebody from down there got shot, so I was wondering why they had those three guys handcuffed.
Q. Did Rodney Matthews ever come down to the area?
A. He got there later on, like -- I want to say like probably 15 minutes after we got there.
Q. Did you learn whether or not it was your friends who had gotten shot?
A. Yes.
Q. And was it?
A. No, it wasn't.
Q. Did you go somewhere afterwards or did you stay in the Agatite and Hazel Street area?
A. Once I found out it wasn't my friends, I decided that I

was about to leave because there was a lot going on and I really didn't know what was going on.

So I walked over to the -- I was with Marshall Payne and he was asking me for some money, but the amount of money he wasn't -- I wasn't willing to give him, so I decided that I would give him some drugs instead of the money.

Q. So how much money was Marshall Payne asking you for?

A. He wanted $20, but then it turned into 40, and so I was like I would just rather give him two bags and let him do whatever he do with it.

Q. So where did you go from the Agatite and Hazel area?

A. We walked to the Phillips' house.

Q. And you mentioned before that that was in the 800 block of Agatite?

A. I think it was 854.

Q. Okay. Had you ever been to the Phillips' building before?

A. I been to the building but I don't know if I had ever been inside the apartment.

Q. Okay.

And what made you think that you could obtain drugs in order to give them to Marshall Payne that evening? What made you think that they were at 854 West Agatite?

A. Because at the time the Phillips' brothers used to hide the drugs on the roof of their building, so I was trying to

find -- locate one of them to ask them to grab it for me.
Q. And did you recall that you had given drugs to one of the Phillips' brothers sometime either that day or prior to that day?
A. It may have been Paul or Lewis, but they were always together and they always hid it in the same spot.
Q. Okay. So did Marshall go with you upstairs to 854 West Agatite?
A. Yes, he did.
Q. Describe what happened when you got there.
A. When we got there Marshall knocked on the door. And I sat in like the -- the banister in the hallway. And like at some -- within seconds I like noticed somebody eye peeked in the peephole and got out the peephole.

So they didn't open the door immediately. So I'm telling Marshall like I'm about to go because I don't know what's going on. And as I jumped down, the door flew open, and it was actually a police with a gun, and he grabbed us and pulled us into the apartment.
Q. When you walked into the apartment, did you observe -- well, first of all, you described police. Was it uniformed police or something else?
A. I think they were both, or a mixture of both.
Q. Okay. And when you walked in, did you observe Chicago Police or -- strike that.

Did you observe people coming in from the back of the apartment at the time that you were coming in from the front?
A. No.
Q. Was it your impression that you arrived right at the same time that police arrived?
A. No. They had been there.
Q. What did you observe to lead you to that conclusion?
A. When I first came to the door they -- they pat me down and they felt my house arrest box, and they immediately handcuffed me and took me to this room straight across the hall. And you could hear like a lot of stuff going on. And they had other people off to the right, in the living room, sitting down, and they put Marshall Payne in the living room with them.
Q. You said you were handcuffed. Did you feel that you were free to go?
A. No.
Q. Was Marshall handcuffed?
A. No.
Q. Who else did you see in the house?
A. I noticed Paul was sitting in the living room, Paul Phillips, and there was some kids, I think.
Q. And what happened after that?
A. Well, they -- the police asked me my name and I told

them, Deon Patrick. And they like immediately went out the room and came back within 30 seconds with some drugs and they was like, are these your drugs? And I told them no. And they was like, well, your mother is in the back saying that these are your drugs. And I told them like my mother can't be in the back because my mother's dead.

So they came -- they went and got Andrea Phillips. And when they brought her in the room she was like, that's not my son Deon, that's the other Deon.

Q. Okay. And what happened after that?

A. They kept me in the room. They finished going through the apartment, looking for stuff, I guess, and then I heard them talking about they wanted to watch a news special on the 10:00 o'clock news that night dealing with --

Q. Who -- I'm sorry. Did you finish?

A. Yeah.

Q. Who said they wanted to watch a news special on the 10:00 o'clock news?

A. The police were talking about watching a special on the 10:00 o'clock news that was dealing with, I thought, corrupt cops. It had something to do with police and something they were doing in another area.

Q. So let me just ask a couple of questions.

Was the room that you were in -- to your knowledge, what kind of room was it?

A. I was in the bedroom.
Q. And was the door completely shut?
A. No.
Q. Describe how the door was.
A. They had it pushed open where I could still like see people walking past, and I could hear what they were talking about.
Q. And how long did you stay in that room? Can you approximate?
A. I was there at least 30 minutes, I think.
Q. Okay. So you talked about hearing police talk about wanting to see a program on the 10:00 o'clock news. And then what did you hear?
A. Well, I heard the news come on. They turned the TV up where you could hear like the reporter like setting up the story.
Q. Okay.
A. And they all watched the story, then after that eventually we left.
MS. AUERBACH: So, Judge, I would like permission to publish to the jury Plaintiff's Exhibit 13, which is in evidence.
THE COURT: It may be published.
MS. AUERBACH: And I would ask, your Honor, if you are able to just slightly dim the lights, because it's a

video.

THE COURT: What do you want?

MS. AUERBACH: Slightly dim the lights.

THE COURT: That's not a good idea.

MS. AUERBACH: It's a video.

THE COURT: Because sometimes it's hard to get them undimmed.

MS. AUERBACH: Okay. We'll do the best that we can.

(Video played.)

THE COURT: Judge, can you raise the volume?

(Video played.)

BY MR. AUERBACH:

Q. Deon, was that the program that you heard?

A. Yes, it was.

Q. And did your -- did the police officers who were at 854 West Agatite that night stay for the duration of the segment?

A. Yes, they did.

Q. And you said that you left the apartment after that was played, correct?

A. Yes.

Q. How soon after did you leave?

A. I'm saying within the next couple of minutes.

Q. Okay. Do you know at what time during the 10:00 o'clock news this segment aired?

A. It would have to have been like 10:15 because it wasn't the breaking news. It was just a special that comes on like between 10:15, 10:20.
Q. You don't know for sure, though, do you?
A. No.
Q. So when you were brought out, were you free to go?
A. No.
Q. What happened?
A. They put me in the back of a police car.
Q. Were you alone in the police car?
A. Yes.
Q. And did you see if they took anybody else into squad cars?
A. They put Andrea Phillips and Mark Tillis in the back of a police car.
Q. Who is Mark Tillis? We mentioned his name before, but what was his role -- or how was he involved in this raid?
A. Well, they claim that they saw him standing in the alley, and he ran up the back stairs and they chased him into the house.
Q. And so, did you know Mark Tillis at the time?
A. Yes.
Q. How old was he?
A. He was a juvenile. I don't know if he was 15 or 16.
Q. Okay. So when you went downstairs, describe the scene.

Was it still -- well, describe the scene at Agatite and Hazel when you went down 854 West Agatite?
A. There was still a lot of police, a lot of congestion where traffic couldn't really get through, and there was still a lot of people like just standing around talking and stuff.
Q. First of all, I'm not sure if I asked you this, but what floor was the Phillips' apartment?
A. On the second floor.
Q. Once you were in the squad car were you able to see anybody that you knew?
A. Yeah, I saw some people that I knew. And then I looked back and I saw Daniel Taylor, known as Black T. He was standing on the corner.
Q. What was he doing at the time that you saw him?
A. He was talking to two police officers.
Q. Are you aware of whether either of those two police officers are defendants in this case?
A. I'm aware of it now, but I didn't know who they were at the time.
Q. Had you recognized them at the time from being officers who were involved in the raid?
A. Yes.
Q. Who are the two defendants who you saw talking to Daniel Taylor on November 16th, after you were brought down from the

Phillips' apartment?
A. Berti and Glinski.
Q. Had you seen defendants Berti and Glinski in the 854 West Agatite apartment when you were there?
A. Yes.
Q. Did you observe Berti and Glinski speaking to Daniel Taylor for the entire time that they -- that they spoke?
A. Well, when I first went back they were on the corner talking. And I might have looked for a second or a minute, then I looked away, and I looked back and they were gone.
Q. Did you see where they went?
A. No.
Q. Did you see if all of them left together?
A. The three?
Q. Yes.
A. No.
Q. Deon, was this your first sight of Daniel Taylor, the evening of November 16th?
A. That was my first time seeing him the entire day.
Q. Did you see Daniel Taylor get arrested at 6:45 p.m. near Clarendon Park on 11 -- on November 16th?
A. No, I did not.
MS. AUERBACH: Judge, I would like to publish Defendants' Exhibit 136. It's in evidence.
THE COURT: It may be published.

BY MR. AUERBACH:
Q. Deon, do you recognize this document?
A. Yes, I do.
Q. What is it?
A. It's an affidavit that I filed while I was incarcerated.
MS. AUERBACH: Okay. Natalie, if you can scroll down to the bottom.
BY MR. AUERBACH:
Q. Are you able to tell the date?
MS. AUERBACH: Natalie, could you please -- actually, could you do all of Paragraph 7 and the date, all the way to the bottom, please.
BY MR. AUERBACH:
Q. I'm sorry. Did you say what date it was?
A. June 23rd, 1999.
Q. Okay. And what was this affidavit to?
A. I think it was a post conviction proceeding that I was filing.
Q. Was this a proceeding that you were filing after you had been convicted of the murders in this case?
A. Yes.
Q. Okay.
This was a document that you swore to under oath, correct?
A. Yes.

Q. Is that your signature at the bottom?
A. Yes, it is.
Q. Take a look at Paragraph 7 of the affidavit.
It's a long sentence, so I'm going to break it down.
MS. AUERBACH: Natalie, if you can pull it up just a little bit more, that would be great. You can just do 7. Thanks.
BY MR. AUERBACH:
Q. The first part of it says: Further, the last time I had seen Daniel Taylor was when he was arrested for disorderly conduct on November 16th, 1992, at around 5:45 p.m., and I did not see him again until 10:30 p.m. after his release from the Addison and Halsted police station. Incidentally, this was the night of the murders.
Do you see that?
A. Yes.
Q. Okay. So the first part of that, the last time I had seen Daniel Taylor was when he was arrested for disorderly conduct on November 16th, 1992, at around 5:45 p.m., was that a true statement when you made it in June of 1999?
A. No, it was not.
Q. What about the second part of that sentence, I did not see him again until 10:30 p.m. after his release from the Addison and Halsted police station. Is that true?

A. Yes.
Q. Why did you not tell the truth in a document that you swore to under oath in 1992 about whether or not you saw Daniel Taylor on the street getting arrested that evening?
A. I think at that time I was a mess and in the penitentiary with two natural lives for something I didn't do. And I was being held by some law clerks and some other guys that were incarcerated, and I think I -- I took some poor advice but I really was trying to be heard -- I took some poor advice and I was really trying to get heard, trying to get into a courtroom where somebody would actually listen to our story and look at the facts of the case and see that we couldn't have had anything to do with this case.
Q. Since 1999, when you had been asked whether or not you saw Daniel Taylor get arrested on November 16th, 1992, what have you said?
A. I've said no.
Q. And is that the truth?
A. Yes.
Q. Let me just ask you a little bit about this post conviction petition.
Did you type that affidavit?
A. No.
Q. And was the affidavit attached to another document, a brief that was submitted?

A. Yes.
Q. To your knowledge, was that post conviction petition successful?
A. No. It was denied.
Q. Okay.
So I want to go back to after you saw Daniel Taylor and officers Berti and Glinski. Did you then go to the police station?
A. Yes. They took us to Addison and Halsted.
Q. Okay. So what happened when you were at Addison and Halsted?
A. Well, initially they put us all in like this open space where they were taking like names and birthdays and stuff. And at some point they put me in another room. But they did advise me that they were gonna fax something to my -- my parole agent. And they also checked to see if I was a fugitive.
Q. Okay. So did you see anybody else at the station when you were there, that you knew?
A. Yes. I saw Andrea Phillips and Mark Tillis.
Q. And at some point did you hear somebody else come into the station that you knew?
A. After they put me in the room I could hear Akia Phillips' voice.
Q. And what did you hear Akia saying?

A. I heard him come in and he was like -- I guess he was directing it at his mother. And he was like, why would you tell them they're my drugs? They're not my drugs, them Deon's drugs.

And she was saying something back to him because -- I don't think she was aware that they were mine. She just knew they were in her house and she assumed they were his. And I heard him telling the police that they were my drugs.

Q. How did that make you feel when you overheard Akia telling the police that?

A. I was upset.

Q. Why?

A. Because I feel like if I had got caught with his drugs, I would have -- it wouldn't have been, oh, these aren't my drugs, they're his drugs.

Q. They were your drugs, though, weren't they?

A. Yes.

Q. So you were upset with him for telling the truth?

A. I was upset with him because -- I guess he was partaking in the drug sale, too, so it's like once you get caught -- if somebody give me some drugs, they become my drugs, and that's how I saw it at the time.

And I think I was upset because, as I just stated, like had it been me that got caught with the drugs, I wouldn't have told them like these aren't mine, they're his,

because I'm the one that got caught with them. And then I never told them they were his; his mother told them that.
Q. Were you charged that night in the police station?
A. No.
Q. You said that they faxed something to your parole officer. How do you know that?
A. Well, they had advised me that they were gonna reach out to him after they found out I wasn't a fugitive and that I wasn't on the run. And the next morning when I woke up he was actually in my living room.
Q. Your parole officer?
A. Yes.
Q. Okay. Let me just ask a couple more questions about that evening.
So after you left -- you were free to go, correct?
A. Yes.
Q. After you left the police station did you have a conversation with Rodney Matthews?
A. Yes, I did.
Q. Describe that conversation.
A. I walked down the street to the White Hen Pantry on Addison and Broadway, and I used the pay phone because I was gonna need him to pay for the cab.
Q. Why weren't you going to get your car?
A. Because there was like a 15 to 20-minute walk back to my

car again.

Q. Okay.

A. And there was so much going on over there, I didn't want to go back down there because I had just got arrested down there, or picked up for being inside that apartment.

Q. Okay.

So when you spoke to Rodney Matthews, did you tell him about what had happened with Akia Phillips in police station?

A. Yes, I did.

I asked him had he talked to Akia, and he was like -- he said Lil Deon had just called him. And I'm like, what did he tell you? And he was like, Lil Deon had told him that he had just left the police station but they had to let him go but they found some drugs in the apartment.

So then I told Rodney like, man, he told them people they was my drugs. And he was like -- he didn't even -- because Rodney didn't even know I was at the police station. So he like, he never told me you was down there. I said, no, because he didn't see me. I was in a room and he didn't seen me with his eyes but I heard him.

And so Rodney was like, hold on, and he clicked over and called Akia. And when he called him, he was asking him like, what you say just happened at the police station? And he gave him his story again --

Q. Hold on. Was this a three-way call?
A. Yes.
Q. Okay. So you were on the phone with Rodney and Akia?
A. Yes.
Q. Okay. So at some point did you reveal that you were on the phone with Akia?
A. Yes, because I felt like Akia was lying, that he was leaving out the fact that he told the police that they were my drugs. So I chimed in and I told him like, man, I just left the police station and I heard you telling them that. And he denied it, of course, but it was like -- I told him like when I see you, we gotta fight. And at some point either he hung up or Rodney clicked us off, but I just ended up getting in a cab and going to Rodney Matthews' sister's house again.
Q. You heard the term violation, correct?
A. Yes.
Q. From the gang connection, right?
A. Yes.
Q. What is a violation in connection with gangs?
A. A violation is when you, I guess, break the rules of the gang. And it could be where they fine you, like charge you an amount of money, give you a workout, or it could be a physical violation.
Q. Is that like you get hit?

A. Yes.
Q. Was it your intention to violate Akia for snitching on you in the police station?
A. No. I wanted to fight Akia. I didn't want to violate Akia.
Q. When you say you want to fight him, did you want to kill him?
A. No.
Q. What did you want to do?
A. I just wanted to fight him. If he won, he won; if I won, I won.
Q. Is that how you settled things back then?
A. Me, I like to fight, and I just -- I didn't want to put him in the hospital or hurt him or nothing to that effect. I just wanted to fight him.
Q. Did you tell Rodney Matthews on Akia because you wanted Rodney Matthews to violate him?
A. No. I just didn't want Rodney Matthews and the Travelers to think that there was a problem, a gang problem, because there wasn't. To me it was more personal than it was a gang problem.
Q. Akia was not even in your gang, correct?
A. He was a Traveler.
Q. You said on November 17th that your parole officer arrived at your -- in your living room the next morning, is

that right?
A. Yes.
Q. So what did he say to you?
A. When I came out he was threatening to like drop me, like take a urine test, because I guess the facts said that I was caught in a crack house. And he took all my movement and told me that if I left the house again, that he will take me back to IDOC.
Q. So did you leave the house on November 17th?
A. No, I did not.
Q. When is the next time that you left the house?
A. I don't remember the exact date but I left the house again on Thanksgiving.
Q. And why did you leave on Thanksgiving?
A. Well, there was a big party in the city at the Bismark Hotel where they used to throw like Christmas and Thanksgiving parties and stuff, and we were gonna attend that.
Q. Was this a gang -- a Traveler Vice Lord party?
A. No. It was actually a house music party, like for people that listen to house music.
Q. Okay.
And other than attending that party, did you leave your grandmother's apartment or your apartment any time after Thanksgiving, before December 2nd, 1992?

A. No.
Q. On November 17th, the day after you were arrested at the Phillips' apartment and the day after the murders, did you ever stand around Agatite and Hazel with a number of people who were ultimately charged on this case?
A. No. I didn't go on Agatite and Hazel on November 17th.
Q. Did you ever stand around with Lewis Gardner, Paul Phillips and Akia Phillips and laugh about what had occurred at 910 West Agatite?
A. No, I did not.
Q. On that day or any day?
A. No.
Q. Let's talk about December 2nd, the day of your arrest.
What time did you get arrested?
A. It was some -- I want to say almost 12:00 o'clock, like late at night, like 11:30 almost, 12:00.
Q. And did some defendant officers come to your apartment?
A. Yes.
Q. And what were you doing at the time?
A. I was actually in my room. I had company.
Q. And how many officers came to the apartment that night?
A. To my recollection, there was about six.
Q. And were some of the defendants in this case part of the group that arrested you?
A. Yes.

Q. Who do you recall arresting you?
A. I recall Officer O'Connor, Abreu. I think Killacky was there. I'm not sure who else was there.
Q. Did you resist your arrest in any way?
A. No.
Q. What did you think that they were coming to your apartment for?
A. I actually thought they were the house arrest people coming about me leaving out on Thanksgiving.
Q. And what did they ask you to do?
A. Well, O'Connor, when he first came in, he patted me down and he was asking was I still on electronic monitoring. And I told him yes, and he cuffed -- he handcuffed me. But they pulled me away from my bedroom door, like to the kitchen area. And one of them went to the back door, sat in my room. So one of them opened the back door and like a couple more came in through the back door.
Q. A couple more police officers?
A. Yes.
Q. Okay. Did they ask you to get -- to get anything?
A. They kept asking me like where was my coat. And I think at the time my cousin had went to the store in my coat, so I'm telling them my cousin went to the store in my coat, and then I could hear them rambling in my room.
So I asked O'Connor, why were they in my room, what

were they looking for? And he just kept saying, where's your coat, where's your coat. And at that time my cousin came back in with my coat, and I'm like, there's my coat right there. And they were like, no, where's your other coat. But I only had one coat, so I didn't know what they were talking about.

Q. What happened after that?

A. They took me out the side of the building, around to the front, to the police car. And as they were taking me out my grandmother came out, because she stayed in the first floor front, I stayed in the first floor rear. And she was asking them where were they taking me, and they lied and said they were taking me to 26th and California.

Q. Where did -- well, first of all, do you know why your mom -- your grandmother was asking where the police were taking you?

A. Because I'm her grandson and she wanted to know. And as well as I had an aunt and a couple cousins that were Chicago Police at the time and she was gonna have them find me to see where I went to.

