**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **DEON PATRICK,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | ) No.: 14 cv 3658 |
| | ) |
| **CITY OF CHICAGO, et al.,** | ) |
| | ) |
| **Defendants.** | ) |

**DEFENDANTS' ANTHONY VILLARDITA, THOMAS JOHNSON, RICK ABREU, TERRY O'CONNOR, SEAN GLINSKI, MICHAEL BERTI, AND CITY OF CHICAGO COMBINED MOTION FOR JUDGMENT AND OTHER RELIEF**

NOW COME the Defendants, ANTHONY VILLARDITA, THOMAS JOHNSON, RICK ABREU, TERRY O'CONNOR, SEAN GLINSKI and MICHAEL BERTI, (collectively "Chicago Police Officers"), by and through their attorneys, BORKAN & SCAHILL, LTD., and THE CITY OF CHICAGO, by and through its attorneys, DYKEMA GOSSETT PLLC, and seeking for judgment and/or other relief to be entered in their favor pursuant Fed. R. Civ. P. 37(c), Fed. R. Civ. P. 60(b)(3) and the inherent powers of this Court under *Chambers v. NASCO, Inc.*, 111 S. Ct. 2123 (1991).

## INTRODUCTION AND PROCEDURAL HISTORY

The above-captioned matter was filed on May 19, 2014 by Plaintiff, DEON PATRICK ("Plaintiff"), against Defendants CITY OF CHICAGO, ANTHONY VILLARDITA, THOMAS JOHNSON, RICK ABREU, TERRY O'CONNOR, BRIAN KILLACKY, SEAN GLINSKI, MICHAEL BERTI, MARTIN FOGARTY, and JOSEPH MAGATS. In general summary, Plaintiff alleged that Defendants framed him for a double murder occurring on November 16, 1992, coerced his confession to same, fabricated evidence, maliciously prosecuted him, and conspired to do such acts. After extensive pretrial discovery, trial began on March 6, 2017. A jury verdict was rendered on April 12, 2017 and Plaintiff was awarded $13,300,000 in compensatory damages and $90,000 in punitive damages. *See* Dckt. No. 365.

For the reasons set forth below, under well-established precedent, the judgment in favor of Plaintiff must be vacated and entered in favor of Defendants and/or other relief must be entered in favor of all Defendants on all claims as a result of Plaintiff's intentional, severe, and pervasive perjury, obstruction of justice, and repeated discovery violations.

### PLAINTIFF'S REPEATED ACTS OF ADMITTED PERJURY
### AND OBSTRUCTION OF ACCESS TO DISCOVERY

Plaintiff committed perjury on at least two material issues in this case and intentionally concealed highly material information during the pre-trial discovery period. First, Plaintiff intentionally and repeatedly lied about his communications with an individual whom Plaintiff and his cohorts had attempted to frame for the murders for which Plaintiff was convicted. It is undisputed that Plaintiff lied for the admitted and express purpose of withholding such information from Defendants in this civil case. Second, Plaintiff committed perjury in post-conviction filings filed in the Circuit Court of Cook County regarding his personal knowledge of Daniel Taylor's "lock up alibi." Plaintiff then lied in the course of this civil case about this perjury and, additionally, intentionally withheld highly material information from Defendants. These actions were repeated, intentional and motivated by a specific malicious intent on behalf of Plaintiff to obstruct Defendants' access to relevant information. Even though prejudice is not required in order to vacate the judgment in this case, Defendants suffered great prejudice as a result of these actions and were deprived of their right to a fair trial. Accordingly, under well-established law, Defendants pray this Court vacate the verdict in favor of Plaintiff, enter judgment in favor of Defendants on all counts, and grant Defendants whatever other relief this Court deems fit and just.

### GENERAL LEGAL STANDARDS

**Inherent Authority of the Court and Fed. R. Civ. P. 37:** A district court has inherent power to sanction a party who "has willfully abused the judicial process or otherwise conducted litigation in bad faith." *Secrease v. Western & Southern Life Ins. Co.*, 800 F.3d 397 (7th Cir. 2015); *Salmeron v.*

*Enterprise Recovery Systems, Inc.*, 579 F.3d 787, 793 (7th Cir.2009); *see Chambers v. NASCO, Inc.*, 501 U.S. 32, 48-49 (1991); *Greviskes v. Universities Research Ass'n*, 417 F.3d 752, 758-59 (7th Cir.2005). A district court may also dismiss a case for discovery violations or other egregious conduct in litigation under Federal Rule of Civil Procedure 37 or under the inherent authority of the district court. *See Greviskes*, 417 F.3d at 758-59; *White v. Williams*, 423 Fed.Appx. 645 (7th Cir. 2011)("Dismissal may be appropriate when a party has shown a lack of respect for the court or proceedings.").

Under Rule 37, the District Court may impose a wide range of remedies including dismissal and awarding of attorney's fees. *See* Fed. R. Civ. P. 37(b)(2) and (c). Although Rule 37 requires violation of a judicial order before a court imposes sanctions, "[c]ourts can broadly interpret what constitutes an order for purposes of imposing sanctions" and a formal order is not required. *Quela v. Payco-General Amer. Credits, Inc.*, 2000 WL 656681, at *6 (N.D.Ill. May 18, 2000)(collecting cases).

As explained by Chief Judge Castillo in *Quela*:

> The order, or equivalent, serves as notice to a disobedient party that sanctions may be imposed. In this case, although there has been no specific court order, we believe such an order is not required to provide notice that parties must not engage in such abusive litigation practices as coercing witness testimony, lying to the court, and tampering with the integrity of the judicial system. Because all litigants are presumed to know that contumacious conduct of this sort is absolutely unacceptable, we can properly consider the sanctions available under Rule 37. *Quela*, 2000 WL 656681 at *6 *citing United States v. Golden Elevator, Inc* ., 27 F.3d 301, 302 (7th Cir.1994)("Lawyers and litigants who decide that they will play by rules of their own invention will find that the game cannot be won."); *Hal Commodity Cycles Management v. Kirsh*, 825 F.2d 1136, 1139 (7th Cir.1987)("The Federal Rules of Civil Procedure, as well as local rules of court, give ample notice to litigants of how to properly conduct themselves."). *Id.*

The reason for this broad interpretation of Rule 37 is that all offending parties are presumed to know that tampering with the integrity of the judicial system, lying to the court, or engaging in other deceptive or abusive practices are absolutely unacceptable regardless of the absence of a specific court order to the contrary. *Id.*; *see also Lightspeed Media Corp. v. Smith*, 2015 WL 3545253, *5 (S.D. Ill. 2015)("Although the language of Rule 37(b) requires violation of a judicial order in order to impose sanctions, a formal, written order to comply with discovery is not required, where a litigant engages in

abusive litigation practices."); *JFB Hart Coatings, Inc. v. AM Gen. LLC*, 764 F. Supp. 2d 974, 981-82

(N.D. Ill. 2011)("Although Rule 37 requires violation of a judicial order before a court imposes sanctions,

'[c]ourts can broadly interpret what constitutes an order for purposes of imposing sanctions' and a formal

order is not required. This broad latitude "stems from the presumption that all litigants ... are reasonably

deemed to understand that fabricating evidence and committing perjury is conduct of the sort that 'is

absolutely unacceptable.'").

