**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DEON PATRICK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 14 C 3658 |
| v. | ) | |
| | ) | Judge Ronald A. Guzmán |
| CITY OF CHICAGO, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

For the reasons stated below, Plaintiff's motion for a new trial as to Defendants Magats,

Fogarty, and Killacky [408], Defendants' motion for judgment as a matter of law, for a new trial,

and to alter or amend the judgment [403], and Defendants' motion for judgment and other relief

[405] are denied.

**STATEMENT**

After Plaintiff had served approximately 21 years in prison for the November 1992

murders of Sharon Haugabook and Jeffrey Lassiter, the Cook County State's Attorney's Office

("CCSAO") moved to vacate his conviction and dismiss the criminal case against him. Plaintiff

subsequently obtained a Certificate of Innocence from the Chief Judge of the Cook County

Criminal Courts. Upon his release, Plaintiff sued Anthony Villardita, Thomas Johnson, Rick

Abreu, Terry O'Connor, Brian Killacky, Sean Glinski, and Michael Berti (collectively, the

"Officer Defendants"), Assistant State's Attorneys ("ASAs") Joseph Magats and Martin Fogarty

(collectively, the "ASA Defendants"), and the City of Chicago (Compl., Dkt. # 1), alleging

various constitutional violations.

Over approximately five weeks in March and April 2017, the Court conducted a jury trial on the following claims: Fifth and Fourteenth Amendment Violation of Right against Compelled Self-Incrimination (*i.e.*, Coerced Confession) (Claim 1); Fabrication of Evidence (Claim 2); Failure to Intervene (Claim 3); Federal Conspiracy (Claim 4); Malicious Prosecution (Claim 5); and State Law Conspiracy (Claim 6). The jury returned a mixed verdict, finding most of the Officer Defendants liable on certain counts but not others, while fully exonerating Officer Killacky and ASAs Magats and Fogarty. The jury awarded Plaintiff $13.3 million dollars in compensatory damages and $90,000.00 in punitive damages, with the latter split among the liable Officer Defendants in amounts not relevant to the instant motions.

The Officer Defendants seek both a new trial under Federal Rule of Civil Procedure ("Rule") 59 and judgment notwithstanding the verdict under Rule 50. Plaintiff moves for a new trial under Rule 59 with respect to Officer Killacky and ASAs Magats and Fogarty. For the reasons stated below, the motions are denied.

**Standards**

Motion for a New Trial. Under Rule 59(a), a "new trial should be granted 'only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience.'" *Estate of Burford v. Accounting Practice Sales, Inc.*, 851 F.3d 641, 646 (7th Cir. 2017) (citation omitted). "The district court has the discretion to 'grant a new trial on all or some of the issues—and to any party,' and a new trial should be granted if a prejudicial error occurred[.]" *Hillmann v. City of Chi.*, 834 F.3d 787, 793 (7th Cir. 2016) (internal citation omitted).

Motion for Judgment as a Matter of Law. A Rule 50(b) motion for judgment as a matter of law requires the Court to "decide whether the jury had 'a legally sufficient evidentiary basis'

for its verdict." *May v. Chrysler Grp., LLC*, 716 F.3d 963, 971 (7th Cir. 2013) (citation omitted). Judgment as a matter of law should be rendered only if "'on the basis of the admissible evidence, no rational jury could have found for the prevailing party.'" *Stragapede v. City of Evanston*, 865 F.3d 861, 865 (7th Cir. 2017) (citation omitted). The Court "'may not make credibility determinations or weigh the evidence'" on a motion for judgment as a matter of law. *Gracia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010, 1018 (7th Cir. 2016) (citation omitted). Rather, the Court views the evidence and "construe[s] the facts strictly in favor of the party that prevailed at trial[,]. . . drawing all reasonable inferences in that party's favor and disregarding all evidence favorable to the moving party that the jury is not required to believe." *May*, 716 F.3d at 971 (internal quotation marks and citations omitted).

**Analysis**

    I.     Plaintiff's Motion

        A.    <u>Verdicts Against Manifest Weight of the Evidence and Inconsistent</u>

Plaintiff contends that a new trial should be granted as to Claim 2 (fabrication of evidence), Claim 4 (federal conspiracy), Claim 5 (malicious prosecution), and Claim 6 (state conspiracy) against Officer Killacky and ASAs Magats and Fogarty, and Claim 3 (failure to intervene) against Killacky. "A party claiming that inconsistent verdicts have been returned is not entitled to a new trial 'unless no rational jury could have brought back' the verdicts that were returned." *Deloughery v. City of Chi.*, 422 F.3d 611, 617 (7th Cir. 2005).

Killacky's trial testimony in this case was brief. He stated that he participated in the arrest of Daniel Taylor (one of Plaintiff's co-defendants in the Haugbook/Lassiter murder case) on December 3, 1992 for disorderly conduct, interviewed Taylor with Villardita, and sat in on Taylor's court-reported confession. (Trial Tr. 3694-95, Dkt. # 389.) On cross-examination,

Killacky testified that he participated in the lineup presented to Faye McCoy, a witness, and typed up the report of the lineup based on the information provided to him by Villardita and O'Connor, who were standing with McCoy at the time she reviewed the lineup. (*Id.* at 3695-3698.) The jury found in favor of Killacky on all counts. Plaintiff contends that "it is impossible to marry the jury's verdict[s] with respect to Johnson, Berti, and Glinski with the finding that Killacky was not also liable on all or at least some of the same claims." (Pl.'s Mem. Supp. Mot. New Trial, Dkt. # 409, at 5.)

The Court disagrees. The jury could have found that Killacky did not participate in fabricating evidence if the jury found that the only fabricated evidence was the Berti/Glinski report regarding their interaction with Taylor on the night of the murders, with which Killacky had no involvement. Even assuming that the jury found that the McCoy lineup report was false, the jury could have found that Killacky did not knowingly fabricate false evidence because he typed the lineup report based solely on what Villardita and O'Connor told him McCoy said. According to Plaintiff, evidence submitted against Killacky "was the same type of evidence" against Defendants who were found liable and "[i]t would be a miscarriage of justice to allow Killacky to escape liability" since his alleged actions were "part of the overall conspiracy among the Liable Defendants and led to the malicious prosecution of Patrick." (*Id.* at 6.)

Plaintiff, however, appears to confuse *his* version of the facts with what a rational jury could have concluded based on the evidence presented. Plaintiff's attempt to necessarily implicate every Defendant in all of the claims simply because the jury heard the "same evidence" is entirely unpersuasive given the different roles each Defendant played in the events at issue. Indeed, the jury was specifically instructed to consider each claim against each Defendant separately. (Jury Instrs., Dkt. # 369, Page 23 of 46.) As Plaintiff acknowledges, "[t]he proper

4

standard to be applied [when purportedly inconsistent verdicts have been returned] . . . is to determine whether the *specific* verdict challenged was supported by the evidence, and whether a jury could rationally reach the decision it reached based on that evidence." (Pl.'s Reply Supp. Mot. New Trial, Dkt. # 428, at 8) (emphasis added). Because the Court finds that the jury's verdict in favor of Killacky was not against the manifest weight of the evidence, the Court rejects this ground for relief.