Q. So where -- the police told your grandmother that you were going to 26th and California?

A. Yes.

Q. Where did they actually take you?

A. They took me to Belmont and Western.

Q. Were you handcuffed when you were placed in the squad car?
A. Yes.
Q. Who was in the squad car with you?
A. I was in the car with Officer O'Connor and Officer Abreu.
Q. Could you please describe for the jury Officer O'Connor?
A. O'Connor is sitting on the back row without the glasses, and Abreu is sitting on the other side with the -- I guess it's like a brown tie, like a gray suit jacket.
Q. When you got to Belmont and Western where were you taken?
A. Well, there was some stuff happening on the way.
MS. AUERBACH: I'm sorry, Judge. I should have asked you to let the record reflect that Mr. Patrick identified defendants O'Connor and Abreu on the record.
THE COURT: Any objection?
MR. SCAHILL: No.
THE COURT: The record will so reflect.
MS. AUERBACH: Thank you.
BY MR. AUERBACH:
Q. I'm sorry. You said that you were placed in a room?
A. There was -- I was actually placed in the car first.
Q. Okay.
A. And they took me down. We turned off of Springfield and

went up to Pulaski, and as we were coming up Pulaski they stopped at the light, I want to say on 14th and Pulaski.

Q. Did they say anything to you?

A. Yes. They kept like asking me did I know who they were. And I'm like, no. Like, why do you have me? And they were like, take a guess.

So I guessed gang crime. And they was like, no, guess again. And I didn't. So they were like, we're homicide. So I'm like, why do you all want -- why do you all have me?

And they tried to -- they told me that my friends were at the police station saying I killed the people on Agatite. And I told them that you couldn't have none of my friends down there because I didn't kill those people and I had nothing to do with that. And they stopped talking to me and they drove all the way to Belmont and Western then.

Q. When you got to Belmont and Western, where were you taken?

A. They took me upstairs to a room and they put me inside the room.

Q. Can you describe the room, please, for us?

A. It's kind of small. I think it was like one or two like desktops that -- where the desk flipped on the chair, and they had a ring on the wall.

Q. And what happened next?

A. They took me to the ring and they handcuffed -- they took one of my cuffs off and handcuffed it to the ring on the wall and left the other handcuff on my wrist. And Officer Abreu, I think, kicked the chair away where I couldn't sit down and they left out of the room.
Q. Did officers O'Connor or Abreu say anything to you before they handcuffed you to the ring and kicked the chair away?
A. They just left out the room the first time they put me in there, I think, and they were gone for awhile.
Q. So when they left were you able to sit down on the floor comfortably?
A. No. I had to -- I actually had to make sure that I could actually reach the floor first, so I just held my arm up and I slid down the wall to see if I could actually get to the floor. And then when I did get there, it was like I just held my arm up the whole time I was in there.
Q. Deon, how many hours in total were you in that same room, starting December 2nd, 1992?
A. Probably over 30 hours.
Q. Were you wearing a watch?
A. No.
Q. Was there a clock in the room?
A. No.
Q. Was there a window in the room?

A. No.
Q. Was there a window on the door to the room?
A. No.
Q. After spending some period of time in that room, were you able to tell what time it was?
A. No.
Q. How quickly did you lose track of time?
A. I would have to say very quickly because it was already late in the evening and I couldn't like tell how often or how long it was taking before they were coming in and out of my room.
Q. Over the course of the next approximately 28, 30 hours, how many times would you estimate that officers or Assistant State's Attorneys came in your room?
MR. SCAHILL: Objection to the form of the question. It's compound.
MS. AUERBACH: I'll break it up, your Honor.
BY MR. AUERBACH:
Q. Over the course of approximately 30 hours, how many times did defendant officers come in the interrogation room where you were in?
MR. SCAHILL: Same objection. Objection to the form of the question. It's compound, grouping people.
THE COURT: Overruled.
BY THE WITNESS:

A. At some point I lost track, but I know it was somewhere around 10 to 15.
BY MR. AUERBACH:
Q. And did you have any interactions with any Assistant State's Attorneys while you were at Belmont and Western?
A. Yes, I did.
Q. Do you know the name of the Assistant State's Attorneys that you had interactions with?
A. I know now it was Joe Magats.
Q. And did Joe Magats also have -- did he also come into the interrogation room where you were?
A. Yes.
Q. Approximately how many times did he come in the room?
A. I think I only saw him around three or four times.
Q. Are you able to name all of the defendant police officers who you had interactions with at any time that you were at Belmont and Western between December 2nd and December 5th, '92?
A. Yes.
Q. Who were they?
A. Most of my interaction was with Officer O'Connor, Officer Abreu and Detective Villardita, who testified here yesterday.
Q. As you sit here today, nearly 25 years later, are you able to remember the exact time of every discussion that you

had with one of the defendants in the case?
A. No, I can't.
Q. Are you able to recall verbatim every word that was said between you and one of the defendants?
A. No.
Q. Describe the state of your memory of those events today?
A. It's -- to me it's, well, I could recall what happened that night.
Q. I would like you to describe as best as you can what happened during that interrogation period.
I would like you to start with telling us your recollection of the first time that somebody came back in the room after detectives O'Connor and Abreu first placed you in there and handcuffed you to the wall.
A. I think by the time someone first came in there I was dozing off because I had been up all day. But I was still like hanging from the ring on the wall, my arm.
And when they came in, they were trying to tell me that they had guys down there that said I had something to do with the murders on Agatite. And I kept telling them that you all couldn't have anyone down there that said I had something to do with it because I didn't.
And I started to like request my attorney at the time because -- they weren't really listening. Like if I tried to say that I didn't have nothing to do with it, they

would either storm out or they would get loud, like you gonna tell us what you did that night. We know you had something to do with it.
Q. To whom did you request your attorney?
A. I think O'Connor and Abreu was in the room at the time.
Q. Did you request your attorney more than one time --
A. Yes.
Q. -- over the course of the period of time that you were at Belmont and Western?
A. Yes, I did.
Q. Did they ever bring you an attorney?
A. No.
Q. What specific words did you use when you asked?
A. I had an attorney from my previous cases that was a paid attorney, and I asked to speak to Sheila Kalish. I still knew her phone number by heart at the time.
Q. And did they bring you Sheila Kalish?
A. No.
Q. Did they let you talk to her?
A. No.
Q. Did you let -- did they let you place a telephone call to her?
A. I didn't get to place a telephone call to anyone.
Q. How were you feeling at the time that you were being told that you had something to do with murders on Agatite?

MR. SCAHILL: Objection to the form of the question.

What time are we talking about, Judge? Can we have a foundation here?

MS. AUERBACH: Sure. I'm happy to set a foundation, your Honor.

THE COURT: Okay.

BY MR. AUERBACH:

Q. So in the beginning, in the first instances where detectives were coming in and out of the room and they were telling you that they had people down there who were saying that you had something to do with the murders on Agatite, what was your state of mind at the time?

A. Initially I thought they were lying. I didn't believe them.

Q. How did you feel?

A. Confused as to why I would even be there. But I didn't believe anything they were saying to me at the time.

Q. Did you think it was all gonna get sorted out?

A. Yes.

Q. Did you remain handcuffed the entire 28 hours, 30 hours that you were there?

A. Outside of a trip or two to the bathroom, yes.

Q. Were you eventually given a chair?

A. Yes.

Q. Did you expressly deny any involvement in the murders?
A. I adamantly denied any involvement in the murders.
Q. So when the defendant -- when the detectives told you that you were involved in the murders, did you remember immediately what you had been doing on November 16th, 1992, at the time of the murders?
A. No.
Q. Why didn't you remember that?
A. I think when you're in a situation when somebody is accusing you of murder, you're not thinking about what you ate that day, or what you did that day, or -- you're just trying to get them to understand that you didn't have anything to do with the murders.
Q. Let me ask you a couple of questions about November 16th, 1992.

When was the first time that you felt like you needed to account minute by minute for what you did that day?
A. I think it was by the time I got to the counter where I was able to relax and actually go back in my mind as to what I was doing. Because the one thing I did recall was that I was with Rodney Matthews, and it's like as soon as I told them that, immediately I heard him screaming in another room, like they had went and locked him up.

So it almost like shook me, like do you keep like naming people as to who you were with, or are they gonna

continue to go get everybody that you say you were with and lock them up.
Q. Well, in 1992 did you keep a journal or a diary?
A. No.
Q. Did you have a cellular phone back then that would track who you were calling?
A. No.
Q. Did you carry a calendar or an appointment book that you marked down what you were doing on a day-to-day basis in November of 1992?
A. No, I did not.
Q. In 1992 were you texting or e-mailing --
A. No.
Q. -- like we do today.
Did you have any written record of people that you had interacted with that day?
A. No.
Q. What did you have to establish what you did that day?
A. My memory.
Q. We always hear on TV that --
MR. SCAHILL: Objection to the form of the question.
THE COURT: I don't know what's coming, so I'll overrule it at this point.
Go ahead.

BY MR. AUERBACH:
Q. Well, let me rephrase it in this way: Were you asked by any of the defendants: Where were you on November 16th at 8:43 p.m.? Did you -- were you asked for an alibi?
A. No. They were telling me where I was at at 8:43 on the night of these murders. They didn't ask me where I was at.
Q. Did you have the impression that the detectives wanted to know what you were doing that evening at 8:43?
A. Absolutely not.
MR. SCAHILL: Foundation.
THE COURT: I will sustain the objection to that. The jury will disregard it.
BY MR. AUERBACH:
Q. You said that you mentioned that Rodney Matthews was with you on November 16th. Do you recall at any point telling them where you saw Rodney?
A. No. I just told them that we were together that day, I think.
Q. As the evening went on did -- or, strike that.
As the time went on that you were in the interrogation room, at any point did any of the defendants tell you any of the facts about the murders?
A. Yes.
Q. What did they say? And who do you recall saying it?
A. At some point Officer O'Connor was bringing me in copies

of the statements that they had from other guys that were down there, and he was showing me the lines where they was saying what I had supposedly actually done, and --
Q. Okay. So first -- well, did you answer -- did you finish your answer?
A. Yeah, I'm fine.
Q. Whose statement do you recall seeing?
A. I think the first one I saw was Lewis Gardner.
Q. And what do you recall seeing?
A. They showed me the part where he was claiming that me, Daniel, T Mack, Matthews and Mixon had went in the apartment. I think they also showed me the part where he was trying to say the next day we were laughing about it and he felt guilty.
Q. Did they show you the part where it said that you actually shot people?
A. They had showed me that at some point.
Q. Describe the statement that you saw. What did it look like?
A. It was court-reported. It was typed -- typed out as if someone was typing while he was talking. And there was like a Q and A, like a question and answer.
Q. Had you ever seen a court-reported statement before then?
A. No.

Q. How did it -- how did it feel -- or what were you thinking when you saw your name in black and white in a court-reported statement saying that you committed murder?
A. At first it confused me because I couldn't figure out what had happened to Lewis to make him tell that lie, or to tell that story, because that didn't happen and I know it didn't happen.
Q. Did you continue to deny your involvement?
A. Yes.
Q. In between the time that defendant officers were coming into your room and leaving, were you able to sleep?
A. No. I like would doze off or nod off, but as soon as -- I feel like as soon as they felt like I was asleep, they would bust back in there and not allow me to sleep.
Q. Why do you think that?
A. Because that's how it was happening. It's like as soon as I get ready to fall asleep or start to nod off, somebody would bust in my room.
Q. When was the last time that you had slept -- so at the time that they arrested you around 11:30 p.m. on December 2nd, when had you woken up that morning?
A. It had to be around 8:00 or 9:00, because my grandmother used to wake me up. She used to make me breakfast in the morning.
Q. And so when you were able to doze, was it restful sleep

for you?
A. No.
Q. When was the last time that you ate before your arrest?
A. It had to be in the early evening of that day, probably like 4:00 or 5:00.
Q. And what about drink?
A. I'm not sure when the last time I drunk something because I could have drunk some water. I'm not sure.
Q. Okay.
Were you given any food to eat at any time while you were in the interrogation room?
A. No. I was never even offered any food.
Q. Were you offered anything to drink?
A. No.
Q. You did say that you were taken to the bathroom, though, right?
A. Once or twice.
Q. Okay.
Other than Lewis Gardner's statement, did you see anybody else's statement while you were in the interrogation room at Area 6?
A. Eventually at some point they showed me some snippets of Akia's statement and Paul's also.
Q. And what did you see in Akia's statement?
A. He was also saying that I was at a gang meeting and that

I was supposed to came out and said "almighty," or something to that effect.
Q. So we talked about the fact that you had extensive experience with law enforcement before December 2nd, 1992, right?
A. Yes.
Q. You had been arrested, right?
A. Yes.
Q. You had spent time in boot camp and in jail waiting for boot camp, correct?
A. Yes.
Q. And waiting for your plea deal, right?
A. Yes.
Q. And the person that you described to us in your late teens seemed like a pretty tough guy.
A. I guess he was pretending to be tough.
Q. Well, wasn't the behavior that you were encountering at Belmont and Western that evening something that was just kind of normal in your day-to-day life at that time?
A. Absolutely not.
Q. Did anything that you had encountered at that point in time, with your interactions with law enforcement, prepare you for what you were going through at Belmont and Western?
A. No, because I had never been questioned before.
Q. You had never been questioned for any of the charges or

arrests that we discussed?
A. No.
I was -- when I caught those cases I was charged. There wasn't a question as to where you were or who you were with. I was either ID'd or picked up.
So, no, I had never been questioned. It was based on the story of the person who identified me.
Q. Had you ever been held against your will for an extended period of time?
A. No.
Q. What about when you were in boot camp, in jail?
A. That was my will because I -- that was the plea that I took.
Q. Had you ever been locked in a room for 28 or 30 hours?
A. No.
Q. Had you ever been handcuffed to a wall for that period of time?
A. No.
Q. Had you ever been denied the right to a lawyer when you asked for one?
A. No.
Q. Deon, had you ever previously participated in a line-up?
A. No.
Q. Had you ever dealt with a State's Attorney in a police station?

A. No.
Q. You had dealt with a State's Attorney when you did your plea deal, though, right?
A. I don't recall if I dealt with him or my lawyer dealt with him. But if I was there, I had no conversation with him.
Q. You said that you heard Rodney Matthews at some point come to the police station. Do you know at what time he came or what -- what point in time that you had been held?
A. By that time I had lost track of time. I could just hear him yelling from another room.
Q. You mentioned that you had interactions with Detective Villardita. Describe the interactions that you recall with Detective Villardita, please.
A. I think he was coming in trying to like convince me to not let all the other guys put everything on me. And he explained to me like if I didn't say something, that I was gonna get the death penalty and I would never see my kids; that I should say something, because by me not saying anything, it was as if I wasn't showing any remorse for what happened.

And I'm telling him like, I don't know anything about what happened. And why would I say that I had something to do with something that I didn't? And he was like, well, you gonna let these guys walk and you gonna go

down for everything if you don't tell us what your part was in it.
Q. Did Detective Villardita come in alone or with others?
A. He came in alone.
Q. How many times do you think he came in the room?
A. I may have seen him three to four times.
Q. Did you ever tell him that -- did you deny your involvement in the crimes?
A. I denied my involvement when all of them came in the room.
Q. Did you ask Detective Villardita for a lawyer?
A. Yes.
Q. Did Detective Villardita ever give you a sandwich?
A. No.
Q. At some point does a District 23 officer come in the room?
A. Yes.
Q. Who came in?
A. Officer Kosz was one of them. He was one of the officers from the neighborhood, that knew us from the neighborhood.
Q. And when he came in, did you have a conversation with him?
A. Yes.
Q. What did you --

A. To my recollection, I think outside the door they had like pictures of us with our name on the door. So when Kosz saw my name, he opened the door. And he was like, why are you down here? And when I saw Kosz I kind of felt a sense of relief --

MR. SCAHILL: Objection to the content of the conversation. It's hearsay.

MS. AUERBACH: Your Honor, this goes to --

(Brief pause.)

THE COURT: That's all right. You want to respond?

MS. AUERBACH: Yes. Thank you.

It goes to state of mind, your Honor, and -- yeah, that it goes to his state of mind.

MR. SCAHILL: Whose state of mind?

MS. AUERBACH: It goes to Deon Patrick's state of mind as to what occurred and what was being discussed, what the -- the impact of having Officer Kosz come in the room.

THE COURT: The objection is overruled.

BY MR. AUERBACH:

Q. I'm sorry.

A. When Officer Kosz came in the room, the first thing he said to me was what was I doing down there. And when I saw Kosz I felt relief, because I had dealt with Kosz before and I knew him from going to the -- they used to have these community events where the police would come out and they

would ask us to come. So they would explain what their expectations of us was in the neighborhood as far as the citizens.

And so when I saw Kosz, I'm like, Kosz, they trying to say I killed them people. And Kosz was like, man, don't worry about that. We already know who killed them, so we --

MR. SCAHILL: Objection. Move to strike that as hearsay.

THE COURT: Well, I'll sustain the objection to the last statement. It will be stricken. The jury will be instructed to disregard it, as to what Officer Kosz said.

BY MR. AUERBACH:

Q. Did Officer Kosz tell you what he was doing at Area 6 when he came in your room?

A. No.

Q. Okay. What happened next?

A. Kosz actually -- he untightened my cuff because I told him that they had squeezed my cuff too hard that was on my wrist. And he left out to go and, I guess, speak to the detectives. And when he left out, like almost immediately, within 30 seconds, Officer Abreu bust in the room and --

THE WITNESS: Can I swear?

THE COURT: Excuse me?

THE WITNESS: Can I swear?

THE COURT: Ask your attorney.

BY THE WITNESS:
A. Can I say exactly what he said?
BY MR. AUERBACH:
Q. You can.
A. When Abreu came back in the room he was angry, and he was like, Kosz don't run shit up here. You better not talk to Kosz about shit as long as you in here. And if we hear you in there talking to Kosz, we coming back in here. And he tightened my -- he grabbed my wrist and squeezed my cuff back tighter.
Q. What was your state of mind at that point, now that you had seen Kosz and that was the reaction?
A. I was lost because I now understood that they had no intention of hearing the truth or hearing where we were at or what we had to do or didn't have to do with these murders.
Q. At some point did you participate in a line-up?
A. Yes.
Q. Do you know how far into your detention period that you were taken to the lineup?
A. I don't.
Q. Okay. Do you know -- or did you know when you were taken to the lineup who was there to view it at the time?
A. No, I did not.
Q. You've come to learn who actually viewed the lineup, correct?

A. Yes.
Q. Were you brought to the lineup room by detectives?
A. Yes.
Q. And, to your knowledge, were you brought in at the same time as the other people in the lineup?
A. No. I think there were other people in there when I got there.
Q. Did you see Faye McCoy when you were brought into the lineup?
A. I didn't see her, no.
Q. Okay. Did you see others in the lineup room when you -- that you knew?
A. Yes.
Q. Who did you see?
A. Rodney Matthews, Daniel Taylor and Paul Phillips.
Q. How many other people were in the lineup aside from you, Paul Phillips, Daniel Taylor and Rodney Matthews?
A. There were two other guys that I didn't know.
Q. Were you able to talk to the people that you knew?
A. No, because they told us when we went in, don't talk to each other.
Q. Did you make any eye contact or have any non-verbal communications with them?
A. At that point nobody was making eye contact with each other.

Q. Was that the first that you had learned that Paul Phillips and Daniel Taylor were at the station?
A. I think I knew Paul was there, so I may have seen his statement already. But I didn't know that Daniel was actually there.
Q. And you said that you had heard Rodney, so that was not a surprise?
A. Yeah.
Q. What did they have you do in the lineup room?
A. They had us like lined up in a row, I guess 1 through 6, and they asked each individual as they called their number to step to the window.
Q. And did you have to do that one time?
A. They actually made me do it three or four times.
Q. Did they make any of the other individuals do it more than one time?
A. No.
Q. Of all the guys that you knew who were arrested with you, to your knowledge had any of them served any time in prison?
A. They hadn't.
Q. You said that you had seen statements of Lewis Gardner, Akia Phillips and you thought Paul Phillips. Were all of those statements court-reported?
A. Yes, they were.