No order of any sort is required in order to dismiss a case based upon the inherent authority of this

Court. These inherent powers "are governed not by rule or statute but by the control necessarily vested

in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases."

*Chambers*, 501 U.S. at 43. Under these powers, courts can impose sanctions including entering judgment

and shifting attorney's fees. *See id.* at 44-45.

Dismissal is warranted when "there is a record of delay [or] contumacious conduct ... In deciding

what measure of sanctions to impose, the district court should consider the egregiousness of the conduct

in question in relation to all aspects of the judicial process.'" *Greviskes*, 417 F.3d at 758-59. The

"contumacious" conduct required for dismissal of a case with prejudice occurs "where a party has

displayed fault, bad faith, or willfulness." *Id. citing Downs v. Westphal*, 78 F.3d 1252, 1257 (7th

Cir.1996). Willfulness and bad faith are associated with conduct that is either "intentional or reckless[.]"

*Long v. Steepro*, 213 F.3d 983, 987 (7th Cir.2000); *see also Maynard v. Nygren*, 332 F.3d 462, 467-68

(7th Cir. 2003). Fault, however, "does not speak to the noncomplying party's disposition at all, but rather

only describes the reasonableness of the conduct-or lack thereof-which eventually culminated in the

violation." *Id.* District Courts are not required to impose lesser sanctions to remedy misconduct if the

misconduct is sufficiently serious. *See Patterson by Patterson v. Coca-Cola Bottling Co. Cairo-Sikeston,

Inc.*, 852 F.2d 280, 284-85 (7th Cir.1988)("Plaintiffs urge this court to reverse the dismissal, arguing that

less drastic sanctions would achieve the same result. Yet we see no reason to impose a requirement that

prevents a district court from imposing sanctions if, under the circumstances, it is warranted.").

Finally, in assessing whether dismissal is an appropriate sanction under the inherent powers of the Court, the Court need not find party's misconduct caused its opponent any prejudice. *See Barnhill v. United States*, 11 F.3d 1360, 1368 (7th Cir. 1993)("We continue to eschew grafting a requirement of prejudice onto a district court's ability to dismiss or enter judgment as a sanction under its inherent power."); *Raziev v. Compass Truck Sales, LLC*, 2016 WL 1449933, at *9 (N.D. Ill. Apr. 13, 2016)("The Seventh Circuit has not imposed a requirement of prejudice on a court's ability to dismiss or enter judgment as a sanction under its inherent power."). As explained in *Barnhill*, some misconduct "may exhibit such flagrant contempt for the court and its processes that to allow the offending party to continue to invoke the judicial mechanism for its own benefit would raise concerns about the integrity and credibility of the civil justice system that transcend the interests of the parties immediately before the court." 11 F.3d at 1368 (7th Cir.1993). Thus, a court may use its inherent powers to dismiss a case or enter default judgment even when the innocent party "incur[s] no real inconvenience" and "suffer[s] no real prejudice ." *Id.*; *see also Secrease*, 800 F.3d at 402 ("Even if it is not successful, the effort imposes unjust burdens on the opposing party, the judiciary, and honest litigants who count on the courts to decide their cases promptly and fairly."); *see also Fuery v. City of Chicago*, 2016 WL 5719442, at *11 (N.D. Ill. Sept. 29, 2016)(The "Court may still impose sanctions even where there is no prejudice but the actions of the party exhibit such flagrant contempt for the court and its processes that to allow the offending party to continue to invoke the judicial mechanism for its own benefit would raise concerns about the integrity and credibility of the civil justice system that transcend the interests of the parties immediately before the court.").

**Fed. R. Civ. P. 60(b)(3)**: Fed. R. Civ. P. 60(b)(3) provides that "[o]n motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:...fraud (whether previously called intrinsic or extrinsic), misrepresentation, or

misconduct by an opposing party." Fed. R. Civ. P. 60(b)(3). This rule requires a party to "show that []he has a meritorious claim that []he was prevented from fully and fairly presenting at trial as a result of the adverse party's fraud, misrepresentation, or misconduct." *Wickens v. Shell Oil Co.*, 620 F.3d 747, 758–59 (7th Cir.2010). In ascertaining whether a party has been prevented from fully and fairly litigating its case, the Court need not find that the fraud would necessarily have altered the outcome of the trial so long as the party is prejudiced in the presentation of its case. *Lonsdorf v. Seefeldt*, 47 F.3d 893, 897 (7th Cir. 1995)("[I]t is unnecessary for Lonsdorf to establish that the misrepresentation altered the outcome of the trial. It is sufficient that prejudice has occurred.").

## ARGUMENT

I.    **Plaintiff's Repeatedly and Intentionally Committed Acts of Perjury Relating To His Communications With The Alleged "True Killer" of Sharon Haugabook and Jeffrey Lassiter.**

Plaintiff intentionally and maliciously lied at his deposition in this case (and in his sworn Interrogatory answers) about his communications with an apparently innocent individual whom Plaintiff and his cohorts attempted to frame for the very murders for which Plaintiff was convicted.

For nearly an entire decade prior to being released from prison, Plaintiff had pursued a factual theory that the "true killer" of Sharon Haugabook and Jeffrey Lassiter included an individual named "Lamuel Hardy." *See* Def.'s Tr. Ex. 215 at 4,7-9; Def.'s Tr. Ex. 234 at 18.[1] Specifically, these accusations against Mr. Hardy were contained in a Verified Petition to Vacate Judgment filed in 2004 and were repeated in Plaintiff's Verified Successive Petition for Post-Conviction Relief filed in 2013. *Id.* The latter of these filings was successful and ultimately resulted in Plaintiff being released from prison and having his conviction vacated. *See* Pl.'s Tr. Ex. 87.