In a similar vein, Plaintiff asserts that certain verdicts in favor of ASAs Magats and Fogarty cannot stand. Plaintiff goes through a detailed analysis of the evidence, crediting only certain testimony and declaring that the jury must have come to specific conclusions based on his own interpretation of the evidence. But on a motion for a new trial, the Court must examine the evidence in the light most favorable to the nonmoving party and leave "issues of credibility and weight of evidence to the jury." *EEOC v. AutoZone, Inc.*, 809 F.3d 916, 919 (7th Cir. 2016) (internal quotation marks and citation omitted). As noted by Fogarty, he was assigned to the cases against suspects Lewis Gardner, Akia Phillips, and Paul Phillips (Trial Tr. 2693, Dkt. # 385), and never spoke with Plaintiff while he was in custody at Area 6. (*Id.* at 2694.) Fogarty testified that he reviewed the evidence provided by the Officer Defendants, took the statements from Lewis Gardner and Akia and Paul Phillips as related in their own words and determined that charges for murder, home invasion, and armed robbery were warranted against these individuals. He also testified that these individuals were questioned by the detectives outside of his presence and that he had no knowledge as to how they were treated by the detectives. (Trial Tr. 2718-19, Dkt. # 385.)

In addition, Anna Demacopoulos, who was a trial supervisor with the CCSAO at the relevant time period, testified that Magats and Fogarty were on the team that she supervised; she

visited Area 6 at least three times between December 2 and December 5, 1992, when the statements from Plaintiff and the other suspects were being taken; during none of her visits to Area 6 at the relevant time period did she observe any mistreatment of the murder suspects nor was she told that any of the ASAs or Officer Defendants had mistreated the suspects; at the time she approved the murder charges against the seven suspects, she had no reason to believe that the statements they provided were involuntary or otherwise coerced; and that having read the statements of all of the suspects, she approved charges against all seven of them despite inconsistencies in their statements given that people recall events differently based on their perspective and their willingness to make certain admissions. (Tr. 3725-34, Dkt. # 389.) Based on this evidence, the Court rejects Plaintiff's assertion that the verdict exonerating Fogarty of having fabricated evidence or participated in a federal conspiracy was against the manifest weight of the evidence.

The Court reaches the same conclusion with respect to ASA Magats. Plaintiff contends that the verdicts in favor of Magats on the fabrication of evidence, malicious prosecution, and federal and state-law conspiracy claims were against the manifest weight of the evidence, pointing to both numerous inconsistencies in the witnesses' testimony as well as evidence that could have supported a finding of liability. But "[e]ven if (and perhaps especially when) the evidence offered by the witnesses is contradictory, 'it's the jury's job—not the district court's job ...—to figure out who's telling the truth.'" *Stanfield v. Dart*, No. 10 C 6569, 2014 WL 996482, at *10 (N.D. Ill. Mar. 13, 2014) (citation omitted).

Here, Magats testified that prior to interviewing Plaintiff, the detectives told him that Plaintiff had confessed; he entered the interview room where O'Connor was sitting with Plaintiff and gave him his Miranda warnings; he asked Plaintiff if he wanted to have a conversation about

the Haugabook/Lassiter murders, and Plaintiff responded that he did; he asked Plaintiff if and how he wanted to memorialize his statement, and Plaintiff chose a handwritten statement; when he was alone with Plaintiff, he asked him if he had been mistreated in any way or had any complaints, and Plaintiff stated he did not; he left the room and drafted the handwritten summary according to what Plaintiff had told him; and after reviewing each page of the statement with Plaintiff, Plaintiff signed each page as well as the last page. (Trial Tr. 2862-66, Dkt. # 385.)  In addition, Magats testified that of the four statements he took (Plaintiff, Daniel Taylor, Joseph Brown, and Rodney Matthews), there were no implausibilities among them that "raised red flags" with him. (Trial Tr. 2895, Dkt. # 386.)  Magats further testified that after the initial charges were approved, he no longer handled the case for the CCSAO because it was passed along to another prosecutor in accordance with the horizontal prosecution method practiced at that time by his office. (*Id.* at 2397-99.)  Finally, Magats testified that prior to going to Area 6 on the evening of December 2, 1992 to interview suspects in the Haugabook/Lassiter murders, he had never met any of the police officers named as co-defendants in this case. (*Id.* at 1900.)  Based on this testimony, a rational jury could have concluded that Magats was not liable for any of the claims Plaintiff asserted against him.

In conclusion, the Court declines Plaintiff's invitation to parse the trial evidence with a fine-tooth comb and essentially relitigate this case in post-trial motions.  Plaintiff's request  for a new trial based on inconsistent verdicts or verdicts against the manifest weight of the evidence is denied.

        B.    <u>Other Errors</u>

Plaintiff also asserts that the Court made the following legal and evidentiary errors prior to and during trial:

· the Court erred in granting summary judgment in favor of the Officer Defendants on the *Brady* claim;

· the Court erred in barring all evidence that Chicago Police Department ("CPD") and CCSAO files were missing and in refusing to give a spoliation instruction to the jury; and

· the Court erred in barring the February 1993 statement that Joseph Brown made to the CPD Office of Professional Standards.

As to the *Brady* issue, Plaintiff states he is not seeking a new trial on that ground but merely raised the issue in the instant motion in order to preserve it on appeal; thus, the Court does not address it. With respect to the other two evidentiary issues, the Court has reviewed its rulings and finds no basis on which to conclude that they were erroneous, and even if they were, finds that any error was harmless. Accordingly, the Court denies these bases for relief.

II. Defendants' Motions

A. Perjury and Discovery Violations

Defendants claim that they are entitled to judgment or a new trial based on Plaintiff's "repeated instances of perjury and failure to disclose relevant information during discovery." (Defs.' Combined Mot. J. Matter Law & New Trial, Dkt. # 403, at 2.) Defendants filed a post-trial motion for judgment or other relief under Rules 37(c) and 60(b)(3) and the Court's inherent powers under *Chambers v. NASCO*, 501 U.S. 32 (1991). In support of this motion, Defendants note that:

· Plaintiff admitted at trial that he lied during his deposition when he said that he never had any communications with Lemuel Hardy, an individual whom Plaintiff identified in several sworn filings in state court as the "true killer," (Trial Tr. 1993-97, Dkt. # 382); and

· Plaintiff committed perjury when he submitted an affidavit in a state-court post-conviction proceeding swearing that he had personally witnessed Taylor being arrested on the evening of the murders at about 5:45 p.m. knowing that the statement was false, and that he did so because he was

8

told by a prison law clerk that he needed "to be more involved with actually seeing Daniel Taylor that day." (Trial Tr. 1704-1710, Dkt. # 381.)