Q. Did they all come in at the same time?
A. No.
Q. And who do you recall bringing those statements into your room?
A. I believe O'Connor may have brought in two and Villardita brought in one or two.
Q. At some point did they bring anybody else into your room other than officers?
A. At some point they brought Daniel Taylor in my room.
Q. Describe that.
A. When Daniel came in he would not look at me. He was like looking straight towards the wall, and they was -- they asked Daniel like, do you know him? And he was like, yes, that's C-Deon. And they was like, what part did he have to do with the murders? And Daniel was like, he the one that shot them people. And I was like, man, that's crazy. Why would you say that? And they grabbed him, ran him out the room before I could even say anything to him.
Q. And did they leave the room at that time?
A. They left for a second.
Q. What were you thinking when you saw Daniel Taylor come and point you out as the murderer?
A. I couldn't believe it because I knew it wasn't true, and I was trying to rationalize in my mind like what had they done to him to make them come here and do that.

Q. What's the next thing that you recall happening?
A. I was left there for awhile. And I'm not sure if that was before the lineup or after the lineup.
Q. Let me ask you one question.
You mentioned that you had heard Rodney Matthews yelling. Did you ever talk to anybody about what you were hearing?
A. Yes.
Officer Abreu came in my room, and by me hearing him yelling, I assume they were beating on him. So I asked him why were they beating on him, and I guess he fed off of that and was like, if you don't start talking you gonna get the same thing he's over there getting.
But I later learned that Rodney was just yelling, that nobody was actually in there with him. But he gave me the impression that they were in there beating him and they were gonna come in and beat me if I didn't start talking.
Q. So at this point what do you decide to do?
A. I still hadn't decided to do anything. I was still telling them that I didn't do it, that I had nothing to do with the murders.
Q. What's the next thing that you remember?
A. At some point one of them came in my room and lied and said that I had been picked out of the lineup as one of the people coming out of the building. And it further like

confused me as to why would somebody say they saw me come out of there and I had never been in there. But I later learned that that wasn't true either, that I hadn't been picked out.
Q. Do you recall which defendant told you that?
A. I'm not sure which one. They were coming in so much that at some point I wanna say they became faces to me because they all had the same message. But I wasn't really looking at them any more because they weren't listening and I was kind of closed off to what they were saying.
Q. Did whoever told you that you had been picked out of the lineup tell you who it was who picked you out?
A. No.
Q. Okay. After you learned that you were picked out of the lineup, what happened next?
A. I just started to like -- it was unsettling. It was like I was breaking down to the point where I was feeling like I was defeated, and I was coming to the realization that I wasn't leaving that room and -- I was leaving but I wasn't going home, that I was leaving there and going somewhere else that had something to do with being in jail for this double homicide. And I just felt like I gave up at some point.
Q. Did you ask to see a State's Attorney?
A. Eventually by me seeing the other statements, I asked them to bring in a State's Attorney, yes.
Q. And why did you do that?

A. Because I wanted somebody else to hear me say that I didn't have something -- anything to do with it.

And I was also under the impression that -- I knew the State's Attorney didn't work for me, but I didn't think they worked for them either. I thought they would either be unbiased and hear the evidence that's set before them. And I was hoping that he would stop the interrogation and I would be able to talk to my lawyer or whoever I needed to talk to.

Q. So you asked for the State's Attorney. Who did you ask to bring the State's Attorney? Which detective did you ask?

A. Officer O'Connor -- O'Connor was in there.

Q. And what do you recall -- did a State's Attorney come in the room?

A. Yeah, they came. They came, yeah.

Q. Did he come alone?

A. No. He came with a stenographer, with a court reporter.

Q. And what happened when the court reporter came in the room with ASA Magats?

A. As she was setting up her stuff, I yelled out like, so you all gonna make me confess to something I didn't do? And he grabbed her and they left out the room and left me in there with O'Connor.

Q. Did Defendant Magats come back into the room shortly after to say, what on earth is going on here?

A. No.

Q. Did he come back to ask you questions about why you would have said something like that?
A. No.
Q. Did you ever see another court reporter while you were at Area 6, Belmont and Western?
A. No, I did not.
Q. What was the reaction of Detective O'Connor when you said what you said in front of ASA Magats and the court reporter?
A. He came back in and he was upset, too, because I think he felt like I had convinced him to get the State's Attorney and I was ready to make a statement. And he threatened me with like, we not gonna play this mf'g game with you. We don't need you to make a statement. We can make you a statement based off of what everybody else has already told us and that would be enough to get you charged.
Q. Did you believe that the police officers could make a statement without you?
A. At that point I believed they can do whatever they want to do.
Q. Were you thinking clearly at this time, Deon?
A. I was -- I don't think I could think at all because it's like everybody that I felt would come in and help or would come in to listen, they weren't listening. So it got to the point where I just didn't want to be there any more.

Q. Did you think you had any options?
A. No.
Q. How long do you think that you were in the room at this point?
A. I had been there over a day at least I know.
Q. What happens next?
A. They left out the room, and the next time I saw them they had a statement written.
Q. So who did you see who had a statement written?
A. Officer O'Connor and State's Attorney Magats.
Q. Had you told Officer O'Connor that you were willing to make a statement at that point?
A. I don't remember if I told him at that point, but I know that there were some things in the statement that they brought that I wasn't gonna agree to sign.
Q. So before, though, ASA Magats came back in, had you told any of the detectives that you would be willing to see ASA Magats again?
A. I may have told O'Connor.
Q. So when you saw ASA Magats, who was he in the room with?
A. Officer O'Connor.
Q. And you said that he came with a statement. Did you get to see the statement that he came in with?
A. I mean, I saw it.
Q. Was it typewritten or handwritten?

A. It was handwritten.
Q. And what did he say to you, if anything?
MS. QUIST: Objection to form, vague as to "he."
THE COURT: I'm sorry? I couldn't hear the objection.
MS. QUIST: I said objection to form, vague as to "he."
MS. AUERBACH: Okay. I'll clarify, your Honor.
THE COURT: Okay.
BY MR. AUERBACH:
Q. When ASA Magats came back in the room with Detective O'Connor and they had a statement with them, did they show it to you?
A. Yes.
Q. And did you read it?
A. I think I skimmed through it but I didn't read it in its entirety, no.
Q. Were you willing to sign that statement?
A. No.
Q. What happened after that?
A. After they brought the statement back in?
Q. After you said that you wouldn't sign the statement.
A. There were some things in the statement that I wasn't, you know, putting my name next to.
Q. Like what?

A. I wasn't gonna sign anything that said I had killed the lady.
Q. Why not?
A. Because I love my mother, man, and she's always raised me and my brother to be respectful of women and not to beat women or do certain things, and I couldn't wrap my mind around putting my name on there.
Q. Were you concerned if you put your name on that and said that you had done something to a woman, that there would be ramifications in the future?
A. Like in some instances when you going to county jail and you have those type of cases, you run into problems, too. So I knew I was going to the county, I knew I wasn't leaving, and I just -- I couldn't agree to that.
Q. So what did you tell ASA Magats and Detective O'Connor?
A. I told them I wasn't signing anything that said I killed the woman.
Q. And did they agree to change it?
A. Yes.
Q. Did they hand-write another statement while you were in their presence, in your room?
A. No. They left the room again.
Q. Had they asked you any questions, before they left the room, with the first statement?
A. They asked me like different like fluffer questions, I

guess, like what school I went to, did I graduate, was I in a gang, different questions of that nature.
Q. Did they ask anything about the crime?
A. No.
Q. Did they come back at some point with another statement?
A. Yes.
Q. How long had elapsed before they came back with another statement?
A. I'm not sure.
Q. When they came back, did you read the statement?
A. I read the part about the shooting, and I noticed that they had changed that I only shot the man and I didn't shoot the woman.
Q. Did you agree to sign that statement then?
A. Yes.
Q. Was that the second statement that you had seen?
A. That they were saying was mine?
Q. Yes.
A. Yes.
Q. We've heard in this case that suspects are given options of how they want confession statements to be memorialized. Were you given a choice to have a court-reported statement?
A. They knew I would never admit in front of a court reporter that I had killed anyone, so they wasn't willing to bring the court reporter back in my room.

Q. Did you ask for the court reporter?
A. The first time -- well, I asked for the State's Attorney because I had saw the other statements court-reported.
Q. But at the time that you were being presented with handwritten statements, had they given you three different options: You can have it court-reported, you can have it orally rendered, or you can write -- or you can have the State's Attorney write the statement? Were you given those options?
A. No.
Q. Did you sign your second statement?
A. Yes.
MS. AUERBACH: Your Honor, I would like permission to publish Plaintiff's Exhibit 48, which is in evidence.
THE COURT: It may be published.
(Brief pause.)
MS. AUERBACH: Your Honor, could you give us the ELMO instead?
BY MR. AUERBACH:
Q. Deon, do you recognize this document?
A. Yes, I do.
MS. AUERBACH: Your Honor, if I could direct the jury to turn to Tab 48 in their binders.
THE COURT: You may.
BY MR. AUERBACH:

Q. Deon, what is this document?
A. It's a handwritten statement by Joe Magats.
Q. I'm going to turn to the last page for a moment and ask you if that is your signature?
A. Yes, it is.
Q. And do you know whose signatures are below yours?
A. Joe Magats and Terry O'Connor.
Q. To your knowledge, is this the first or the second handwritten statement that was made for you to sign?
A. It's the second.
Q. Did you ever see the first statement again?
A. No.
Q. To this day have you seen it since December 1992?
A. No.
Q. I'm going to go through this and ask you about the statements that are made here, please.
First, starting right here, it says: Deon Patrick, after being advised that Joe Magats is an Assistant State's Attorney, a lawyer and prosecutor and not his lawyer and not the public defender, and after being advised of each of his constitutional rights and stating that he understood each of those rights, Deon Patrick agreed to give the following statement in summary and not word for word.
Were you given your rights by ASA Magats?
A. No.

Q. Was he -- did he give them to you orally?
A. No.
Q. You do see in the typewritten section on this first page that your constitutional rights are reflected there, correct?
A. Yes.
Q. And is that your signature below it?
A. Yes.
Q. Your signature is on the bottom of every page of this document, correct?
A. Yes.
Q. Okay.
I show you the second page. Is that your signature there?
A. Yes, it is.
Q. Is that your signature there? It's cut off a little bit.
A. Yes.
Q. And we saw the fourth already.
The statement then says: Deon Patrick agreed to give the following -- I'm sorry, we read that already.
Deon states that he is 20 years old and can read and write English as he went to Lincoln Park High School and has his G.E.D.
Did you tell ASA Magats that you were 20 years old?
A. Yes.

Q. Did you tell him that you could read and write English?
A. Yes.
Q. And did you tell him that you went to Lincoln Park High School and had your G.E.D.?
A. Yes.
Q. Did you -- the next line says: Deon states that he is a member of the Conservative Vice Lords and he -- I'm sorry. I'm going to read that again, Judge. I apologize.
Deon states that he is a member of the Conservative Vice Lords street gang and has been a member for eleven years.
Did you tell ASA Magats that you were a member of the Conservative Vice Lords?
A. Yes.
Q. Did you tell him that you had been a member for eleven years?
A. No.
Q. How old would you have been when you joined the Conservative Vice Lords if you had been a member for eleven years?
A. Nine.
Q. Next says: Deon states that his gang name is C-Deon and that the "C" stands for Conservative.
Did you tell ASA Magats that that was your gang name?

A. No.
Q. Do you know where he got that information?
A. From the other statements.
Q. Next says: Deon states that on November 16th, 1992, he was on electronic monitoring and had to wear an ankle bracelet.
Did you tell ASA Magats that statement?
A. Yes.
Q. Next says: Deon states that he had a curfew of 10:30 Mon November 16th, 1992.
Do you recall telling ASA Magats that?
A. Yes.
Q. Sorry. Let me restate that. I didn't read that correctly.
It says: Deon states that he had a curfew of 10:30 p.m. on November 16th, 1992.
Did you tell ASA Magats that statement?
A. Yes.
Q. It then goes on to say: Deon states that at about 6:30 or 7:00 p.m. on November 16th, 1992, someone he knows as Goldie called a meeting of the Traveling Vice Lords street gang.
Did you tell ASA Magats that at 6:30 or 7:00 Goldie called a Traveling Vice Lords gang meeting?
A. No.

They actually put Goldie in there because I wasn't -- they knew I wasn't gonna say that I called a meeting. And with Rodney being my friend, I wasn't gonna sign anything that said he called a meeting.

Q. But did you say anything -- were you asked any questions or did you say anything about a gang meeting?

A. No.

Q. It then goes on to say: Deon states that Goldie told him there was a guy who owed Goldie money for drugs and that the guy did not pay the money, so they had to beat him up and break his ribs.

Did you tell ASA Magats that there was a guy who owed Goldie money, that the guy didn't pay money and they had to beat him up to break his ribs?

A. No, because at the time I had no knowledge of Lassiter or his ribs being broken.

Q. It goes on to say: Deon states that Goldie told him that the guy was now out of the hospital and they had to go collect the money.

Did you ever tell ASA Magats anything about a guy being out of the hospital or -- or did you ever tell him that Goldie told you there was a guy who was out of the hospital and that they needed to collect money?

A. No.

Q. It then goes on to say: Deon states that Goldie said

that if the guy did not have the money, then they would have to take care of business.

Did you ever tell ASA Magats any of that?

A. No.

Q. It goes on to say: Deon states that this meeting took place at Clarendon Park.

Did you tell ASA Magats that there was a meeting at Clarendon Park?

A. No.

Q. It says: Deon states that besides himself and Goldie, Black T, Baby T, Popeye, whose real first name is Lewis, Slick, Rock, whose real name is Rodney Matthews, and Carrick, were present at the meeting.

So, first of all, did you mention any of those names to ASA Magats?

A. I may have mentioned those names to O'Connor because they was asking us who hung in the neighborhood and we would get them a list of names of who hung out there.

Q. Who is Carrick?

A. He was like a -- at the time Carrick might have been 11 or 12, but he lived in the neighborhood and he used to play basketball at the park.

Q. Did you ever tell ASA Magats or Detective O'Connor that any of those individuals were attending a gang meeting on November 16th, 1992?

A. No.
Q. It then goes on to say: Deon states that all of those people are Traveling Vice Lords.
Did you tell ASA Magats that those people listed were Traveling Vice Lords?
A. No.
Q. It says: Deon states that during the meeting it was decided who would act as lookouts and who would go into the apartment.
Did you tell ASA Magats or Detective O'Connor that it was decided at the meeting who would be lookouts and who would go into the Lassiter apartment?
A. They decided that for us.
Q. So did you ever say anything like that to any of the defendants in this case?
A. No.
Q. It then goes on to say: Deon states that he remembers that Slick, Lewis and Baby T were to act as lookouts and that he, Rock, Goldie and Black T were to enter the apartment.
Did you ever tell ASA Magats or Detective O'Connor that information?
A. No.
Q. It then says: Deon states that he, Rock, Goldie and Black T entered the building.
Did you ever tell ASA Magats or Detective O'Connor

that you entered the building with those individuals?
A. No.
Q. Did you enter the building with those individuals?
A. Excuse me?
Q. Did you enter the building with those individuals?
A. No.
Q. It then says: Deon states that Goldie pressed a doorbell and someone buzzed them in.
Did you tell ASA Magats or Detective O'Connor that?
A. I don't think I told them that, but that came from me not agreeing to say that I kicked the door in or we kicked the door in either.
Q. Did you tell either of those that you pressed a doorbell and someone buzzed you in?
A. I don't recall how that got in there.
Q. It goes on to say: Deon states that as they went upstairs to the guy's apartment, Goldie gave him a silver revolver.
Did you ever tell ASA Magats or Detective O'Connor that?
A. I may have because that was their way of taking the gun out of my hand, I guess.
Q. So did you ever learn that there was a gun used in the murders?
A. Yes. They had told me. And then in one of the

statements they had shown me, that it supposed to have been a black gun.

Q. So did you give this information to ASA Magats or Detective O'Connor?

A. I may have. I'm not sure.

Q. It goes on to say: Deon states that when the four of them got to the apartment, Goldie knocked on the door and the guy who owed the money for the drugs answered the door and let them in.

First of all, had you learned in the course of you being at Belmont and Western that the door to Lassiter's apartment was supposedly kicked in?

A. Yes.

Q. Who told you that?

A. The officers, either O'Connor or Villardita. Somebody had told me that the door was kicked in.

Q. And did you tell ASA Magats that actually the door -- that whoever answered the door let you in?

A. This is actually -- as I said before, this is their story. But it's like I also -- I know I told them that I wasn't gonna agree to kicking in a door. So I think this was the way of getting that around --

Q. So you told the ASA Magats and Detective O'Connor something different than they had told you?

A. Yes.

Q. Why did you do that?
A. Because there were certain things that was in there that I wasn't gonna agree to sign. And then I also felt like if my statement was different, then they couldn't hold it up as evidence as to what actually happened that day.
Q. Let's go on. It says: Deon states that inside the apartment was the guy and a girl.
Did you tell ASA Magats or Detective O'Connor that?
A. No.
Q. Did you know that there was a man and a woman who allegedly had been -- strike that.
Did you know that it was a man or a woman who had been killed?
A. At that point, yes.
Q. Okay. It says: Deon states that the girl ran out of the room.
Did you tell ASA Magats or O'Connor that?
A. No.
Q. It says: Deon states that they went into another room and Goldie and the guy started arguing about money.
Did you tell ASA Magats or Detective O'Connor that?
A. No.
Q. It says: Deon states that Goldie then asked Deon to shoot the guy.
Did you tell ASA Magats or Detective O'Connor that?

A. No.
Q. It then states: Deon states that he then pulled the gun -- I'm sorry -- yes.
It says: Deon states that he then pulled the gun Goldie had given him and shot the guy in the head.
Did you tell ASA Magats or Detective O'Connor that that happened?
A. No. I just told them that I wasn't gonna say I shot a girl.
Q. So you knew that it was gonna say that you shot the man, right?
A. Yes.
Q. It then says: Deon states that he then pulled the gun -- I'm sorry.
It then says: Deon states that the girl then started running and that Black T chased her and grabbed her and brought her back to the room.
Remind us, please, who is Black T?
A. Black T is Daniel Taylor.
Q. Did you tell ASA Magats or Detective O'Connor that Daniel Taylor had grabbed Sharon Haugabook and brought her back to the room?
A. No.
MS. AUERBACH: Your Honor, is this a good place to stop?

THE COURT: How much longer before you finish with this?

MS. AUERBACH: I'm going to go through the entire statement. I'm on Page 3 and it ends at Page 4. So I'm happy to continue.

THE COURT: No, I think we better break now. Let's do that.

We'll break for lunch, ladies and gentlemen. We'll return here -- it's almost 12:15. We will return here at 1:30 and recommence the testimony at that time.

Have a good lunch.

(Jury exited the courtroom.)

THE COURT: You may step down, sir.

(Witness left the stand.)

THE COURT: Okay. I'm going to have a ruling during the lunch break on the Fifth Amendment issue.

Is there anything else we need to take up at this point?

MR. SCAHILL: We had judicial notice motion filed, too, which may actually come into play at some point during the cross. I don't know if I'm going to get to it today --

THE COURT: What's the judicial notice motion? I missed that?

MR. SCAHILL: I'm sorry?

THE COURT: What is the motion? I missed that.

What is it?

MR. SCAHILL: It's a motion that I never thought I would bring of this type in my career, but it's to have you take judicial notice of a notorious incident in professional sports where Joe Theismann's leg was broken my Lawrence Taylor of the New York Giants.

And the reason that we brought that up is that one of Mr. Patrick's alibi witnesses swore under oath in an affidavit that was submitted as part of post conviction, that he knew that the event that -- he knew he was watching Monday Night Football on the night of the murders because this was the game that was going on. The only problem is that the game had happened seven years earlier. So, it's impeachment.