---

[1] Citations to trial exhibits shall be as follows: "Def,'s/Pl.'s Tr. Ex. at ___." Copies of all trial exhibits were previously provided to this Court. In the interest of brevity, Defendants do not attach such exhibits again. In the event this Court desires additional copies of such exhibits, Defendants will tender same upon request. Citations to the trial transcript shall be as follows: "Tr. at ___." Defendants can tender a complete copy of the trial transcript in the event such is desired by this Court.

Despite Mr. Hardy being named by Plaintiff as the "true killer" in 2004 (and again in 2013), no credible evidence of his alleged involvement in these murders appears to have surfaced at any point over the following nine (9) years.[2] More importantly, however, the timing of Mr. Hardy's identification as the "true killer" was highly suspicious in the first place. Specifically, Mr. Hardy had fortuitously shown up at Stateville Prison in 2003 after being convicted of a different murder. At this time, Plaintiff, Dennis Mixon, and Daniel Taylor all happened to be serving their sentences at Stateville as well. Shortly after being placed in Stateville, Mr. Hardy claimed that "[h]e was approached at Stateville and someone wanted him to file papers at Stateville about some murders to get an inmate off." *See* Def.'s Tr. Ex. 817 at C236. This incident prompted Mr. Hardy to request placement in protective custody. *Id.*

In 2013, Mr. Hardy was interviewed by investigators from the Cook County State's Attorney's Office. *See* Def.'s Tr. Ex. 812. At that time, Mr. Hardy advised that the individual that had initially approached him in this regard was Dennis Mixon. *Id.* Mr. Hardy went on to state that, after he had been placed in protective custody, Plaintiff also approached him in protective custody (where Plaintiff had access as a result of a work detail) and again pressured Mr. Hardy to take responsibility for the murders. *Id.* According to Mr. Hardy, Plaintiff was later placed in Menard Correctional Center. *Id.* As luck would have it, both Dennis Mixon and Plaintiff were eventually placed there as well. *Id.* Mr. Hardy claimed that Plaintiff and Dennis Mixon again attempted to pressure him to implicate himself in the Lassiter/Haugabook murders. *Id.*

Given the obvious probative value of Plaintiff's active involvement in trying to intimidate an apparently innocent person into taking responsibility for the murders for which Plaintiff was alleging he himself was framed, Defendants explored this issue extensively in pre-trial discovery.

First, Defendants propounded specific Interrogatories requesting that Plaintiff list any "contact

_____

[2] Two days before trial, the Cook County States Attorney's Office produced a memorandum summarizing an interview with Dennis Mixon taken in 2013. In this summary, Mr. Mixon purportedly admitted that the claim that Mr. Hardy was involved in the murders was fabricated. *See* Pl.'s Tr. Ex. 158.

or communication" that he had with Mr. Hardy during the entire period of Plaintiff's incarceration as well as "describe in detail the dates, number of times, nature of [Plaintiff's] contact, the contents of any conversations and identify by name the facility where [Plaintiff] incarcerated when [Plaintiff] had contact with" Mr. Hardy. *See* Pl.'s Resp. Villardita Interrog. at ¶ 13, pp. 25 (attached hereto as Ex. A). Plaintiff denied, under oath, having any contact or communications whatsoever with Mr. Hardy. *Id.* These statements were sworn under oath by Plaintiff on November 17, 2014. *Id.* These answers were never amended nor supplemented at any point (prior to trial or otherwise).

At Plaintiff's later deposition, Plaintiff was again asked (repeatedly) about any contact or communications he had with Mr. Hardy. *See* Def.'s Tr. Ex. 997 at 492:14-498:14 . While Plaintiff admitted that Mr. Hardy was indeed placed at Stateville with him in 2003, Plaintiff specifically, repeatedly, and unambiguously denied having any communication with Mr. Hardy whatsoever. Indeed, the questions posed on this topic could not have been more clear and the answers given by Plaintiff could not have been more unequivocal. To wit:

> Q. Okay. Did you ever have any conversation with Lemuel Hardy?
> A. No.
>
> Q. Ever?
> A. No.
>
> Q. Okay. Did you ever -- have you ever spoken to Lemuel Hardy about your case?
> A. No.
>
> Q. Never?
> A. No.
>
> Q. Have you ever told anyone that you've told -- spoken to Lemuel Hardy about your case?
> A. Not that I recall.
>
> Q. Okay. If you had, in fact, said that to somebody, would that be a lie?
> A. To my recollection, yes. Def.'s Tr. Ex. 997 at 494:4-494:19.

In response to being confronted with the statements attributed to Mr. Hardy by CCSAO (as referenced above), Plaintiff responded unequivocally "I've never spoken to Lemuel Hardy." Def.'s Tr. Ex.

997 at 495:10-496:2. Indeed, Plaintiff testified that he never even *considered* having such conversation

with Mr. Hardy and appeared to scoff at the very idea that anyone would do such a thing:

> Q. Did you ever consider speaking to Lemuel Hardy about your case?
> A. No.
>
> Q. Why not?
> A. I don't want to know Lemuel Hardy. I don't want to know Dennis Mixon. I didn't want to know what happened in that house because when I was sitting in this room, I don't want to know. And what I'm telling you and I am saying that I'm speaking from what I know to be the truth, that's what I want it to be.
>
> Q. Well, you were given information that an individual who you were locked up with had something to do with the murders that you were serving a life sentence for, correct?
> A. Yes.
>
> Q. Okay. And didn't you have any sort of urge to want to go and talk to this person and maybe try to get him to take responsibility for what they did?
> A. Who does that?
> A. If he was going to take any sort of responsibility, he would have been done it. I don't want to talk to Lemuel Hardy. I was just in Menard with Lemuel Hardy. Lemuel Hardy didn't know me, but he will sit there and say that he had a conversation with me where I said, "My nigger wrap, are you going to something"? He didn't know me until somebody pointed me out to him. We don't know each other. We've never seen each other. We've never been around each other like that. Def.'s Tr. Ex. 997 at 496:21-498:14.

During trial in this case, however, Plaintiff admitted that his previous sworn statements regarding

his allegedly having had no communications whatsoever with Mr. Hardy were simply false. Specifically,

Plaintiff testified as follows:

> Q. Now, after Lemuel Hardy shows up in Stateville where you're housed and Dennis Mixon is housed, you become aware that Lemuel Hardy actually had been placed in protective custody, right?
> A. Yes, he did come in protective custody.
>
> Q. And at this time you just so happened to have a work detail where you're allowed -- you are allowed to go into protective custody, right?
> A. There was -- there wasn't into protective custody, because protective custody was on the first floor in the building that I just so happened to be working in when Lemuel Hardy got there.
>
> Q. And you had access to those prisoners who were in protective custody, right?
> A. Yes. We fed them.
>
> Q. You could have verbal interaction with those people if you wanted to, right?