Defendants further assert that Plaintiff not only committed perjury but also engaged in discovery violations by failing to indicate in response to interrogatories that he had communicated with Hardy while they were both in jail and had discussions with prison law clerks about Taylor's arrest. According to Defendants, Plaintiff's misconduct warrants a sanction of vacating the verdict and entering judgment against him, or absent that, a new trial on all claims on which they did not prevail at trial.

As another court in this district recently noted:

> A district court has inherent power to sanction a party who has willfully abused the judicial process or otherwise conducted litigation in bad faith. In general the severity of a sanction should be proportioned to the gravity of the offense. Although [d]ismissal can be appropriate when the plaintiff has abused the judicial process by seeking relief based on information that the plaintiff knows is false, it is a hefty sanction that should be used only when there is a record of delay [or] contumacious conduct.

*Phillips v. City of Chi.*, No. 14 C 9372, 2018 WL 1309881, at *17 (N.D. Ill. Mar. 13, 2018) (internal quotation marks and citations omitted). The Court of Appeals has "signaled a willingness to broadly construe what constitutes a court order for purposes of imposing sanctions under Rule 37." *Ramirez v. T&H Lemont, Inc.*, 845 F.3d 772, 776 n.3 (7th Cir. 2016). "This broad latitude stems from the presumption that all litigants . . . are reasonably deemed to understand that fabricating evidence and committing perjury is conduct of the sort that is absolutely unacceptable." *JFB Hart Coatings, Inc. v. AM Gen. LLC*, 764 F. Supp. 2d 974, 981–82 (N.D. Ill. 2011) (internal quotation marks and citations omitted). "In civil cases, the facts underlying a district court's decision to dismiss the suit or enter a default judgment as a sanction

9

under Rule 37 or the court's inherent authority need only be established by a preponderance of the evidence." *Ramirez*, 845 F.3d at 781.

Statements Regarding Lemuel Hardy.  In motions for post-conviction relief filed in 2003 and 2014, Plaintiff referred to an affidavit by Dennis Mixon, one of his criminal co-defendants, in support of his contention that he was actually innocent of murdering Haugabook and Lassiter. Specifically, Mixon's affidavit named Lemuel Hardy as having involvement in the Haugabook/Lassiter murders.   As part of the 2013 CCSAO's review of the murder charges against Plaintiff, an investigator and ASA interviewed Hardy in October 2013 about Mixon's labeling him as a participant in the murders.  The CCSAO's report of that interview indicates that Hardy denied any involvement in the murders and stated he was approached by Mixon sometime in 2003, while they were both incarcerated at Stateville Correctional Center. According to Hardy, Mixon asked him if he was Lemuel and said "something to the effect of 'do you remember what you told me about that case?'"  (Defs.' Trial Ex. 812, at 2.)  Hardy stated he knew Mixon was speaking of the Haugabook/Lassiter murders and was taken aback at Mixon's remark.  (*Id*.)  Hardy did not speak with Mixon other than asking him if he was wearing a wire; Hardy also saw Daniel Taylor sitting nearby.  (*Id*.)  Hardy stated he regularly saw Mixon because they were in the same housing unit and subsequently sought placement in protective custody because he felt uncomfortable around Mixon.  (*Id*.)

Hardy further stated to the CCSAO interviewers that after being placed in protective custody, Plaintiff approached him about the case, saying "something like 'my n----- rappy [Daniel Taylor] said you were going to take my case'" because Taylor "'got me in and is now trying to get me out.'"  (*Id*.)  According to Hardy, Plaintiff later apologized for asking Hardy to "take" his case.  Nevertheless, when the interviewers asked Hardy about other encounters by

individuals attempting to implicate him in the murders, he told them that "he was pressured by" Mixon and Plaintiff, even after Plaintiff had apologized to him. (*Id*. at 3.)

During this case, Defendants sought to investigate Hardy's assertions that Plaintiff had spoken to him about taking responsibility for the Haugabook/Lassiter murders. However, when asked in an interrogatory whether he had had any contact or communication with Hardy during his incarceration from 1992 to 2014, Plaintiff answered, "no." (Pl.'s Resp. Villardita's Interrog. # 23, Dkt. # 405-1, at 25.) Moreover, during his deposition for this case, Plaintiff testified repeatedly that while he and Hardy were incarcerated at Stateville and Menard together, he never spoke with, or even considered speaking with, Hardy. (Pl.'s Dep., Dkt. # 152-1, at 494-98) (stating, among other things, "I don't want to talk to Lemuel Hardy . . . . He didn't know me until someone pointed me out to him. We don't know each other. We've never seen each other. We've never been around each other like that.")

At trial, Plaintiff admitted that he had had contact with Hardy about the case and that his deposition testimony was false. (Trial Tr. 1993-94, Dkt. # 382.) According to Plaintiff's trial testimony, he told Hardy that Mixon was telling people that Hardy had committed the murders, and that if Hardy had not actually committed the murders, "he should probably talk to the lawyers and explain to them he didn't do it." (*Id*. at 1994.) When defense counsel asked Plaintiff at trial why he failed to provide this answer at his deposition and, indeed, denied having ever spoken with Hardy, Plaintiff responded, "because you don't work for me and you're with them." (*Id*.) As noted above, Defendants seek relief for Plaintiff's purported perjury.

Plaintiff responds that he did not commit perjury because his statements were not actually inconsistent given that the question during his deposition was whether he had ever had a "conversation" with Hardy while the "testimony at trial related to *a single statement* [Plaintiff]

11

made to Hardy."[1] (Pl.'s Resp., Dkt. # 426, at 38 n.6.) (emphasis in original).  This argument is patently ridiculous, and the Court rejects it.

Plaintiff also claims that his lie (both in his deposition and his answers to interrogatories) that he had not had any contact with Hardy was immaterial because Plaintiff never pursued a theory that Hardy was one of the "real killers."  According to Plaintiff, he was not at the Haugabook/Lassiter apartment on the night of the murder, so he could not attest to who was present.  Rather, he says, he merely adopted "on information and belief" the statements in Mixon's affidavit that Hardy was present.  (*Id*. at 39.)  Thus, Plaintiff concludes that the fact that "Mixon *might have* lied about Hardy's involvement does not make the Hardy issue a material one as to [Plaintiff]."[2]  (*Id*. at 40) (emphasis in original).  The Court also rejects this premise. To the extent Plaintiff had sworn testimony that someone else was present in the apartment on the night of the murders who could be implicated in the killings, it is material to Plaintiff's contention that he was innocent; indeed, it is highly unlikely he would have included Mixon's statements with respect to Hardy's presence or even mentioned Hardy were it immaterial to the relief he was seeking in his post-conviction petitions.[3]

---

[1]  Plaintiff cites to the Oxford English Dictionary definition of "conversation" as a discussion "between two or more people in which news and ideas are exchanged," and contends that Plaintiff did not have a "two-way" conversation with Hardy.  (Pl.'s Resp., Dkt. # 426, at 38-39 n.6.) (emphasis omitted).

[2]  Mixon invoked his Fifth Amendment right not to provide information to Defendants' counsel both in a deposition and at trial.