We submitted a number of reputable sports sources to that effect, and we're asking the Court to take judicial notice of that game having occurred.

And then the other aspect doesn't have to do -- there's two parts of the judicial notice motion. The other one actually doesn't pertain to Mr. Patrick's testimony but it's going to pertain to Mr. Grimes' testimony, who may go -- actually, who I believe is going to be the next witness after Mr. Patrick. And it's a similar issue, about a sporting event taking place on this particular day.

In Mr. Grimes' case he alleges he was watching the Chicago Bulls play that evening and, of course, according to

our research, they did not play that evening. So that's the crux of it.

MR. CHANEN: I mean, Judge, I don't know if you want me to argue now. I pulled some cases, including about six cases from your Honor, and this is a disfavored process. There's no -- they have not provided any explanation for why any of this evidence could not have been -- I mean, they've had the 2002 -- I mean, they took Grimes' Deposition two or three years ago. They had the evidence that the -- the affidavit that they're trying to impeach -- at least the state has had it for 15 years.

And so the question is, why in the middle of -- I mean, this is a question your Honor has been asking. Why in the middle of the trial, when they had plenty of ways to put this on their exhibit list, perfect their impeachments, do it any way they wanted to do it -- this is the first we're hearing about Joe Theismann, and the first we're hearing about the Bulls' success or lack of success in 1992, or their home schedule, or their away schedule in 1992. And so that's position No. 1.

Position No. 2 is, your Honor has written several times that the rule, which I'll grab -- I didn't know we were going to argue this at the moment.

In their written motion they -- you know, the first place I would go is to look at rules that you issued. And

you were very specific that not everything comes in under this rule.

It has to be a fact that is generally known within the trial courts' territorial jurisdiction. And I don't think that the Bulls schedule on a specific night, whether they played or didn't play, is a fact generally known within the trial courts' jurisdiction. Or, it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. And your Honor has written that that second prong is not to swallow the rule.

So I just don't think -- you know, my understanding is that judicial notice is for things like, that 25 years ago, November 16th, fell on a Monday, because we all agree that the Gregorian calendar controls. We just don't have a memory of which day of the week November 16th fell on in 1992. So that's an example of something that you could take judicial notice of.

Distances. We could hire someone to go out and measure the distance between, say, where Rodney Matthews and Deon Patrick were watching the football game at the corner of Hazel and Agatite, but instead of that, you can take judicial notice that that's 1.2 miles.

But the idea of taking judicial notice that Theismann got his leg broken on a certain day by a certain defensive end is not in the nature -- under either the common

law or the Federal Rules of Evidence of what was ever intended for you to take judicial notice.

THE COURT: Well, I certainly didn't know it was Taylor that did it, that's for sure.

MR. SCAHILL: Lawrence Taylor? He was pretty dirty, Judge.

THE COURT: Well, you know, my immediate reaction is that you can fairly easily obtain evidence of the Bulls' schedule. Their administrative offices are right here. They have records of that, and that would have been an easy thing to do. And, frankly, I don't see the need for judicial notice of that.

I don't see how that can -- how I can conclusively ascertain what the Bulls' schedule was during any given day, week, month or year, nor do I think it's common knowledge as to what the Bulls' actual schedule was on a particular day.

The incident with the quarterback for the Redskins, Joe Theismann's thigh bone being broken and his -- frankly, it's a bit more widely known than the Bulls' particular game schedule for any period of time. It is an incident that would be -- it would cause a great deal of work and -- to attain independent evidence of it, you know, as it would to get evidence of scientific facts that we all accept, such as the earth being round. But -- and I'm more likely to allow that. The fact is easily ascertainable by going to multiple

newspaper headlines, at least if you look at the sports section, I suspect, where it was well documented.

But I'm just really perturbed why these things are being brought up now. I mean, you know, the opening statements referring to it, no prior ability to tell his story, I can understand that you can't anticipate, but this -- why are we doing this now? I mean --

MR. SCAHILL: Well, I did ask -- during Mr. Matthews' deposition, I mean, this issue, of course, came up, and he did sort of come off of the specific game a little bit and thought it might be, you know, a different game.

But nonetheless, he was so specific in the affidavit. I mean, this isn't something we would do discovery on. As much as I would love to depose some of those NFL players, you know, it just didn't seem to be necessary. It's a historical event, for sports fans, anyway, and that's, you know, one of the things that judicial notice is for. I mean, this isn't something we're gonna do affirmative discovery on. It's indisputable. It's an indisputable historical fact.

MR. CHANEN: Judge, it is an indisputable historic fact that Taylor tackled Theismann and it was a career-ending injury.

What is not an undisputed fact, or very easily ascertainable, is the date that that occurred. That's what

they're trying to ask you to take judicial notice of.

They want you to draw the -- they want you to help them draw the inference for the jury that Mr. Matthews lied in his affidavit.

THE COURT: No. They want me to establish a fact. The inferences that the jury draws are totally different.

So let me ask you this: Do you have an issue as to when this actually happened?

MR. CHANEN: I don't have an issue that it happened, nor do I necessarily have an issue on the date that it happened. I think you could find an article that gave the date, and if you trusted the author of the article, you know, I don't have a problem with that.

What I have problem with is proving up that fact through judicial notice. I don't think it's appropriate to the rule. I don't think it's appropriate to the circumstances given the opportunities -- the multi ways they could have laid the foundation for such an article or such a date. They could have impeached him at his dep, they could have -- once he moved off of it at his dep they could have found ways to put in impeachment material.

They listed 1,161 exhibits and not a single one had to do with Theismann having a career-ending injury at the hands of Taylor.

MR. SCAHILL: Judge, it's just not really an

evidentiary issue as far as documents are concerned. This is a historical event. And your Honor has very wide discretion and --

THE COURT: I'll take it under advisement.

Again, I'm disappointed that I don't have weeks to take it under advisement, as I should, given that this is an issue that you knew was there. Clearly you knew it was going to be contentious and it involves something that could have been addressed during our multiple days of motions in limine hearings so that we would avoid having to decide this under pressure during a lunch break.

I'll take it under advisement. During the lunch break the ruling on the Fifth Amendment issue will come out as well.

Anything else?

MR. SCAHILL: Thanks, Judge.

MS. AUERBACH: Thank you.

MR. CHANEN: Thank you.

THE COURT: Okay. We're recessed.

MR. BORKAN: Thanks, Judge.

(Trial recessed until 1:30 p.m.)

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DEON PATRICK | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 14 C 3658 |
| | ) | |
| CITY OF CHICAGO, et al., | ) | Chicago, Illinois |
| | ) | March 21, 2017 |
| Defendants. | ) | 1:55 o'clock p.m. |

VOLUME 8B
TRANSCRIPT OF PROCEEDINGS - TRIAL
BEFORE THE HONORABLE RONALD A. GUZMAN, and a jury

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | VALOREM LAW GROUP LLC<br>BY: MR. STUART JAY CHANEN<br>MS. NICOLE NEHAMA AUERBACH<br>MR. DANIEL C.F. WUCHERER<br>218 North Jefferson Street<br>Suite 300<br>Chicago, Illinois 60661 |
| For Defendant City of Chicago: | DYKEMA GOSSETT PLLC<br>BY: MR. DANIEL MATTHEW NOLAND<br>10 South Wacker Drive<br>Suite 2300<br>Chicago, Illinois 60606 |
| For the individuals defendant police officers: | BORKAN & SCAHILL, LTD.<br>BY: MR. TIMOTHY P. SCAHILL<br>MS. MISHA ITCHHAPORIA<br>MR. STEVEN BLAIR BORKAN<br>20 South Clark Street<br>Suite 1700<br>Chicago, Illinois 60603 |

APPEARANCES: (Continued)

For Defendants County of Cook, Martin Fogarty, and Joseph Magats:

COOK COUNTY STATE'S ATTORNEY
BY: MR. CHAKA M. PATTERSON
MR. THOMAS EDWARD NOWINSKI
500 Richard J. Daley Center
Chicago, Illinois 60602

JONES DAY
BY: MS. PAULA SUE QUIST
77 West Wacker Drive
Suite 3500
Chicago, Illinois 60601

MS. MARY M. HACKER, CSR, FCRR
Official Court Reporter
United States District Court
219 South Dearborn Street
Room 1212
Chicago, Illinois 60604
(312) 435-5564
mary.hacker.csr@gmail.com

(The following proceedings were had in open court outside the presence of the jury:)

THE COURT: So I have the ruling I promised. Give you a couple minutes to digest it, and we'll bring the jury out.

MS. AUERBACH: Your Honor, we will withdraw our objection to the entrance of the TACS exhibit that you believed was a public document.

THE COURT: I'm sorry? One more time. You are withdrawing?

MS. AUERBACH: We withdraw any objection to the document that you were shown this morning by Mr. Scahill, TACS.

THE COURT: Okay. TASC.

MS. AUERBACH: TASC, sorry.

THE COURT: Okay.

(Brief pause.)

MS. AUERBACH: Thank you, your Honor. We have had an opportunity to review it.

THE COURT: Okay. We will bring the jury out now.

MS. AUERBACH: Can Mr. Patrick resume the stand?

THE COURT: Yes.

MS. AUERBACH: And could you, Judge, give us control again of our computer, please?

(Jury entered the courtroom.)

THE COURT: You may resume.

MS. AUERBACH: Thank you, your Honor.

DEON PATRICK, TESTIFIED IN HIS OWN BEHALF, PREVIOUSLY SWORN

DIRECT EXAMINATION (Resumed)

BY MS. AUERBACH:

Q. Deon, when we -- right before the break, we were going through the handwritten statement. I'd like to draw your attention back to where we left off.

You have that in front of you?

A. Yes.

Q. Could you -- let me read the next statement. It says: Deon states that Black T was holding on to the girl. Is that something that you told ASA Magats?

A. No.

Q. It says: Deon states that Goldie then started yelling, quote, shoot the bitch, shoot the bitch, end quote.

A. No.

Q. Is that something that you -- that you said to ASA Magats?

A. No.

Q. It then says: Deon states that Goldie then took the gun and shot the girl. Is that something that you told ASA Magats?

A. No, I didn't state it like that. That was part of the agreement to take out the fact that I shot the girl.

Q. It then says: Deon states that after the girl and the guy were shot, Goldie went into the guy's pocket and took out some money. Did you tell ASA Magats that?

A. No.

Q. It says: Deon states that they then ran out of the apartment. Did you tell ASA Magats that?
A. No.
Q. Then states: Deon states that from the apartment he went to Andrea Phillips' house. Did you say that?
A. I don't think it was stated in that context. I was asked about where I -- what happened with me that night. And I interrupted that raid. So that's how I ended up in Andrea Phillips' house.
Q. Did any of the detectives raise the issue of the raid having occurred on November 16 with you?
A. Yes.
Q. And do you know how they learned about the raid?
A. I think from Paul's statement.
Q. It then goes on to say: Deon states that when he got the police -- I'm sorry. Let me reread that.
Deon states that when he got there, the police were there because they raided Andrea's house. Did you tell ASA Magats that?
A. No.
Q. It then says: Deon states that the police took him to the 23rd District station and released him. Did you tell ASA Magats that?
A. I may have because I got released that night. I didn't get charged with anything.

Q. Then says: Deon states that he then went home to 1637 South Springfield. Did you tell ASA Magats that?
A. No. That's where I was living at. That's where they picked me up from.
Q. It then says: Deon states that the state's attorney showed him Exhibit 2 of 12/3/92, and that Exhibit 2 is a photo of himself. First of all, did ASA Magats show you any photo of yourself?
A. They showed me pictures, yes.
Q. And was one of them of you?
A. To the best I recall, yes.
Q. And did you identify yourself from that photo?
A. Yes.
Q. It then says: Deon states that the state's attorney showed him Exhibit 3 of 12/3/92, and Exhibit 3 is a photo of Paul Phillips. Do you recall seeing a photo of Paul Phillips?
A. They showed me pictures of everybody and was asking me, who were they.
Q. And did you identify everybody?
A. By name, yes.
Q. It then says: Deon states that Paul Phillips was at the meeting on November 16, 1992, at Clarendon Park. Did you tell ASA Magats that Paul Phillips was at a meeting on November 16 as Clarendon Park?
A. No.

Q. Then says: Deon states that the state's attorney showed him Exhibit 4 of 12/3/92, and Exhibit 4 is a photo of Baby T. First of all, remind us who Baby T is please?
A. Baby T is Deon, Akia Phillips.
Q. And was one of the photos you saw of Akia Phillips?
A. Yes.
Q. And did you identify Akia as Baby T?
A. I think I identified him as Deon but --
Q. It then says: Deon states that the state's attorney showed him Exhibit 5 of 12/3/92, and Exhibit 5 is a photo of Black T. Did you identify a photo of Black T with ASA Magats that night?
A. Yes.
Q. It says: Deon states that the state's attorney showed him Exhibit 6 of 12/3/92, and Exhibit 6 is a photo of Goldie. Did you identify a picture of Goldie?
A. I may -- I may have been shown a picture of Goldie, yes.
Q. And again, Goldie is who?
A. Dennis Mixon.
Q. Did you identify Dennis Mixon in the picture?
A. Yes.
Q. Then says: Deon states that the state's attorney showed him Exhibit No. 7 of 12/3/92, and that Exhibit 7 is a photo of Rock. Was that one of the photos that you saw that evening?
A. It could have been, yes.
Q. Then says: Deon states that the state's attorney showed

him Exhibit 8 of 12/3/92, and that Exhibit 8 is a photo of someone known to him as Cuzzo, and that Cuzzo was not involved in any of the incidents on November 16, 1992. First of all, do you know who Cuzzo is?
A. Yes.
Q. Who -- did you know on December 4 who Cuzzo was?
A. I knew who he was. I didn't know his real name, though.
Q. Do you now know his real name?
A. Yes.
Q. What is?
A. Kenneth Wade.
Q. And were you shown a picture of Cuzzo by ASA Magats?
A. I'm not sure. I know that I was shown pictures of all the guys that hung around us. May, may not have been.
Q. Do you recall, though, telling ASA Magats specifically that Cuzzo was not involved in any of the incidents on November 16, 1992?
A. No, because I don't know who all was involved in the incidents.
Q. It then says: Deon states that he was treated well by the state's attorney and by the police. Did you tell ASA Magats that?
A. Never.
Q. It says: Deon states that he was not made any promises for his statement nor was he threatened in any way. Did you tell

ASA Magats that?
A. Absolutely not.
Q. It says: Deon states that he was allowed to eat, drink, smoke and use the bathroom. Did you tell ASA Magats that?
A. No.
Q. Did you smoke in 1992?
A. I've never smoked a cigarette in my life.
Q. It says: Deon states that he is free from the effects of drugs and alcohol and appears to be free from the effects. So at least with respect to the beginning part of that, did you tell ASA Magats that you were free from the effects of drugs and alcohol?
A. No.
Q. Then says: Deon states that he has read all four pages of this statement and has initialed any changes. First of all, did you read all four pages of this statement?
A. I didn't read all four. But I skimmed over parts that they pointed out to me that had been changed.
Q. That had been changed from the first statement?
A. Yes.
Q. And it says: Deon has initialed changes. Are there any changes?

MR. SCAHILL: Mischaracterizes, doesn't say that.

MS. AUERBACH: I'm sorry? I will restate that, your Honor. I may have misspoken.

BY MS. AUERBACH:
Q. It says: Deon states that he has initialed any changes. Are there any changes that are listed on this statement where your initials are found?
A. I couldn't have stated that because my initials is no where on this paper.
Q. What are your initials?
A. DP.
Q. After you agreed -- well, first of all, let me ask you one more question before we take this down.
MS. AUERBACH: Natalie, could you please turn to page 1.
BY MS. AUERBACH:
Q. The very front of this it says, Deon Patrick, and then, taken December 4, 1992, at 3:35 a.m. Do you know if 3:35 a.m. was the time that you signed this statement?
A. I have no idea what time it was.
Q. So you don't know if that is the time it actually was first written?
A. No.
Q. After you signed the statement, what happened?
A. They left the room, left me in there still handcuffed. I think at that point little while later somebody brought in a bag of chips and a pop. And eventually I was taken downstairs I think for booking.

Q. Was the bag of chips and pop the first food that you had had since you had arrived at Area 6?
A. Yes.
Q. Was the lockup in the same building as the detectives -- as the interrogation room where you were?
A. Yes, it was downstairs.
Q. Okay. And how long were you in lockup?
A. I'm not sure because I had lost track of time.
Q. Do you know -- at some point you were transferred to the county, correct?
A. Yes.
Q. And do you know what day you were ultimately transferred to the county jail?
A. I left for the county on December the 5th.
Q. At some point were you -- well, strike that.
After you confessed, were you ever taken for an interview with Detective Villardita?
A. It wasn't an interview, but he did come and take me back out the cell.
Q. So we heard Detective Villardita testify that he might have interviewed you about the whereabouts of Goldie. Did that occur?
A. He never asked me about Goldie.
Q. Were you removed from lockup at any point after you had been placed there after you confessed?

A. Yes, I was.
Q. Okay. Where did you go?
A. He took me back upstairs to convince Rodney Matthews and Joe Brown to also make a confession, so we could all leave and go to the county together.
Q. And when you said, he, who are you referring to?
A. Detective Villardita.
Q. Do you know approximately what time it was?
A. No.
MS. AUERBACH: Your Honor, I'd like permission to publish Plaintiff's Exhibit 33 please. It's in evidence.
THE COURT: May be published.
BY MS. AUERBACH:
Q. Deon, do you recognize this document?
A. Yes.
Q. What is it?
A. It's arrest report from the incident.
Q. And this is an arrest report, and has your name at the top. Do you see that, Deon Patrick?
A. Yes.
Q. Underneath it it says, aliases and nicknames. First of all, it says Lil Deon, L-i-l. Is that a nickname that you went by?
A. I think it was a nickname that was on the previous arrest report. But I've always been Deon.

Q. And then it also says, a.k.a. C Deon. Do you know where that came from?
A. Them typing it there from making a distinction between me and Deon Phillips in these statements.
Q. Okay. I'd like you to look at the second page of this document, please.
MS. AUERBACH: And, Natalie, if you can blow up the first part. At the top it says: Moving of arrestee out of into arrest slash detention facility.
So first of all, if you look at the -- if you look down below that, Natalie, under record -- I'm sorry, under receiving screening record for arrestee to be held in lockup.
BY MS. AUERBACH:
Q. Do you see the date is December 4, 1992?
A. Yes.
Q. And what time is listed there?
A. 8:10 time in, and 8:17 time out.
Q. So below that I am looking at December 4, '92, time 0435. Do you see that?
MR. SCAHILL: You are having the wrong thing highlighted.
BY MS. AUERBACH:
Q. Do you know if that was the time that you were brought down to lockup after you gave the handwritten statement, which is marked as December 4, 3:35 a.m.?