A. Yes.

Q. Your story is, you never talked to Lemuel Hardy about him taking responsibility for these murders, ever?
A. My story is that Lemuel Hardy came over there because Mixon had him called on a visit to speak to Kathleen Zellner about taking part in these murders. When Hardy figured out what that was about, he didn't wanna do it, and he came to PC and he came over there to that house, yes.

Q. And while he was in that house, you actually talked to him, didn't you?
A. Yes.

Q. And you told him that you heard that he was gonna take responsibility for your case, didn't you?
A. Is that what you're saying I told him or are you asking me what did I tell him?

Q. I'm asking you, did you tell him that?
A. No.

Q. What did you tell him?
A. I told him that the lawyers just wanted to speak to him because Mixon was saying that he had something to do with it, and if he didn't, he should probably talk to them and tell them that. Tr. at 1991:2-1992:16

Plaintiff was then impeached with his deposition testimony and admitted having lied under oath

at his deposition about:

Q:MR. SCAHILL: Defendants' Exhibit 997 in evidence.
This is Page 495.
        THE COURT: It may be published.
MR. SCAHILL: Actually, 494, Line 4.
BY MR. SCAHILL:
Q. (Reading:) Question: Okay. Did you ever have any conversation with Lemuel Hardy? This is from your deposition on November 21st, 2014.
        Question: Did you ever have any conversation with Lemuel Hardy?
        Your answer: No.
        Question: Ever?
        Answer: No.
        Question: Okay. Did you ever -- have you ever spoken to Lemuel Hardy about your case?
        Answer: No.
        Question: Never?
        Answer: No.
That's what you answered at your deposition, right?
A. If it's there, yes.

Q. And you just told this jury the complete opposite of that, didn't you?
A. I'm telling the jury the complete story that happened. And when you talk about -- about the

case, I knew nothing about the case. I was telling him that he should probably talk to our lawyers, that Mixon was trying to get him to talk to.

Q. No, no, no. I asked you whether you, at your deposition under oath, the same oath you took here today, whether you ever had any conversation with Lemuel Hardy and you told me under oath, no, no, you did not?
A. Yes, I did.

Q. You lied at your deposition, didn't you?
A. If that's what's in there. Tr. at 1993:20-1994:4.

Plaintiff refused to admit that he had pressured Mr. Hardy to take responsibility for his case and essentially just testified that he had simply politely asked Mr. Hardy to talk to his lawyer to set the record straight. To wit, Plaintiff testified as followed:

Q. You did try to get Lemuel Hardy to take responsibility for a case that you knew that he didn't have anything to do with, didn't you?
A. I don't know who was in that house other than Mixon. If Mixon said he was there with him, I assumed he was with him.

Q. And you wanted to use that information so you could try to get out of prison in 2004 by identifying somebody else to take your case, right?
A. What do you mean use that information? If that's what Mixon was saying happened, that's what I believed happened.

Q. And you were having conversations with Mr. Hardy to try to make that happen, weren't you?
A. Trying to make it happen? My conversation was, if he didn't do it, Mixon was saying he did it, he should probably talk to the lawyers and explain to them he didn't do it. So to try to make it happen? No, I wasn't like, go tell them you killed them people. No, because I don't know who killed them people. Tr. at 1994:5-1994:22

In response to further questioning on the topic, Plaintiff proffered one of the single most outrageous explanations for his prior perjury imaginable in a court of law. Specifically, Plaintiff admitted he intentionally lied *for the specific purpose of concealing information from the Defendants*. Indeed, Plaintiff appeared to try to blame Defendants' counsel for his perjury because of the confrontational nature of Defendants' counsel's questions. To wit, Plaintiff testified as follows when asked to explain why he lied about communicating with Mr. Hardy:

Q. If it's as innocent as that, Mr. Patrick, why didn't you just tell me that at your dep?
A. Because you don't work for me and you're with them. And it's like everything that you're

asking me now, it's like you're putting me back in that room and I'm going through it all over again.

Q. You filed a lawsuit against the people that I represent. You know that, right?
A. That you work for.

Q. That -- people that I represent, correct?
A. Yes.

Q. I have every right to ask you questions about this case. You know that, don't you, Mr. Patrick?
A. But you don't want to hear the truth either because you're --
           *                 *               *
Q. I deposed you on two occasions. You recall that, Mr. Patrick, right?
A. I think you deposed me on one and somebody else did the other one.

Q. I deposed you on the 20th and the 21st of November, 2014, two consecutive days. Do you recall that?
A. I consider it the same deposition, but yes.

Q. Are you telling this jury that when you -- when I was asking you questions about the lawsuit that you had brought, you didn't think that you needed to tell me the truth when you were answering those questions?
A. I'm telling you that I answered the questions the way you asked them. And if that's what's in there, that's what I answered to.

Q. But you didn't tell me the whole truth when I was asking those questions?
A. To that question, no.  Tr. at 1994:23-1997:3.

## B.	Plaintiff Committed Perjury Regarding Daniel Taylor's Lock Up Alibi In Connection With The Underlying State Court Proceedings Challenging His Conviction And Then Lied About Having Done So In Connection With This Civil Case.

In addition to committing perjury regarding his communications with a person who Plaintiff falsely implicated as the "true killer" of Sharon Haugabook and Jeffrey Lassiter, Plaintiff also committed perjury regarding another highly material issue at trial in this case, specifically, the purported "lock up alibi" of Daniel Taylor.  In connection with an attempt to free himself from prison via a post-conviction filing in 1999, Plaintiff swore under oath that he had personally witnessed Daniel Taylor being arrested on the evening of the murders at around 5:45 p.m.. *See* Def.'s Tr. Ex. 136 at ¶ 7. During his deposition in 2014, Plaintiff claimed he did not recall having made any such statement. Def.'s Tr. Ex. 995 at 163:24-165:18. However, Plaintiff adamantly claimed at this same deposition that he had made no intentionally

false statements in any affidavits in connection with those 1999 proceedings. *Id.*

At trial, Plaintiff finally admitted having intentionally lied about these facts. *See* Tr. at 1533:3-1534:13. Indeed, this prior perjury was fronted by Plaintiff during his direct examination and was presented in such a fashion as to attempt to intentionally soften the impact of this prior perjury. Moreover, Plaintiff attempted to blame an unnamed prison law clerk for advising him to place these perjured statements in his affidavit. To wit, during Plaintiff's direct examination, this information was presented as follows:

> Q. Take a look at Paragraph 7 of the affidavit. It's a long sentence, so I'm going to break it down.
> MS. AUERBACH: Natalie, if you can pull it up just a little bit more, that would be great. You can just do 7. Thanks.
> BY MR. AUERBACH:
> Q. The first part of it says: Further, the last time I had seen Daniel Taylor was when he was arrested for disorderly conduct on November 16th, 1992, at around 5:45 p.m., and I did not see him again until 10:30 p.m. after his release from the Addison and Halsted police station. Incidentally, this was the night of the murders. Do you see that?
> A. Yes.
>
> Q. Okay. So the first part of that, the last time I had seen Daniel Taylor was when he was arrested for disorderly conduct on November 16th, 1992, at around 5:45 p.m., was that a true statement when you made it in June of 1999?
> A. No, it was not.
>
> Q. What about the second part of that sentence, I did not see him again until 10:30 p.m. after his release from the Addison and Halsted police station. Is that true?
> A. Yes.
>
> Q. Why did you not tell the truth in a document that you swore to under oath in 1992 [sic] about whether or not you saw Daniel Taylor on the street getting arrested that evening?
> A. I think at that time I was a mess and in the penitentiary with two natural lives for something I didn't do. And I was being held by some law clerks and some other guys that were incarcerated, and I think I -- I took some poor advice but I really was trying to be heard -- I took some poor advice and I was really trying to get heard, trying to get into a courtroom where somebody would actually listen to our story and look at the facts of the case and see that we couldn't have had anything to do with this case. Tr. at 1533:3-1534:13

On cross examination, Plaintiff confirmed again that these perjured statements were, in fact, made intentionally and that Plaintiff had always known that they were false. Tr. at 1704:25-1710:13 ("Q. And you knew when you swore to this under oath in your post conviction petition to try to get out of prison

that this was false? A. Yes. Q. You've always known that that's false, correct? A. Yes."). Plaintiff also admitted, for the first time, that the statements at issue were made for the specific purpose of attempting to create false evidence to bolster Plaintiff's own connection to Daniel Taylor's "lock up alibi." *Id.* ("Q. Now, just so we're clear, you were intentionally putting false information in this affidavit, right? A. I was advised by a law clerk, as I explained yesterday, that I had to be more involved with actually seeing Daniel Taylor that day.").

As with Plaintiff's disclosure in the middle of trial regarding his communications with Mr. Hardy, this issue was also preceded by Plaintiff's failure to disclose this information in his Interrogatory answers as well. Specifically, Plaintiff was asked during the course of written discovery *on three separate occasions* to provide information regarding any communication he had with any persons regarding Daniel Taylor's November 16, 1992 arrest and any of the other allegations in his Complaint between the date of his arrest and the present date. *See* Ex. A at 26-40; *see also* Pl.'s Resp. Interrog. Johnson at 12, 13 (attached hereto as Ex. B). Plaintiff failed to disclose that he had any such conversation with any such prison law clerk about this topic (much less that such person had allegedly convinced him to lie about this topic for the express purpose of bolstering his own connection to the Daniel Taylor "lock up alibi"). *Id.* Indeed, the very first time this soft-peddled version was disclosed was in the third week of this trial without any warning or prior disclosure to Defendants. This non-disclosure is particularly alarming because the manner in which this information was elicited from Plaintiff clearly indicated that Plaintiff's counsel knew this information ahead of time and wanted to soften the impact of the prior perjury (and, at the same time, prevent Defendants from being able to impeach this explanation by conducting pre-trial discovery).

**C.      Vacating The Verdict And Entering Judgment Against Plaintiff Is The Appropriate Sanction For Plaintiff's Perjury And Discovery Violations.**

Plaintiff's misconduct in this case is of the most serious character imaginable in a federal

proceeding. Plaintiff repeatedly lied under oath about material issues and did so for the specific purpose of concealing material facts from an opposing party. To recap, Plaintiff:

- Lied in his Interrogatory responses about his communications with Lamuel Hardy

- Lied at his deposition about his communications with Mr. Hardy

- Admitted lying about these facts for the express purpose of concealing information from an opposing party

- Lied in his post-conviction filings in order to create a personal evidentiary connection between himself and Daniel Taylor's "lock up alibi"

- Lied at his deposition about intentionally lying in this post-conviction filing

- Lied and/or failed to disclose communications with the individual who supposedly advised him to place perjured statements in his post-conviction filings

At the outset, while it is clear that Defendants suffered prejudice as a result of this misconduct, dismissal would be the appropriate sanction for this repeated misconduct even if this were not the case. Courts generally have an interest in both punishing a party's dishonesty and deterring similar misconduct. *See Secrease,* 800 F.3d at 402; *Greviskes*, 417 F.3d at 759. Lying cannot be condoned in any formal proceeding. *See ABF Freight System, Inc. v. N.L.R.B.*, 510 U.S. 317, 323 (1994)("False testimony in a formal proceeding is intolerable."). "Our legal system is dependent on the willingness of the litigants to allow an honest and true airing of the real facts." *Quela* , 2000 WL 656681 at *7. Thus, "[p]arties who wish to use the judicial system to settle disputes have certain obligations and responsibilities" and "[o]ne of those responsibilities is to tell the truth" *Id. quoting Rodriguez v. M & M/Mars*, 1997 WL 349989, *2 (N.D. Ill. June 23, 1997)(dismissing plaintiff's case for lying about her prior criminal record in a deposition). "'[P]erjury strikes at the heart of the integrity of the judicial system....'" *United States v. Stokes*, 211 F.3d 1039, 1046 (7th Cir.2000). It "undermines the function and province of the law and threatens the integrity of judgments." *United States v. Alvarez*, 132 S.Ct. 2537, 2540 (2012). It "poisons the life blood of the administration of justice." *United States v. DiStefano*, 464 F.2d 845, 854 (2nd

Cir.1972).