[3]  Defendants assert that during trial, Plaintiff fingered Mixon as one of the killers in the Haugabook/Lassiter case, and denied any friendly relationship with him.  According to Defendants, "[h]ad Plaintiff truthfully copped to his own communications with Mr. Hardy, they would have been able to create a strategy more strongly demonstrating a clear nexus between

Whatever the label, Plaintiff admits he did not tell the truth at his deposition and in his responses to interrogatories. The Court finds such conduct to be completely at odds with the goals of our justice system and, in particular, the discovery process; the rules regarding pretrial disclosure of information exist in order to ascertain the truth as it relates to a party's claims. Their import in a case such as this, where Plaintiff claimed to have been imprisoned unjustly for twenty years, cannot be overstated. That litigants sometimes lie to advance their causes is an unfortunate reality that our adversarial system is generally prepared to address. Discovery, investigation, and cross-examination are just some of the means attorneys have at their disposal to ferret out the truth from an entrenched opposing party. Indeed, it can be argued in this case that these tools worked. Plaintiff's lies were revealed at trial, and defense counsel rightly took the opportunity during closing arguments to highlight Plaintiff's lack of credibility on this issue.

It is clear, however, that Plaintiff's conduct goes beyond "mere" lying. When asked by defense counsel why he lied at his deposition, Plaintiff's response is, frankly, chilling in its implications for our system of justice: "Because you don't work for me and you're with them." (*Id.*) With this unfiltered response, Plaintiff makes clear that he felt free – indeed, entitled – to lie during this litigation simply because the person asking the question did not "work for him." As aptly noted by another court in this circuit, "[l]itigants must live with the stories that they tell under oath," and while "[t]he legal system offers many ways to deal with problems; perjury [or lying] is not among them." *Escamilla v. Jungwirth,* 426 F.3d 868, 870 (7th Cir. 2005), *abrogated on other grounds by McQuiggin v. Perkins*, 133 S. Ct. 1924 (2013).

---

Mr. Mixon and Plaintiff," (Defs.' Combined Mot. J. & Other Relief, Dkt. # 405, at 23), which apparently in turn could have implicated Plaintiff in the murders.

While the Court in no way condones Plaintiff's misconduct and finds deeply unsettling the apparent ease with which Plaintiff rationalized his transgression, the Court must, at the same time, acknowledge that the lies came out at trial, and defense counsel rightly took the opportunity during closing arguments to highlight Plaintiff's lack of credibility on this issue. Thus, the jury was made aware of the lies, and Defendants had an opportunity to cure any prejudice they suffered by Plaintiff's surprise admission at trial that he had previously lied (twice) under oath. Moreover, Hardy's potential presence at the crime scene, while material to the factfinder's determination of whether Plaintiff had committed the murders, was not dispositive of Plaintiff's claims in this case.

Defendants assert that "had Plaintiff been truthful about []his interaction [with Hardy] during the pre-trial period, [they] would clearly have developed this angle further and used it at trial to their advantage given the corroboration by Plaintiff himself that this conversation occurred." (Defs.' Reply, Dkt. # 427, at 7.) But, as Plaintiff notes, Defendants were aware that Hardy claimed that Plaintiff had approached him in jail and pressured him to take responsibility for the murders and indeed questioned Plaintiff about this fact at his deposition. Although Plaintiff denied any contact with Hardy, Defendants were not foreclosed from pursuing other means (*i.e.*, statements of other prisoners or correctional officers) of challenging Plaintiff's pretrial assertion that he never had contact with Hardy.[4]

---

[4] Defendants agree that they were aware of allegations that Plaintiff had pressured Hardy to take responsibility for the murders, but state that the only people who could rebut Plaintiff's denials in this regard were Hardy, a convicted murderer who is serving a lengthy term of imprisonment and thus "subject to serious credibility impeachment," and Mixon, who elected not to provide any testimony in this case, citing the Fifth Amendment. Defendants contend that had Plaintiff not lied in the pretrial proceedings about his contact with Hardy, they "would have strongly considered writ[t]ing Mr. Hardy out to give live testimony at trial to give his version of events." (Defs.' Combined Mot. J. & Other Relief, Dkt. # 405, at 22.) As noted, however, Plaintiff

Accordingly, the Court denies Defendants' request for relief on this ground.

Statements Regarding Daniel Taylor.  At trial, Plaintiff also admitted the falsity of a statement in his own affidavit attached in support of a petition for post-conviction relief in state court, that the last time he saw Taylor "was when he was arrested for disorderly conduct on November 16th, 1992, at around 5:45 p.m."  (Trial Tr. 1706, Dkt. # 381.)  According to Plaintiff's trial testimony, he knew that the statement was false but included it in his affidavit because he "was advised by a [prison] law clerk . . . that [he] had to be more involved with seeing Daniel Taylor that day [of the murders]."  (*Id.* at 1708.)  In addition, when asked at his deposition whether he had "intentionally put false statements in any of those affidavits," Plaintiff responded, "No."  (*Id.* at 1709.)  Thus, Plaintiff lied in his affidavit in support of his state-court petition for post-conviction relief and at his deposition for this case.

Defendants argue that they were prejudiced by Plaintiff's false statement because the contention that Taylor, who had confessed to participating in the murders and implicated Plaintiff, was actually in lockup at the time of the murders was critical to Plaintiff's case in this suit.  (Defs.' Combined Mot. J. & Other Relief, Dkt. # 405, at 23 ("Plaintiff appears to have spent more time presenting evidence on this issue than any other issue in this case.").)  Defendants assert that Plaintiff's lie in the affidavit and failure to set the record straight before trial inhibited their "ability to plan an effective trial strategy based upon the evidence."  (*Id.*)  In addition, Defendants assert that they were deprived of the opportunity to locate and interview the prison law clerk who supposedly told Plaintiff that he needed to shore up his connection to

---

admitted on the stand that he had lied during his deposition, and Defendants do not indicate how Hardy's potential testimony on the issue would have affected the verdict.

15

Taylor's being in lockup at the time of the murders. They contend that learning of Plaintiff's lie might have allowed them to show that:

· the prison law clerk did not exist and that the decision to lie was Plaintiff's alone; or

· the prison law clerk did exist and advised Plaintiff to lie about other statements in the affidavit; or

· Plaintiff had substantive conversations regarding the subject matter of his criminal case that conflict with his testimony in this case; or

· other persons were present for or had knowledge about Plaintiff's communications with the law clerk and these people "could provide information about conversations with Plaintiff."

(*Id.*) According to Defendants, Plaintiff ambushed them at trial and "[i]t is simply impossible to fully gauge the additional matters that could have been revealed if Plaintiff had followed the rules and not lied over and over again in this case." (*Id*. at 24.)