A. I don't know for sure, but it could have been.
Q. Up above that just right above that, where it says: December 4, '92, time in and time out, eight -- 0810, time out is 8:17. There is a list of a visitor. I believe that the name is Michael Vellarde?
A. Yes.
Q. And it says, relationship, parole officer.
A. Yes.
Q. Who is Michael Vellarde?
A. He was my parole officer at the time. He had came to retrieve the house arrest box, to cut it off my ankle.
Q. So you had confessed. You went down to the lockup. And then Mr. Vellarde came, and you were removed for a period of time?
A. From the lockup?
Q. Yes.
A. Yes.
Q. In order for him to do what with your electronic monitoring?
A. He cut it off. I think they took me to like a side area that seemed like it for visitors, if you have visitors at the lockup. And he talked to me for a second and cut the box off my ankle.
Q. Okay. At the very top under moving of arrestee out of and into arrest detention facility, it says, 04 December '92. And

the time I believe says 1845. You see that?
A. Yes.
Q. And then it says: Turned over to or received from. Can you tell what name is listed there?
A. I think it's Villardita.
Q. There is a star number following that, 20849. And then it says: Reason interviewed. Do you see that?
A. Yes.
Q. Do you know what time in civilian time 1845 is on December 4, 1992?
A. I think it would be 6:45.
Q. In the evening?
A. Yes.
Q. And so if your court -- if your handwritten statement was at 3:35 a.m., that would be more than 12 hours after you had been in lockup, correct?
A. Yes.
Q. And does that comport with your memory of what time you were brought to Rodney Matthews and Joe Brown's rooms?
A. It really doesn't bring back my memory because when I got downstairs I finally got a chance to go to sleep. So I don't know what time they brought me up there.
Q. Did you have any reason to be with Detective Villardita -- well, strike that.
Were you with Detective Villardita for any reason

other than to go to Joe Brown and Rodney Matthews' rooms after you were in lockup after you had confessed?
A. No.
Q. So tell us about you going into the rooms. Whose room did you go into first?
A. He took me into Matthews' room first. On the way he was telling me like they couldn't get Matthews to confess.
MR. SCAHILL: Objection, nonresponsive.
THE COURT: Sustained. That will be stricken.
BY MS. AUERBACH:
Q. Did Detective Villardita say anything to you when you were being escorted to Rodney Matthews' room?
A. Yes.
Q. What did he say?
A. He said that they couldn't get Matthews to confess, and that -- I don't know if Matthews was requesting me or that he wanted me to talk to Matthews to see if I can get him to confess.
Q. And were you actually brought into Rodney Matthews' room?
A. Yes.
Q. Was that an interrogation room that was similar to the one that you had been in?
A. Yes, it was.
Q. And when you went in there, was Detective Villardita in the room with you?

A. Yes.
Q. Were there any other defendants or any other people in the room aside from you, Rodney Matthews and Detective Villardita?
A. No.
Q. And describe what happened between you and Rodney Matthews.
A. When he first walked -- opened the door and I walked in, Matthews was like why the F would I confess to something that we didn't do. And he went to snatch me out.
Q. He meaning Detective Villardita?
A. Yes. He didn't want Matthews talking to me like about why I had done what I done. So as he was taking me out, Matthews started to plead with him, like, please don't take him. Okay. I won't say that no more.
And he let me stay in there and talk to him.
Q. And what did you discuss with Rodney Matthews at that time?
A. At that point in my mind I had come to the realization that we weren't leaving, going home. And I didn't actually know what Matthews had been subjected to because I'm still under the impression that they had been beating on him.
And they was telling me that we could all go to the county. Detective was telling me that we could all go to the county together on the same bus. So I was trying to get Matthews to leave with me.
Q. Were you trying to convince him to confess?
A. I was trying to convince him to do whatever it took to get

out of that room and leave with me.
Q. Did you have an opportunity to observe what Rodney Matthews looked like at the time?
A. He was -- he was very shooken up. He was mad, I guess, angry. And he had -- he had urinated all over hisself, like he had peed on hisself in the room.
Q. How long do you think that you were in the room with him?
A. Probably about five to ten minutes at the most.
Q. Where were you taken afterwards?
A. Directly down the hall to Joe Brown's room.
Q. And who were you taken by?
A. Detective Villardita.
Q. Did you go inside Joe Brown's room?
A. Yes, I did.
Q. And did the detective also go with you?
A. Yes.
Q. What do you occur -- what do you recall happening in Joe Brown's room?
A. When I got in Joe Brown's room, he was like -- he was very disheveled, like his hair was messed up. And you could tell he had been crying. He was still crying a little bit. And he was broken to the point where he couldn't understand what was going on.
And I tried -- I kind of like explained the same thing to him, that if he do what they was asking him, that we could

all leave together, because we weren't leaving there going back home anyway.

Q. After you had that conversation with Joe Brown, where -- were you taken somewhere?

A. I was taken back to the lockup.

Q. Did you remain in the lockup until you went to the county?

A. Yes.

Q. At some point -- well, first of all, when you got down to the lockup, do you recall seeing any of the other individuals who had been charged with you who had confessed previously?

A. Eventually Rodney Matthews came down. And they put him in a cell with me.

Q. So let me just ask, though, before Rodney Matthews came down, did you recognize anybody else in lockup when you were brought down?

A. No.

Q. So once Rodney Matthews came down, what happened? Did you have a conversation with him?

A. They put him in the cell with me. And he began asking me again like, why would you confess to this? Why would you do that?

And I told him, like, at that point I didn't think I was leaving that room. And they weren't letting us leave that room without confessing.

Q. At some point did anyone else come down to the lockup?

A. Yes, they brought Joe Brown down.
Q. Did you have an opportunity to see Joe Brown when he was brought to the lockup?
A. Yes, they walked him past our cell and put him next to us.
Q. And describe the cell, was it all walls or were you able to see?
A. It's like three walls. In the front is bars.
Q. Okay. And when Joe Brown walked by, were you able to -- to tell his emotional state at the time?
MR. SCAHILL: Objection, form of the question.
THE COURT: No, I will allow it.
MS. AUERBACH: Your Honor, I lost the question. I apologize. Is it possible to have it read back?
THE COURT: Sure.
(Record read as requested.)
BY MS. AUERBACH:
Q. And your answer?
A. Yes.
Q. Let me just ask one clarifying question. Do you know how long you were in the cell with Rodney Matthews before Joe Brown came?
A. I don't think it was that long. But I'm not sure exactly how long it was.
Q. Can you estimate how long it was?
MR. SCAHILL: Objection, foundation.

THE COURT: Overruled.
BY THE WITNESS:
A. I would probably say 30 minutes to an hour, if that.
BY MS. AUERBACH:
Q. Okay. Did you have an opportunity to speak with Joe Brown when he was in the cell next to you in lockup?
A. Yes.
Q. Where were you when you were speaking to Joe Brown?
A. We came to the bars at the front of the cell, and we were talking.
Q. And were you able to determine whether he was crying at the time?
A. He was still crying. He was still pretty shook up.
Q. So --
MS. AUERBACH: Your Honor, I would ask for leave to proceed?
THE COURT: Ask your next question.
BY MS. AUERBACH:
Q. What did Joe Brown say now?
MR. SCAHILL: Objection.
THE COURT: Overruled.
BY THE WITNESS:
A. Joe Brown was telling me about the different things that happened to him in the interrogation room.
Q. What did he say happened?

A. Joe Brown told me at that time that one of the officers put a gun in his mouth, and they told him they'd make it look like an accident.
Q. I'm sorry. I missed the -- they told him?
A. That they will make it look like an accident.
Q. Did Joe Brown indicate who had done that to him?
A. I don't recall which officer because I don't recall who was interrogating him.
Q. Did -- did he tell you anything else that had happened?
A. He was just telling me how they kept like -- telling him like he was never coming home. Saying, as they did with me, like he'd never see his kids. And that he was just -- he was broken. He just wanted to get out of that room. He was scared for his life in there.
Q. Did you and Rodney and Joe Brown get transferred to county together?
A. Yes, we did.
Q. Did you learn that you were charged with double murder and a number of other crimes?
A. Yes, I did.
Q. Once you got into county, did you ever get out of jail or prison before January 10, 2014?
A. No, I did not.
Q. Sometime after you arrived at the county, did you contact a lawyer?

A. Yes.
Q. Who did you contact first?
A. I contacted Sheila Kalish, who I had a call with her since I had been in police custody.
Q. How many times do you think in the course of the time that you were at Area 6 did you ask for Sheila Kalish?
A. Anywhere from three to five times.
Q. Did Ms. Kalish agree to represent you?
A. When I called her from the county?
Q. Yes.
A. No.
Q. Why not?
A. She was a paid attorney, and I didn't have the money to afford to pay for her.
Q. Did she tell you that -- did she give you options of other things to do?
A. Well, she -- I don't -- I don't think she gave me options like other attorneys to call. I think she advised me that the state would afford me a lawyer, give me a public defender or something.
Q. Okay. did you ultimately get a court-appointed lawyer?
A. Yes, I did.
Q. What was his James?
A. His name was John Theis, T-h-e-i-s.
Q. Deon, before you were arrested on December 2, 1992, did you

have an opportunity to put your personal possessions in order?
A. No.
Q. Did you have an opportunity to say good-bye to your friends and family?
A. No.
Q. Did you ever get an opportunity to go back to 1637 South Springfield, where your grandmother lived?
A. No.
Q. Were there family and friends who you never saw after that -- that day?
A. Yes.
Q. At some point did you learn that the grand jury had indicted all seven who had been arrested between December 2 and 5?
A. Yes.
Q. What did you learn about Dennis Mixon?
A. As of --
MR. SCAHILL: Form of the question.
BY MS. AUERBACH:
Q. Did you learn anything about another arrest being made in the case?
A. Later on in like March of '93.
Q. And who did you learn got arrested in March of '93?
A. Dennis Mixon.
Q. Did you maintain your innocence while you were in Cook

County Jail?
A. Yes, I did.
Q. And where did you remain while you were waiting for trial?
A. I was in different divisions in the county because sometime they move you from deck to deck.
Q. So you were in the county jail, though, from the time that you were brought there on December 5 until you actually had your trial?
A. Yes.
Q. Do you recall the date of your trial?
A. It was early March of '95.
Q. Did you raise the fact that you were contending that your confession was coerced to a judge at any point?
A. Yes, I did.
Q. How did you do that?
A. We had a motion to suppress evidence hearing, I think it's called.
Q. And did your confession get suppressed at that time?
A. No, it did not.
Q. I want to talk a little bit about the trials. So eight of you were charged with the crimes as of March, once they had arrested Dennis Mixon, correct?
A. Yes.
Q. We know the disposition of Akia and Joe Brown. And that's unrelated to this case, correct?

A. Yes.
Q. They did not go to trial, right?
A. No.
Q. Okay. So did the remaining six who were charged with these crimes get tried in one trial together?
A. No.
Q. How was that broken out?
A. We went two at a time.
Q. Who were you paired with?
A. Lewis Gardner.
Q. Did you have any choice as to who you were paired with for trial?
A. No.
Q. And what order was your trial with Lewis?
A. We went to trial first.
Q. Okay. Had you spent time with Lewis Gardner after you were charged with the crimes?
A. No.
Q. Did you choose a judge or a jury trial?
A. I took a jury trial.
Q. What did Lewis Gardner take?
A. He took a bench trial, will be by Judge.
Q. And what did you plead?
A. I pled not guilty.
Q. What did Lewis Gardner plead?

A. I don't -- like I think initially he pled not guilty, but when he went to trial --
Q. Let me just back up. Were you in the room when he had to give a plea?
A. He didn't give a plea actually. He went to trial.
Q. Okay. At some point after you were charged with these crimes, did you recall that Daniel Taylor had been in lockup on November 16?
A. Actually Daniel recalled it. And so we were all made aware of it, yes.
Q. And did you mention that to your own lawyer, John Theis?
MR. SCAHILL: Objection, this is hearsay.
THE COURT: Overruled.
BY THE WITNESS:
A. It was always spoken about when we went to court where all the attorneys were present. So he was aware of it, yes.
BY MS. AUERBACH:
Q. Prior to your trial, did you learn that the state had turned over evidence relating to this case?
A. I don't understand the question.
Q. Did you know that as part of the trial process, as part of the process of bringing you to trial for these charges, that the state had to turn over documents to your lawyer?
A. Yes.
Q. And did you -- did you learn that the state in fact did

that?

A. Yes.

Q. And did you learn that there were certain reports saying an individual by the name of Adrian Grimes had seen Daniel Taylor before 10:00 p.m. in Clarendon Park?

MR. SCAHILL: Objection. This is all leading, Judge. Form of the question.

THE COURT: Sustained as to leading.

BY MS. AUERBACH:

Q. Did you -- did you know that there were any reports relating to Adrian Grimes?

A. Yes.

MS. AUERBACH: Judge, I'd like to publish Defendants' Exhibit 47. It's admitted in evidence.

THE COURT: May be published.

BY MS. AUERBACH:

Q. Deon, I'd like to direct your attention to this document. It is a general progress report dated December 7 and 8, 1992. And at the top it says: Subject, Grimes, Adrian.

MS. AUERBACH: Natalie, can you pull out just a little bit. I want to scroll down to the text, please.

BY MS. AUERBACH:

Q. Do you see part way down where it says: He saw Deon Patrick, Daniel Taylor, who he knows as Black T -- or, I'm sorry -- as Black something, and Lewis Gardner playing

basketball.

Do you see that?

A. Yes.

Q. Did you learn that Adrian Grimes had identified you as somebody who was at Clarendon Park playing basketball on November 16, 1992?

A. I don't know if I learned that at that time, because they were more focused on him identifying Daniel Taylor.

Q. Did you know that he had identified you as well?

A. No.

MS. AUERBACH: Judge, I'd like to direct your attention to -- I'm sorry, I'd like permission to publish DTX 53 in evidence.

THE COURT: May be published.

BY MS. AUERBACH:

Q. First of all, were you playing basketball that evening at Clarendon Park on November 16, 1992?

A. No.

Q. So directing your attention to DTX 53, this is a -- another police report. It's dated January 4, 1993.

MS. AUERBACH: Judge, would you give me one moment please?

(Brief pause.)

BY MS. AUERBACH:

Q. I'd like to direct your attention to page 4 of this

exhibit. At the top part way down, on the left it says: Adrian Grimes. And in the second paragraph it says: Inside the field house he observed Deon Patrick, known to him as C Deon, Daniel Taylor, known to him as Black something, Lewis Gardner, known to him as Popeye, and Paul Phillips whose name he did not know but identified him by photo.

First of all, did you know Adrian Grimes in December 1992?

A. I had seen him around the neighborhood, but I didn't know him like that.

Q. Did he have a nickname?

A. They was calling him Pookie, yes.

Q. Did Adrian Grimes ever refer to you as C Deon?

A. No.

Q. Had you ever had a conversation with Pookie?

A. Not that I recall because I wasn't friends with Pookie.

Q. I'd like to direct your attention to a little bit further down on the page, the second to last paragraph. It says: Once at that location, Grimes observed Deon Patrick walk out of 854 West Agatite and hang around the area along with many other spectators. Do you see that?

A. Yes.

Q. Did you learn that as of December 28, 1992, Adrian Grimes had identified you as coming out of 854 West Agatite on November 16, 1992?

A. No.
Q. When you came out of 854 West Agatite on November 16, 1992, did you hang out with spectators?
A. When I came out of 854 West Agatite on November 16, 1992, I was handcuffed and put in a police car.
Q. Do you remember if Adrian Grimes was placed on the list of witnesses that the state intended to call at your trial?
A. I think he was. I'm not sure, though.
Q. Would anything refresh your recollection?
A. Yes, if I saw a list.
MS. AUERBACH: Permission to approach, your Honor?
THE COURT: You may.
MS. AUERBACH: Your Honor, do you need, if I'm refreshing recollection for me to label this? So we will call this Plaintiff's 1402. That's the Bates number that appears.
Your Honor, may I approach?
THE COURT: You may.
BY MS. AUERBACH:
Q. Mr. Patrick, does this refresh your recollection that the state put Adrian Grimes on the list of witnesses who they would or could call to testify against you at your trial.
MR. SCAHILL: Objection, form of that question, the nature in which she's refreshing -- objection to the form of the question. It's an improper way to refresh somebody's recollection of --

THE COURT: Sustained.

BY MS. AUERBACH:

Q. Mr. Patrick, does seeing this list refresh your recollection of who the state put on its list of witnesses?

A. Yes.

Q. Yes or no?

Now that you are refreshed, your recollection is refreshed, do you recall whether Adrian Grimes was a witness who was listed on the state's witness list for your trial?

A. Yes.

Q. Yes, you remember? Or, yes, he was?

A. Yes, he is on the list, yes.

Q. So with respect to the strategy that you decided to use at trial in this matter -- first of all, had you ever gone to trial before?

A. No, I had not.

Q. The guilty plea that you took, does that involve going to trial?

A. No.

Q. Who came up with the defense strategy that you employed?

A. I think it was part myself, as well as my lawyer.

Q. And what was your strategy going to be at trial?

A. That I was actually innocent, that I didn't do it.

Q. Were you going to put on the defense that your confessions were coerced, like you had at your suppression hearing?

A. I think after you dealt with it in the suppression hearing, I don't know how far you can go into it in a trial. I'm not sure.
Q. Did you intend to use that Daniel Taylor was in lockup as part of your defense?
A. We had intention of using it. But we ran into some other obstacles that prevented us.
Q. What type of obstacles?
A. They have what you call a fall-to conference before you go to trial, where they deal with the different evidence that's going to come in and the motions and stuff. And we are -- we were advised by the judge that if we brought up anything pertaining to any of the co-defendants, that he would allow the statements of all the rest of the co-defendants to come in.
Q. So you had to weigh whether or not to raise issue relating to other defendants with having their confessions about you come in?
A. Yes.
MR. SCAHILL: Objection, leading.
THE COURT: Sustained. That will be stricken.
BY MS. AUERBACH:
Q. So was there a balancing that you --
MR. SCAHILL: Objection, leading.
THE COURT: I have to hear the question. Overruled.
BY MS. AUERBACH:

Q. Was there a balancing that you and your lawyer had to undertake when deciding what trial strategy to take?

MR. SCAHILL: Objection, leading.

THE COURT: I am going to have to sustain that.

BY MS. AUERBACH:

Q. What did you and your lawyer resolve regarding whether or not to raise issues relating to other defendants?

A. At the time we had already knew that they were challenging the fact that Daniel was in lockup. And he had also went through a suppression hearing. I don't know -- I don't know if he went through his yet.

But we knew that they were challenging the fact that he was in lockup. And so we had to decide if getting that one statement or that one piece of paper in would outweigh six other guys that they had got to say that I actually was there and had something to do with it.

Q. Did you talk to your lawyer about having alibi witnesses at the trial?

A. Yes, I did.

Q. Who did you identify as someone who could be an alibi witness for you?

A. Marshall Payne and Audrey Matthews.

Q. What about Rodney?

A. Rodney was in his own fight. So I didn't think that he would be willing to come before he went to trial, or that his

lawyer would even allow him to come.
Q. Were you concerned about what you just described to us as other statements coming in if you used Rodney as an alibi witness?
A. Yes.
Q. Did you ever see either Audrey Matthews or Marshall Evans at your -- I'm sorry -- Marshall Payne at your trial?
A. Marshall was actually in the courtroom.
Q. Was he ultimately called as a witness in your trial?
A. No, he wasn't.
Q. Was Audrey Matthews?
A. No. She was actually called at home and was told that we wouldn't need her.
Q. Why -- why was she called and told that she wasn't needed?
MR. SCAHILL: Objection, foundation, hearsay.
THE COURT: No. I will allow him to answer that.
BY THE WITNESS:
A. She was called at home and advised that we didn't need her because after they put on the evidence and we heard the testimony of the witnesses, we felt like I would be found not guilty.
BY MS. AUERBACH:
Q. Other than the confession statement, was there any evidence that the state put on against you that linked you to the crimes?

A. No.
Q. Were there any fingerprints?
A. No.
Q. Was there any other physical evidence?
A. No.
Q. Was there any eyewitness who identified you as having been at the scene or near the scene that evening?
A. No.
Q. Did you agree with the decision not to call the alibi witnesses?
A. Reluctantly, yes, because I still wanted to -- I wanted to put as many pieces in front of the jury to know that I didn't do it. But we felt, or he advised me, I think at the end we both felt that our defense was strong enough that I would be found not guilty.
Q. And when you say, he advised you, are referring to Mr. Theis?
A. Yes.
Q. Did any of the defendants testify at your trial, any of these defendants?
A. I think Villardita testified. But he testified at a couple of my things. So it may be O'Connor, I'm not sure.
Q. Did the jury hear your confession?
A. Yes.
Q. Do you know how the confession was ultimately read to them?