Because of its seriousness and pernicious consequences, perjury in the course of discovery may warrant the drastic sanction of dismissal. *Jackson v. Murphy*, 468 Fed.Appx. 616, 619-620 (7th Cir.2012); *Ridge Chrysler Jeep, LLC v. Daimler Chrysler Services North Am., LLC*, 2006 WL 2808158, *8 (N.D. Ill. 2006)(dismissing case as a sanction: "When discovery non-compliance [ ] is coupled with lies to both an adversary and the Court in order to gain an advantage in the litigation, the Court must step in and impose the ultimate sanction in order to preserve the integrity of the federal judicial system."); *Thomas v. General Motors Acceptance Corp.*, 288 F.3d 305, 306, 308 (7th Cir.2002)(court did not abuse discretion in dismissing suit with prejudice where plaintiff knowingly filed false application to proceed in forma pauperis );*Quela*, 2000 WL 65668182 at *7 ("This Court, too, has a responsibility: where we find deliberate falsehoods told in proceedings, we cannot allow such conduct to go unchecked. Turning a blind eye to false testimony erodes the public's confidence in the outcome of judicial decisions, calls into question the legitimacy of courts, and threatens the entire judicial system… Given the extreme importance of accurate and truthful discovery, our court system must have zero tolerance for parties who seek to intentionally distort the discovery and trial process.").

The duties upon the Court when faced with undisputed deliberate perjury was explained by Judge Castillo in *Quela*:

> Lying cannot be condoned in any formal proceeding. This Court, too, has a responsibility: where we find deliberate falsehoods told in proceedings, we cannot allow such conduct to go unchecked. Turning a blind eye to false testimony erodes the public's confidence in the outcome of judicial decisions, calls into question the legitimacy of courts, and threatens the entire judicial system. Our entire civil justice system is dependent on accurate and truthful discovery. Every day, litigants make settlement decisions on the basis of information obtained during the discovery process. Across the country, our fellow judges enter summary judgment in numerous cases on the basis of undisputed facts determined during the discovery process. Ultimately, the discovery process aids parties, who need to proceed all the way through trial to resolve a case, ensure that the trial is based on objective facts and not the parties' selective and subjective recollections about their respective positions. Therefore, the importance of accurate and truthful discovery to the civil justice system cannot be overstated. *Id.* at *7-8.

The Seventh Circuit addressed the consequences of perjury in a related state proceeding upon a plaintiff's later pursuit of a Section 1983 claim in *Dye v. Wargo*, 253 F.3d 296, 298 (7th Cir. 2001). In *Dye*, a Section 1983 plaintiff attempted to create a genuine issue of material fact by contradicting a previous version of events given in an underlying criminal proceeding. *Id.* In affirming the entry of summary judgment, the Court stated as follows:

> Some of the statements that [Plaintiff] has made under oath in this litigation are inconsistent with statements he made under oath in state court…One or the other of [Plaintiff's] stories is perjury. His lawyer contends that [Plaintiff] was entitled to lie in state court to ensure that the judge accepted the favorable plea bargain, and that we should therefore disregard his earlier sworn statements. That is not a position any judicial system can, or does, tolerate. *Id.* at 298.

Similarly, the Seventh Circuit also rejected a habeas petitioner's attempt to seek post-conviction relief by changing the nature of his testimony in the underlying proceeding:

> It is difficult to see how a collateral attack based on the proposition that the petitioner's own trial testimony was a pack of lies has any prospect of success. Litigants must live with the stories that they tell under oath. Escamilla maintains that, once his lawyer withdrew the motion to exclude the statement, he had "no choice" but to testify consistently with it. Not at all. He could have asked the court for a new lawyer, remained silent at trial, or testified to what he now insists is the truth and asked the jury to disregard what he had said before. The legal system offers many ways to deal with problems; perjury is not among them. How could any court credit statements made by a litigant such as Escamilla who trumpets a willingness (indeed, asserts an entitlement) to lie under oath whenever deceit serves his interests? *See Escamilla v. Jungwirth*, 426 F.3d 868, 870 (7th Cir. 2005) *abrogated on other grounds by McQuiggin v. Perkins*, 133 S. Ct. 1924 (2013).

As explained in *Rhodes v. LaSalle Bank, N.A.*, 2005 WL 281221, *3 (N.D. Ill. 2005), "[t]he decisions in these cases are premised on the fact that a litigant cannot be permitted to say 'oops, you've caught me,' and thereafter be 'allowed to continue to play the game.'" *Id.* "Not to dismiss a case for such blatant disregard of the judicial process would 'erode the public's confidence in the outcome of judicial decision, call into question the legitimacy of courts, and threaten the entire judicial system.'" *Id.*

To this end, regardless of any factual merit of a plaintiff's underlying claim and regardless of whether the perjury involves matters material to the litigation at bar, dismissal for perjurious conduct remains appropriate in order to protect the integrity of the civil judicial system. In *Dotson v. Bravo*, 202 F.R.D. 559, 572 (N.D. Ill. 2001), *aff'd*, 321 F.3d 663 (7th Cir. 2003), a plaintiff was convicted of criminal

offenses relating to his alleged discharge of a firearm at a police officer. *Id.* at 665-66. The defendant officer, Bravo, had testified against plaintiff at this criminal trial that plaintiff was the person who had shot at him. *Id.* However, audio recordings later surfaced which appeared to directly contradict the veracity of the defendant officer's account. *Id.* Plaintiff was immediately released from prison as a result. *Id.* A lawsuit followed. *Id.* Plaintiff's problems began, however, when it was revealed that he had misrepresented his identity in concert with the underlying criminal court proceedings. *Id.*

Despite the fact that these misrepresentations had nothing whatsoever to do with the veracity of the plaintiff's underlying version of the events forming the basis for his case (and despite the existence of evidence supporting the viability of his underlying claims against the defendant officer), the District Court dismissed plaintiff's suit as a sanction for his admitted dishonesty. *See Dotson*, 202 F.R.D. at 572. In so doing, the District Court stated as follows in dismissing plaintiff's lawsuit in its entirety:

> Credibility and veracity issues are among the ultimate factually disputed issues in a trial, and are not to be resolved beforehand or otherwise be used as a basis for a sanction. Admitted perjury, however, is quite another matter. The fact is that whether or not [the defendant's] testimony under oath in prior state court proceedings or in these proceedings is inconsistent, contradictory, or in any way false remains to be determined by a trier of fact. [Plaintiff] has to prove before a jury of his peers that [defendant] is a prevaricator. [Plaintiff], on the other hand, is an admitted perjurer...Defendants need prove nothing with respect to this matter. No jury need make any factual determination regarding the matter. The only issue is whether [Plaintiff] will be permitted to profit from his deceit.

In affirming the dismissal of plaintiff's claim as a result of the exposure of his prior dishonesty, the Seventh Circuit stated:

> Given the evidence that supported his acquittal from all criminal charges, we note that [Plaintiff's] civil rights case may well have had some merit. But, we cannot allow a plaintiff to so abuse the court system in order to avoid criminal justice, yet obtain civil reward. If [Plaintiff] sought to expose the "truth" of what occurred on January 1, 1998, he should not have begun the lie that now leads to the dismissal of his case. *Id.* at 669.