The Court agrees that Plaintiff's lying about having witnessed Taylor's arrest was entirely unacceptable and wholly inconsistent with any court's ability to dispense justice. Nevertheless, at Plaintiff's deposition in this case, when asked if he was "present at any point during the time that Daniel Taylor was arrested," Plaintiff responded, "No." (Pl.'s Dep., Dkt. # 152-1, at 161.) Defense counsel then asked if Plaintiff had seen Taylor involved in the fight that led to his arrest or if he had witnessed the police arrest Taylor, and Plaintiff again responded, "No." (*Id*.) Defense counsel then confronted Plaintiff with the affidavit in which he stated that he had seen Taylor being arrested, and Plaintiff admitted that the statement was false. (*Id*. at 164.) While Plaintiff denied at his deposition having "intentionally" put false statements in his affidavits, Defendants were clearly on notice prior to trial that the statement about Plaintiff having witnessed Taylor's arrest was false. Accordingly, the Court denies this basis for relief.

B.    Effect of *Manuel v. City of Joliet*

Defendants contend that judgment should be granted in their favor with respect to Plaintiff's Fourteenth Amendment fabrication of evidence claim based on the Supreme Court's decision in *Manuel v. City of Joliet*, 137 S. Ct. 911 (2017), which holds that "the Fourth Amendment protects not only against an initial arrest without probable cause, but also continued detention in its absence." *Hurt v. Wise*, 880 F.3d 831, 843 (7th Cir. 2018). Nevertheless, the Seventh Circuit has recently confirmed, post-*Manuel*, that the "Fourteenth Amendment's Due Process Clause . . . forbids the state from depriving a person of liberty (including by pre-trial detention) based on manufactured evidence." *Id.* If a plaintiff "can show that . . . fabricated police reports furthered the prosecution, they have done enough." *Id.* at 844. Accordingly, Defendants' contention that the fabricated evidence must be used at trial in order to establish a constitutional violation is unpersuasive. Indeed, the *Hurt* court rejected a similar contention that no Fourteenth Amendment violation could have occurred because the fabricated police reports were not used for the plaintiffs' arrests or at the trial of the one plaintiff whose case proceeded that far, stating:

> With respect to [Plaintiff] William, all of the [Evansville Police Department] Defendants accuse the district court of misjudging the facts that relate to causation. They note, accurately, that the [fabricated police] reports were not used for the arrests or at William's trial. From that, they reason that the reports also contributed nothing to William's pre-trial detention. That conclusion, however, does not follow from the premise. The police went to some trouble to create the falsified reports. Had they not done so, it is reasonable to assume that William would have been released promptly. Though the "confession" may have been the focal point of the case against William, *the prosecution might have ended sooner if the state knew that most of the seemingly inculpatory information at its disposal was fabricated or impossible*.

*Id.* (emphasis added). Here, the jury found in favor of ASAs Magats and Fogarty with respect to the fabrication of evidence claims against them (and in favor of Magats with respect to the Fifth

17

and Fourteenth Amendment coerced-confession claim), supporting the conclusion that because

the jury found the ASAs were not involved in the police officers' wrongdoing, the ASAs might

have ended the prosecution sooner had they known about the problems with the evidence against

Plaintiff.  Therefore, this basis for relief is denied.

> C.   Jury Instructions on Fabrication of Evidence

Defendants assert that the Court improperly removed the materiality element from the jury

instruction regarding fabrication of evidence.  "The district court has discretion concerning the

specific wording of instructions so long as the final result, read as a whole, completely and

correctly states the law."  *United States v. Hilliard*, 851 F.3d 768, 782 (7th Cir. 2017).  "If the

instruction contains an error or misguides the jury, [the Court of Appeals] [will] reverse a jury

verdict only if the error prejudiced the litigant."  *Id.*

The fabrication of evidence instruction was given, in relevant part, as follows:

> Plaintiff claims that all of the Defendants violated his right to due process under the
> Fifth and Fourteenth Amendments to the United States Constitution by fabricating
> evidence against him.  To succeed on this claim against any of the Defendants,
> Plaintiff must prove each of the following propositions by a preponderance of the
> evidence:
>
> > 1.   The Defendant you are considering knowingly fabricated false
> >      evidence or participated in fabricating false evidence;
> >
> > 2.   That evidence was used to deprive Plaintiff of his liberty in some
> >      way;
> >
> > 3.   The fabricated evidence proximately caused Plaintiff to be
> >      damaged.

(Jury Instrs., Dkt. # 369, at Page 32 of 46.)

Defendants contend that the Court erred in altering the second element as set forth in the

Seventh Circuit Proposed Revised § 1983 Instruction No. 7.14 (Fair Trial–Fabrication of

Evidence) from "[t]he evidence was material" to "[t]hat evidence was used to deprive Plaintiff of his liberty in some way." The Court declined to include the materiality portion of the proposed instruction, finding that "the materiality aspect is taken care of in this case by the requirement that the evidence caused [Plaintiff] to lose his freedom.. . . It can't cause it if it's immaterial. By definition, that just can't happen." (Trial Tr. 3803, Dkt. # 390.)

As an initial matter, the Court notes that the instruction relied upon by Defendants was, as the title indicates, a proposed instruction that had been published for public comment. Moreover, even as to the finalized pattern instructions that have been approved for publication (and not for content),[5] the Introduction states that "[t]hese are pattern instructions, no more, no less. No trial judge is required to use them, and the Committee . . . strongly recommends that each judge review the instructions to be sure each fits the case on trial." (Fed. Civ. Jury Instrs. 7th Cir. (2017 rev.), Intro., at 1) (available at http://www.ilnd.uscourts.gov/_assets/ _documents/Pattern%20Civil%20Jury%20Instructions.pdf).[6]

In any event, the Court concludes that its instruction correctly "conveyed to the jury reasonably well" the elements of a due process violation based on the fabrication of evidence. *Saathoff v. Davis*, 826 F.3d 925, 932 (7th Cir. 2016) (in determining whether the "correct message was conveyed to jury reasonably well," the court "examin[es] the instructions as a

---

[5]  The Introduction to the Seventh Circuit Pattern Civil Jury Instructions notes that "[t]he Circuit Council has approved the publication of these instructions, but has not approved their content."

[6]  Flexibility is further called for given the uncertain state of the law with respect to such claims. In the current version of the jury instruction, the Committee Comments note that as to both fabrication of evidence claims generally and the materiality standard applied to such claims, the law in these areas area is still "in flux" and "in development" and that courts should "check for developments" and "examine the point further" before instructing the jury.