Do you know who read it to them?
A. Joe Magats may have read it to them.
Q. Did your family come to the trial?
A. My grandmother was there, my son's mother and my son.
MS. AUERBACH: I'd like to have permission to publish Defendants' Exhibit 111, your Honor, in evidence.
THE COURT: May be published.
BY MS. AUERBACH:
Q. Deon, I'd like to direct your attention to this document. It says: Certified statement of conviction disposition.
MS. AUERBACH: And, Natalie, I'd like you to please highlight the charges starting with murder. All the way down, yes.
BY MS. AUERBACH:
Q. Were these the charges that the state proceeded against you in this case?
A. I think those are only the charges of what they convicted me of.
Q. Okay. Did you know what sentence was eligible if you were indeed convicted?
A. Yes.
Q. What was it?
A. Natural life or the death penalty.
Q. Deon, what was the verdict in your underlying trial?
A. I was found guilty.

Q. What was your family's reaction to the verdict?
A. They couldn't believe it. Like my grandmother was distraught. My son's mother, my son, he was too young to really understand. So he didn't know what was going on.
Q. What was your reaction?
A. I just couldn't believe that they were actually saying those words, because I knew I had nothing to do with this case. And I shouldn't even have been sitting in that courtroom.
Q. Were you sentenced at the time that the verdict was read?
A. No.
Q. When was the sentencing?
A. In May of '95.
Q. So a couple months later?
A. Yes.
Q. As a -- how old were you, 22?
A. Yes.
Q. As a 22 year old, were you able to wrap your mind around the concept that you were going to spend the rest of your life in prison or be put to death for a crime that you didn't commit?
A. No. I never wrapped my mind around it because I knew I was innocent. And I never wrapped my mind around dying in the penitentiary or being put to death.
Q. What were you ultimately sentenced to in May of 1995?
A. I think I had two natural lives, 60 and 30.

Q. Describe going back to the jail after you learned that you were convicted. Did you see anybody at the jail?
A. Me and -- me and Matthews were actually cellmates at the time.
Q. In the county jail?
A. Yes.
Q. Was he awaiting trial as well?
A. He was going to trial the following week.
Q. One week?
A. Yes.
Q. And do you recall telling Rodney Matthews that you were convicted?
A. When I first walked back in the cell, he was kind of happy because I think he assumed that I was going home that night.
Q. And what happened?
A. And I had to -- I had to tell him that they had found me guilty. But our conversation had to be short because they was actually giving me a phone call to call my family and check on them before I locked up and went in my cell.
Q. What was Rodney's reaction when he heard that you were found guilty?
A. I think he -- I don't think I know. He cried before I did. And he made a statement that he didn't want to go home now, that he wanted to stay there with me. But I'm telling him, like, you don't belong here. So don't stay for me because I

don't need you in here with me.

And I went and made my phone call.

Q. Do you know what ultimately happened in Rodney Matthews' trial a week later?

A. Rodney Matthews was acquitted. He went home the next week.

Q. Did you get to see him before he left?

A. Yes.

Q. And describe that.

A. On his way back from court he snuck up to -- they call it the well. It's like the stairwell in division one. And he ran up to the deck and he told me that he was going home tonight. And I was happy for him, but it was like bitter sweet because I knew I wasn't going home.

Q. Do you know what ultimately happened with Lewis Gardner?

A. Lewis Gardner was found guilty, too.

Q. Did you have a chance when you were sitting in trial with Lewis Gardner to determine what strategy -- first of all, let me back up.

Did you and Lewis coordinate your trial strategy together since you were going to be tried at the same time?

A. No.

Q. When was the first time that you learned what strategy Lewis Gardner was going to use at trial?

A. In his lawyer's opening arguments in court.

Q. What did you learn from the opening arguments that Lewis'

lawyer made?
A. We learned that Lewis had been convinced to try to I guess throw hisself on the mercy of the Court by him being 15 at the time, and argue that he was a kid and he didn't know what he was doing, and like some guys made him do it.
Q. So was -- from the opening statement, could you tell that Lewis was going to say that actually all of this had occurred?
A. Yes.
Q. Did you have an opportunity to talk to Lewis Gardner about that during your trial?
A. Yes. They actually put us in the back in the bullpen during the intermission. And I asked him, why would he let his lawyer do that? And he was saying that his lawyer was like, that's the only way he won't get natural life if he tell the people something, that he had something to do with it.
Q. Did you get the feeling that Lewis was the one who was directing his trial strategy?
MR. SCAHILL: Objection to the form of the question, foundation.
THE COURT: Sustained.
BY MS. AUERBACH:
Q. After you were convicted, did you remain in the county jail for your sentence?
A. Yes.
Q. And after you were sentenced actually?

A. After I was sentenced, I might have left that week.
Q. So you mentioned your sentence. Can you explain what the sentence meant? I believe that you said, 60 and 30, two natural lives. What --
A. I think it was like consecutive or however they do that. But there was a natural life without the possibility of parole. And I had 60 for either the robbery or the home invasion and then 30 was for the other one.
Q. All on top of the double natural lives?
A. Yes.
Q. So where is the first prison that you went to after you were sentenced?
A. They processed us through Joliet. But I was only there like a week or so. I ended up at Pontiac Correctional Center.
Q. So let me first ask you to describe a little bit your time in Cook County, between your arrest and moving from Cook County to Pontiac. Can you describe Cook County Jail for us?
A. The first that I went on in division six it housed either 36 or 38 inmates. But at that time in '92 there was over 110 guys on that deck. And you got sleeping in the dayroom. None of the doors locked. There were no locks on the cells.
And it was a very scary and violent place at the time because there were a lot of guys running around with weapons and stuff.
Q. You had previously spent some time in the county while you

were waiting for boot camp, right?
A. Yes.
Q. Was it the same area? Were you housed in the same area as you had been?
A. No. When I was going to the county in '90, '91, I was always on the school way with the guys I was going to school.
Q. So in light of what you described as scary, did you have to do anything in order to protect yourself?
A. I think just tried to fit in and not rub anybody the wrong way or get into anybody's way.
Q. Did you have to align yourself with any gangs?
A. Yes.
Q. And who did you align yourself with?
A. I continued to align myself with the Vice Lords.
Q. If you had not aligned yourself with the gang when you were in Cook County Jail -- well, strike that.
Were there people who had not aligned with gangs in Cook County Jail when you were there?
A. Yes.
Q. And what happened to them?
MR. SCAHILL: Objection to the form of the question and to relevance.
THE COURT: I am worried about the relevance here.
MS. AUERBACH: Your Honor, I believe that it goes to his damages. I think it goes to his state of mind when he's in

that prison. I think it goes to what the environment was and what he had to do in order to protect himself and survive.

THE COURT: Up to that point, this last question I have to sustain the objection. I don't see that as relevant.

MS. AUERBACH: Okay.

BY MS. AUERBACH:

Q. Did you get -- were you ever physically assaulted when you were in Cook County Jail?

A. Yes.

Q. And describe what happened.

A. One day I was coming back from -- from the church service. And there were some guys waiting in the stairwell. And they jumped on me.

Q. Do you know why?

A. Some stuff that I wasn't going to do for the guys that were saying they were Vice Lords.

Q. And how were you injured?

A. They bust my lip, and they just punched me about my body a little bit.

Q. Did you report that to authorities?

A. No.

Q. Why not?

A. You just didn't do that in there because I still had to live there. And had I reported it to authorities, it would have happened on more occasions.

MR. SCAHILL: Objection, foundation for this --
THE COURT: Overruled.
BY MS. AUERBACH:
Q. Did you ever see people fighting with weapons in Cook County Jail while you were there?
A. Yes.
Q. Did you ever fight with weapons?
A. No.
Q. What did you see?
A. When I first moved from the division six to division one, I saw an inmate get stabbed to death.
Q. Do you know how old that inmate was?
MR. SCAHILL: Objection to the relevance of it, Judge.
THE COURT: Yes, I will sustain that.
BY MS. AUERBACH:
Q. When you went to Pontiac, how did that differ, if at all, from Cook County Jail?
A. It was much different because in the county we have a mixture of kids. And the county kept the kids or the younger guys separate. But when you got to Pontiac, it's like when you stepped off that bus, you had to become a man.
Q. How were you transported from Cook County to Pontiac?
A. They transferred us by bus.
Q. Were you handcuffed?
A. We were handcuffed and shackled.

Q. Where were you shackled?
A. At our ankles.
Q. How far was Pontiac from Cook County Jail? Where is Pontiac?
A. It's in central Illinois. I think it was like an hour and 45 minutes.
Q. So were you placed in a cell?
A. Yes.
Q. Did you have a cellmate?
A. Yes.
Q. Did you get to pick your cellmate?
A. No.
Q. Did you ever get to pick your cellmate for the 21 years that you spent in prison?
A. You don't get to pick them. But sometimes if you have a work detail, you'll be housed with the guys that's on that same detail with.
Q. When you first got to Pontiac, can you describe the cell that you were in? How big was it?
A. It was very small. Like if you're standing in the middle of the floor, you could actually touch both walls. But from wall to wall, it was a little longer from the back wall to the bars.
Q. From the back of the wall of the courtroom, where did it come out to?

A. Probably somewhere right in here where her banister is right here.
Q. And there were two people in that size space?
A. Yes.
Q. Was there -- where was the bathroom?
A. In the back of the cell by the back wall.
Q. And did you have any privacy?
A. No.
Q. Were you allowed to shower whenever you wanted?
A. No.
Q. Where were the showers?
A. You would have to come out to a cell and go down to what they call the gallery. And they probably be on the front break or the back break.
Q. How often did you get to shower?
A. When I first got to Pontiac, I think we were showering like twice a week. Whenever we was on lockdown, it would be once a week.
Q. Describe how Pontiac was in terms of safety. Did you feel safe there?
A. I didn't. But I mean like they put us in the yard. It would be three to 400 guys out there. And it will be a lot of different activity going on in the yard. And like in my first 24 hours there, we went all the way to -- to get fingerprinted, get our pictures taken. And we had ran across a guy that was

like planting the flowers around the joint, around the penitentiary.

And by time we got to the hospital, all officers' radio start going crazy, like it was a lot of chat on there. And they was beeping. And they brought him over there. And he had stabbed like four, five guys.

Q. That was your first day in Pontiac?

A. Yes.

Q. Did that set the tone for what you would experience for the duration of your stay there?

MR. SCAHILL: Objection, leading.

THE COURT: I will sustain that.

BY MS. AUERBACH:

Q. At some point you moved from Pontiac, correct?

A. Yes.

Q. Where did you move?

A. I move to Menard in '97.

Q. And did you get notice that you were going to be moved?

A. They had actually changed the dynamic of Pontiac and turned it into a segregation, where everybody there was in seg or in protective custody. And everybody that was there had to move to either Stateville or Menard.

Q. So when you got moved to Menard -- first of all, where is Menard?

A. It's down south. I think in Chester, Illinois.

Q. Do you know approximately how many hours of a drive that is from Chicago?
A. Probably like six, almost seven.
Q. Did you have any issues getting used to a new prison?
A. I didn't want to be there. So, yes.
Q. Did you ever get acclimated to prison life, life in the penitentiary?
A. No, I refused to get acclimated to that.
Q. After 21 years you didn't get used to it?
A. No.
Q. Were you able to see your family frequently when you were at Menard?
A. Only family members I ever say when I was doing time in Menard was when my brother arrived up from Florida. He would stop by and see me on his way back to Florida.
Q. You were not able to see your children?
A. No.
Q. At some point were you transferred from Menard?
A. Yes. I went from -- in June of '97 I went back to Pontiac.
Q. Why did you go back to Pontiac?
A. I actually ended up in the hole, in segregation.
Q. So tell us what happened that -- what occurred that caused you to be in segregation.
A. There was a fight that happened on the yard down in Menard, where --

Q. I'm sorry. Go on.
A. Where some guys got shot, and some other guys had got beat up.
Q. People got shot in prison?
A. Yes.
Q. By whom? By prisoners?
A. No, by the officers in the tower.
Q. So how were you involved?
A. I was on the yard when the fight broke out. And once everybody get to fighting, it's like you fight to protect yourself or you become pray on the yard.
Q. And so you got punished as a result of that fight?
A. Yes.
Q. And what was the punishment?
A. I had to do a year in the hole.
Q. A year in the hole?
A. Yes.
Q. What does that mean? Is that a separate -- separate place that you were housed?
A. Yes. You don't go to the yard with everybody else. You don't get to walk to the chow hall. You eat all your meals in the cell. And they actually put the showers on the gallery where you would go right on the gallery to the shower.
Q. So were you able -- how many hours a day were you able to leave your cell when you were in segregation?

A. You don't leave daily. You get five hours a week, but you'll get that all in one day.
Q. In order to get a year segregation, had you injured somebody?
A. No.
Q. Did you do something like use a weapon or do something extraordinary?
A. No, it was called -- I was found to be -- they considered it a dangerous disturbance. And that carried up to a year segregation.
Q. Were you the only one who was involved in that fight who got punished?
A. It may have been one other guy. But I think they only punished me and I think the guy that got shot.
Q. While you were in segregation, what did you do to pass the time?
A. I did a lot of reading, wrote letters to my family.
Q. Did you spend any time thinking?
A. I was always thinking. Whether I was in segregation or not, I was constantly thinking.
Q. And at that point, what were you thinking about?
A. How did I end up in this place? Like what am I doing so wrong in life that it's turning out like this? And I just started to reevaluate myself and figure out what I want to do with the rest of my life.

Q. What did you want to do?
A. I know what I didn't want to do, and that was not be a part of a gang anymore. And not even move around with those guys and had those gang conversations. I wanted to continue to fight for my freedom. I want to get back out here and be a father to my kids. And I wanted to become a productive citizen and be doing things that people are supposed to do in life.
Q. So did you take any steps in order to realize those things?
A. Yes. I stopped hanging out with the gangs in jail.
Q. Did you actually renounce your gang membership?
A. To me, I renounced it to me. I didn't give anyone that much power over me where I felt like I had to get their permission to not be a part of something that I shouldn't have been doing in the first place.
Q. But did you have to -- did you have to explain to people why you weren't going to be part of a gang in prison?
A. Not really, because at that time too it had become a little bit safer, where the administration had somewhat taken back the penitentiary. And they wasn't allowing the gangs to huddle up and live in the cells together, have a whole tier to theirself. They wouldn't even let you be in the same cell with guys that you were in the same gang with.
Q. At some point, when you first got to the penitentiary, did you have to declare what gang you were affiliated with?
A. You had to tell them because that was how they housed you.

Q. And were you required to continue -- did they ask you over other periods of time whether you continued to be in a gang?
A. No.
Q. What year was it when you decided that you no longer wanted to be involved in any gang?
A. It was '97, going into '98.
Q. How old were you then?
A. About 25; 24, 25.

THE COURT: Is this good place to stop?

MS. AUERBACH: Yes, your Honor.

THE COURT: Take a 15-minute afternoon break.

(Jury exited the courtroom.)

THE COURT: You may step down.

We will break for 15, then resume.

(Brief recess.)

(Proceedings had in open court.)

THE COURT: Are we ready for the jury?

MS. AUERBACH: Can Mr. Patrick resume the stand? Yes, we're ready.

THE COURT: Okay. Let's bring them out.

(Jury entered the courtroom.)

THE CLERK: Please be seated.

MS. AUERBACH: Thank you, your Honor.

BY MS. AUERBACH:

Q. Deon, when we last left, we talked about renouncing your gang in, I believe, 1997; is that correct?

A. Yes.

Q. How old were you at the time?

A. I was around 24, 25.

Q. You transferred to a number of other jails during the rest of your 21 years in prison. You talked about -- sorry, prisons. You talked about being in Pontiac, I believe. Is that where you were for segregation?

A. Yes.

Q. Where did you go after Pontiac?

A. I went to Stateville in, like, April of 1998.

Q. And after Stateville, where did you go?

A. I stayed in Stateville until June of 2010, and then I went back to Menard.

Q. And did you remain in Menard until your convictions were

vacated?
A. Yes.
Q. Okay. Just for people who have never been -- strike that. Could you describe, briefly, a day in the life of a prisoner that you experienced?
MR. SCAHILL: Objection to the form of the question.
THE COURT: Excuse me?
MR. SCAHILL: Objection to the form of the question.
THE COURT: It's overruled. You may answer.
BY THE WITNESS:
A. I mean, it was all scheduled, I guess I could say. Like, everything was on a set timeframe. And, like, our breakfast was probably brought to us at 4:30 in the morning to our cells. After breakfast, we probably stayed asleep until after the count, say around 7:00, 7:30. If we didn't have any movement that day, you in your cell basically all day until lunch or dinner. If you had yard, you would go to the yard. It was really, like, trying to find something to do to occupy your time while you were in the cell.
Q. Did you have any choices? Did you have any autonomy when you were in prison?
A. No. It was by their schedule and their rules.
Q. Did you get to decide what time you would have

breakfast?
A. No.
Q. Did you get to decide what you would wear every day?
A. No, everything -- everybody wore the same thing.
Q. Did you get to decide what you felt like doing that day?
A. No.
Q. Did you get to decide when you would take a shower?
A. No.
Q. What did you get to decide?
A. If you came out of your cell or not.
Q. You had the option of just refusing to come out?
A. It's not refusing. If you don't want to go to chow, you don't have to, if you have food in there to eat. That was like the only thing that we had control over, whether or not we wanted to come out at the times permitted.
Q. Did your cellmates change periodically when you were in one prison?
A. Yes.
Q. And did you have any notice that one day you would walk in and have a new cellmate?
A. Yes.
Q. You did get notice, advanced notice?
A. No, you didn't. I thought you said did I notice when I walked in. You didn't get advanced notice. Sometimes you would come back to your cell and a new guy would be in there.

Q. And describe how easy that was to adjust to.
A. It's not easy because I don't think you ever adjust to sharing that small a space with another man. But, I mean, once you get comfortable where you understand how a guy moves, what time he does certain things, you get -- you become okay with it. But it's, like, as soon as you get okay with a cellmate, you will end up with another one.
Q. Are you a private person by nature?
A. Yes.
MR. SCAHILL: Objection, leading.
THE COURT: I'll allow it.
BY MS. AUERBACH:
Q. Did you have any privacy when you were in prison for these 21 years?
A. No.
Q. You talked about the bathroom or the toilet being in your cell. Can you describe how that would work? Would you have any privacy when you would use the toilet?
A. Not really. I think, like, if you had a celly that we considered respectful, they would go to the bars while you used it; or you would also have cellies that would refuse to go to the bars, that would just stay sitting on their bed or laying on their bed.
Q. How close was the bed to the toilet?
A. Like, right here. (Indicating.)

Q. If you ever needed just time by yourself, alone time, did you ever have that when you were in prison?
A. No.
Q. Is that something that you wanted?
A. I enjoy alone time now. So, yes, I would want it.
Q. Can you describe how you interacted with the guards?
A. You have I guess what you consider your good guards and your bad guards. Some guards they would, like, come and just do their job and make sure that they did their shakedowns, nobody left, nobody hurt people. And you had other guards that would, like, come in your room, tear up your stuff on shakedowns. There was instance where they put the dogs in your bed. When you come back, there is muddy paw prints all over your sheets and your blankets and your stuff is just thrown all over the room for you to get it back in order.
Q. Were there rodents or bugs?
A. Yes.
Q. What about temperature? Were you able to control the temperature in your cell?
A. No.
Q. Were some prisons better or worse when it came to temperature extremes?
A. I think in the summer, they all got hot. When you were down south in Menard, it gets really hot. And they only allow you, like, one small fan, and it would get extremely

hot down there.
Q. Do you know what temperature it got to?
A. Sometimes it would be -- inside those cells it would probably be over 110.
Q. What about cold? Did you ever experience cold that you couldn't -- that you couldn't control?
A. I think every winter was cold. But there was nights where you had to sleep in your sweatsuits and your blankets. Some guys had their skullcaps on. But, I mean, like, it was either extremely cold or extremely hot in some places.
Q. Did you have any jobs while you were in prison?
A. Yes, I did.
Q. Describe what you did.
A. At some point I was, like, what they call cell house help where you feed the guys that's in the cells. You pick up the trash, you mop and sweep the galleries. I worked in the kitchen in there. I worked in the commissary, which is where you go to shop for your cosmetics and food items and stuff. And I also became a porter in the hospital, where I helped with the guys that were getting elderly and sickly.
Q. What prison were you in when you worked as a porter in the hospital?
A. I was in Stateville.
Q. And what was it like for you knowing that you faced life in the penitentiary without parole to see people who were

sick, getting old and dying there?
A. It was scary. But it's like always, like I said earlier, my mentality that was -- I wasn't dying in there. I was coming home. But it was definitely a scary thought because I never wanted to be that sick where -- like some of those guys had conformed back to being in diapers. Some of them couldn't eat. I even seen like some of them, like, almost really like starve to death because they couldn't swallow or they couldn't do certain things. And I think that was the scariest part for me. It used to make me pray at night that I never got to that point to where I needed somebody to take care of me in there.
Q. How many hours a week did you work when you worked?
A. When I worked in the hospital, I worked two shifts. I think I came out at 1:30 in the morning, and I might lock back up at 3:00 o'clock in the afternoon.
Q. Were you paid for the work that you did?
A. Yes.
Q. Tell the jury what your hourly wage was in prison.
A. We didn't get paid hourly. We got paid daily.
Q. What was your daily wage?
A. Thirty cent a day.
Q. I'm sorry?
A. Thirty cent a day.
Q. Did you need money for anything in prison?