In explaining, the Court also stated that:

> [M]isconduct may exhibit such flagrant contempt for the court and its processes that to allow the offending party to continue to invoke the judicial mechanism for its own benefit would raise concerns about the integrity and credibility of the civil justice system that transcend the interests

of the parties immediately before the court. *Id.*

Echoing these sentiments, countless courts addressing perjured testimony by litigants seeking relief and courts have found that dismissal is necessary to protect the integrity of the judicial process. *See Jackson*, 468 Fed. Appx. at 619–620 (affirming dismissal of Section 1983 case based upon Plaintiff's perjured testimony); *Allen*, 317 F.3d at 703 ("it is arguable that a litigant who defrauds the court should not be permitted to continue to press his case"); *Secrease*, 800 F.3d at 401 ("Dismissal can be appropriate when the plaintiff has abused the judicial process by seeking relief based on information that the plaintiff knows is false."); *United States v. Stewart*, 198 F.3d 984, 987 (7th Cir. 1999)("[S]tatements made to a federal judge in open court are not trifles that defendants may elect to disregard. A defendant has no legal entitlement to benefit by contradicting himself under oath."); *Fuery,* 2016 WL 5719442, at *2 (vacating jury verdict in favor of Plaintiff based upon Plaintiff's trial misconduct and misrepresentation); *Ridge Chrysler Jeep, LLC*, 2006 WL 2808158 at *8 (dismissing case as a sanction); *Thomas*, 288 F.3d at 308 (court did not abuse discretion in dismissing suit where plaintiff knowingly filed false document); *Brady v. United States*, 877 F.Supp. 444, 453 (C.D.Ill. 1994)("Permitting this lawsuit to proceed would be an open invitation to abuse the judicial process. Litigants would infer they have everything to gain, and nothing to lose, if manufactured evidence is merely excluded while their lawsuit continues. Litigants must know that the courts are not open to persons who would seek justice by fraudulent means."); *Rodriguez*, 1997 WL 349989, at *2 (N.D. Ill. 1997)(dismissing lawsuit as a result of perjured testimony; "False testimony in a formal proceeding is intolerable. This court is aware that the law favors a trial on the merits. That right to a trial, however, is not absolute…In the instant case, plaintiff sought to conceal relevant information bearing directly upon her credibility both as a witness and a litigant…This court cannot and will not allow a litigant to so abuse the judicial process.").

As indicated by the above authorities, Plaintiff's repeated perjury warrants dismissal. Indeed, the facts in many of the above cases pale in comparison to what occurred in this case. While dismissal for

perjured testimony and discovery has repeatedly been found to merit dismissal of a plaintiff's claims, dismissal has also been found appropriate for such things as simply misrepresenting one's identity in prior criminal court proceedings, misrepresenting financial condition in a filing to proceed *in forma pauperis*, and other such misrepresentations not directly germane to the merits of the case. *See e.g. Dotson*, 202 F.R.D. at 572 (affirming dismissal of Section 1983 claim based upon Plaintiff misrepresentation of identity in underlying state court proceeding); *Jackson*, 468 Fed. Appx. at 619-20 (dismissal of Section 1983 claim affirmed based on Plaintiff misrepresenting date on which grievance filed); *Thomas*, 288 F.3d at 306-08 (misrepresentation of financial condition for purposes of filing seeking to proceed *in forma pauperis* merited dismissal with prejudice of lawsuit); *Secrease*, 800 F.3d 397, 400 (7th Cir. 2015)(affirming dismissal of claim based upon Plaintiff's misrepresentation of contents of employment contract); *Rodriguez*, 1997 WL 349989, at *2 (affirming dismissal of Plaintiff's case as a result of perjured testimony at deposition regarding criminal history). Unlike some of the above cases, the perjury at issue related to highly important substantive issues in the case. The issue of the framing of Mr. Hardy by Plaintiff and his cohorts was a repeated theme by Defendants throughout the course of this case. Tr. at 66:14-67:15; 4078:19-4080:25. Indeed, this issue was prominently featured in Defendants' opening statement and closing argument. *Id.* The Daniel Taylor "lock up alibi" was similarly a centerpiece of Plaintiff's case and the validity of this "lock up alibi" was hotly contested by Defendants.

Moreover, this case stands alone in reported jurisprudence in this area regarding the undisputed malicious intent and bad faith behind the perjury. While the above cases indicate that litigants often try to claim confusion or mistake or some other innocent motive to explain their perjury, Plaintiff admitted that he lied at his deposition simply because the person asking him questions represented an opposing party. This cannot be tolerated. Insofar as Plaintiff's intentional perjury was specifically designed to obstruct Defendants' access to relevant information, it is simply impossible at this stage to determine whether or not Plaintiff committed perjury on other material matters as well. Frankly, it is highly dubious

that Plaintiff would intentionally decide to commit perjury on this one issue yet be chastened enough (by the very oath he admitted disregarding) to tell the truth about everything else material to this case.

In this regard, Plaintiff appears only to have admitted to this perjury in the first place because he momentarily lost his composure on the stand and accidentally let the truth slip out. *See* Tr. at 1994:23-1995:3 ("Q. If it's as innocent as that, Mr. Patrick, why didn't you just tell me that at your dep? A. Because you don't work for me and you're with them. And it's like everything that you're asking me now, it's like you're putting me back in that room and I'm going through it all over again."). Prior to letting this slip, Plaintiff, in his deposition, had essentially scoffed at the very suggestion that he would even think of approaching Mr. Hardy to discuss his case. Def.'s Tr. Ex. 997 at 496:21-498:14. This perjury was not a mere slip of the tongue or casual white lie; this was a pre-meditated and conscious decision to obstruct an opposing party's access to relevant information.

With respect to Plaintiff's false allegations of personal knowledge of Daniel Taylor's "lock up alibi," Plaintiff admitted that these perjured statements were specifically designed to create false evidence to bolster his own connection to this issue in order to increase his chances of success in his post-conviction filings. Tr. at 1704:25-1710:13. Moreover, the manner in which Plaintiff fronted this perjury on direct examination indicates that it was known by Plaintiff's attorney well in advance trial yet never brought to Defendants' attention until trial. Nonetheless, the strategic soft-peddling by blaming this perjury on an unnamed prison law clerk was completely withheld from Defendants for nearly three years. Again, the sequence of events clearly indicates that Plaintiff intentionally decided to obstruct Defendants access to relevant information prior to trial.