19

whole, in a common sense manner, avoiding nitpicking.") (citation and internal quotation marks omitted). While the instruction did not use the term "material," the Court directed the jury to consider whether the "evidence was used to deprive Plaintiff of his liberty in some way," *i.e*., to prejudice Plaintiff. That materiality and prejudice are related concepts is demonstrated by the Seventh Circuit's decision in *Carvajal v. Dominguez*, 542 F.3d 561, 569 (7th Cir. 2008), in which the court equated materiality with prejudice. *Id.* (in considering a *Brady* claim, stating that "[the plaintiff] has not established the third requirement—materiality or prejudice—because there is no reasonable probability that the failure to disclose would have altered the outcome of the suppression or caused the prosecutor to forego the trial.").[7]

Defendants' next argument that the Court's instruction was improper because it directed the jury to consider whether the evidence was "*used to deprive* Plaintiff of his liberty in some way" and not whether the evidence *actually caused* the deprivation of liberty constitutes the "nitpicking" that the Seventh Circuit warned against in *Saathoff*. The last element in the instruction given to the jury states that the "fabricated evidence proximately caused Plaintiff to be damaged." The Court finds that while the instruction did not expressly include a direction that the evidence "proximately caused the Plaintiff to be deprived of his liberty," the instruction as a whole properly conveyed the concept that Defendants had to have fabricated evidence, and that the fabricated evidence proximately caused Plaintiff to be damaged by depriving him of his liberty in some way. Moreover, even if the wording of the instruction was erroneous,

---

[7] The Court recognizes that *Carvajal* is a case dealing with suppression of exculpatory evidence under *Brady* and not a fabrication of evidence claim, but does not find the distinction relevant for the purposes for which the case is cited.

Defendants have not demonstrated that it prejudiced them. Accordingly, the Court denies this ground for relief.

D.    Plaintiff's Counsel's Comments and Questions

Defendants contend that a new trial is warranted as a result of Plaintiff's counsel's "highly suggestive and inflammatory questions [during direct examination] of Defendant Johnson," addressing certain topics such as whether Villardita's supervisors judged his performance on the percentage of cases that he closed and how fast he did so, and whether Villardita was "very fixated" on the percentage of cases he cleared such that it was a "point of pride" with him. (Defs.' Combined Mot. J. Matter Law & New Trial, Dkt. # 403, at 10.)

Defendants objected on form and foundation grounds at the time of the questioning, but the Court overruled the objections. (Trial Tr. 2605-07, Dkt. # 384.). After the jury left for the day, Defendants' counsel challenged the propriety of the questions and asked the Court to inquire of Plaintiff's counsel whether he had a good-faith basis for having asked the questions. (Trial Tr. 2636-2642, Dkt. # 385.) Plaintiff's counsel indicated he did not have the document relating to the source of the questioning in front of him and needed time to check the state-court record from the criminal trial. (*Id.* at 2638-39.) Two court days later, Defendants' counsel, having checked the state-court record himself, raised the issue again. After listening to Defendants' counsel's argument and Plaintiff's counsel's explanation regarding the basis for the questions, the Court stated:

> I make this ruling with the full understanding that . . . you're entitled to a great deal of flexibility and room in cross-examining an adverse witness. Nevertheless, I think those particular questions were damaging and there was no good faith basis for asking them. I assumed when you asked about the superiors, that there was something, some document, something in the Chicago Police Department rules, regulations, standards or something that indicated that that was a criteria. But apparently there is nothing.

21

> But I'm not going to give a jury instruction on it. I will strike the questions and answers and instruct [Plaintiff's] counsel not to mention it or bring it up in any way in closing arguments.

(Tr. 3564-3565, Dkt. # 388.) The Court, however, never instructed the jury that the questions and answers were being stricken.[8] Defendants contend that a new trial is necessary because the questions related to "the most important issues in this case: motive and credibility." (Defs.' Combined Mot. J. Matter Law & New Trial, Dkt. # 403, at 12.)

Defendants also contend that a new trial is required because during his closing argument, Plaintiff's counsel asked the jury, "What's someone's life worth? If I offered you money to give up the last 21 years of your life . . . ." (Trial Tr. 4067-68, Dkt. # 392.) After an objection was overruled, Plaintiff's counsel then asked the jury, "How much would it take? How much would it take to miss your kids from ages 1 to 22 growing up?" (*Id*.) Such so-called "Golden Rule" arguments, which place the jury in the shoes of a party when deliberating, are prohibited. *United States v. Roman*, 492 F.3d 803, 805 (7th Cir. 2007) (request by counsel that "jury should place itself in [the party's] shoes" is improper "'because it encourages the jury to depart from . . . neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence'") (citation omitted). Defendants also take issue with Plaintiff's counsel's following comment during closing argument: "I hope you are outraged and incensed, and I hope that you show that you are by your compensatory verdict for Deon Patrick." (Trial Tr. 4156, Dkt. # 392.)

Finally, Defendants challenge Plaintiff's counsel's reference to the other individuals who,

---

[8] It is not clear why this instruction was not provided to the jury, but Defendants do not contend that they ever raised the issue with the Court again.

22

like Plaintiff, were charged, incarcerated, and later exonerated, in arguing for the amount of

damages to assess:

> And the joke becomes even less funny still when you realize that the seven guys
> that they framed for murder spent 78 years in prison for something they had
> absolutely nothing to do with.
> . . .
> And I don't know what that number is.  I don't know if it's 20 million, 40 million.
> I don't know how you begin to compensate someone for what these guys did to
> him.  They just made the decision that because these guys were drug dealers on a
> corner, that it was okay to take their lives away.  And these were death penalty
> charges.  For the older ones, at the time they put these cases on them, they had no
> idea whether the State's Attorney would or would not seek the death penalty or
> whether the judge would or would not order the death penalty.
> . . .
>
> They ruined lives.  They ruined families.  They stole opportunities and experiences
> and relationships and decades, and they did it with impunity.  They didn't care.

(*Id*. at 4044, 4069-70, 4155.)  According to Defendants, these statements in closing arguments

further tainted the verdict in this case.  *See Adams v. City of Chi*., No. 06 CV 4856, 2014 WL

2621115, at *5 (N.D. Ill. June 10, 2014) (reducing jury award based, in part, on plaintiff's

counsel's references in closing arguments to experiences of co-plaintiffs and not plaintiff).

"To obtain a new trial on attorney misconduct grounds, the defendants must show both

that misconduct occurred and that it prejudiced their case." *Whiting v. Westray*, 294 F.3d 943,

944 (7th Cir. 2002).  As to the questioning of Johnson, even assuming that Plaintiff's counsel's

questions constituted misconduct and taking into account that the jury was never instructed that

the questions and answers were stricken from the record, Defendants have failed to show

prejudice.  Johnson answered each of Plaintiff's counsel's (few) questions on the issue in the

negative, and although given the opportunity to cross-examine Johnson about his testimony in

this regard, defense counsel chose not to do so.  Further, when Villardita was asked about his

written comment to colleagues that they "[c]lear this case by the time we get back from our days

off," he explained that the comment was not intended to be taken seriously and meant that he had other cases he was working on and would "love for it to be done" when he returned. (Trial Tr. 448-49, Dkt. # 375). While the Court found that Plaintiff's counsel had no factual basis to have asked Johnson the questions about Villardita's perspective on closing cases, the Court does not conclude based on the record that the questions resulted in an unfair trial. *See Willis v. Lepine*, 687 F.3d 826 (7th Cir. 2012) (in addressing argument that attorney misconduct--as opposed to a verdict against the manifest weight of the evidence--required a new trial under Rule 59, stating that the only issue the court had to consider was whether "defense counsel's misconduct resulted in an unfair trial").