A. You need money for basically everything. I mean, like, to buy your cosmetics. A lot of the stuff that they feed you, if you don't eat it, you have to buy food to survive.
Q. You talked about lockdown at some point. Can you describe what that is?
A. A lockdown is when something happens in the penitentiary where they don't let any inmates out at the time until they figure out what's going on.
Q. What was the longest lockdown that you experienced?
A. When I was in Pontiac in, like, January of '97, I don't think we came back out -- no, it was January of '96. I don't think we came back out until, like, April or May.
Q. And when you say you don't think you came back out, does that mean you stayed in your cell 24/7?
A. Other than going to the shower or on a call pass to the hospital or a visit, or something.
Q. What about for meals?
A. They brought them to your door.
Q. And while you were on lockdown, then, were you able to go to the commissary and replenish your food?
A. No.
Q. Or replenish your toiletries?
A. They let you buy cosmetics, so, but they wouldn't let you buy -- like if you smoked at the time, they wouldn't let you buy cigarettes or food.

Q. I want to ask you a little bit about your health and health issues in prison. First I'd like to ask you follow-up on a question that I had asked you yesterday.

And for this, Judge, I'm going to ask that you turn on the ELMO for us.

Deon, I asked you earlier in your testimony whether you ever took drugs or drank. Do you remember that?

A. Yes.

Q. And you -- what did you say?

A. No.

Q. To get into the boot camp program, were you -- well, let me do it this way. Judge, can I have permission to publish what we will mark as Defendant's Exhibit 188-16 in evidence now?

THE COURT: It may be published.

BY MS. AUERBACH:

Q. Deon, do you recognize this document?

A. No.

Q. Have you ever seen this?

A. No.

Q. At the top, it's dated October 7, 1999. And the first --

MR. SCAHILL: It says 1991.

MS. AUERBACH: I'm sorry.

MR. SCAHILL: I'm sorry, Counsel, what exhibit

number did you say this is?

MS. AUERBACH: 188-16. You had called it 188. It's Page 16 of your exhibit.

MR. SCAHILL: Okay. But you're designating it as Plaintiff's 188 dash --

MS. AUERBACH: No, defendants.

MR. SCAHILL: Oh, okay. All right. Thank you. Sorry. Go ahead.

BY MS. AUERBACH:

Q. So, I apologize, it's dated October 7, 1991. The very first paragraph it says: "Pursuant to your order to examine Deon Patrick Gerald Taylor, please be informed that TASC conducted an examination to determine if the defendant is eligible to be treated as a drug addict or alcoholic." And then it goes on.

Do you recall ever being examined in connection with any of the pleas that you made or any other context to determine whether or not you were a drug or -- drug addict or alcoholic?

A. No.

Q. Paragraph 1 says: "The defendant is an addict." And your primary substance of abuse is heroin. Were you ever a heroin addict?

A. I never held a bag of heroin in my hand.

Q. Were you -- it says your secondary substance of abuse is

cocaine. Did you ever abuse cocaine?
A. No.
Q. It says, "tertiary substance of abuse is alcohol." Were you ever an alcoholic?
A. No.
Q. Did you lie about your substance abuse issues in order to have any favorable treatment either for boot camp or for purposes of your plea agreement?
A. First off, I don't really -- I don't even remember this -- this paper ever having to go through this process. But if that's what it says, then, yes, I did.
Q. Where it says: "The defendant is an addict," were you an addict?
A. No, absolutely not.
Q. You don't have any recollection of being examined at any time?
A. Not to my recollection. This is 1991. And I was never a 20-year-old heroin addict, cocaine addict, alcoholic. No.
Q. Let me talk a little bit about your health issues in prison. When you get sick, what do you do?
A. You lay in your cell and wait on the med tech to come around and get a cold tablet or aspirin.
Q. Did you ever have to go to the hospital while you were in prison?
A. Yes.

Q. What for?
A. I think in 1998, I got the chicken pox from somewhere.
Q. Had you never had the chicken pox before?
A. No.
Q. What about anything else?
A. Well, I had -- in the county, I think I had caught the flu real bad, and they diagnosed me as being an asthmatic. So for years after that, I was on their, like, asthma program or asthma checkup -- asthma clinic, rather.
Q. And what's the ventilation like in prison? Is that good for your respiratory system?
A. No, it's not.
Q. Was there healthy food in prison?
A. No. We actually ate a lot of soy. Most our meat was soy meat other than the chicken.
Q. Did you have any weight gain issues when you were in prison?
A. When I came in the county in 1992, I weighed 165 pounds.
Q. What did you weigh when you got out?
A. Like, 285 or 290.
Q. Were you ever subject to strip searches?
A. Yes.
Q. Can you describe that, please?
A. It's humiliating, to say the least. I mean, you have another grown man standing in back of you saying, bend over

and spread yourself so they can look inside you.
Q. Under what circumstances did strip searches occur?
A. Under all circumstances. If you went on a visit, you had to be strip-searched. If they did shakedowns, you had to be strip-searched.
Q. Was there ever a point when you just hit rock bottom and you lost hope?
MR. SCAHILL: Objection to the leading nature of that question.
THE COURT: I'll allow it.
BY THE WITNESS:
A. No, I never -- I don't -- I don't put the two together because I hit rock bottom a long time ago when they first were charging me with this case. But I never lost hope in proving my innocence.
BY MS. AUERBACH:
Q. At some point did you believe that Dennis Mixon had participated in some way in these crimes?
A. I think from the start I did.
Q. Were you hopeful that he would one day tell the truth about what had occurred?
A. Yes.
Q. Did you know what the truth actually was with respect to what happened with respect to these crimes?
A. No, and I still don't know what the truth is.

Q. Did you approach Dennis Mixon at some point to ask him if he would sign an affidavit either saying what happened or saying that he was there and that you were not?
A. I don't know if I approached him directly or someone approached him for me because me and Dennis Mixon didn't really talk.
Q. Did you ever have direct contact with Dennis Mixon?
A. Yes.
Q. When did you have direct contact with him?
A. It may have started around '02, '03. Maybe even '01. I'm not sure.
Q. Were you in the same prison as him at the time?
A. We had been around -- we had been in the same prison for over three years.
Q. When you first approached him to file an affidavit, did you do that directly, or did you go through someone else?
A. I may have went through someone else.
Q. At some point he did provide you with an affidavit saying that he was at least at the apartment on November 16, 1992; correct?
A. Yes.
Q. And he also said that you were not there; correct?
A. Yes.
MR. SCAHILL: Objection, leading.
THE COURT: I'll allow that to stand, but let's not

lead.

BY MS. AUERBACH:

Q. At some point was there a lawyer who approached you and asked whether or not you needed to be represented?

MR. SCAHILL: Judge, this is all leading. Counsel is testifying. Objection.

THE COURT: Well, I don't know how she can get to that point in time, so I'll overrule that objection. But -- I'll overrule that objection. You may answer.

BY MS. AUERBACH:

Q. Did you answer?

A. Yes.

Q. Who was the lawyer who approached you?

A. Kathleen Zellner.

Q. Do you know if Kathleen Zellner was representing anybody else?

A. At the time she approached me, I think she had Daniel Taylor already.

Q. And at some point do you know if she ended up taking on the representation of others?

A. Yes, she did.

Q. Who else?

A. She took on, starting with Daniel Taylor and myself, Paul Phillips and Lewis Gardner were still incarcerated also. And Dennis Mixon.

Q. What year was this?
A. I want to say, like, 2000 or 2001.
Q. Prior to that point, had you attempted to appeal your convictions yourself?
A. Yes. And I had also reached out to other attorneys to see if they would take my case.
Q. To that point, did you have any success with the appellate process?
A. No.
Q. So when Kathleen Zellner approached you, did she indicate that she was going to file something?
A. Yes. She was filing I think a supplementary post.
Q. And what was that? What was your understanding of what she was going to do?
A. Well, because at the time most of us had already filed a post-conviction, so she was going to file a second one.
Q. Okay. Did you -- were you asked to give an affidavit?
A. Yes, I was.
Q. And do you know if others who were also represented by Kathleen Zellner at the time were asked to give affidavits?
A. I think everyone on the case gave an affidavit.
Q. Do you know if Dennis Mixon did?
A. Yes.
Q. By you signing on to your own affidavit, did you believe that you were also signing on to what Dennis Mixon was

testifying to in his affidavit?

MR. SCAHILL: Objection to the leading nature, again, of this question.

THE COURT: I'll sustain that.

BY MS. AUERBACH:

Q. What was your understanding of what the connection was between Dennis Mixon's affidavit and your affidavit?

A. My understanding of affidavit to this day is still where I'm held accountable for what's said in my affidavit. I'm not held accountable for what's said in someone else's affidavit.

Q. When Dennis Mixon, over the years, pointed to other individuals as participating in the crimes with him, did you have any way of understanding whether or not he was being truthful or not?

MR. SCAHILL: Objection, leading.

THE COURT: Yes. I will sustain the objection.

BY MS. AUERBACH:

Q. Describe your ability to determine whether or not Dennis Mixon's affidavits were accurate or not.

A. I didn't really have an ability to understand if they were accurate or not because I didn't know what happened that night. I didn't know who was there and who wasn't there.

Q. Do you know if Kathleen Zellner ever filed a petition or a brief on your behalf?

A. I think she did. I learned I think recently that she actually did, when at some point I thought she didn't.
Q. Did you also learn that she withdrew that petition?
A. That's why I thought she didn't because mine was withdrawn. So I thought she only moved forward with the other guys.
Q. I'm sorry to get into maybe a little bit of an uncomfortable topic, but you went to prison in your early 20s, the prime of your romantic and sexual life; correct?
A. Yes.
Q. Were you able to sustain any romantic or sexual relationships with anybody between the age that you went in and 42, when you came out?
A. No.
Q. Were you allowed any physical contact with any visitors?
A. When I first got there, they used to let you hug and kiss them. But, now, I don't even think you can kiss them now.
Q. You don't think you could?
A. Well, they wouldn't let me kiss them when I left.
Q. Did any of your family members pass away when you were in prison?
A. Yes.
Q. Who?
A. I lost both of my grandmothers, a couple of my aunts.

Q. Were you able to get a furlough to attend their funerals?
A. No.
Q. How did it feel to be in prison when you lost those close family members?
A. It hurt because that was, like -- most notably my grandmothers were like two of the people that I really wanted to see when I got back out here. Because one of them I didn't see at all while I was in there. And my father's mother, I think the last time I saw her was 1998.
Q. Tell us a little bit about what it was like to spend holidays and your birthday in prison.
A. Over a period of time, it becomes a regular day. Because, like, even now that I'm here, I don't really, like, celebrate holidays and birthdays because I'm so used to not having them and not doing anything differently for them.
Q. What was the toughest day of the year for you in prison?
A. The day my mother died.
Q. In prison?
A. You saying, like, what day on the calendar or?
Q. Yeah. Were there any particular dates that would come up year after year that were particularly difficult for you in prison?
A. March 11th, and then the day my grandmother died.
Q. And what is March 11th?

A. That's the day my mother died, in 1988.

Q. Okay. How were you impacted, Deon, by not being there while your kids were growing up?

A. It was hard. I mean, because I love my kids, and I had a relation with my son because I talked to him a lot more. My daughter, sometimes with them being south out of state and her mother not really having the finances to keep her phone on for me to call her, I would lose contact with her for years.

Q. Did your family ever tell you how difficult it was for them to have you away from them?

A. All the time. I mean, I think we still struggle with me actually being back home now because, you know, I left, they were babies. When I came home, they was 22 and 21. And it's, like, we still learning each other now. We still trying to figure each other out.

Q. What would you do to try to stay connected with your kids?

A. I would write a lot. Then I would also, like, I had some friends that would go get my son and bring him to see me. If my daughter was in town, they would grab her too and bring her.

Q. Were you able to keep in contact at all with your son's school while you were in prison?

A. We found a way when he got to high school. And, like,

at some point I was having a conversation with, like, the dean, which was his basketball coach in school. And he was telling me how he was doing in school. And I think I spoke to his band teacher, or another one of his teachers, at one time.

Q. Were there important things that you were trying to instill with them, even though you were doing it from a long distance?

MR. SCAHILL: Objection, leading.

THE COURT: No, I'll overrule it.

BY THE WITNESS:

A. I was trying to teach my son to be an individual and to make his own decisions. And I definitely always told him to choose his friends wisely because you never know, like, what's really going on when you're not there. And I just wanted him to take his education seriously and not regret not taking his education seriously. And I just wanted him to do more with his life. I wanted him to be somebody and not be -- not look back 20 years later and be, like, I wasted my life doing something else.

Q. Did you ever talk to him about getting involved in gangs?

A. When he was a baby. I mean, a little baby. I used to -- he used to stand in the window a lot, and I asked him what he see. And he be like he see guys standing on the

corner. And I tell him, is that what you want to do? And, I mean, as a kid, he knew that wasn't what he wanted to do. And I told him, like, don't ever join a gang. I felt like at that time, in my mind, I felt like gangs were for punks. And I think a lot of people joined gangs out of fear and not so much as because they thought they were tough guys. And that's how I see it, you know.

Q. Do you know if your son ever joined a gang?

A. Absolutely not.

Q. Do you know what area of Chicago he grew up in?

A. He grew up on the west side.

Q. In prison, were you allowed to get on the internet?

A. No.

Q. Were you allowed to send or receive e-mails?

A. No.

Q. What about texts?

A. No.

Q. Deon, did you think about the defendants at all when you were in prison?

A. A lot. I read my case a lot. Their names was all over it. So, yes, I thought about them.

Q. What did you think?

A. Well, what I still think, you know. I felt like how do they sleep at night, doing what they do and doing what they do to people that it just shouldn't be done to.

Q. Your case came back to the forefront in 2012 and 2013. Did you have lawyers at that time?
A. I don't know if I actually had an attorney, but I may have, though. I think I did.
Q. Did you learn that Daniel Taylor's lawyers were pursuing his case at some point?
A. Yes.
Q. At some point did you -- did you learn that documents --
MR. SCAHILL: Objection, leading.
THE COURT: Sustained.
BY MS. AUERBACH:
Q. What did you learn about your case in the course of Daniel's proceedings?
A. I think I learned a lot about past proceedings, where they explained to me that even if they wanted to take me they couldn't because there was a conflict of interest. So one lawyer shouldn't take all of us on. And I learned that there was some new evidence that had -- I don't even want to use the word mysteriously, but had came about.
Q. What do you mean by mysteriously came about?
MR. SCAHILL: Objection to the form of the question. Foundation and motions.
MS. AUERBACH: Your Honor, I'm trying to --
THE COURT: Let's have a sidebar.
(Proceedings had at sidebar:)

THE COURT: So where are we going here?

MS. AUERBACH: Well, your Honor, part of the reason why I was leading was so that I don't sort of inadvertently have him blurt out something. But I need to establish that at some point in time he learned that documents emerged and that's what caused Daniel Taylor's conviction to be vacated and caused him to get lawyers.

MR. SCAHILL: Judge, that's exactly what you said he couldn't do. That's the concern here. They're trying to get --

THE COURT: Well, what I don't see is what -- how is this relevant to the case?

MS. AUERBACH: Well --

THE COURT: There is no issue where his conviction was -- clearly established his conviction was vacated. He was granted the certificate of innocence, but --

MS. AUERBACH: But the jury doesn't --

THE COURT: -- the process by which it happened?

MS. AUERBACH: You don't think the jury needs to -- I mean, like, one day, you know, 21 years later, all of a sudden, one day, just somebody --

THE COURT: You want to establish a court proceedings, that's fine as well. But his understanding as to why his case was exonerated is going to get us into problem territory, I think.

MS. AUERBACH: Okay.

MR. SCAHILL: Judge, the problem we have is that isn't even the question. The question was about Daniel Taylor's proceedings. She is not even asking about his.

MS. AUERBACH: Right because what happened with Daniel Taylor's proceedings is what led him to --

MR. SCAHILL: We went over this. We went over this. You said they couldn't do it.

THE COURT: Well, you can establish the courtroom proceedings. You can establish what petitions were filed by whom for whom, when, the chronology, all of that.

MS. AUERBACH: I will short-circuit it, Judge.

THE COURT: But don't ask him about his understanding of why it happened because that's just going to be what we talked about before.

MS. AUERBACH: Okay.

MR. CHANEN: Judge, can she have a little permission to lead, especially to lead him away from the areas that they're expressing concern with?

THE COURT: It depends on what she is leading to and what the questions are. You can go from one area to another, from one incident to another, but --

MS. AUERBACH: That's fine.

MR. CHANEN: Thank you, your Honor.

MS. AUERBACH: Thank you, your Honor.

(End of sidebar.)

BY MS. AUERBACH:

Q. Deon, let me just ask you a couple of questions. Did you ever see Lewis Gardner or Paul Phillips when you were in jail?

A. I think the last time I saw Paul was when I left the county jail in 1995.

Q. Did you ever see Lewis in any of the prisons that you were in?

A. When I first got to Pontiac, Lewis was there, but he was in a totally different cell house from where I was at.

Q. What about Daniel Taylor?

A. Daniel came down to Pontiac a few months after me. But he was in another cell house, too, at the time.

Q. Okay. At some point did you learn that Daniel Taylor's conviction was vacated?

A. Yes.

Q. First of all, did you work with Daniel to concoct a story to allow him to get his conviction vacated?

A. There was no story to concoct. We just stuck to the truth what we had been saying from Day One.

Q. Did you think that Daniel somehow defrauded or pulled a fast one on the Cook County state's attorney's office who had moved to vacate his conviction?

MR. SCAHILL: Objection to the form of this

question and the relevance to what finally thought that.

THE COURT: I'll sustain the objection.

BY MS. AUERBACH:

Q. Do you know who vacated or who moved to vacate Daniel Taylor's conviction?

A. The state's attorney's office.

Q. How did you learn that Daniel's convictions were vacated?

A. The day Daniel was being released he had an officer walking him over to personal property. And he asked the officer, could he stop in and talk to me. And I can hear him, like, calling my name as he was coming up the stairs. Initially I thought that he was getting moved to the cell house with me. But when he got to my door, he was ecstatic, and he was saying that he was going home today.

Q. How did that make you feel?

A. It took me back to '95, when Matthews then went home and I was still there. It was bittersweet because I was happy for him, but I still knew that I had to be there, and I was still there.