Third, while this Court need not determine that Defendants suffered prejudice as a result of Plaintiff's misconduct in order to grant the relief sought in this Motion, Defendants clearly suffered great prejudice in planning and presenting their case. To wit:

- As indicated above, the attempted framing of Mr. Hardy was a prominent theme by

Defendants throughout the course of this case. While Defendants were aware of allegations that Plaintiff had pressured Mr. Hardy to take responsibility for the murders, Plaintiff flatly (and falsely) denied any communications whatsoever with Mr. Hardy. To this end, the only persons who could rebut such allegations would be Mr. Hardy or Dennis Mixon. Mr. Hardy is a convicted murderer who is currently serving a lengthy prison sentence. Even if Mr. Hardy were called as a witness (and did not choose to invoke his Fifth Amendment rights), Mr. Hardy would be subject to serious credibility impeachment. Dennis Mixon, for his part, had previously implicated Mr. Hardy but then refused to give testimony in this case (citing his rights under the Fifth Amendment). Plaintiff, on the other hand, flaunted the vacating of his own conviction and Certificate of Innocence at every opportunity. In a credibility contest under these facts, it is clear which person the jury would most likely believe. Had Plaintiff not committed perjury on these facts in 2014, Defendants would likely have developed this issue in greater detail during discovery by locating, interviewing, and deposing other corroborative witnesses regarding these interactions (other inmates, prison officials, etc.). With Mr. Hardy's version of the events at least partially corroborated by Plaintiff himself, Defendants also would have strongly considered writing Mr. Hardy out to give live testimony at trial to give his version of the events. Frankly, forcing Defendants to simply react to Plaintiff's stunning admission of perjury in the third week of trial is not a fair substitute for three years of discovery and months of trial preparation.

•    The alleged involvement of Mr. Hardy as one of the "true killers" of Mr. Lassiter and Ms. Haugabook was introduced into these proceedings via an affidavit sworn to by Dennis Mixon. While Plaintiff himself executed a verification essentially adopting this affidavit in support of his post-conviction proceedings, Plaintiff repeatedly attempted to distance himself from Mr. Mixon and Mr. Mixon's identification of Mr. Hardy throughout the course of this case. Tr. at 1663:1-1666:23,1977:10-1977:18; 1983:2-1987:21; 1994:5-1995:3, 2002:15-2003:10, 2139:13-2139:21. Indeed, Plaintiff's counsel directly and repeatedly fingered Mixon as one of the true killers in both opening statement and closing argument. Tr. at 35:25-36:2, 4035:12-4035:13, 4059:20-4060:13. Along these lines, Plaintiff presented Mr. Mixon

as essentially the only guilty party convicted of these crimes and repeatedly disputed any friendly relationship with Mr. Mixon. Had Plaintiff truthfully copped to his own communications with Mr. Hardy, Defendants would have been able to create a strategy more strongly demonstrating a clear nexus between Mr. Mixon and Plaintiff. Instead, Defendants were left with simply reacting to Plaintiff's sudden admission of perjury in the third week of trial on this highly material issue.

•   Plaintiff perjury regarding his personal knowledge of Daniel Taylor's "lock up alibi" was prejudicial in two separate respects. First, the importance of the Daniel Taylor "lock up alibi" to Plaintiff's case cannot be overstated. Indeed, Plaintiff appears to have spent more time presenting evidence on this issue than any other issue in this case. Forcing Defendants to react to a strategic admission to perjury at trial is inherently prejudicial to Defendants ability to plan an effective trial strategy based upon the evidence. Second, and perhaps more importantly, Defendants were entirely deprived of the ability to locate, interview, and depose the alleged prison law clerk who allegedly gave Plaintiff the advice to place false statements in a sworn affidavit. This information was clearly requested at least three times and not disclosed. This discovery may have revealed any number of relevant pieces of information: (1) this prison law clerk did not exist and that the decision to commit perjury was Plaintiff's alone; (2) this prison law clerk did exist and advised Plaintiff to put other pieces of false information in this affidavit (and others)(recall that the affidavit in question contains a wealth of other information about the alleged circumstances leading up to Plaintiff's confession); (3) Plaintiff had substantive conversations regarding the subject matter of his criminal case that conflict with his testimony in this case; (4) other persons were present for or had knowledge about this alleged occurrence and these persons could provide information about conversations with Plaintiff. Simply stated, it is difficult to overstate the importance of this withheld discovery. Defendants were essentially ambushed with withheld evidence and then forced to simply "take the word" of Plaintiff that this one piece of evidence was the only instance of perjury he committed. It is simply unfair to permit this verdict to stand given the gravity of this potential evidence.

Simply stated, while there are specific instances of palpable prejudice, it is simply impossible to

ascertain the true scope of the prejudice visited upon Defendants in this case. Plaintiff lied repeatedly and engaged in trial by ambush on multiple separate issues. It is simply impossible to fully gauge the additional matters that could have been revealed if Plaintiff had followed the rules and not lied over and over again in connection with this case. Under these circumstances, the case law is clear that dismissal is not only appropriate but necessary in order to protect the sanctity and integrity of the judicial process.

Finally, while Defendants contend that vacating the judgment in favor of Plaintiff and dismissing his claims with prejudice are the appropriate sanction in this case, Defendants are, at minimum, entitled to a new trial on all the claims on which they did not prevail at trial. *See Colyer v. City of Chicago, Gildardo Sierra*, 2016 WL 25710 (N.D. Ill. 2016)(new trial warranted as a result of disclosure of relevant evidence for the first time in middle of trial).

## <u>CONCLUSION</u>

WHEREFORE Defendants pray this Court vacate the judgment entered in favor of Plaintiff and enter judgment in favor of Defendants pursuant to Fed. R. Civ. P. 37(c), Fed. R. Civ. P. 60(b)(3) and the inherent powers of this Court under *Chambers v. NASCO, Inc.*, 111 S. Ct. 2123 (1991) and for whatever other relief this Court deems fit.

Respectfully submitted,

BORKAN & SCAHILL, LTD.        DYKEMA GOSSETT PLLC

By:  s/Timothy P. Scahill        By:  s/ Daniel N. Noland
    Timothy P. Scahill           Daniel N. Noland

Steven B. Borkan           Daniel M. Noland
Timothy P. Scahill         Dykema Gossett PLLC
Misha Itchhaporia         10 S. Wacker Drive
BORKAN & SCAHILL, LTD.     Suite 2300
Two First National Plaza     Chicago, IL 60606
20 South Clark Street, Suite 1700  (312) 876-1700
Chicago, Illinois 60603
(312) 580-1030