As to Plaintiff's comments during closing argument asking the jury how much it would take to compensate them if they had to spend 21 years in prison for a crime they did not commit, Plaintiff admits that at least one of counsel's statements in this regard violated the Golden Rule. Nevertheless, the Court does not conclude that any error was so prejudicial that it was not subsequently cured. The Court properly instructed the jury on how to assess damages. *See Joan W. v. City of Chi.*, 771 F.2d 1020, 1023 (7th Cir. 1985) ("Although the judge did overrule the City's objection to the Golden Rule argument and did not give a limiting instruction, we have noted that any prejudice can often be cured simply by a general instruction that properly informs the jury on the law of damages."). In addition, the Court directed the jury to "[p]erform the[ir] duties fairly and impartially," and to "not allow sympathy, prejudice, fear, or public opinion to influence you." (Jury Instrs., Dkt. # 368, at 2.) The Court presumes that "juries . . . follow limiting and curative instructions." *Karahodzic v. JBS Carriers, Inc*., 881 F.3d 1009, 1022 n.2 (7th Cir. 2018). The verdict itself reflects that the jury did just that. It cannot be seriously argued that the size of the damages verdict in this case reflects unwarranted sympathy or

prejudice.  The compensation verdict was high, but so was the injury. The jury found that Plaintiff spent the better part of his life in jail for a crime that he did not commit -- due, at least in part, to Defendants' actions.  Once liability was established, Defendants could not have expected anything less.

With respect to Plaintiff's counsel's comments regarding being "outraged and incensed," Defendants waived the argument by not making an objection at the time.  *Venson*, 749 F.3d at 657.  Even assuming that defense counsel objected when, at a subsequent unrelated sidebar, he stated that "[f]or the record the last comment was about–something about sending a message with the compensatory damage verdict.  I want to preserve my objection to that," and the Court responded, "Okay," (Trial Tr. 4157, Dkt. # 392), the Court finds that Defendants have not demonstrated that the remark was prejudicial.  *See Venson*, 749 F.3d at 657.

Finally, Defendants state that Plaintiff's counsel's reference to the other individuals who also have been absolved of wrongdoing with respect to the Haugabook/Lassiter murders was "highly improper and irreparably taints the verdict in this case."  (Defs.' Combined Mot. J. Matter Law & New Trial, Dkt. # 403, at 16.)  This assertion, however, is conclusory and therefore unpersuasive.  Defendants point to nothing in the record that would indicate that the damage award was intended to compensate anyone other than Plaintiff.

"[I]mproper remarks made during closing arguments rarely are so serious as to constitute reversible error."  *Venson v. Altamirano*, 749 F.3d 641, 657 (7th Cir. 2014).  The Court finds no prejudice or reversible error with respect to Plaintiff's counsel's comments during his closing argument.

E.  Ruling Barring Reference to Plaintiff's Failure to Testify at Criminal Trial

During her opening statement, Plaintiff's counsel stated that Plaintiff had "waited a very long time to have the opportunity to speak to you, a jury from the community . . . ."  (Trial Tr. 8, Dkt. # 373.)  In his subsequent opening statement, Defendants' counsel referenced Plaintiff's counsel's remark and commented that while Plaintiff had waited a long time to tell his story, the instant trial "wasn't the first time" that Plaintiff could have told his story to a jury because he "had the chance to tell [his story to] the jury that was going to decide whether he spent the rest of his life in prison or got the death penalty," but "[h]e sa[id] nothing."  (*Id.* at 57.)  Several days later, the Court *sua sponte* requested briefing on whether evidence regarding Plaintiff's failure to testify at his criminal trial was admissible.  (Trial Tr. 1140, Dkt. # 378.)  The Court concluded that any such evidence was inadmissible, barred any further reference to Plaintiff's silence at his criminal trial, and refused to give an adverse inference instruction to the jury.  (3/21/17 Order, Dkt. # 335.)  The Court has reviewed its ruling and finds no error.

Even assuming *arguendo* that the Court's evidentiary ruling was error, it is not a ground for granting a new trial unless it affected a party's "substantial rights."  Fed. R. Civ. P. 61.  "A new trial based on an error in the admission or exclusion of evidence is granted only in 'extraordinary situations.'"  *Viramontes v. City of Chi.*, No. 13 C 6251, 2015 WL 4637958, at *6 (N.D. Ill. Aug. 4, 2015) (citation omitted).  The Court finds that Defendants have not made such a showing, particularly in light of the fact that, as noted above, defense counsel made specific reference in his opening statement to Plaintiff's failure to "tell his story" at his criminal trial, and the Court did not strike that statement but merely precluded future reference to the issue.  Thus, this basis for a new trial is denied.

26

F.     Malicious Prosecution Claim

Defendants next assert that the verdict in favor of Plaintiff on his malicious prosecution claim against Villardita, Johnson, O'Connor, and Abreu is legally and factually defective on its face and cannot be reconciled with the verdict on the fabrication of evidence verdict exonerating O'Connor, Abreu, and Magats. Defendants argue that because the jury's verdict requires a conclusion that the confession was not fabricated, then probable cause must have existed for arresting Plaintiff, and the malicious prosecution claim cannot stand.

As an initial matter, it is not the Court's role to delve into the evidence and try to ascertain what evidence the jury found credible or why they came to the verdict they did. *United States v. Segal*, 339 F. Supp. 2d 1039, 1049 (N.D. Ill. 2004) (noting that "it is not the role of this Court to divine the jury's reasoning" and "[b]ecause [the Court] can only speculate as to why and how the jury reached its verdict, the role of this Court is appropriately limited to determining whether the jury's verdict is supported by the evidence"). The Court disagrees that the verdict requires a conclusion that the confession was not fabricated. To the extent that Defendants' argument here is premised on their earlier assertion that judgment must be entered on the fabrication of evidence claim, it is rejected for the reasons discussed above.

In any event, "[a]lthough civil juries must return consistent verdicts, courts are required to reconcile apparently inconsistent verdicts if it is possible to do so." *Springer v. Ethicon, Inc.*, No. 17 C 3930, 2018 WL 1453553, at *3 (N.D. Ill. Mar. 23, 2018). Here, the fabricated evidence and malicious prosecution claims are not "apparently inconsistent." As Defendants acknowledge, Plaintiff presented several pieces of evidence that he contended were fabricated, including the Berti/Glinski report regarding their arrest of Taylor on the night of the murders. The jury could have found that Villardita, Johnson, Berti and Glinski were responsible for the

false report that Villardita and Johnson requested from Berti and Glinski, thus providing a basis for the jury verdict against them on the fabrication of evidence claim. While Villardita and Johnson were found liable on the malicious prosecution claim, Berti and Glinski were not, which could be based on the jury's conclusion that Berti and Glinski did not file criminal charges against Plaintiff or take an *active* part in causing those charges to be filed.[9]

G.     Coerced Confession and Conspiracy Counts

Defendants next assert that the verdicts on the coerced confession and conspiracy claims "cannot be reconciled with the evidence." (Defs.' Combined Mot. J. Matter Law & New Trial, Dkt. # 403, at 22.) The basis for this assertion is not clear from Defendants' brief. It appears that Defendants contend that because the jury must have found that the confession was not fabricated, Plaintiff was therefore guilty; thus, an "independent claim for damages arising from coercion cannot stand under the particular circumstances of this case." (*Id*. at 23.) They then seek to restrict the period during which Plaintiff could recover damages to the time he was being questioned by police and assert that the $13.3 million in compensatory damages and $90,000.00 in punitive damages for that duration is unreasonably large. In turn, Defendants assert that because substantive liability cannot stand, the conspiracy verdict also fails. Given, however, that the Court does not agree with Defendants' premise that the jury must have concluded that the confession was not fabricated, this argument fails. Moreover, the Court notes that Defendants do not address this ground for relief in their reply brief, so the Court considers it abandoned.