Q. When was the next time that you saw Daniel Taylor?

A. January 14th -- January 10th of 2014.

Q. Under what circumstances did you see Daniel Taylor on that day?

A. That was the day I was getting out and Daniel rode down

with my lawyers and my son to come and pick me up from Menard.
Q. Tell us about what thoughts went through your mind when you learned that your convictions had finally been vacated.
A. When I first heard it, I didn't -- I still didn't believe it, when the guards came and told me to pack my stuff, that I was going home. But the closer I got to that door, the more believable it came -- it became. And then when I was able to actually hold my son and hug my son, it became a reality for me there.
Q. How long had it been since you had seen your son?
A. It had been over four years.
Q. Did you drive back to Chicago that evening?
A. Yes.
Q. What did you do later that evening?
A. I got here, like -- well, when I got there, like 2:00 in the morning, probably later, practically my entire family was waiting on me.
Q. When did you see your daughter next?
A. I think we got up there within the next few days where she brought my two grand babies that were here already with her, and she was carrying my granddaughter.
Q. Had you ever met your grandchildren?
A. No.
Q. And what was the most important thing for you to do once

you got home?
A. I think the first thing I really wanted to do, that I knew I had to do, was go to the cemetery and see my mother.
Q. Why did you need to do that?
A. It was just a talk that was long overdue that I felt I needed to have with her.
Q. What did you tell her?
A. I just told her, like, I knew I made mistakes in life. I made a lot of them, but nothing once at what I had been through. And I promised her that from that day forward that I will make her proud of me and that I would do the things the right way out here, and I would do things the way that she want me to do them.
Q. Do you think you've done that?
A. I know I have.
Q. A few weeks later, you petitioned for a certificate of innocence; correct?
A. Yes.
Q. Who did you -- well, first of all, did you attend a hearing for that?
A. Yes, I did.
Q. And who was the hearing before?
A. The chief judge, Judge Biebel.
Q. Why was it important? I mean, you were out of prison now, your conviction was vacated. So why take the extra step

of petitioning for a certificate of innocence?
A. Because I wanted them to actually admit that I was innocent. I wanted to hear it out of their mouths. I wanted to see it in writing. I wanted to know that they believed that I was innocent, too.
Q. Where did the hearing take place?
A. It wasn't a courtroom, but it was like in the back of the first floor. I don't know what you would call that room.
Q. Was the judge there?
A. Yes, he was.
Q. Had you or your lawyers filed anything in advance?
A. Yes.
Q. What did you file?
A. I don't know what the petition was called, but it was seeking a certificate of innocence.
Q. Were you prepared to give testimony that day?
A. Yes, I was.
Q. Were you prepared to call witnesses if the judge asked you to do that?
A. Yes, I was.
Q. Was there a lawyer from the Cook County state's attorney's office present at the hearing?
A. Yes.
Q. Did the judge ask the Cook County state's attorney for their position on your certificate of innocence petition?

A. Yes.
Q. And what position did the Cook County state's attorney's office take?
A. They took no position.
Q. Did the judge indicate that he was familiar with your case?
A. Yes.
Q. And were you granted a certificate of innocence?
A. Yes, I was.
Q. Deon, did you defraud the chief judge of the criminal courts, Paul Biebel?
A. No.
Q. Did you somehow trick him into granting a certificate of innocence?
A. No.
Q. Tell us how life has been after getting out of prison.
MR. SCAHILL: Objection to the form of the question.
BY MS. AUERBACH:
Q. Is it -- I'll rephrase, your Honor. That's fine.
Is it easy to get used to life outside of prison after you've spent more than 21 years there?
A. No, it's not.
Q. Tell us why.
A. I still go through some of the same things as if I've

actually -- if I'm still convicted of the crime. Like it still shows up if they -- if I pull over for a traffic stop, they bring it up. When I was trying to find housing, I couldn't get housing because it's on my background. And then when I did finally get somebody after having to produce my certificate of innocence, my vacate order from the state's attorney, I had to get a letter from you guys to tell the people at Remax Masters that I was actually innocent of everything that they said I did. I had to show them newspaper articles. They still made me pay my rent for a whole year in advance. So it's like every day, when I'm trying to do something, it's always an obstacle because of this stuff that I went through with these guys.

MR. SCAHILL: Objection, move to strike. Motions.

THE COURT: Overruled.

BY MS. AUERBACH:

Q. Tell the jury some of the things that you've had to adjust to after 21 years in prison.

A. It's a lot faster out here. I mean, like, in there, everything is in slow motion. Technology is just so much more advanced. Like, I always considered myself to be a fairly intelligent guy, and I hate feeling stupid. And a lot of the stuff that people do on computers and with technology, I still don't understand it. But I have a five-or-six-year-old cousin or niece or nephew that has

showed me how to use my phone. And it's just a lot of things that I'm slowly getting used to. But I think I'm getting back to where I need to be.
Q. What about interacting with other people? Have you had any effects from being in prison for so long?
A. I still have, like, trust issues because I lost so many friends. Even family members disappear for years while I was in there. So I don't really let people get close to me. And just from my perception, I think people are a lot ruder out here than they are in jail. And when I say that, I mean like the night when I first got out, they were reaching over my plate and over my food. And, like, I never seen that in there because people knew, like, you just don't do certain things. And it was -- it ended up being funny because the guys -- the people that are with me, my son, they was like: Dad, that's just how it is. But I'm like, whoa, like, it was too close for comfort for me. And I'm just readjusting to being in society, period, still.
Q. How is your relationship with your daughter?
A. We struggle sometimes.
Q. Was it easy to get back to a father and daughter relationship not having had one?
A. Not really because, like, I think in my daughter mind, she feel like I abandon her, when I always tried to tell her that I didn't ask to leave them. I didn't volunteer to leave

them for all that time. But she wrestles with the fact that she went through some stuff while I was in there, and she felt like she probably wouldn't have, had I been out here with her. But I think for the last eight months to a year, we've been fine. She is starting to get that we both are a little bit stubborn and set in our ways, and we just learning how to cope and just love each other and be good to each other.

Q. And what about your relationship with your son?

A. It's a little better. My son, he doesn't talk much about when he is hurting. It's like pulling teeth with him. But I know my son, and I know when he is going through something. And I think there is a part of him that feels like I should have been here. And they're right, I should have been here. So it's hard to, like, argue or debate that issue with them because I'm their father, and I should have been out here with them.

Q. What are your plans for the future?

A. I just want to see my family happy. I want to see us get back to loving each other and treating each other with respect. I want to do so many things with the inner city kids. I get out now, and I, like, help with the coaching of the peewee football in the community. And I want to see a lot of the kids that a lot of people give up on get a chance to actually do the right thing and do the things that they're

capable of doing.
Q. With respect to this trial, you did not come into direct contact with every single defendant that was named in this trial; correct?
A. Correct.
Q. For example, did you ever come into contact with ASA Fogarty?
A. No.
Q. Why, then, would you have included him in this lawsuit?
MS. QUIST: Objection, your Honor, relevance. This witness had no contact with Mr. Fogarty at all.
THE COURT: I'm going to sustain that objection.
BY MS. AUERBACH:
Q. Deon, are you trying to profit on the murder of two people?
A. Absolutely not.
Q. Why are you here today?
MR. SCAHILL: Objection to the form of the question.
THE COURT: Overruled.
BY THE WITNESS:
A. I'm here seeking accountability. And there has been a lot of talk about if someone did this or did that they should go to jail, when that's not even an option because that's what I would love to see them -- I would love to see them go

through what we went through for breaking the law. And this is the only recourse we have in order to hold them accountable for the things they did, is to bring forth suits like this, civil suits like this, because there is no accountability in their office. Nobody loses their --

MR. SCAHILL: Objection. Objection. Move to strike. This is non-responsive and bordering on irrelevant.

THE COURT: You've got your answer. Move on.

MS. AUERBACH: That's all I have, your Honor.

THE COURT: Well, we're five minutes from quitting time, so that's what we're going to do. We're done for the day, Ladies and Gentlemen. We've covered a lot of ground so far this week, and we still have some more to cover. So we thank you for being here. As always, I admonish you not to discuss the case with anyone or to allow anyone to discuss it with you. Not to see, read or view any news reports there might be and not to do any research on your own. Please, have a good evening. We will see you here tomorrow morning at 9:30.

(Jury exited the courtroom.)

THE COURT: Anything we need to take up before we break?

MR. SCAHILL: Judge, just one thing. We obviously read your ruling about the Fifth Amendment issue. I can pull the cites tonight, but Mr. Patrick went into very great

detail about his trial strategy and discussions with his attorney about who would and wouldn't be called at the trial. And, you know, he is leaving the jury with the impression that I think he explicitly said he wasn't pursuing an alibi theory. He was saying he is not pursuing coerced confession theory. And that he was all in agreement with his attorney with respect to this alibi evidence, which is completely contrary to what he has pursued in post-conviction proceedings specifically.

THE COURT: So what has that got to do with Fifth Amendment?

MR. SCAHILL: Because they are introducing issues that -- about his alibi evidence that is completely contradicted by the other evidence in the case. And now I'm left --

THE COURT: So it's contradicted. What has that got to do with his Fifth Amendment?

MR. SCAHILL: Because the position that he has taken, that he took in his post-conviction proceeding, the 1999, one is that he wanted to pursue an alibi theory and he wanted to do that by testifying. But his attorneys specifically told him that he could not testify, and that he lied to him. And then he got on the stand.

THE COURT: I didn't see any of that coming out on the stand. Did he say those things on the stand?

MS. AUERBACH: No.

MR. SCAHILL: Well, that's the problem is he said the opposite. He said that we felt -- when I was discussing it with my attorney, we felt that the state didn't have anything, so I was fine with not having --

THE COURT: So bring out the evidence that shows that he didn't feel that way and that's not true. Do you have any evidence to contradict that?

MR. SCAHILL: Yes.

THE COURT: Bring it out.

MR. SCAHILL: In order to do that, though, I have to talk about --

THE COURT: No, you don't have to talk about his Fifth Amendment assertion to do that.

MR. SCAHILL: But about his not testifying.

THE COURT: No, you don't have to talk about his not testifying.

MR. SCAHILL: Judge, that's specifically what he said in his post-conviction. Would you like me to grab the exhibit?

THE COURT: Bring out -- if you want to dig up language as to what he said that you think is going to make a difference in my ruling, feel free. But, right now, I don't see any of that. I didn't see any mention of his Fifth Amendment.

MR. SCAHILL: He said -- this is in post-conviction. This is our Exhibit 133.

MS. AUERBACH: Can I see that, too? Thanks.

MR. SCAHILL: This was a petition that Mr. Patrick filed in 1999. One of the exhibits was already referred to where he is saying that his lawyer --

THE COURT: Wait. What I want to know is what he said here today. What did he say here today to implicate his Fifth Amendment?

MR. SCAHILL: He said that he and his attorney looked at the state's case after it came in and decided the state didn't have -- didn't have anything, and so they didn't need to pursue an alibi defense.

THE COURT: Okay.

MR. SCAHILL: Okay? So -- but what he said in 1999, was the opposite of that, which is that he did want to pursue an alibi defense by testifying. And his attorney specifically told him he could not testify, he wasn't allowed to, and that he lied to him. And so he said something that's completely inconsistent with the record. And without talking about this dispute how -- I can't impeach him.

THE COURT: You can bring out -- you can impeach him with what he said. Whatever he said that contradicts what he said here today, you can impeach him with.

MR. SCAHILL: Okay. That's all I'm asking to do on

these -- on these exhibits.

THE COURT: So what's the impeachment going to be? Tell us.

MR. SCAHILL: Did your lawyer talk you into not testifying and told you that you couldn't testify and that you found out later that he had lied to you? Which is the exact language of what he said in 1999.

THE COURT: Wait. What's the part that contradicts his testimony about the alibi defense not going in, because he and his lawyer felt they were going to win without it?

MR. SCAHILL: Right.

THE COURT: What part contradicts that? What part -- what does he say in what you've just shown? Where does he say, I wanted an alibi defense? I wasn't satisfied that it was going to be a not guilty without the alibi defense. Because that's the impeachment; right?

MR. SCAHILL: Right, right. There is actually a couple of statements to that effect.

THE COURT: Okay.

MR. SCAHILL: So one of them is from this letter, which I just read, which his statement is: "My lawyer talked me into not testifying. He told me that I could not, but I found out that I can if I want to. He lied to me." That's one statement.

THE COURT: Okay. So then you can ask him if his

decision not to put on an alibi defense was because of what his lawyer told him.

MR. SCAHILL: Okay. Second issue.

THE COURT: Go on. See, I just don't see how the alibi defense and his taking the Fifth necessarily go hand in hand.

MR. SCAHILL: Okay. So here -- this is Defendant's Exhibit 140, which is another affidavit that was filed by Mr. Patrick, which says, at Paragraph 3: "During my trial, I told my attorney I wanted to testify to tell the jury where I was at the time of the murders, but he told me that I could not raise an alibi defense because of the statement I allegedly made." Which, again, is -- he said he is in agreement with this, and now it's the opposite of that.

THE COURT: Okay. Do you want to respond to that? It sounds like contradictory to what he said here.

MS. AUERBACH: Your Honor, I purposely stayed away from the issue of why he didn't take the stand based on your ruling. I think the alibi is fair game. I think that they can ask if he wanted to put on an alibi defense, why didn't he put on an alibi defense. Was it because his lawyer told him something? I don't think you have to say it's because my lawyer told me I couldn't testify. He never said he wanted to put on an alibi defense because he -- you know, he didn't want to testify. He didn't bring in any aspect of his

testimony with respect to the alibi defense. And I will say that, in his deposition, what he said on the stand is consistent with what he said in his deposition.

THE COURT: Not consistent with what he just read, I'll tell you that.

MS. AUERBACH: No, I agree that it's not consistent. He took an ineffective assistance of counsel as -- as you've seen probably a hundred times, your Honor. He said that I wanted to do this, my lawyer didn't let me do this, my lawyer didn't let me do that.

THE COURT: The fact that a lot of people do it all the time, that's not an argument for anything.

MS. AUERBACH: That's fine because I say that to my kids all the time, so duly noted.

MR. CHANEN: Judge, can I just add one thing? In terms of the direct -- the way the direct went in today, she very specifically led -- raised the issue of the two alibi witnesses to avoid the issue of the Fifth Amendment.

THE COURT: Yeah, here is the problem. The problem is that, in the inconsistent statements that your client gave before that, he mixes that and his wishing to testify, he mixes them up. So it is a problem. I think you can impeach him without bringing the language about he wanted to testify and his lawyer told him he couldn't. I think you can impeach him by asking him, isn't it a fact that you wanted to present

an alibi defense, but your lawyer talked you out of it, that's why you didn't present an alibi defense? You can ask him that. Now, if he lies about that or if he -- I shouldn't say lies. If he denies that he made those statements, then we may have to go into the specific language and the prove-up, which will be very specific.

MR. SCAHILL: Well, one of the other issues that came up during discovery was that we've had to litigate the attorney-client privilege, which was something that we won with the magistrate. And Mr. Theis -- and obviously -- well, and obviously Mr. Patrick testified, you know, about discussions he had with his attorney.

THE COURT: Yes, he did.

MR. SCAHILL: Which was fine. But, so, we took Mr. Theis's deposition and asked him about all of these things. Did you say this to Mr. Patrick? Did you tell him this? And obviously he, as expected, he said, no, I never said anything or anything like that to him. And so what we have is a sworn statement under oath by a party in a very important case saying one thing and the attorney saying no, that statement is completely false. And so what you have here beyond Fifth Amendment issues, you have somebody who is going to be -- who would be impeached by their own attorney by lying under oath.

THE COURT: This would have been nice if you had

raised this while we were discussing the Fifth Amendment issue.

MR. SCAHILL: I did put that in there, Judge. That was in my petition.

THE COURT: Not like that. Not quite like that. I still think you can work around the Fifth Amendment issue. I mean, the idea is not to -- not to bring forth the fact that he asserted his right not to testify. You can still ask him -- you ask him if he made the statements in those affidavits as to what his lawyer told him he could or couldn't do.

MR. SCAHILL: I can ask him whether he told his attorney that he wanted to testify to tell the jury where he was at the time of the murders?

THE COURT: You can ask him -- well, put together the questions, and I will tell you what you can ask him. As I see it, the contradiction is in why he chose not to put in the alibi defense. Well, any question regarding the alibi defense. And ask him: Did you want to testify to your alibi defense? And isn't it true that the reason you didn't is because your lawyer told you not to, not because you felt you weren't going to be convicted? That's direct impeachment, without raising the fact -- in fact, the jury will still not know whether he testified or not.

MR. SCAHILL: So I just want to be clear because I

don't want to run a foul -- well, first of all, can -- when we finish this discussion, it may be hard to un-ring a bell now, but to have Mr. Patrick not be here when he is still on the stand, we're talking about evidence? It might be a little --

THE COURT: No, he is the plaintiff in the case. He gets to be here.

MR. SCAHILL: He is on the stand, though.

THE COURT: Yeah, but he is the plaintiff in the case. He gets to be here.

MR. SCAHILL: All right. So can I ask him directly from the affidavit, is this statement true: During your trial, did you tell your attorney that you wanted to testify to tell the jury where you were at the time of the murders but your attorney told you that you could not raise an alibi defense because you had -- of this statement you allegedly made, which is exactly the language from his sworn affidavit?

THE COURT: How about you ask him: You testified here today that the reason you didn't raise an alibi defense is that you and your attorney believed you were going to be found innocent without it. Isn't it true that the reason you didn't raise the alibi -- that you did want to raise an alibi defense and that you did want -- and that your lawyer talked you out of it, ask him that. If he denies it, you can ask him the specific, well, did you say this in this affidavit on

such and such a date and such and such a time? And if he denies that, then the affidavit comes in as evidence. What else?

MS. AUERBACH: Your Honor, I have a --

THE COURT: Wait, wait. With him, what else?

MR. SCAHILL: The other -- the other things I think are, from what I understand both from counsel and your Honor, is fair game, which is with respect to the other alibi witnesses, who was called and who wasn't called. It sounds like that's fine, so.

THE COURT: Yep.

MR. SCAHILL: Okay. And I'm going to look at the transcript tonight. You know, I just -- I may re-visit it. I know your Honor, it's fresh in your mind, but --

THE COURT: I'm quite convinced you can quite effectively impeach him with the reason for not putting an alibi defense in without having to mention his assertion of his Fifth Amendment right. And from which, what you've read to me here, I'm sure a gifted attorney such as yourself can put together the proper language to do that.

MR. SCAHILL: Well, I won't let you down, Judge.

MS. AUERBACH: Judge, I have one unrelated issue, if you were willing to entertain it?

THE COURT: What?

MS. AUERBACH: So we have an expert that's coming

hopefully sometime this week. And I know that you had us put in statements that are going to be read relating to the expert. I wanted to just get a sense -- the expert's qualifications. I wanted to get a sense of how much leeway, if any, we have into giving a little bit of background, or -- so, for example, I have a handwriting expert. And while you're going to read, you know, basically his resume, where he was trained, where he worked, et cetera, do I have the ability to go into any of his training or any of his background before putting his ultimate analysis before the jury?

THE COURT: Yeah, you can do one or the other.

MS. AUERBACH: One or the other? Okay. Fair enough. We will make a decision. Thank you.

MR. CHANEN: Judge, in those situations where we choose to do from the stipulated version, who do you want -- what is your practice in terms of reading those qualifications; that the attorney does it, or your Honor does it?

THE COURT: You can publish it any way you wish.

MR. CHANEN: Okay.

MS. AUERBACH: Okay. Thank you.

THE COURT: You can publish it any way you wish. What I don't want is to have both -- you have a right to bring out the credibility of your expert, as long as it

doesn't take half a day.

MS. AUERBACH: So -- okay. That's fine. We will figure that out. Thank you, your Honor.

MR. CHANEN: Thank you.

THE COURT: Okay. We're in recess.

(Trail adjourned until March 22, 2017, 9:30 a.m.)

* * * * *

C E R T I F I C A T E

We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Mary Hacker*

___________________________________

*/s/ Alexandra Roth*

___________________________________

*/s/ Sandra Tennis* March 21, 2017

___________________________________ _____________

Official Court Reporters Date
United States District Court
Northern District of Illinois
Eastern Division