H.     Cumulative Effect of Errors

---

[9] While Berti and Glinski were found liable on the federal conspiracy claim, the jury instructions expressly state that Plaintiff did not have to prove that "each participant knew of the plan or . . . the extent of others' involvement in the plan." (Jury Instrs., Dkt. # 369, at 34.)

To prevail on an argument that the cumulative effect of alleged evidentiary errors warrants a new trial, the movant must show (1) that multiple errors occurred at trial; and (2) those errors, in the context of the entire trial, "were so severe as to have rendered [the] trial fundamentally unfair." *Christmas v. City of Chi.*, 682 F.3d 632, 643 (7th Cir. 2012). "In conducting this analysis, [courts] examin[e]. . . the entire record, paying particular attention to the nature and number of alleged errors committed; their interrelationship, if any, and their combined effect; how the trial court dealt with the errors, including the efficacy of any remedial measures; and the strength of the prosecution's case." *Id.*

Defendants assert that the above-described purported errors, in combination with the following, require a new trial.[10] First, Defendants take exception to the Court's granting Plaintiff's motion in limine barring Defendants from introducing the prior sworn testimony of Audrey Matthews, who testified at the trial of her brother Rodney Matthews (one of Plaintiff's criminal co-defendants) that Rodney and Ms. Matthews' boyfriend were at her house at the time of the murders. Ms. Matthews did not mention in her trial testimony that Plaintiff was there, yet his alibi was that he was at Ms. Matthews' home at the time of the murders. The Court excluded this evidence because: (1) Ms. Matthews is deceased; (2) Plaintiff did not have the opportunity to question Ms. Matthews at Rodney Matthews' criminal trial, nor did Rodney Mathews have a sufficient common interest with Plaintiff in establishing that Plaintiff was at Ms. Matthews' house at the time of the murders – in fact, his attorney may very well have determined that it

---

[10] Not only do Defendants squeeze the following arguments into single-spaced bullet points, apparently in an effort to circumscribe the Court's already-generous page limits, but Plaintiff conclusorily responds that the arguments should be rejected "for all of the reasons already stated in [the Court's] prior rulings."

would be best for Rodney Mathews to distance himself from Patrick at that point in time; and (3) the Court was concerned with satellite litigation which might ensue regarding the many possible reasons for Ms. Mathews' failure to mention Patrick's presence.  (3/7/17 Order, Dkt. # 311.)

The trial was already lengthy, with the parties eliciting testimony from over twenty-five witnesses who often testified to vastly different versions of the facts, and at times, contrary even to their own earlier statements.  The prospect of jury confusion represented a real and ongoing concern throughout the trial; given the minimal probative value of this particular piece of evidence, the Court can find no error in having excluded it.  Defendants argue that because Plaintiff's credibility was a critical issue in this trial, their inability to present evidence challenging Plaintiff's alibi likely affected the outcome of the trial.  The Court remains unconvinced.  Assuming, *arguendo,* that the ruling was in error, the effect of this evidence would have been largely cumulative.  Defense counsel's detailed cross-examination and, at times, blistering closing argument was almost entirely focused on Plaintiff's lack of credibility and the many instances of contradictory testimony Plaintiff offered during his years in prison as he attempted to gain release.  The Court cannot conclude that precluding the use of Audrey Matthews' prior sworn testimony was so prejudicial that it altered the jury's verdict.

Defendants further point as error to the Court's allowing Plaintiff, over Defendants' objection, to introduce at trial Plaintiff's Certificate of Innocence.  According to Defendants, the statute governing the issuance of a Certificate of Innocence expressly provides that it "was never intended to be used in this fashion," and that Plaintiff repeatedly misrepresented at trial that Defendants had an opportunity to object and be heard on vacating Plaintiff's conviction.  (Defs.' Combined Mot. J. Matter Law & New Trial, Dkt. # 403, at 25.)  Finally, Defendants contend that the Court erred in permitting Plaintiff to introduce evidence regarding the disposition of the cases

30

of Plaintiff's criminal co-defendants. Defendants assert that they were prejudiced because Plaintiff "repeatedly emphasized the dispositions of the cases of other persons with respect to both damages and liability," thus allowing Plaintiff "to use the dispositions of numerous other individuals to establish his own claims" and requiring Defendants "to defend against eight (8) separate cases instead of one." (*Id.*) With respect to these arguments, Defendants' assertion of prejudice is conclusory and fails to include any specifics or citations to the record; thus, the argument is waived.

In any case, the Court finds no error. The claims in this case revolved around Plaintiff's assertion that he had been wrongfully accused and imprisoned because of Defendants' misconduct; allowing reference to the Certificate of Innocence provided background information to the jury regarding Plaintiff's release. With respect to the latter argument, the record reveals that both Plaintiff and Defendants had reason to present evidence regarding the actions, whereabouts, detentions, and interrogations of Plaintiff's co-defendants. Defendants, for example, asserted in their opening statement that "[i]n order for [Plaintiff] to carry his burden in this case, he has to prove to you by a preponderance of the evidence that . . . [Defendants] intentionally framed not only [Plaintiff] but six or seven other people for murders that they didn't commit." (Trial Tr. 40, Dkt. # 373.) While Defendants sought to disprove the existence of such a scenario, Plaintiff repeatedly referred to his and his co-defendants' confessions as "interlocking," and asserted that there was "not enough time during th[e] opening statement to tell you all of the tactics that these defendants used on those seven young men and boys and [Plaintiff] in order to get them to collectively break their will and confess to something they didn't do." (*Id.* at 20.) Accordingly, the parties' versions of the events meant that the jury was exposed to how Plaintiff's co-defendants were arrested, interrogated, and charged as well as

what they said to police and to each other during the period Plaintiff claimed he was being framed.

Because the Court finds no error with respect to the rulings, these bases for relief are denied, whether viewed cumulatively or individually. Moreover, any error in admitting the stated evidence was harmless.

**Conclusion**

For the reasons stated above, Plaintiff's motion for a new trial as to Defendants Magats, Fogarty, and Killacky [408], Defendants' motion for judgment as a matter of law, for a new trial, and to alter or amend the judgment [403], and Defendants' motion for judgment and other relief [405] are denied.

**Date**: July 17, 2018

**Ronald A. Guzmán**
**United States District Judge**

32